**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE SEMGROUP ENERGY PARTNERS, L.P., SECURITIES LITIGATION | CASE NO. 08-MD-1989-GKF-FHM |

**CORRECTED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**NELSON, ROSELIUS, TERRY**
**O'HARA & MORTON**
Douglas A. Terry (Bar Number 15855)
Jason E. Roselius (Bar Number 16721)
Guy R. Wood (Bar Number 15875)
P. O. Box 138800
Oklahoma City, Oklahoma 73113-8800
Telephone: (405) 705-3600
Facsimile:  (405) 705-2573

*Liaison Counsel for Lead Plaintiff*
*and the Class*

**BARROWAY TOPAZ KESSLER**
  **MELTZER & CHECK, LLP**
Stuart L. Berman (*admitted pro hac vice*)
Gregory M. Castaldo (*admitted pro hac vice*)
Lauren Wagner Pederson (*admitted pro hac vice*)
Sharan Nirmul (*admitted pro hac vice*)
Naumon A. Amjed (*admitted pro hac vice*)
Michelle M. Newcomer (*admitted pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610)667-7056

*Counsel for Lead Plaintiff and the Class*

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ....................................................................- 2 -

II.     JURISDICTION AND VENUE ..............................................................- 10 -

III.    PARTIES...............................................................................................- 11 -

    A.    Lead Plaintiff...............................................................................- 11 -

    B.    Company-Related Defendants .....................................................- 11 -

    C.    Individual Defendants..................................................................- 12 -

    D.    Underwriter Defendants...............................................................- 15 -

    E.    Investment Company Defendants ................................................- 19 -

    F.    Relevant Non-Parties ..................................................................- 21 -

IV.     OVERVIEW OF DEFENDANTS' SECURITIES LAWS VIOLATIONS.................- 22 -

V.      VIOLATIONS OF THE SECURITIES ACT .........................................- 23 -

    A.    Background to SGLP's Public Offerings ....................................- 23 -

        1.    SemGroup's Undisclosed Speculative Trading ................- 25 -

        2.    Westback Trading..............................................................- 33 -

        3.    SemGroup's Margin Balance Grows.................................- 35 -

        4.    SemGroup's Collapse Into Bankruptcy............................- 38 -

    B.    SemGroup's July 2007 IPO ........................................................- 41 -

    C.    Materially False Statements and Omissions in the IPO
        Offering Documents ....................................................................- 45 -

    D.    SGLP's Secondary Offering .......................................................- 55 -

    E.    Materially False Statements and Omissions in the
        Secondary Offering Documents...................................................- 58 -

VI.     VIOLATIONS OF THE EXCHANGE ACT ..........................................- 64 -

i

A.  Defendants' Materially False and Misleading Statements
and Material Omissions During the Class Period ..........................................- 66 -

1.  SGLP's Second Quarter 2007 Reports................................................- 66 -

2.  SGLP's Third Quarter 2007 Reports...................................................- 70 -

3.  The Secondary Offering Conference Call .........................................- 72 -

4.  SGLP's Report for Year-End 2007 ...................................................- 75 -

5.  The Year-End 2007 Conference Call ................................................- 82 -

6.  SGLP's First Quarter 2008 Report....................................................- 83 -

7.  The May 2008 Drop Downs and Press Releases...............................- 88 -

8.  The May 22, 2008 Investor Conference ...........................................- 89 -

B.  Investors Belatedly Learn That SemGroup Is Insolvent
And SGLP Is In Dismal Financial Condition ..................................................- 90 -

C.  Additional Post-Class Period Disclosures And Developments.......................- 95 -

D.  Additional Facts Supporting Defendants' Scienter .....................................- 103 -

1.  Defendants' Knowledge of Kivisto's Speculative
Trading Strategy, the Rise in Margin Calls Attendant
Thereto, and the Company's Increasing Liquidity Issues ...............- 107 -

2.  Defendants' Compensation Creates a Strong Inference
of Scienter .......................................................................................- 114 -

3.  Defendants' Failure Monitor Known Trading Risks at
SemGroup Raises a Strong Inference of Scienter ...........................- 117 -

4.  Other Indicia of Defendants' Scienter ............................................- 119 -

E.  Additional Causation Allegations ...............................................................- 121 -

VII.  FRAUD ON THE MARKET APPLICABILITY
OF PRESUMPTION OF RELIANCE ...................................................................- 123 -

VIII.  CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS .................- 126 -

COUNT I ................................................................................................................- 128 -

COUNT II ..............................................................................................................- 132 -

COUNT III.............................................................................................................- 134 -

COUNT IV.............................................................................................................- 136 -

COUNT V ..............................................................................................................- 138 -

COUNT VI.............................................................................................................- 141 -

Lead Plaintiff Harvest Fund Advisors LLC ("Harvest" or "Lead Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired registered securities issued by SemGroup Energy Partners, L.P. ("SGLP" or the "Company") from July 17, 2007 to July 17, 2008, inclusive (the "Class Period"), by its undersigned attorneys, for its Consolidated Securities Class Action Complaint (the "Complaint"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on its investigation (made by and through Lead Counsel), which included, among other things, a review and analysis of: (1) public documents pertaining to SGLP, the Individual Defendants (as defined herein) and SemGroup, L.P. (hereafter "SemGroup" or the "Parent") and its subsidiaries and affiliates; (2) SGLP's filings with the U.S. Securities and Exchange Commission ("SEC"); (3) press releases published by SGLP and SemGroup; (4) analyst reports concerning the Company; (5) pleadings in other actions in which SGLP, SemGroup or any Individual Defendant is a party; (6) interviews with, *inter alia*, former employees of SGLP and the Parent; (7) pleadings and other documents filed in the Parent's consolidated bankruptcy proceedings, *In re Semcrude, L.P.*, No. 08-11525 (BLS) (Bankr. D. Del.); (8) newspaper and magazine articles and other media coverage regarding SGLP, the Parent or any Individual Defendant; and (9) the Final Report of Louis J. Freeh, the court-appointed Examiner in SemGroup's bankruptcy proceedings (the "Examiner's Report"), and exhibits attached thereto.  Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their possession, custody and/or control. Lead Plaintiff believes that substantial further evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

I.      **NATURE OF THE ACTION**

1.      This is a federal securities class action that sets forth claims under the Securities Act of 1933 (the "Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of purchasers of the common units of SGLP during the Class Period, and on behalf of purchasers of common units issued pursuant or traceable the Registration Statements and Prospectuses filed with the SEC in connection with SGLP's July 17, 2007 initial public offering ("IPO") and February 14, 2008 secondary public offering (the "Secondary Offering").

2.      Defendant SGLP began its publicly-traded existence on July 17, 2007, partially spun-off by its corporate Parent, SemGroup.  Prior to and throughout the one-year Class Period, Defendants represented that SGLP enjoyed and would continue to enjoy stable revenues and other strategic advantages derived substantially from its contractual and overlapping corporate relationships with energy titan SemGroup.  Indeed, SemGroup was described to possess: (1) a significant asset base with operations in the United States, Canada, and the United Kingdom; (2) a strong management team with significant experience and knowledge in many facets of the energy industry that would overlap with SGLP; and (3) a track record of historical aggressive growth and financial success.  SGLP units were sold for $22.00 per unit in the IPO, and reached a high of $31 per unit during the Class Period.

3.      A mere one year after the IPO, however, Lead Plaintiff and other Class members learned that their purchases of SGLP had been made based upon materially false statements and material omissions by Defendants.  Unbeknownst to investors during the Class Period, SemGroup – the entity upon which SGLP relied for over 80% of its income – was teetering on

- 2 -

financial ruin.   Specifically, even before SGLP's IPO, SemGroup was engaged in extremely risky, speculative and unauthorized trading in crude oil and other commodities, implemented primarily by then-CEO of SemGroup, Defendant Thomas Kivisto.   Kivisto also served as a director on the Board of Directors of SGLP's General Partner (defined *infra*).

4.       Although it is customary for an energy company like SemGroup to "hedge" its exposure to "commodity price risk" through forward contracts and other arrangements, the trading activities of SemGroup prior to the IPO and continuing through the Class Period deviated far from industry norm.   Defendants steadfastly classified SemGroup's commodities trading as "commercial," *i.e.*, as conducting trading strictly in conjunction with minimizing the effect of price swings for crude oil and other commodities in its distribution channels.   SemGroup, however, routinely engaged in trades as fast-profit-seeking investments that were divorced from any physical inventory or commodity purchases or sales, which devoured its cash and exposed SemGroup to extreme risks.   These so-called "naked" options transactions – bereft of any relation to hard assets or physical commodities – typically only occur by speculators, financial players engaged in the business of risking capital for the lure of big profits from buying and selling commodities futures and options by mystically predicting future price movements.

5.       By July 2007, prior to the IPO, SemGroup's trading practices became so rampant and excessive that they lost all characteristics of customary "hedging," becoming nothing more than speculative commodities "gambling."   SemGroup amassed hundreds of millions of dollars of paper losses as its "bets" that oil prices would decrease went severely awry.   Throughout the Class Period, however, Kivisto stood by his arrogant theory that no losses would ever have to be recognized, directing SemGroup traders never to close out trades with loss positions, but rather to roll forward the options and increase SemGroup's levels of trading, and to "up its wagers" that

oil prices would fall. In fact, Kivisto even exposed SemGroup to personal trading losses he suffered through a third-party vehicle known as Westback (defined *infra*). Westback was an entity wholly owned by Kivisto and his wife, but traded commodities through SemGroup accounts, using SemGroup funds. Kivisto and SemGroup, however, ran out of time. Oil prices continued to escalate throughout 2007 and 2008. By July 2008, Kivisto's massive bets had all gone bad, and SemGroup's trading losses exceeded $3.0 billion. SemGroup undeniably was insolvent.

6.     Thus, undisclosed to investors throughout the Class Period, SGLP's financial condition was premised entirely upon undisclosed speculative commodities "gambling" by SemGroup. Specifically, certain Defendants had bet the financial health and future of SGLP and SemGroup on mere speculation that crude oil prices would plummet because, according to Kivisto, crude oil prices always returned to a specified historical trading range. Kivisto's specious theory, however, failed to account for time – *i.e.*, how long it would take for oil prices to return to their purported historical trading range – or the fact that oil prices throughout 2007 and 2008 traded far outside any normative trading range for oil. Moreover, SemGroup ran out of cash to cover its failing bets before Kivisto's contrived theory could prove true. Specifically, on July 17, 2008, SGLP belatedly disclosed that SemGroup possessed a severe lack of liquidity. Days later, SemGroup filed for bankruptcy, and SGLP was forced to disclose to investors that, without its purportedly guaranteed revenues from its Parent, SGLP too, had "substantial doubt" it could continue as a going concern. As the true nature of SGLP's and its Parent's financial condition seeped into the market, Lead Plaintiff and other Class members lost hundreds of millions of dollars as SGLP's market price plummeted to less than $1.00 per unit. As set forth herein, Defendants are liable under the federal securities laws for investors' massive losses.

7.     At all times, SemGroup held itself out as a conservative midstream service company providing the energy industry with the means to move products from the wellhead to the wholesale marketplace.  In early 2007, SemGroup and its affiliated companies determined to partially "spin-off" certain assets into a publicly-traded Delaware limited partnership – Defendant SGLP.  The spun-off assets included energy assets used to provide crude oil terminalling, storage, gathering, and transportation services.  On July 17, 2007, the IPO was accomplished for SGLP common units.  Defendants and their affiliates publicly sold 14.375 million units of SGLP for $22.00 per share, generating gross proceeds of approximately $316.3 million.

8.     In the IPO Documents (defined *infra*), Defendants touted various aspects of SGLP's business, particularly the significant advantages it possessed by virtue of its ongoing relationship with its corporate Parent, SemGroup.  For example, Defendants represented, among other things, that:

a.     SGLP was party to a Throughput Agreement with SemGroup pursuant to which the Company would provide certain gathering, transportation, terminalling, and storage services to SemGroup in exchange for contracted fees.  Regardless of the volume of services used by SemGroup in a given month, SemGroup was obligated to pay SGLP "guaranteed" minimum monthly fees of $6.4 million, totaling $76.8 million annually;

b.     SGLP would not have to rely upon unrelated third-parties for significant revenue as its relationship with SemGroup historically provided over 80 percent of its revenues.  These revenues were described as "stable, fee-based, contracted cash flows."  Moreover, Defendants promised that revenues from SemGroup

would, in and of themselves, be sufficient to pay SGLP common unitholders their minimum quarterly distribution;

c.      Based upon its relationship with SemGroup, SGLP would be able to aggressively pursue acquisitions that otherwise would not be attractive because of commodity price risk, *i.e.*, SGLP's relationship with SemGroup permitted the Company only minimal direct exposure to commodity price fluctuations, a unique industry advantage; and

d.      SGLP would enjoy the benefits of overlapping management with SemGroup and its affiliates.    SemGroup's management was described as "experienced and knowledgeable . . .with an average of more than 20 years' experience in the energy industry."   Defendants boasted that SGLP "expects to directly benefit from this [SemGroup's] management team's strengths," and that SemGroup management has "significant experience in the implementation of acquisition, operating, and growth strategies in many facets of the energy industry, specifically including crude oil marketing, gathering, transportation, terminalling and storage and other midstream businesses."

9.      Defendants made similar representations in Secondary Offering Documents (defined *infra*) in January and February 2008.  In addition, Defendants reported that SGLP was entering into a "Terminalling Agreement" with SemMaterials, a subsidiary of the Parent, pursuant to which SGLP would: (1) acquire certain asphalt-related assets from SemMaterials in exchange for $378.8 million; and (2) agree to provide services to its Parent related to the asphalt assets in exchange for guaranteed minimum monthly revenues totaling $58.9 million annually.

SGLP, through its affiliates and underwriters, sold 6.9 million SGLP common units at $23.90 per common unit, generating additional gross proceeds of $164.9 million in the Secondary Offering.

10.     As set forth herein, Defendants negligently prepared the IPO Documents and the Secondary Offering Documents as they contained numerous materially false and misleading statements.  Contrary to Defendants' representations, SGLP's relationship with SemGroup did not "guarantee" the Company consistent and recurring annual revenues of over $76 million.  In fact, at the time of both the IPO and the Secondary Offering, SemGroup was suffering from substantial liquidity concerns.  Specifically, SemGroup's financial livelihood was tied to unauthorized, speculative commodities trading that had begun to fail and was resulting in massive unrecognized "gambling" losses.  These losses seriously jeopardized SemGroup's ability to meet its revenue obligations to SGLP under various agreements, which constituted over 80% of SGLP's revenues.

11.     Likewise, SGLP did not enjoy "minimal direct risk" to commodity prices.  At the time of the IPO and Secondary Offerings, unbeknownst to investors, SemGroup had tied its entire financial survival to the hope that crude oil prices would plummet, thereby offsetting the billions of dollars of "trading" losses that were then unrecognized by the Parent.  Thus, contrary to Defendants' representations, SGLP's financial well-being was tied directly to the price of oil.  If oil prices did not plummet in the very near future, thereby wiping away the billions of dollars in trading losses amassed by SemGroup, the Parent would fail, eviscerating SGLP's primary source of revenue.

12.     Similarly, the overlap of management with SemGroup was not fairly characterized as a "benefit" to SGLP.  As revealed after the Class Period, SemGroup's management possessed little, if any, internal controls, which permitted Defendant Kivisto and

other Defendants to "bet the farm" on speculation that oil prices had to fall. SemGroup's purported "experience" with respect to the implementation of acquisition, operating, and growth strategies in many facets of the energy industry was, in fact, irrelevant. Rather, management of SemGroup showed no expertise by risking the entire financial livelihood of the Parent, as well as the financial survival of SGLP, on unauthorized and speculative commodities trading.

13.     In addition to the undeniably-negligent statements and omissions made by Defendants in connection with the IPO and Secondary Offerings, the facts alleged herein demonstrate that certain Defendants continued to make false and misleading statements and omissions throughout the Class Period with actual knowledge and/or reckless disregard of their falsity.

14.     For example, throughout the Class Period, Defendants repeatedly played up the "guaranteed" monthly income the Company would receive from SemGroup, ignoring the escalating liquidity problems of the Parent and the increasing likelihood that SemGroup would become insolvent. An investigation by Louis J. Freeh (the "Examiner") in SemGroup's bankruptcy proceedings has revealed that, by no later than July 2007, the escalating price of crude oil had placed a substantial stress on SemGroup's balance sheet. By December 31, 2007, SemGroup's margin balance had increased to $1.7 billion and its mark-to-market liability had increased $2.04 billion. The Examiner's Report found that numerous Defendants and other SemGroup employees expressed serious concerns internally about SemGroup's growing margin balance and its effect on the Parent's liquidity. Nevertheless, Defendants knowingly and recklessly kept SGLP's investors in the dark. Indeed, Defendant Stallings admitted to the Examiner that "going into the first quarter 2008, SemGroup's margin payments and margin calls

were becoming the focus of [SemGroup's] liquidity problems."  No liquidity concerns, however, were communicated to SGLP's unitholders.

15.     Further, SGLP continued to assure investors that it was insulated "from commodity price risk" because of its unique relationship with its Parent.  All the while, certain Defendants knew or recklessly disregarded that SGLP's financial condition was worsening as SemGroup was on the brink of insolvency due to continued increases in crude oil prices.  Shockingly, on a March 6, 2008 conference call, Defendant Foxx told analysts that, even though "these energy prices continue to get higher and higher . . . we don't really see any impact on our business."

16.     Moreover, certain Defendants continually boasted that SGLP's disclosure controls and procedures were effective, blatantly ignoring the fact that SemGroup's lack of any effective controls permitted Kivisto and other Defendants to gamble away SGLP's financial health.  The Examiner's Report stated:

> In essence, Kivisto "bet" that the price of oil would return to a more normal trading range, and that the unrealized losses associated with the "rolled forward" trades would eventually expire worthless. SemGroup's virtually blind deferral to Kivisto on trading matters, and its failure to develop or implement a suitable risk management policy, was central to its problems.

17.     SGLP shocked the market on July 17, 2008, when news leaked out and SGLP was forced to disclose for the first time that SemGroup "is experiencing liquidity issues."  SGLP admitted that its Parent was considering alternatives, including bankruptcy.  The market punished SGLP's unit price, dropping it over 52 percent that day to $11.00 per unit.

18.     Four days later, SemGroup filed for bankruptcy.  As a result of the conduct alleged herein, the U.S. Attorney's Office, the SEC, and other federal regulators have initiated investigations into SemGroup and SGLP.  By November 2008, SGLP units were trading lower

than $1.00 per unit.  In February 2009, SGLP's units were altogether delisted from the National Association of Securities Dealers ("NASDAQ").

19.     In sum, at the time of the IPO, and continuing for one year, Defendants made materially false and misleading statements concerning SGLP's financial condition.  Undisclosed to investors, but known or recklessly disregarded by Defendants, SemGroup – the primary source of revenues and the key to SGLP's financial viability – was teetering on insolvency as its financial existence was predicated upon billions of dollars in improper and speculative "bets" that oil prices would plummet in the immediate future.  When oil prices continued to escalate in 2007 and 2008, SemGroup predictably collapsed, leaving SGLP with "substantial doubt" that it could continue as a going concern.   Investors have lost hundreds of millions of dollars. Defendants must be held accountable.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and §27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77(1)(a)(2) and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations of the SEC promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

21.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(c).  Many of the acts and transactions that give rise to the violations of law alleged herein, including the dissemination to the public of press releases and filings with the SEC that contained untrue statements of material fact and/or omitted material information required to be disclosed therein in order to render other statements made

therein not misleading, occurred in this District.  SemGroup's and SGLP's principal place of business, Defendants and witnesses also are located in this District, and for these reasons, by Order dated October 10, 2008, the United States Judicial Panel on Multidistrict Litigation transferred various related actions to this Court pursuant to 28 U.S.C. § 1407.

22.      In addition, at all relevant times, SGLP's common units traded on the NASDAQ, a national securities exchange, and SGLP filed numerous documents with the SEC.  Thus, in connection with the acts alleged herein, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce including the United States mails.

### III.   PARTIES

#### A.   Lead Plaintiff

23.      Harvest purchased SGLP common units in SGLP's IPO and Secondary Offering, and at various other times throughout the Class Period as set forth in the certification previously filed with the Court, which is incorporated herein by reference, and was damaged thereby.

#### B.   Company-Related Defendants

24.      Defendant SemGroup Energy Partners, L.P. (previously defined herein as "SGLP") is a publicly-traded Delaware limited partnership formed by SemGroup in 2007.  SGLP owns and operates a diversified portfolio of midstream energy assets, including storage facilities, terminals and pipelines in the United States.   The Company provides terminalling, storage, gathering, and transportation services for companies engaged in the production, distribution, and marketing of crude oil, and the Company owns and operates an aggregate of approximately 6.7 million barrels of storage capacity.   These crude oil-related assets were contributed to the Company by its Parent in connection with SGLP's IPO in July 2007.  During the Class Period, SGLP also owned and operated 46 liquid asphalt cement terminals, which provide liquid asphalt cement terminal and storage services in the continental United States.   SGLP acquired its

asphalt-related assets from an affiliate of its Parent in connection with the Secondary Offering in February 2008.

25.     SemGroup Energy Partners G.P., L.L.C. ("SemGroup GP" or the "General Partner") is a Delaware limited liability partnership and is the general partner of SGLP, having a 2.0% ownership interest in the Company.  The General Partner is a wholly owned subsidiary of SemGroup Holdings, L.P., which is wholly-owned by SGLP's Parent, SemGroup.  The General Partner manages SGLP's operations and activities, and its Board of Directors and officers control SGLP and make decisions on SGLP's behalf.  All of the executive officers and some of the directors of the General Partner also served as executive officers or directors of SemGroup during the Class Period.  The General Partner, by its officers and directors, signed and authorized both the IPO and Secondary Offering Documents on behalf of SGLP.

### C.     **Individual Defendants**

26.     Defendant Kevin L. Foxx ("Foxx") served as the President, Chief Executive Officer and a Director of SemGroup GP, beginning in February 2007.  In his capacity as President, CEO and Director of SemGroup GP, Foxx signed or authorized: (1) the Registration Statements issued in connection with both the IPO and the Secondary Offering; (2) SGLP's Annual Report on Form 10-K for the fiscal year-ended December 31, 2007 ("2007 10-K"); and (3) the certifications required by the Sarbanes-Oxley Act of 2002 ("SOX"), which were filed as Exhibits to SGLP's Quarterly Reports on Forms 10-Q for the quarters-ended June 30, 2007 ("2Q07 10-Q"), September 30, 2007 ("3Q07 10-Q") and March 31, 2008 ("1Q08 10-Q"), as well as the 2007 10-K.  Foxx was removed from the Board of the General Partner on July 18, 2008, after an abrupt change in control of the General Partner's Board of Directors.  Foxx remains President and CEO of SemGroup GP as of the date of this Complaint.  In addition, Foxx joined forces with the SemGroup founders in 2000 and served as the Parent's Chief Operating Officer

and Executive Vice President, and as an Executive Vice President of numerous SemGroup subsidiaries, including Eaglwing L.P.   Foxx also served as a member of the Parent's Management Committee until July 2008, when he resigned from these positions.  He also served as Executive Vice President and Chief Operating Officer of SemGroup subsidiaries known as SemCrude, L.P. and SemCanada Crude Company.

27.      Defendant Thomas L. Kivisto ("Kivisto") served as a Director of SGLP's General Partner from May 2007 until July 18, 2008, when he was removed from the Board.  In his capacity as Director of the General Partner, Kivisto signed or authorized the Registration Statements issued in connection with both the IPO and the Secondary Offering, as well as SGLP's 2007 10-K.  In addition Kivisto co-founded SemGroup in 2000 and served as its Chief Executive Officer and President until July 18, 2008, when he was placed on administrative leave, escorted from the SemGroup premises and subsequently terminated.

28.      Defendant Michael J. Brochetti ("Brochetti") served as Chief Financial Officer and Director of SemGroup GP beginning in February 2007.  In his capacity as Chief Financial Officer and Director of the General Partner, Brochetti signed or authorized: (1) the Registration Statements issued in connection with both the IPO and the Secondary Offering; (2) the 2007 10-K; (3) SGLP's 2Q07, 3Q07 and 1Q08 Forms 10-Q; and (4) SOX-required certifications attached as Exhibits to the 2007 10-K and SGLP's 2Q07, 3Q07 and 1Q08 Forms 10-Q.  Brochetti was removed from the Board of the General Partner on July 18, 2008.  Brochetti remains Chief Financial Officer of the General Partner.  In addition, Brochetti served as a Senior Vice President of SemGroup from October 2005 until March 2008, when he resigned from that position.

29.      Defendant Alex G. Stallings ("Stallings") has served as Chief Accounting Officer of SemGroup GP since February 2007.   In his capacity as Chief Accounting Officer of the

General Partner, Stallings signed or authorized: (1) the Registration Statements issued in connection with both the IPO and the Secondary Offering; (2) the 2007 10-K; (3) the 2Q07, 3Q07 and 1Q08 Forms 10-Q; and (4) various Current Reports on Form 8-K filed by SGLP with the SEC during the Class Period.  In addition, Stallings served as the Parent's Chief Accounting Officer from September 2002 until July 2008, when he resigned from that position.

30.     Defendant Gregory C. Wallace ("Wallace") served as a Director of SemGroup GP from May 2007 through July 18, 2008, when he was removed from the Board.  In his capacity as Director of the General Partner, Wallace signed or authorized the Registration Statements issued in connection with both the IPO and the Secondary Offering, as well as the 2007 10-K.  In addition, Wallace served as the Parent's Chief Financial Officer, Vice President and Secretary during the Class Period.

31.     Defendant Brent Cooper ("Cooper") served as SemGroup's Treasurer throughout the Class Period, until July 17, 2008, when he resigned.  Cooper managed the day-to-day financial decisions for SemGroup and monitored its cash flow and uses of cash, including margin calls, and liquidity.

32.     Defendant W. Anderson Bishop ("Bishop") served as a Director of SemGroup GP from July 17, 2007 through July 18, 2008.  In his capacity as Director of the General Partner, Bishop signed or authorized the Registration Statements issued in connection with both the IPO and the Secondary Offering, as well as the 2007 10-K.

33.     Defendant Brian F. Billings ("Billings") was appointed as a Director of SemGroup GP on October 3, 2007 and served in that same capacity through the end of the Class Period.  In his capacity as a Director of the General Partner, Billings signed or authorized the Registration Statement for the Secondary Offering, as well as the 2007 10-K.

34.     Defendants, Foxx, Brochetti, Stallings, Kivisto, Wallace, Bishop, Cooper and Billings are sometimes referred to herein as the "Individual Defendants."

35.     The Individual Defendants, because of their positions with SemGroup, SemGroup GP and SGLP, possessed the power and authority to control and did control the contents of the Company's IPO and Secondary Offering Documents, reports to the SEC, press releases and presentations to securities analysts, ratings agencies and institutional investors, *i.e.*, the market. Each of the foregoing Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each either personally made by one of the Individual Defendants or "group-published" information as the result of the collective actions of the Individual Defendants.

**D.     Underwriter Defendants**

36.     Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") was at all relevant times a brokerage and investment adviser firm with its principal place of business in St. Louis, Missouri.  A.G. Edwards was an underwriter of SGLP's IPO.  In the IPO, A.G. Edwards sold at least 875,000 common units to the public for gross proceeds of approximately $19,250,000. Wachovia Corporation acquired A.G. Edwards in October 2007 and Wells Fargo & Company ("Wells Fargo") acquired Wachovia Corporation on December 31, 2008.

37.     Defendant BOSC, Inc. ("BOSC") is a brokerage and investment adviser firm with its principal place of business in Tulsa, Oklahoma.  BOSC was an underwriter of SGLP's IPO.  In the IPO, BOSC sold 312,500 common units to the public for gross proceeds of approximately $6,875,000.  BOSC was at all relevant times a subsidiary of BOK Financial Corporation.

38.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a brokerage and investment banking firm with its principal place of business in New York, New York.  Citigroup acted as joint bookrunning manager and representative of all other underwriters in both SGLP's IPO – which offered and sold 14,375,000 common units to the public for gross proceeds of approximately $316,250,000 before expenses – and SGLP's Secondary Offering – which offered and sold an additional 6 million common units to the public for gross proceeds of approximately $143,400,000 before expenses.  In the IPO, Citigroup sold 4,375,001 common units to the public for gross proceeds of approximately $96,250,022.   In the Secondary Offering, Citigroup sold 1,650,000 common units to the public for gross proceeds of approximately $39,435,000.

39.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a global financial services firm that provides investment banking services and has its principal place of business in New York, New York.  Goldman Sachs acted as an underwriter of SGLP's Secondary Offering.  In the Secondary Offering, Goldman Sachs sold 465,000 common units to the public for gross proceeds of approximately $11,113,500.

40.     Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") is the primary non-bank subsidiary of JP Morgan Chase and provides investment banking services in the United States.  J.P. Morgan's principal place of business is in New York, New York.  J.P. Morgan acted as an underwriter of SGLP's Secondary Offering.   In the Secondary Offering, J.P. Morgan sold 210,000 common units to the public for gross proceeds of approximately $5,019,000.

41.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") was a subsidiary of Merrill Lynch & Company, Inc., and was, at all relevant times, a brokerage and investment banking firm with its principal place of business in New York, New York.  Merrill Lynch acted as joint bookrunning manager and representative of all other underwriters in SGLP's IPO.  On September 15, 2008, Bank of America Corporation ("BOA") announced its intention to acquire Merrill Lynch & Company, Inc., which merger was completed on January 1, 2009.  In the IPO, Merrill Lynch sold 2,500,000 common units to the public for gross proceeds of approximately $55,000,000.  In the Secondary Offering, Merrill Lynch sold 465,000 common unites to the public for gross proceeds of approximately $11,113,500.

42.     Defendant Raymond James & Associates, Inc. ("Raymond James") is a financial services holding company with subsidiaries engaged primarily in investment and financial planning, in addition to investment banking and asset management, with its principal place of business in St. Petersburg, Florida.  Raymond James acted as an underwriter for SGLP's IPO and Secondary Offering.  In the IPO, Raymond James sold 875,000 common units to the public for gross proceeds of approximately $19,250,000.  In the Secondary Offering, Raymond James sold 210,000 common units to the public for gross proceeds of approximately $5,019,000.

43.     Defendant RBC Capital Markets Corporation ("RBC") is an investment banking firm with its principal place of business in New York, New York.  RBC acted as an underwriter for SGLP's IPO and Secondary Offering.  In the IPO, RBC sold 1,083,333 common units to the public for gross proceeds of approximately $23,833,326.  In the Secondary Offering, RBC sold 210,000 common units to the public for gross proceeds of approximately $5,019,000.

44.     Defendant SMH Capital Inc. ("SMH Capital") is a brokerage and investment adviser firm with its principal place of business in Houston, Texas.  SMH acted as an underwriter

of SGLP's IPO and Secondary Offering.  In the IPO, SMH sold 312,500 common units to the public for gross proceeds of approximately $6,875,000.  In the Secondary Offering, SMH sold 210,000 common units to the public for gross proceeds of approximately $5,019,000.

45.     Defendant UBS Securities LLC ("UBS") is a brokerage and investment adviser firm with its principal place of business in Stamford, Connecticut.  UBS acted as an underwriter of SGLP's Secondary Offering.  In the Secondary Offering, UBS sold 465,000 common units to the public for gross proceeds of approximately $11,113,500.

46.     Defendant Wachovia Capital Markets, LLC ("WCM") was at all relevant times, the corporate and investment banking arm of Wachovia Corporation, with its principal place of business in Charlotte, North Carolina.  WCM acted as an underwriter for SGLP's IPO and Secondary Offering.  In the IPO, WCM sold 1,083,333 common units to the public for gross proceeds of approximately $23,833,326.  In the Secondary Offering, WCM sold 465,000 common units to the public for gross proceeds of approximately $11,113,500.  Wells Fargo acquired WCM on December 31, 2008.

47.     Defendant Wachovia Corporation was, at all relevant times, a financial holding company with its principal place of business in Charlotte, North Carolina.  Wachovia Corporation is named herein as the successor-in-interest to A.G. Edwards, which Wachovia acquired in October 2007.

48.     Defendant Wells Fargo was, at all relevant times, a financial services company with its principal place of business in San Francisco, California.  Wells Fargo is named herein as the successor-in-interest to WCM, which Wells Fargo acquired on December 31, 2008.

49.     Defendant Bank of America ("BOA") is a large financial institution with its corporate headquarters in Charlotte, North Carolina.  BOA is named herein as the successor-in-

interest to Merrill Lynch, which merged with a wholly owned subsidiary of BOA on January 1, 2009.

50.     Defendants A.G. Edwards, BOSC, Citigroup, Goldman Sachs, J.P. Morgan, Merrill Lynch, Raymond James, RBC, SMH Capital, UBS, Wachovia Corporation, WCM, Wells Fargo and BOA are collectively referred to herein as the "Underwriter Defendants."

### E.     Investment Company Defendants

51.     Defendant Ritchie Opportunistic Trading, Ltd. ("Ritchie"), by its subsidiaries, SGLP Holdings, Ltd., SGLP US Holdings, L.L.C. and Ritchie Holdings, L.L.C., holds a 25.2% interest in SemGroup, L.P.  Ritchie Capital Management, Ltd. and Ritchie Capital Management, L.L.C., are the investment manager and sub-adviser, respectively, to Ritchie, and have voting power and investment control over Ritchie's interest in SemGroup, L.P.  A. R. Thane Ritchie controls Ritchie Capital Management, Ltd. and Ritchie Capital Management, L.L.C.  The mailing address of Ritchie Opportunistic Trading, Ltd. is c/o Ritchie Capital Management, L.L.C., 2100 Enterprise Avenue, Geneva, Illinois 60134.

52.     The "Carlyle/Riverstone" defendants (defined below) hold a 29.3% interest in SemGroup, L.P.  Carlyle/Riverstone is associated with Riverstone Holdings, LLC ("Riverstone") and The Carlyle Group ("Carlyle").  Riverstone is based in New York, New York and was organized in May 2000 specifically for the purpose of originating private equity investments in the energy and power industry.  Carlyle is a global private equity firm, based in Washington, D.C., that originates, structures and acts as lead equity investor in management-led buyouts, strategic minority equity investments, equity private placements, consolidations and build-ups, and growth capital financings.  The address of C/R SemGroup Investment Partnership, L.P., C/R Energy Coinvestment II, L.P. and Riverstone is 712 Fifth Avenue, 51st Floor, New York, NY 10019. The "Carlyle/Riverstone" defendants are:

a.      Defendant C/R SemGroup Investment Partnership, L.P. is a limited partnership formed to hold Carlyle/Riverstone Global Energy and Power Fund II, L.P.'s investment in SemGroup.   Entities owning the equity interests of C/R SemGroup Investment Partnership, L.P. include investment partnerships affiliated with Carlyle/Riverstone Global Energy and Power Fund II, L.P.

b.      Defendant C/R Energy Coinvestment II, L.P. is a limited partnership formed to hold Carlyle/Riverstone Global Energy and Power Fund II, L.P.'s investment in SemGroup.   Entities owning the equity interests of C/R Energy Coinvestment II, L.P. include investment partnerships affiliated with Carlyle/Riverstone Global Energy and Power Fund II, L.P.; and

c.      Defendant Carlyle/Riverstone Global Energy and Power Fund II, L.P. is an investment fund through which Carlyle/Riverstone invested in SemGroup.  Defendant C/R SemGroup Investment Partnership, L.P., Defendant C/R Energy Coinvestment II, L.P. and Defendant Carlyle/Riverstone Global Energy and Power Fund II, L.P. are collectively referred to herein as "Carlyle Riverstone."

53.      Defendant A.R. Thane Ritchie ("Thane Ritchie") was the designee of Ritchie Capital Management and its affiliates and served on SemGroup's Management Committee during the Class Period.

54.      Defendant Andrew Ward ("Ward") was one of the two designees of Riverstone and served on SemGroup's Management Committee during the Class Period.

55.      Defendant E. Bartow Jones ("Jones") was one of the two designee of Riverstone and served on SemGroup's Management Committee during the Class Period.

F.     **Relevant Non-Parties**

56.     SemGroup L.P. (previously defined herein as "SemGroup" or the "Parent") is the parent of SGLP.  SemGroup has a 100% ownership interest in SemGroup Holdings, L.P., which has a 100% ownership interest in SemGroup Energy Partners G.P., L.L.C., SGLP's General Partner.  According to its website, SemGroup is a midstream service company providing the energy industry with the means to move products from the wellhead to the wholesale marketplace.  SemGroup owns and operates proprietary and common carrier pipelines, terminals, storage tanks, processing plants, underground storage and a transportation fleet.  Subsidiaries of SemGroup include SemCrude, L.P., SemFuel, L.P., SemGas, L.P., SemMaterials, L.P., SemStream, L.P., SemCanada, L.P., SemLogistics, and SemGreen.  SemGroup initially was named as a Defendant in this consolidated action.  On July 22, 2008, SemGroup filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.  For this reason, SemGroup is not presently named as a Defendant in this Complaint.

57.     SemGroup Holdings, L.P. (previously defined herein as "SemGroup Holdings") is a wholly-owned subsidiary of SGLP's Parent that was formed in July 2007 to hold the Parent's investment interests in future entities, initially SLGP.  In the IPO, SGLP issued 12,500,000 common units to SemGroup Holdings, which in turn sold the units to the public.  SGLP also issued 12,570,504 common subordinated units to SemGroup Holdings, which beneficially held the units on behalf of SemGroup.  SemGroup Holdings controls SGLP through its 100% ownership interest in SGLP's General Partner.  SemGroup Holdings is the sole limited partner of SGLP's General Partner and, at all times relevant hereto, selected the members of the Board of Directors of the General Partner which, in turn, controlled and directed the operations of SGLP. SemGroup Holdings initially was named as a Defendant in this consolidated action.  On October 22, 2008, SemGroup Holdings filed a voluntary petition for relief under Chapter 11 of the United

- 21 -

States Bankruptcy Code.  As set forth in the bankruptcy filings, SemGroup Holdings had no operations or employees of its own.  As such, because the Parent wholly-owned SemGroup Holdings, the Parent and its executives effectively appointed the members of General Partner's board and controlled SGLP thereby.  But for its bankruptcy filing, SemGroup Holdings would have been named a Defendant in this Complaint.

58.     Lehman Brothers Inc. ("Lehman") was a registered broker-dealer with its principal place of business in New York, New York.  Lehman acted as joint bookrunning manager and representative of all other underwriters in SGLP's Secondary Offering, through which SGLP offered and sold an additional 6 million common units to the public for gross proceeds of approximately $143,400,000 before expenses.  Lehman was, at all relevant times, a wholly-owned subsidiary of Lehman Brothers Holdings, Inc ("LBHI").  Lehman initially was named as a Defendant in this action.  On September 15, 2008, LBHI filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.  Shortly thereafter, on September 19, 2008, Lehman also became a party to the bankruptcy proceedings, when the bankruptcy court ordered its liquidation.  For these reasons, Lehman is not named as a Defendant in this action.

## IV.   OVERVIEW OF DEFENDANTS' SECURITIES LAWS VIOLATIONS

59.     In Counts I through III, Lead Plaintiff asserts claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act against Defendants who are statutorily liable for the untrue statements and material omissions set forth in the IPO and Secondary Offering Materials.  Lead Plaintiff specifically disclaims any allegations of fraud in connection with the Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

60.     In Counts IV through VI, Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act and the rules and regulations promulgated thereunder, including Rule 10b-5, against certain Defendants for knowing or reckless conduct, and/or control of those Defendants who engaged in such conduct, in violation of the Exchange Act and Rule 10b-5.

## V.     VIOLATIONS OF THE SECURITIES ACT

### A.     Background to SGLP's Public Offerings

61.     In a press release dated March 9, 2007, SemGroup announced a planned public offering of limited partnership interests in SGLP, which was a newly-formed Delaware limited partnership created by SemGroup to spin off some of its midstream energy assets that were being used to provide crude oil terminalling, storage, gathering and transportation services.  The terms of the offering proposed for a wholly-owned subsidiary of SemGroup to sell 12,500,000 common units in SGLP to the public, plus an over-allotment option for underwriters of the offering to sell an additional 1,875,000 common units.  At the close of the offering, SemGroup was to transfer ownership to SGLP of certain crude oil assets collectively valued at $102 million, including two pipelines and crude oil transports used to gather oil at remote wellhead locations with approximately 6.7 million barrels of storage capacity.

62.     SemGroup announced that proceeds from the IPO, together with proceeds from SGLP's borrowings under a credit facility extended to SGLP at or about the close of its IPO, were going to be paid to SemGroup and used to reduce amounts outstanding under SemGroup's senior secured credit facilities.  Proceeds from sales of common units sold in the Underwriters' over allotment, if any, were to be paid directly to SGLP.  SemGroup further announced that an application had been made to have the common units quoted on the NASDAQ Global Market under the symbol "SGLP," thus giving birth to the publicly-traded arm of SemGroup.

63.     SGLP's anticipated core operating areas were in Oklahoma, Kansas and Texas. Also, according to the Company, a large percentage of the storage facilities were "strategically" located at the Cushing Interchange in Cushing, Oklahoma.   Even more lucrative to SGLP, however, was SemGroup's purported contractual guarantee of $6.4 million per month in payments for crude oil terminalling and storage services provided by SGLP to SemGroup.  As set forth in its press release dated March 9, 2007, SemGroup had global operations, including operations in the United States, Canada and the United Kingdom, and had been ranked for two years in the top 10 of *Forbes* magazine's list of America's Largest Private Companies.   The seemingly guaranteed revenue stream from a corporate stalwart like SemGroup – as SGLP repeatedly touted in the IPO and Secondary Offering Documents – ensured stable cash flows to SGLP, which in turn ensured cash distributions to unitholders and a financially-healthy SGLP.

64.     Unbeknownst to investors, SemGroup was tapping the public markets to raise capital to feed its Parent's massive need for cash to post collateral for a margin balance on its New York Mercantile Exchange ("NYMEX") and other trading accounts that exceeded *$1 billion* in the months immediately prior to the IPO in July 2007.  According to the Examiner's Report, in approximately July 2007, the rising price of crude oil put a stress on SemGroup's balance sheet.  SemGroup traders,  operating under Kivisto's direction,  held fast to massive "short" positions, betting (wrongly) that the price of crude oil would fall.

65.     Prior to the Company's Secondary Offering in February 2008, the margin balance had increased to *$1.7 billion*, which further and severely impaired SemGroup's liquidity.  In fact, according to the Examiner's Report, SemMaterials' President, Frank Panzer, "began to feel uneasy about SemGroup's liquidity in late 2007."  Others at SemGroup and its affiliates became concerned about SemGroup's liquidity in January 2008 when SemGroup's cash balance on the

daily cash report dropped below $200 million.  The cost of carrying the trading positions that Kivisto, and others at his direction, executed on behalf of SemGroup increased in 2007 and 2008 as the positions became larger and strained SemGroup's ability to generate cash to maintain its corresponding margin payments.

**1.**  **SemGroup's Undisclosed Speculative Trading**

66.     In the course of terminalling, storing and transporting crude oil, SemGroup was exposed to price fluctuations in crude oil that it purchased and sold.  Therefore, as frequently is the case in the energy industry, SemGroup had an element of commodity-price risk inherent in its operations.  To manage this risk, SemGroup reported that it engaged in trades of forward contracts and other arrangements to hedge its exposure to fluctuations in the price of crude oil. SemGroup engaged in trading activities with a number of counterparties through brokers and a NYMEX trade account.  If SemGroup's position on a trade became "out-of-the-money" (*i.e.*, the strike price was higher than the underlying futures price for calls, or lower than the underlying futures price for puts), SemGroup was required to post cash as collateral for the margin requirements with the counterparty to the trade.

67.     According to a confidential witness ("CW1") who worked at SemGroup as a financial manager at SemGroup's corporate headquarters from 2001 through June 2007, commodities trading was a daily part of SemGroup's business activities.

68.     CW1 stated that Defendant Kivisto initially performed all trading activity for SemGroup and its subsidiaries, until the Parent's business expanded and the president of each SemGroup subsidiary became responsible for the commodities trading of their respective subsidiaries.  Separate from the subsidiaries' trading, Kivisto continued to engage in trading activity for SemGroup.  As SemGroup's business and operations expanded, two traders named Jim Coen ("Coen") and Mia Oven ("Oven") began working directly under Kivisto, and they

traded the commodities of the various SemGroup subsidiaries at and under Kivisto's direction. CW1 stated that Kivisto supervised Coen's and Oven's trading activities and that Coen and Oven traded commodities "all day long."

69.     All of Kivisto's, Coen's and Oven's trading activities were entered into and maintained in an Excel spreadsheet, which reflected gains and losses from the trading.  CW1 monitored the trading activity data and, according to CW1, Kivisto closely monitored the "trading spreadsheet," which reflected the gains and losses from all trading.  CW1 also worked with and had access to numerous Excel spreadsheets that contained SemGroup's and its subsidiaries' financial data, including SemGroup's margin balance, which CW1 stated reflected the aggregate amount of losses owed at any given time as a result of SemGroup's trading activities.

70.     According to CW1, at the beginning of his tenure with SemGroup, trading that was "standard practice" in the energy business occurred at SemGroup.  In June 2006, however, CW1 became concerned over SemGroup's increasing margin balance, which continued to increase subsequent to SGLP's IPO.

71.     By at least July 2007, SemGroup's trading practices had lost the characteristics of being a hedging mechanism, and had become highly speculative.  Speculative trading occurs when an entity does not possess the commodity being traded.  Trading without possession of the underlying commodity is commonly referred to as trading "paper barrels" and occurs when an oil cargo is sold and traded on the open market, but not actually shipped; essentially, the cargo is passed back and forth on paper.  Trading in paper barrels can drive the price of oil up considerably.  In periods when oil prices are rising precipitously, trading in paper barrels may be the cause.  When paper barrel trading is extensive, like it was at SemGroup according to CW1,

the trading drives oil prices up quickly, causing per barrel prices to jump radically and, in turn, triggering a rise in fuel prices.

72.    CW1 explained the dangers of speculative trading of "paper barrels," which he stated usually occurs at private companies that have no risk policies in place.  CW1 stated that sound risk policies ensure that entities involved in trade agreements, possess "wet barrels," or the actual commodity being traded.  If the entity does not possess the commodity, and, as a result of trading, the entity is required to provide the trade counterparty with the commodity, the entity has to purchase the commodity at what possibly could be fluctuating prices.  Purchasing the commodity at fluctuating prices can result in financial losses. If the entity already possesses the commodity, however, then the entity only has to transfer the commodity to the counterparty.  It is, thus, unaffected by any fluctuating prices.

73.    CW1 stated that Coen and Oven primarily conducted "paper barrel" trades. Because Coen and Oven primarily conducted paper trades, they became responsible for a monthly Reconciliation Statement (the "Reconciliation").  The purpose of the Reconciliation, according to CW1, was to ensure that the trading agreements (paper barrel) matched the actual commodities possessed (wet barrels) by each subsidiary.  In other words, if 100,000 barrels of oil were traded, the Reconciliation ensured that a SemGroup subsidiary actually possessed the 100,000 barrels of oil to back up the trade.  It was the responsibility of each subsidiary's controller to confirm that the commodity inventory levels could support Coen's and Oven's trades. CW1 stated that SemGroup's "Risk Department" was responsible for ensuring that the commodities possessed by each subsidiary matched the trade agreements.  Kivisto's, Coen's and Oven's trading went well beyond SemGroup's commercial hedging needs, as they were engaged in speculative, high-risk trading that dangerously exposed SemGroup to oil-price volatility.

74.     According to the Examiner's Report, Kivisto personally conducted and directed through a few trusted (albeit inexperienced) underlings, including Coen and Oven, a complex trading strategy that was speculative and placed SemGroup at increased risk in 2007 and 2008 when oil prices rose to unprecedented levels and experienced extreme volatility.  From January 2007 to July 2008, the spot price of NYMEX crude oil rose from approximately $50 to $147 per barrel.  During the Class Period, Kivisto and others failed to calculate sufficiently risks imposed on SemGroup's trading portfolio by the increase in crude market volatility, and Kivisto failed to adjust his trading strategy.  SemGroup lost billions of dollars sticking to a "short" position betting that prices would fall, even as crude oil prices rose above $145 per barrel.  Kivisto's trading plan ultimately unraveled as SemGroup ran out of cash to pay its margin calls and filed bankruptcy.

75.     Coen admitted to the Examiner that he, under the direction of Kivisto, routinely engaged in options trades that were unrelated to the physical inventory or commodities purchases of SemGroup.  Consequently, SemGroup (without the knowledge of its creditors and SGLP investors) engaged in what is known as speculative "naked options" transactions, which included the sale of naked call and put options.  The Examiner stated that "SemGroup's agreements with its creditors precluded speculative trading."

76.     As part of its undisclosed speculative commodities-trading strategy, SemGroup was involved in active trading of crude oil, gasoline, natural gas and other refined products and traded the commodities not only on a physical, but also a financial basis through execution of a variety of high-risk derivative transactions, including futures, options and swaps.  In fact, the Examiner's Report states that SemGroup's trading activity "comprised 20% of [all] market positions for crude oil options beyond three months to expiry."   Unbeknownst to SGLP

investors, Kivisto used commodities trading to generate substantial revenue for SemGroup. Kivisto and other traders commonly referred to commodities trading revenue as "marketing" revenue, according to the Examiner's Report.

77.     Kivisto developed for SemGroup and his own trading book a speculative trading strategy called "managing to expiry," which he and other SemGroup traders used to generate revenue through premiums from the sale of naked call and put options.  Important to Kivisto's trading strategy, and dangerously risky to SemGroup and all of its affiliates, including SGLP, was the constant sale and rolling forward of options contracts to prevent any recognition of losses resulting from the options.  The Examiner's Report stated that according to Foxx, in the years before 2007, commodities trading "was providing a huge portion of SemGroup's yearly revenue.  Foxx stated that, "prior to 2007, approximately 50% of SemGroup's revenues came from operations and 50% came from marketing."   SGLP never disclosed this nature of SemGroup's business to investors and shareholders.

78.     The Examiner interviewed all of SemGroup's traders.   According to the Examiner, Joe Shimonov, a crude-oil trader at SemCanada from 2003 through 2008, who worked directly for Kivisto, described to the Examiner Kivisto's trading strategy as implemented by Coen, as follows:

> Kivisto told him that the market was backwardated [*i.e.*, falling prices] 70% of the time and that, because of the backwardation, Kivisto's strategy was to sell crude oil call options in near term commodities contract months, and, at the same time, purchase futures contracts for the same or less volume as the call options, but for contract months approximately six months later. Shimonov stated that Kivisto told him that his trading strategy relied upon the concept that "the market can't be in two places at once."

> The shorter term sold calls would be rolled over until the last rolled call was for the same contract month as the initially purchased futures contract (about six months after the first trades were made). Because Kivisto never wanted to pay for the rolled trades for sold calls that were deep in-the-money, to finance the rolled

calls, Kivisto instructed Shimonov to obtain premiums by selling puts, calls or a combination of the two. Shimonov stated that in 2008, as crude oil prices were rising, he would sell puts, straddles and strangles in order to finance the roll of the sold call options.

Shimonov indicated that at about six months from the first trades, the options contracts and the futures contracts would both be allowed to settle out and offset each other. Shimonov stated that the theory behind the strategy was that, in a market with upward moving prices, premiums could be collected, and any loss on the sold options would be offset by the purchased futures contracts.

* * *

According to Shimonov, Kivisto's trading philosophy never changed, and because of the rise and volatility of the price of oil, many more positions were being put on the trading book during 2008. The cost of more options being traded grew, and so did the number of sold puts, calls, straddles and strangles, in an attempt to pay for the rolled trades. The cost of carrying these positions became extremely expensive. SemGroup's positions were growing larger and it was rolling more and more options.

79.     Coen told the Examiner that to his knowledge, Kivisto had "never experienced trading losses like the losses at SemGroup in 2007 and 2008."  In fact, Kivisto's oil-trading strategy was entirely premised upon ***never*** recognizing a loss, although trading naked options exposed SemGroup to potentially massive losses.  Coen also admitted that he sold options that were unrelated to physical inventory or purchases at SemGroup, and he summarized his trading activity as either, (a) "hedging crude oil from lease purchases," or (b) "managing residual options positions."  Coen also stated that he and Oven would on occasion engage in day trading to offset existing positions and the risk in their trading book.

80.     Coen summarized Kivisto's trading strategy, as implemented by Coen, to the Examiner as follows:

Coen stated that SemCrude acquired approximately 80,000 barrels of crude oil per day from lease purchases that were not priced until the date of delivery. To hedge these oil purchases, Coen would execute two initial transactions at nearly the same time, which he referred to as a spread trade. As described by Coen, a spread trade is the sale of prompt month crude oil and the purchase of crude oil for a different future contract month. Coen's first transaction would be a sale of

approximately 80,000 barrels worth of NYMEX prompt month crude oil futures. This sale established a mechanism to effect eventual physical re-delivery of the purchased crude oil, but this sale was at a fixed price. Lease purchased barrels did not price until delivery but, since Coen needed to arrange for somewhere for that oil to go before delivery began, he sold the NYMEX prompt month contracts. Selling the NYMEX prompt month crude at a fixed price while a purchase price for lease purchase crude was undetermined created a short price position for SemCrude. (To explain further, SemCrude would sell oil at a fixed price on NYMEX before it knew the price it would pay for lease purchased oil, which it did in order to physically dispose of the oil that would be delivered as a result of lease purchases.) In an attempt to offset this fixed price risk created by the short NYMEX position, Coen stated that he would contemporaneously execute a second NYMEX transaction, which was a purchase of approximately 80,000 barrels of oil for a further dated contract month. Although not exact, Coen anticipated any losses on the fixed-price NYMEX sale to be offset by gains on the fixed priced NYMEX purchase. Coen stated that he would execute this spread trade daily until it was time to start transacting for the next prompt month.

Coen stated that when SemCrude began to take daily delivery of the lease purchased crude oil, the purchase price of that oil would also be set daily. To Coen, this daily delivery and pricing meant that the longer dated component of the spread hedge was no longer needed. But, instead of simply selling the longer dated NYMEX position which he had purchased as part of the spread hedge, Coen executed a different transaction. Coen stated that it was Kivisto's strategy to enhance marketing (commodities trading) revenues by selling call options in the same quantity and same contract month as the longer dated component of the spread position. Coen stated that this call option sale was the theoretical exit of the spread position. Coen stated that if the market price of crude oil went above the strike price of this sold call option (*i.e.*, the call was "in-the-money"), Kivisto's strategy would have been to avoid realizing a loss on the option sale. To avoid realizing a loss on the sold option, Coen would sell even longer dated options (puts and calls) and use the premiums collected to purchase call options identical to those sold as the "exit" to the spread strategy. *This strategy allowed SemCrude to offset a current liability by creating a future liability and allowed SemCrude to forego the realization of [market-to-market] losses on the sale of options.* Coen described this process as rolling the position or as managing a residual position.

*Coen indicated that it was Kivisto's strategy to never realize a loss on an option.* Accordingly, Coen stated that he pulled a report every morning that showed which options were in-the-money, which report would guide his daily trading. *Coen also stated that part of Kivisto's philosophy was that the price of crude oil would eventually return to within historical ranges, and that, when it did, the options sold through the "rolling" process would expire worthless. Correspondingly, Coen indicated that it was Kivisto's strategy to continue to roll the in-the-money options until all options expired worthless. Coen stated that,*

*after the first roll, any subsequent options transactions could no longer be considered as tied to a physical barrel.*

*Coen also stated that inventory was not a factor in his daily decision making process.* Coen stated that his main daily trading priorities were enacting spread hedges and rolling "in-the-money" options. Again, Coen stated that after the first options roll, that the residual options position could no longer be tied to a physical barrel of oil. Coen stated that, during management of the residual position, he executed options on products other than crude oil to diversify risk. Coen also indicated that he implemented Kivisto's strategy for SemMaterials and SemStream, meaning that he attempted to enhance revenues through the sale of options, and then would roll forward any "in-the-money" options. (Emphasis in original.)

81.     Oven also implemented Kivisto's trading strategy of selling options to generate revenue and managing options "to expiry."   The Examiner's Report states that Oven's description of Kivisto's trading strategy was similar to Coen's description, and Oven advised that her trading responsibilities primarily involved execution of option transactions that were designed to protect the price risks for various SemGroup subsidiaries' commodities.  Oven stated that she used a combination of puts purchased "at the money" (*i.e.*, the strike price is equal to or near the underlying futures price) for commodities such as propane, which was intended to offset potential losses from the decline in the propane inventory.  Contemporaneously, Oven would sell "out-of-the-money" put options to offset the cost of the premiums paid for the purchased puts to create what Oven referred to as a "costless floor" for protection of the commodities inventory.

82.     Oven further described the trading strategy, as dictated by Kivisto, "to never realize a loss on an options transaction," and summarized this strategy, as implemented by Oven, as follows:

Oven indicated that near options expiry (which was also near the anticipated sale of the propane inventories), if the purchased puts were "in-the-money," they would be exercised. Further, if the market price of propane fell to where the sold put options were "in-the-money" near expiry, Oven would sell further dated puts and calls and use the premiums to offset any losses on the put options that were originally sold as part of the costless floor hedging strategy.…She indicated that

- 32 -

it was Kivisto's strategy to never realize a loss on an options transaction. Oven described selling options (both puts and calls) to manage a residual position. Oven indicated that Kivisto's philosophy was that prices would always return to within historical ranges, so she and Coen thought that the losses would never be realized because the position could be rolled until the options expired worthless.

83.     The Examiner stated that Coen, Oven and Shimonov were the only SemGroup traders that executed options sales transactions during 2007 and 2008.  Coen and Oven told the Examiner that due to rising crude oil prices and the need to roll increased volumes of "in the money" options, the "volume" of SemGroup's "residual positions" from Kivisto's trading strategy grew through 2007 and mid-2008.  The Examiner's analysis demonstrates that the volume of options sales for all commodities actually increased for all SemGroup entities and Westback (as explained below) from 71,896 contracts in February 2007 to 241,704 contracts in May 2008, which were not directly correlated to the commercial volume of crude oil sold by SemGroup.

84.     The Examiner's analysis further established that SemGroup's storage capacity was *8 million* barrels of crude oil for the United States and Canada; however, SemGroup had sold the equivalent of a shocking *56 million* barrels of crude oil via sales of call options as of May 12, 2008.  According to the Examiner's Report, the mark-to-market liability from the options contracts increased from *$2.4 billion* on December 31, 2007, to *$4.0 billion* in July 2008.  Oven and Coen confirmed to the Examiner that SemGroup was using "bank collateral" to finance their options trades.

### 2.     Westback Trading

85.     In addition to trading on behalf of SemGroup and its subsidiaries, Kivisto had long ago formed Westback Purchasing Co. LLC ("Westback"), which was a trading company wholly owned by Kivisto and his wife, and was separate from SemGroup.  According to CW1, Kivisto originally formed Westback to help protect the oil inventory of a group of Kansas

- 33 -

producers from market fluctuations.  To protect the oil inventory from exposure to oil-price fluctuations, Kivisto traded and hedged the purchased oil.  Kivisto also traded for himself through Westback.

86.     The Examiner stated that during 2000 through 2007, a substantial number of trades were conducted for Westback by a SemGroup affiliate, Eaglwing Trading, L.P. ("Eaglwing").  The trades conducted by Eaglwing on behalf of Westback were extremely profitable for Kivisto, and in 2006 generated $26 million for Kivisto and his wife.  Beginning in 2007, the Westback trades ceased yielding profits, and instead generated $290 million in losses for Eaglwing by July 2008.

87.     In March 2006, Eaglwing entered into a written agreement with Westback, which confirmed that when Eaglwing entered into trading contracts for Westback, it was doing so only as Westback's authorized agent and that all obligations and benefits under the trading contracts were for the "sole account of Westback." The agreement was signed by Defendant Wallace, on behalf of Eaglwing, and also was signed by Defendant Kivisto on behalf of Westback.  As a result of this agency relationship, Eaglwing funded Kivisto's and Westback's trading activities.

88.     According to the Examiner, using Eaglwing, Kivisto caused SemGroup to "front" margins and margin call requirements for Kivisto's personal options trades, essentially using Westback as his alter ego.  The Examiner also stated that Kivisto, Wallace, Cooper, and Stallings knew that Kivisto was using SemGroup's funds to engage in options trading on his own behalf through Westback, and yet they failed to stop him, although they were aware that such activity had the potential to and did expose SemGroup to increased risk.

89.     The Examiner concluded that if Kivisto had reimbursed SemGroup for Westback's trading losses, "it might have affected the timing of, or necessity of, SemGroup's bankruptcy filing."

### 3.     SemGroup's Margin Balance Grows

90.     As a result of SemGroup's speculative trading practices, including the increasing number of trades being made during the Class Period, and in conjunction with the rising price of oil, in early 2007, SemGroup's trading losses mounted and its margin balance increased commensurately.   The margin balance was the amount of cash collateral that SemGroup was required to post for open trading losses on its NYMEX, over the counter ("OTC") and other trading accounts with its trading counterparties, including, among others, Bank of Oklahoma ("BOK"), ConAgra Trading Group, Inc., Merrill Lynch, Prudential Bache Commodities, LLC ("PBC"), Calyon, Magellan, and J. Aron, a wholly-owned subsidiary of Goldman Sachs.

91.     According to CW1, SemGroup's increasing margin balance was a "threat" to SemGroup and was a financial drain that was pulling cash away from SemGroup, and CW1 was very concerned that it would deplete SemGroup's credit facility and SemGroup would not have enough funds to make margin payments.   CW1 also stated that others became concerned about Kivisto's trading operations, and in fact, in March 2007, PricewaterhouseCoopers LLP ("PWC"), which was SemGroup's and SGLP's auditor, required Kivisto to sign off on a trade involving Westback, SemGroup and ConAgra, so that SemGroup would not have exposure to the trade. Shortly before the IPO in July 2007, SemGroup's overall liquidity was "impaired" according to CW1.

92.     CW1 stated that in or around June 2007, SemGroup's Treasury Department, became responsible for recording margin balance information.   However, CW1 continued to have access to the margin balance as part of his financial management responsibilities.

93.     CW1 stated that he became "increasingly nervous" and very concerned about the margin balance, which had grown to approximately $1 billion before CW1 left SemGroup in June 2007.  CW1 stated that SemGroup's Treasurer, was required to "sign off" on all margin payments, and that Defendant Stallings, SemGroup's Chief Accounting Officer, also was "very aware" of SemGroup's increasing margin balance.  In fact, prior to June 2007, CW1 raised his concern about the increasing margin balance with Stallings on "multiple occasions" in face-to-face meetings at the SemGroup corporate offices.  In addition, CW1 stated that in June 2007, he had several meetings with Cooper (SemGroup's Treasurer) and Stallings during which CW1 raised his concern over the "rising margin balance."

94.     According to statements made at a hearing by SemGroup's counsel to the Bankruptcy Court overseeing SemGroup's Chapter 11 proceedings, Kivisto's trading strategies began to fail and SemGroup became "more and more out of the money on its positions" approximately one year before SemGroup filed bankruptcy.  Through the bankruptcy hearing it was revealed that the trading positions that SemGroup was running on behalf of Westback also started getting "more and more out of the money" at that time.

95.     Continuing into late 2007, oil prices experienced additional price volatility and SemGroup's commodities trading strategy continued to fail.  In spite of the volatility in crude oil prices, Kivisto and his traders did not cut SemGroup's losses.  Instead they decided to "double down" their bets and engaged in further dangerous speculative trading with SemGroup's accounts.

96.     The Examiner's Report states that SemMaterial's President, Frank Panzer, in late 2007 was concerned about SemGroup's liquidity and repeatedly tried to raise his concerns to Defendant Kivisto, who failed to return numerous phone calls from Panzer and when he did have

contact with Panzer, brushed aside the serious nature of the situation by simply telling Panzer "not to worry."

97.     A sworn declaration filed by Terrence Ronan ("Ronan"), SemGroup's current CEO, in support of SemGroup's bankruptcy filings, also indicates that during the twelve months ended December 31, 2007, SemGroup posted *$1.7 billion* "to satisfy margin deposit requirements, a 159% increase over the twelve months ended December 31, 2006." Based upon analysis of the Parent's consolidated financial statements, the Examiner determined that on December 31, 2007, SemGroup had a total mark-to-market liability of $*2.04 billion*, and a mark-to-market liability of *$2.4 billion* from options transactions.

98.     According to the Examiner's Report, Defendant Stallings stated that "going into First Quarter 2008, the price of crude oil continued to increase, which continued to stress SemGroup's liquidity position . . . [and] SemGroup's margin payments and margin calls were becoming the focus of its liquidity problems."

99.     Ronan's declaration similarly indicates that during the three months ended March 31, 2008, the margin balance continued to increase, and SemGroup posted "*$1.96 billion* to satisfy margin deposit requirements, a 115% increase over the three months ended March 31, 2007." Also, on or about March 18, 2008, Kivisto signed an acknowledgement that, as of December 31, 2007, Westback owed SemGroup over *$333 million*, as a result of trades entered into by Eaglwing on behalf of Westback.

100.     Ronan reported to the Examiner that when the "cumulative margin posted had reached approximately $2.5 billion," a series of meetings in which Ronan participated were held with Defendants Kivisto, Wallace, Cooper, Foxx and others, and that everyone was looking to Kivisto to find a way to resolve the fact that SemGroup was in critical condition and was going

to run out of money because of the strain Kivisto's speculative trading losses and related margin calls had put on SemGroup's liquidity.

101.    In his Report, the Examiner concluded that Wallace, Kivisto and Cooper failed to integrate properly the commodities trading function into SemGroup's financial controls. Similarly, the Examiner concluded that Foxx, Wallace and Kivisto, SemGroup's "business leaders," failed to develop or implement a suitable risk management policy into SemGroup's business controls, and they failed to comply with the express Risk Management Policy that did exist.

### 4.    SemGroup's Collapse Into Bankruptcy

102.    By July 2008, the cash margin posted because of shortfalls in SemGroup's aggregate trading positions had increased to $2.3 billion, which was generated from borrowings, asset sales to SGLP and virtually all of the cash generated by SemGroup's operations. Westback's receivable for trading losses also remained outstanding at approximately $290 million, which was more than 10% of SemGroup's trading debts.  In addition, SemGroup's trade position on its OTC account was $850 million negative mark-to-market as of July 17, 2008, as Kivisto's traders had moved some of their trades from NYMEX to an OTC account that had lower margin requirements.  As the Individual Defendants used more and more of SemGroup's liquidity to sustain margin positions with its NYMEX account and counterparties, they stripped SemGroup of all of its cash – $2.4 billion in the aggregate.  According to the Examiner's Report, on July 11, 2008, SemGroup's overall mark-to-market liability for sold options increased to *$4.0 billion*.

103.    As a result of the foregoing, by July 2008, the Individual Defendants no longer were able to create any means to satisfy SemGroup's margin payment requirements.  They caused SemGroup to "ex-pit" or transfer all of its trading positions to Barclays, which assumed

the risk (and upside, if any) of all of the transactions in SemGroup's NYMEX trade book, including the continuing need to post cash collateral for margin payments.  According to the Examiner's Report, when Wallace presented the novation of SemGroup's NYMEX trading book to Barclays to SemGroup's Management Committee, Wallace stated that transferring the book to Barclays (for a fee of $143 million for the assumed risk) would "crystallize" SemGroup's recognized loss at *$2.9 billion*.

104.    The Examiner's Report states that Defendant Ward indicated that SemGroup's colossal transfer of its entire trading book to Barclays was one of the largest novations to ever occur on NYMEX.  Within days, on July 22, 2008, SemGroup filed for bankruptcy.

105.    News reports on the spectacular collapse of SemGroup into bankruptcy have revealed the dangerous nature of SemGroup's speculative trading.   An article published by *Forbes.com* on March 25, 2009, reports on trading data filed in SemGroup's bankruptcy case and states that in February 2008, SemGroup entered into a trade to sell 500,000 barrels of oil for July 2008 delivery, with a strike price of $96 per barrel.  According to the *Forbes.com* article, this one trade generated losses of $51 per barrel, or $25.5 million when oil spiked to $147 per barrel on July 12, 2008.

106.    The *Forbes.com* article, dated March 25, 2009, further states that SemGroup "racked up $2.4 billion in trading losses betting that oil prices would go down."  According to this article, SemGroup's "short positions amounted to the equivalent of 20% of the nation's crude oil inventories."  According to another *Forbes.com* article published on July 28, 2008, "regular hedging apparently wasn't enough to satisfy Kivisto's ambitions for growing SemGroup …This was a company that wanted to grow fast, so they hedged big."  When oil prices spiked in July 2008, Kivisto's and other traders' big bets the wrong way on oil prices triggered a $500

million margin call for which SemGroup was unable to post cash collateral and was left with no other options but to file for bankruptcy protection.

107.     The July 2008 *Forbes.com* article quotes pipeline industry experts as stating that they "are surprised that SemGroup dared to take short positions so far beyond anything the company could cover with physical barrels."  The article also quotes another expert as stating that hedging is no longer hedging, but is speculation "when you have a large open short position and not enough physical barrels to cover your short when the contracts expire."

108.     Defendants failed to disclose SemGroup's trading losses or massive bets on oil prices to SGLP investors.  From its inception, SGLP was used by Defendants as a vehicle to raise capital from the public to pay down SemGroup's mounting trading debts from undisclosed speculative trading in oil futures and options.  Beginning with the IPO in July 2007, Defendants caused SemGroup to enter into a series of complex transactions through which SemGroup and its affiliates sold assets – purportedly valued at hundreds of millions of dollars – to SGLP to raise cash because SemGroup's credit facilities could not accommodate the margin payments associated with its trade book on the NYMEX market and its OTC accounts.

109.     In total, during the Class Period, Defendants caused SGLP to purchase from SemGroup assets valued at over $615 million and caused SGLP to pay to SemGroup consideration of approximately $967 million for the acquired assets.  Indeed, without disclosing the dire nature of SemGroup's margin balance or the dangerous speculative trading of SemGroup, Defendants dropped down assets to SGLP and up-streamed to themselves hundreds of millions of dollars that they raised from public sales of common units in SGLP. Contemporaneously, Defendants saddled SGLP with debt from a credit facility that was secured by substantially all of SGLP's assets. The dropdown to SGLP of assets associated with the IPO

and Secondary Offering also created a complicated dependent business relationship between and among SemGroup, its affiliates and SGLP as the companies shared employees, their physical assets became mingled and SGLP's credit facilities were drained to funnel cash to SemGroup.

110.    Defendants also caused SGLP and SemGroup to enter into several services agreements binding SemGroup as SGLP's only major customer, with express guarantees of over $135 million of guaranteed revenue to SGLP, without disclosing to investors significant risks regarding SemGroup's financial capabilities to fulfill its obligations under the services agreements.  Further, because SemGroup represented over 80% of SGLP's business following the Secondary Offering, SemGroup essentially prevented SGLP from mitigating the risk derived from its Parent by seeking out business form third parties.  Accordingly, any serious disruption in SemGroup's ability to continue as a going concern would – and ultimately did – have a devastating impact on SGLP.

111.    When SemGroup was no longer able to squeeze SGLP for additional cash or borrow funds to raise capital to meet margin calls, SemGroup's business collapsed and took SGLP down with it.

**B.**    **SGLP's July 2007 IPO**

112.    On March 9, 2007, SGLP filed a Registration Statement and Prospectus on Form S-1 with the SEC to register SGLP's common units for sale to the public.  In a series of public filings with the SEC, SGLP's Registration Statement was amended and declared effective by the SEC on July 17, 2007 (collectively, the "IPO Registration Statement").  On July 18, 2007, SGLP filed an additional amendment to the IPO Registration Statement to increase the IPO price per common unit to $22.  Defendants Foxx, Brochetti, Stallings, Kivisto and Wallace signed the IPO Registration Statement.  SGLP's General Partner also signed the Registration Statement, by and

through Defendant Stallings on behalf of SGLP's General Partner in his capacity as the General Partner's Chief Accounting Officer.

113.    The Company's IPO Prospectus also was amended in a series of public filings with the SEC, and Defendants caused SGLP to file a final IPO Prospectus in accordance with Rule 424(b)(4) on July 18, 2007 (the "IPO Prospectus").  The IPO Registration Statement and the IPO Prospectus are collectively referred to herein as the "IPO Documents."

114.    After the IPO Registration Statement became effective, on July 17, 2007, SGLP sold 12,570,504 subordinated and unregistered partnership units (the "Subordinated Units") to SemGroup Holdings.  SGLP also issued 12,500,000 units to SemGroup Holdings, which immediately sold the units to investors, including Lead Plaintiff and other members of the Class. Also, the over-allotment option to the Underwriters was fully subscribed.  Thus, in total, SGLP accomplished an IPO of 14.375 million units at $22 per unit (including 1.875 million units due to an overallotment) for proceeds of $316.3 million, pursuant to the IPO Documents.

115.    According to the IPO Documents, SGLP intended to use the proceeds from the IPO to acquire certain crude oil assets transferred to SGLP from its Parent (the "Transferred Assets").  To effectuate this purchase, the IPO Documents reported that, at the close of the offering, the following transactions would occur:

- SemGroup Holdings will transfer the Crude Oil Business to [SGLP];

- [SGLP] will issue to SemGroup Holdings 12,500,000 common units and 12,570,504 subordinated units;

- [SGLP] will issue to our general partner, SemGroup Energy Partners G.P., L.L.C., a wholly owned subsidiary of SemGroup Holdings, 511,643 general partner units representing its initial 2% general partner interest in us, and all of our incentive distribution rights, which incentive distribution rights will entitle our general partner to increasing percentages of the cash we distribute in excess of $0.3594 per unit per quarter;

- [SGLP] will borrow $137.5 million under our new $250.0 million five−year credit facility and distribute the proceeds to SemGroup Holdings;

- [SGLP] will enter into the Throughput Agreement pursuant to which we will provide certain gathering, transportation, terminalling and storage services to our Parent in exchange for contracted fees; and

- [SGLP] will enter into the Omnibus Agreement with our Parent and our general partner which will address, among other things, the provision of, and the reimbursement for, general and administrative and operating services and indemnification matters.

116.     Other than the net proceeds from the Underwriters Defendants' exercise of their over-allotment option, all of the net the proceeds from the IPO went to SemGroup Holdings, which provided these proceeds to its sole limited partner and Parent, SemGroup. SemGroup had formed SemGroup Holdings in July 2007 as a holding company to hold SemGroup's investment in SGLP. Subsequent to the IPO, the common units offered to the public represented an aggregate 52.3% limited partner interest in SGLP, while SemGroup retained the remaining interest through its 100% ownership interest in the General Partner and the Subordinated Units, which continued to be held by SemGroup Holdings.

117.     The underwriters for the IPO were: Citigroup, Merrill Lynch, Lehman, Raymond James, RBC, Wachovia, A.G. Edwards, SMH Capital and BOSC. Citigroup and Merrill Lynch served as joint bookrunning managers of the IPO, and collectively the Underwriter Defendants involved in the IPO received $19.36 million in fees and commissions for underwriting the IPO.

118.     In the first day of trading, SGLP's units rose to over $30 per unit and closed at $29.32 per common unit on July 18, 2007, which was a one-day 33% increase over its IPO price of $22 per common unit.

119.    Further in connection with the IPO, SGLP entered into a 5-year credit facility with various bank lenders and immediately borrowed $137.5 million under the credit facility and distributed it to SemGroup Holdings, as required under the terms of the IPO and related transactions.  SemGroup Holdings also immediately transferred these proceeds to its Parent, SemGroup.  SGLP's obligations under the credit facility were secured by all of the Company's assets.

120.    SGLP's partnership agreement, which was attached to the IPO Registration Statement, required SGLP to distribute all of its available cash (less established reserves) at the end of each quarter to unit holders via quarterly distributions.  In the IPO Registration Statement, SGLP stated that it expected to make an initial quarterly distribution of $0.3125 per common unit ($1.25 per common unit on an annualized basis) to the extent that the Company had sufficient cash from operations.

121.    After the IPO, at all relevant times, SGLP was managed by the executive managers of the General Partner, who also were executive managers of SemGroup.  Also, SGLP never had any employees, and instead, SGLP shared personnel with SemGroup.  All of the executive managers of the General Partner had knowledge of SemGroup's business operations, including its speculative trading strategy, and critical, growing margin balance.

122.    In connection with the IPO, SGLP entered into a Throughput Agreement with SemGroup, which required SGLP to provide crude oil gathering, transportation, terminalling and storage services for SemGroup and committed SemGroup to minimum monthly volume requirements.  Regardless of the volume actually used by SemGroup in a given month, SemGroup was obligated to pay SGLP minimum monthly fees of $6.4 million, totaling $76.8 million annually.  The Throughput Agreement was attached to the IPO Registration Statement.

123.     Prior to the dropdown of transferred crude oil assets at the close of the IPO, less than 20% of SemGroup's revenues from these assets were generated by third-party transactions. For the year ending December 31, 2006 and the quarter ending March 31, 2007, SemGroup and intercompany-affiliated transactions represented approximately 82.5% and 82.4%, respectively, of revenues generated from operation of the transferred assets.

124.     In light of SGLP's parasitic dependency on its Parent, Defendants were obligated to disclose in the IPO Documents SemGroup's speculative trading and SemGroup's inability to effectively manage risks arising from the speculative trading.  Defendants also were obligated to disclose that SemGroup's trading strategy went well beyond merely managing risks and hedging against crude oil supplies and pricing.  Defendants further had a duty to disclose that Kivisto's and SemGroup's trading strategy had begun to fail and that the Parent was in desperate need of additional cash to post as collateral for its trading positions, jeopardizing SGLP's vitality.

### C.      Materially False Statements and Omissions in the IPO Offering Documents

125.     The IPO Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts and omitted material facts regarding the negative impact that SemGroup's undisclosed speculative trading and increased margin requirements had on SemGroup's liquidity position.  SemGroup's resulting inability to cover sufficient margin calls also rendered SemGroup unable to continue as a going concern and unable to meet its obligations to SGLP, which Defendants negligently represented were contractually guaranteed in the IPO Documents.

126.     The IPO Documents made numerous untrue statements and disclosures with material omissions regarding SGLP's relationship with the Parent and the benefits of SGLP's position as the publicly-traded arm of SemGroup.  Specifically, the IPO Documents contained

statements highlighting SemGroup's business and success, without disclosing the true nature of

SemGroup's speculative trading operations and impaired liquidity position, as follows:

> Our Parent has a significant asset base consisting primarily of pipelines, gathering systems, processing plants, storage facilities, terminals and other distribution facilities located between North American production and supply areas including the Gulf Coast and Mid-Continent regions of the United States and the province of Alberta, Canada and high demand regions such as the Midwest.
>
> Since our Parent's inception in April 2000 through March 31, 2007, our Parent has completed 47 acquisitions at an aggregate purchase price of approximately $978 million, excluding amounts paid for working capital. Our Parent has indicated that it intends to use us as a growth vehicle to pursue the acquisition and expansion of midstream energy businesses and assets. Our Parent believes that by contributing crude oil gathering, transportation, terminalling and storage operations to a publicly traded partnership, these operations will have a greater value and a lower cost of capital than could be obtained by operating the assets in a separate business segment of our Parent. As a publicly traded limited partnership, we will have greater liquidity, which we believe will enhance our valuation. In addition, as a publicly traded partnership, we will have the ability not only to access the public capital markets (which we believe will enable us to have lower overall capital cost than available in private markets resulting in a lower cost of capital and funding costs) but also to use our units as consideration for potential future acquisitions.

127.    Profitable operation of the crude oil businesses generated by the transferred assets

was dependent upon SemGroup's continuing operations, which were uncertain and subject to

undisclosed liquidity risks from speculative trading.  With no mention of the true nature of

SemGroup's commodities trading or related risks to the enterprise, the IPO Documents contained

statements discussing SGLP's Throughput Agreement with SemGroup, highlighting the benefits

and guaranteed revenue stream therefrom, as follows:

> Prior to the closing of this offering, we will enter into the Throughput Agreement pursuant to which we will provide crude oil gathering, transportation, terminalling and storage services to our Parent. Our Parent will pay us a fee based on the number of barrels of crude oil we gather, transport, terminal or store on behalf of ***our Parent and will commit to utilize our services at a level that will provide us with minimum revenues of $6.4 million per month.*** We intend to acquire and construct a significant amount of

additional midstream energy assets, including acquisitions from our Parent and jointly with our Parent.

*      *      *

We derive a ***substantial majority of our revenues from services provided to the crude oil purchasing, marketing and distribution operations of our Parent pursuant to the Throughput Agreement.  For the year ended December 31, 2006 and the three months ended March 31, 2007, our Parent represented approximately 82.5% and 82.4%, respectively, of our pro forma revenues and third parties accounted for the remainder***.  Our Parent's crude oil purchasing, marketing and distribution operations are substantially dependent on our services and assets.  The Throughput Agreement has an initial term of seven years with additional automatic one-year renewals unless either party terminates the agreement upon prior notice.  ***Our Parent will pay us a fee based on the number of barrels we gather, transport, terminal or store on behalf of our Parent and will commit to utilize our services at a level that will provide us with minimum revenues of $6.4 million per month, which we expect to be sufficient to initially pay nearly all of the minimum quarterly distribution on our common units but no distribution on our subordinated units.***  Our Parent will be obligated to pay us fees in respect of this minimum commitment, regardless of whether such services are actually utilized by our Parent.

*      *      *

We believe we are well positioned to successfully achieve our primary business objectives and execute our business strategies based on the following competitive strengths:  Stable, fee-based, contracted cash flows.  We believe our fee structure enhances our ability to generate stable and predictable cash flows. (emphasis added).

128.     The IPO Documents also contained statements highlighting the "significance and versatility" of SGLP's Cushing terminal storage facilities, as well as its relationship with its Parent, as competitive strengths that would enable SGLP to expand its storage capacity and operations, including, in relevant part:

We believe that the ability of our systems to transport crude oil to multiple end points, particularly the Cushing Interchange, creates increased demand for our systems, which will in turn result in increased volumes through our systems by allowing our customers, including our Parent, the flexibility to more effectively manage their marketing of crude oil and thereby increase their profitability….

- 47 -

*Relationship with our Parent*. We expect that our relationship with our Parent will provide us with significant business opportunities. … Our Parent has indicated that it intends to use us as a growth vehicle to pursue the acquisition and expansion of midstream energy businesses and assets. (emphasis added).

129.   The IPO Documents also contained statements setting forth SGLP's "primary business objectives," representing that SGLP sought to "maintain stable cashflows and *to increase distributable cash flow per unit over time by becoming a leading provider of midstream services to the energy industry*." Further, the IPO Documents contained statements indicating that SGLP's ability to leverage its relationship with SemGroup would be instrumental in the success and growth of the Company and in its ability to generate stable cashflows, as follows:

Our relationship with our Parent provides us access to its extensive pool of operational and commercial expertise. We intend to pursue acquisition opportunities as well as organic growth opportunities with our Parent. *For example, as is frequently the case in the energy industry, potential acquisition opportunities may have an element of commodity price risk inherent in their pre-acquisition operations. We expect to be able to pursue such acquisitions jointly with our Parent in a manner that minimizes the direct commodity price exposure to us. In these circumstances, our Parent or one of its affiliates may retain the portion of the acquired business that has direct commodity price exposure and thereby assume most or all of the direct commodity price exposure inherent in the acquired business and incorporate these risks into its overall distribution and marketing operations. We could retain assets and the other portions of the acquired business that do not have direct commodity price exposure. As a result of our affiliation with our Parent, we believe we will be able to aggressively pursue acquisitions that otherwise would not be attractive to us or other midstream service providers because of the commodity price risk inherent in the acquired business' operations.* (Emphasis added.)

130.   Similarly, the IPO Documents also contained statements representing that SGLP's $250 million credit facility provided SGLP with extensive financial flexibility and borrowing capacities to facilitate lucrative opportunities for future acquisitions. Specifically, the IPO Documents stated:

Prior to the closing of this offering, we will enter into a new $250.0 million five-year credit facility pursuant to which we will have approximately $112.5 million of borrowing capacity available for general partnership purposes. We

believe the available capacity under this new facility combined with our ability to access the capital markets should provide us with a flexible financial structure that will facilitate our organic expansion and acquisition strategy.

131.    The IPO Documents also contained statements representing that, as a result of its relationship with its Parent, SGLP had ***minimal direct exposure to commodity price fluctuations*** and ***minimal exposure*** to changes in crude oil prices, despite its active crude oil storage and transportation business.  Specifically, the IPO Documents stated:

> ***We do not take title to, or marketing responsibility for, the crude oil that we gather, transport, terminal and store.  As a result, our operations have minimal direct exposure to changes in crude oil prices, but the volumes of crude oil we gather, transport, terminal or store are indirectly affected by commodity prices.*** (Emphasis added.)

132.    In light of SGLP's dependency on its Parent, Defendants were obligated to disclose in the IPO Documents SemGroup's speculative trading and SemGroup's inability to effectively manage risks arising from the speculative trading.  Defendants also were obligated to disclose that SemGroup's trading strategy went well beyond merely managing risks and hedging against crude oil supplies and pricing.  Defendants further had a duty to disclose that Kivisto's and SemGroup's trading strategy had begun to fail and that the Parent was in desperate need of additional cash to post as collateral for its trading positions.  SemGroup's increasing margin balance and lack of liquidity created known (but undisclosed) disabling conflicts of interest for the common executive managers of SGLP and SemGroup.

133.    Defendants negligently breached their duties to disclose the true nature of SemGroup's business and that investors in SGLP were investing in a high-risk gambling enterprise, with virtually unlimited exposure to increasing commodities prices, instead of a stable energy company that was well-hedged against exposure to commodities price and supply volatility as Defendants had represented.

134.    The foregoing statements were also materially untrue and misleading because, at the time of the IPO, SemGroup's liquidity was impaired and Kivisto had caused SemGroup to engage in speculative commodities trading that was draining billions of dollars of cash from the SemGroup's operations.  Kivisto and his traders bet the proverbial farm on short positions in crude oil (betting that prices would fall) when crude oil prices were rising and reached unprecedented levels.  SemGroup exacerbated its liquidity problems by trying to avoid recognizing a loss on expiring options by selling additional options and rolling forward (instead of eliminating) speculative trading positions to delay recognizing losses, which increased SemGroup's margin balance to support the speculative trades as set forth above.

135.    Defendants also failed to disclose that Kivisto was engaging in speculative trading through SemGroup's accounts on behalf of himself and affiliated third parties and thereby further exposing SemGroup to margin calls.

136.    The cascading effect of SemGroup's high-risk speculative trading on SGLP was material information that directly impacted all aspects of SGLP's business and operations, and was necessary to make statements in the Company's IPO Offering Documents not misleading at the time of the IPO because:

(1) The cash drain from margin calls associated with Kivisto's and SemGroup's speculative trading business, which violated SemGroup's lending agreements, imposed a serious undisclosed risk to the overall liquidity of SemGroup and made the operation of the Parent's business "extremely difficult;"

(2) Kivisto's speculative trading strategy created an extreme risk to SemGroup's liquidity and its ability to meet the Parent's guarantees and obligations under the Throughput Agreement;

(3) Kivisto's and SemGroup's speculative trading created an undisclosed risk to SGLP investors because absent revenues from the Parent's guarantees and obligations under the Throughput Agreement, SGLP would not be able to pay quarterly distributions to unit holders;

(4) Defendants failed to disclose that SemGroup was transferring assets to SGLP to raise cash for margin calls because SemGroup's credit facilities could not accommodate the capital needs associated with its trade book on the NYMEX market and its OTC account, and the money Defendants raised from SGLP through the IPO was used to pay debts from margin calls; and

(5) Although generic risk factors were disclosed, stating that SemGroup might be unable to pay SGLP for the amounts guaranteed under the Throughput Agreement, because SemGroup represented a 88% customer and SGLP had no separate management or employees from SemGroup, Defendants essentially precluded SGLP from mitigating the risks of its relationship with SemGroup (by finding third-party customers or otherwise) and failed to disclose the significant risks associated with SemGroup's trading business, while contemporaneously using all of the resources of SGLP.

137.    The IPO Offering Documents also contained statements highlighting SGLP's "experienced management team" and the benefits SGLP derived from the fact that its management team overlapped that of its Parent, including SemGroup's "strong relationships" in the energy industry and SemGroup's executives' expertise at managing the many facets of the demanding energy business.  Specifically, the IPO Offering Documents state, in relevant part:

> ***Our Parent has an experienced and knowledgeable executive management team with an average of more than 20 years' experience in the energy industry who collectively owns an approximate 30.5% interest in our Parent.  We expect to directly benefit from this management team's strengths.  The management team has significant experience in the implementation of acquisition, operating and growth strategies in many facets of the energy industry, specifically including crude oil marketing, gathering, transportation, terminalling and storage and other midstream businesses. In addition, the management team has established strong relationships throughout the energy industry with producers, marketers and refiners of crude oil in the United States, which we believe will be beneficial to us in pursuing our own acquisition and organic expansion opportunities.*** (Emphasis added.)

138.    In reality, members of the Parent's management were engaged in improper self-dealing; Defendants Kivisto and Wallace caused SemGroup to pay them bonuses of approximately $47.7 and $26 million, respectively, without the approval of the Parent's Management Committee.  Further, at the time of the IPO, Kivisto was stubbornly adhering to a dangerous undisclosed trading operation for his personal benefit with SemGroup funds borrowed

from bank credit facilities.   Moreover, Kivisto surreptitiously placed some of these trades through Westback using SemGroup cash, which ultimately caused $290 million in recognized losses for the Parent and precipitated its bankruptcy.

139.   The IPO Documents also contained the following inadequate risk disclosures:

- "We depend upon our Parent for a substantial majority of our revenues, and any reduction in these revenues would have a material adverse effect on our results of operations and our ability to make distributions to our unitholders."

- "We are exposed to the credit risk of our Parent and any material nonperformance by our Parent could reduce our ability to make distributions to our unitholders."

- "Our Parent's obligations under the Throughput Agreement may be reduced or suspended in some circumstances, which would reduce our ability to make distributions to our unitholders."

140.   The IPO Documents offered, however, only two circumstances that could result in a reduction or suspension of its Parent's obligations under the Throughput Agreement: (1) a disagreement over the payment of capital expenditures incurred at SGLP's facilities as a result of new laws or regulations; or (2) a force majeure.

141.   The IPO Documents also contained the following insufficient disclosures regarding SGLP's *indirect* exposure to the business risks of its Parent:

Because we will utilize a substantial majority of the operating capacity of our existing assets to provide services to our Parent pursuant to the Throughput Agreement, we do not expect to materially increase our revenues from third-party customers in the near term unless we undertake significant acquisition or construction projects. Therefore, we expect our dependence on our Parent for a substantial majority of our revenues to continue.  If our Parent is unable to make to us the payments required by it under the Throughput Agreement for any reason, our revenues would decline and our ability to make distributions to our unitholders would be reduced. Therefore, we are indirectly subject to the business risks of our Parent, many of which are similar to the business risks we face.  In particular, these business risks include the following:

- The inability of our Parent to generate adequate gross margins from the purchase, transportation, storage and marketing of petroleum products;

- Material reductions in the supply of crude oil and petroleum products;

- A material decrease in the demand for crude oil and petroleum products in the markets served by our Parent;

- The inability of our Parent to manage its commodity price risk resulting from its ownership of crude oil and petroleum products;

- Contract non-performance by our Parent's customer; and

- Various operational risks to which our Parent's business is subject.

142.    The foregoing boilerplate warnings, despite their intended nature, were misleading at the time they were made because they omitted material information that SGLP's Parent was already engaged in an unauthorized, speculative trading strategy that substantially jeopardized the Company's "contractually guaranteed" stable revenue stream and financial condition.   Such omitted information was required to be disclosed in order to render the risk disclosures adequate and not misleading.

143.    Similarly, the IPO Documents insufficiently warned that SGLP's unit holders could lose confidence in SGLP's financial reporting if its "general partner fails to develop or maintain an effective system of internal controls" stating, in relevant part:

> SemGroup Energy Partners G.P., L.L.C., our general partner, has sole responsibility for conducting our business and for managing our operations. Effective internal controls are necessary for our general partner, on our behalf, to provide reliable financial reports, prevent fraud and operate us successfully as a public company.   If our general partner's efforts to develop and maintain its internal controls are not successful, it is unable to maintain adequate controls over our financial processes and reporting in the future or it is unable to assist us in complying with our obligations under Section 404 of the Sarbanes-Oxley Act of 2002, our operating results could be harmed or we may fail to meet our reporting obligations.   Ineffective internal controls also could cause investors to lose confidence in our reported financial information, which would likely have a negative effect on the trading price of our common units.

144.    The foregoing statements were materially false or misleading at the time they were made because the Company's General Partner and Parent had failed to develop or maintain an effective system of internal controls.   The General Partner and SGLP did not have any employees or business of its own.   They were controlled by SemGroup.   SemGroup's internal

controls, itself, were severely deficient, as SemGroup and all members of its Management Committee, which operated as its Board of Directors, negligently allowed Kivisto to engage in dangerous, speculative trading that generated billions of dollars in margin calls and impaired SemGroup's liquidity.  Also, SemGroup and the Individual Defendants and other members of the Mangement Committee failed to implement any risk controls that precluded Kivisto from trading for his own personal benefit through the Westback account, using hundreds of millions of dollars of SemGroup money, with no valid business purpose.

145.    The IPO Documents also contained the following misleading statements regarding SGLP's partnership structure and management, and the potential conflicts of interest such structure potentially posed:

> Semgroup Energy Partners G.P., L.L.C., our general partner, manages our operations and activities, and its board of directors and officers make decisions on our behalf.  All of the executive officers and some of the directors of our general partner also serve as executive officers or directors of our Parent.
>
> *      *      *
>
> Our general partner has a legal duty to manage us in a manner beneficial to our unitholders.  …  However, because our general partner is owned by our Parent, the officers and directors of our general partner also have fiduciary duties to manage our general partner in a manner beneficial to our Parent.  As a result of this relationship, conflicts of interest may arise in the future between us and our unitholders, on the one hand, and our general partner and its affiliates on the other hand.

146.    The foregoing statements were untrue and omitted material information at the time that they were made because Defendants failed to disclose that SemGroup's executives, including Defendants Kivisto, Wallace, Cooper, Foxx and others, who effectively controlled SGLP, were causing and allowing SemGroup to engage in undisclosed, high-risk speculative trading strategies that dangerously exposed SemGroup and SGLP to virtually unlimited exposure to commodities trading losses, contrary to the interests of SGLP and its unit holders.

147.    Defendants further negligently failed to disclose that the Individual Defendants, Carlyle/Riverstone, Ritchie and others received distribution payments from the IPO totaling more than $76 million.

### D.    SGLP's Secondary Offering

148.    Seven months after the IPO, SGLP issued a press release on January 14, 2008, stating that it had agreed to acquire 46 U.S. liquid asphalt cement and residual fuel oil terminalling and storage facilities from SemMaterials, L.P. ("SemMaterials"), a subsidiary of SemGroup for $378.8 million.

149.    The acquisition, to be financed through a combination of equity and debt under an amendment to SGLP's credit facility, was portrayed as being beneficial to SGLP.  Specifically, SGLP boasted that it was entering into a related terminalling and storage agreement (the "Terminalling Agreement") with SemMaterials that would provide SGLP with minimum fee-based annual revenues of approximately $60 million.  In addition, the Company stated that following the acquisition, SGLP's management intended to recommend to the Board of Directors of SGLP's General Partner an increase in the annual cash distribution rate to unit holders of approximately $0.40 to $0.50 per unit which was a 32 to 40 percent increase over the annualized rate of $1.25 per unit.

150.    In reality, the transaction was merely a desperate attempt by SemGroup to place a band-aid on its mounting and gaping liquidity problems.

151.    On January 18, 2008, after the close of trading, SGLP announced that it had filed a Registration Statement for a public offering of 6 million of its common units to raise money to consummate the SemMaterials transaction.  SGLP stated that a substantial portion of its revenues from the assets acquired from SemMaterials would be derived from services provided to the finished asphalt product processing and marketing operations of SemGroup.  The Company also

specified that its agreement with SemMaterials executed in connection with the asphalt facilities acquisition obligated SemGroup to pay SGLP minimum monthly fees totaling $58.9 million annually for its liquid asphalt cement terminalling and storage services.

152.     After its Registration Statement became effective on February 13, 2008, SGLP accomplished a Secondary Offering of 6.9 million common units at $23.90 per common unit for gross proceeds of $164,910,000 ($158.3 million net, after deducting underwriting discounts, but before expenses), including the full exercise of a 900,000 common unit over-allotment by the Underwriter Defendants.  The Secondary Offering was effectuated pursuant to a Registration Statement and Prospectus filed with the SEC on Form S-1 on January 18, 2008, as amended on February 12, 2008 (the "Secondary Offering Registration Statement"), as well as a Prospectus filed with the SEC on Form 424(b)(4) on February 14, 2008 (the "Secondary Offering Prospectus").  The Secondary Offering Registration Statement and the Secondary Offering Prospectus are collectively referred to as the "Secondary Offering Documents."

153.     Defendants Foxx, Brochetti, Stallings, Kivisto, Wallace and Bishop signed the Secondary Offering Registration Statement.  SGLP's General Partner also signed the Secondary Offering Registration Statement, by and through Defendant Stallings on behalf of SGLP's General Partner in his capacity as the General Partner's Chief Accounting Officer.

154.     According to the Second Offering Documents, SGLP intended to use the proceeds from the Secondary Offering to acquire certain liquid asphalt assets from its Parent (the "Acquired Asphalt Assets").  To effectuate this purchase, the Secondary Offering Documents reported that, at the close of the Secondary Offering, the following transactions would occur:

- [SGLP] will issue 6,000,000 common units to the public, representing a 17.8% limited partner interest in [SGLP];

- [SGLP] will receive a $2.9 million capital contribution by our general partner to maintain its 2.0% general partner interest in [SGLP];

- [SGLP] will borrow approximately $241.2 million under our credit facility, which will be amended at the closing of this offering to increase our total borrowing capacity to $600 million; and

- [SGLP] will use the net proceeds from this offering, together with our general partner's capital contribution and borrowings under our amended credit facility, to pay expenses associated with this offering and the amendment of our credit facility and to pay consideration of approximately $378.8 million to our Parent to purchase the Acquired Assets."

155.    Similar to the proceeds of the IPO, the proceeds of the Secondary Offering, other than net proceeds received from the exercise of the Underwriter Defendants' over-allotment option, were paid upstream to SGLP's Parent to repay unspecified outstanding indebtedness.

156.    The underwriters for the Secondary Offering were: Citigroup, Lehman, Merrill Lynch, UBS, J.P. Morgan, Raymond James, RBC, Wachovia, SMH Capital and Goldman Sachs. Citigroup and Lehman served as joint bookrunning managers of the Secondary Offering, and collectively the Underwriter Defendants involved in the Secondary Offering received $6.8 million in fees and commissions for underwriting the Secondary Offering.

157.    In connection with the Secondary Offering, SGLP amended its credit facility with its bank lenders to increase the total borrowing capacity to $600 million.  SGLP immediately borrowed $238 million under the credit facility to partially finance the $378.8 million acquisition of the Acquired Asphalt Assets and distributed it to SemGroup, as required under the terms of the Secondary Offering and related transactions.  SGLP's obligations under the amended credit facility were secured by all of the Company's assets.

158.    Further in connection with the Secondary Offering, SGLP entered into the Terminalling Agreement with SemMaterials.  The Terminalling Agreement committed SGLP to provide SemMaterials with terminalling and storage services for liquid asphalt services and

committed SemGroup to pay SGLP minimum monthly fees totaling $58.9 million annually, regardless of the volume actually used by SemMaterials.  In connection with the SemMaterials transaction for the Acquired Asphalt Assets, SGLP was required to enter into a non-compete agreement with SemMaterials and was allowed to contract with other customers only for services in excess of its minimum commitments to SemMaterials.  Under the terms of the Secondary Offering, SGLP was required to reserve 5 million of its total 6.6 million storage capacity for SemMaterials; thus, SGLP's revenue from the Acquired Asphalt Assets was extremely dependent upon SemMaterials fulfilling its obligations under the Terminalling Agreement.  The Terminalling Agreement was attached to the Secondary Offering Documents.

### E.    Materially False Statements and Omissions in the Secondary Offering Documents

159.    The Secondary Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts and omitted material facts regarding the negative impact that SemGroup's undisclosed speculative trading and increased margin requirements had on SemGroup's liquidity position and its consequent impact on the vitality of SGLP. Specifically, SemGroup's inability to cover sufficient margin calls also rendered SemGroup unable to continue as a going concern and unable to meet its obligations to SGLP, which Defendants negligently represented were "*guaranteed*" in the Secondary Offering Documents.

160.    As in the IPO, the Secondary Offering Documents contained untrue or misleading statements regarding the guaranteed stream of $76.1 million annual revenues that SGLP derived from its Parent under the Throughput Agreement, substantially similar to those set forth above at ¶127.

161.    The Secondary Offering Documents also contained untrue or misleading statements regarding the dropdown of assets from its Parent that would occur concurrently with

the Secondary Offering pursuant to the Terminalling Agreement and the additional stream of

guaranteed revenues SGLP would derive therefrom stating, in relevant part:

> … we will acquire substantially all of our Parent's domestic owned liquid asphalt cement terminalling and storage assets for a purchase price of $378.8 million concurrently with the closing of this offering. We believe this acquisition will increase the scope and scale of our operations, provide geographic diversity to our business and position us to pursue future growth opportunities.… The Acquired Assets (as defined below) that we will purchase concurrently with the closing of this offering represent approximately $130 million of this amount. In connection with our acquisition of the Acquired Assets, we will enter into a terminalling and storage agreement with our Parent, which we refer to as the Terminalling Agreement. Pursuant to the Terminalling Agreement, our Parent will pay us a fee based on the number of barrels of liquid asphalt cement we terminal or store on behalf of our Parent and will commit to utilize our services at a level that will provide us with minimum monthly fees totaling $58.9 million annually. Our Parent will be obligated to pay us fees in respect of this minimum commitment, regardless of whether such services are actually utilized by our Parent.

162.    In addition, as in the IPO, the Secondary Offering Documents contained untrue or

misleading statements touting the Company's ability to leverage its relationship with its Parent to

minimize exposure to commodity price risk as a key business strategy, stating, in relevant part:

> As is frequently the case in the energy industry, potential acquisition opportunities have an element of commodity price risk inherent in their pre-acquisition operations. We expect to be able to pursue such acquisitions jointly with our Parent in a manner that minimizes the direct commodity price exposure to us. In these circumstances, our Parent or one of its affiliates may retain the portion of the acquired business that has direct commodity price exposure and thereby assume most or all of the direct commodity price exposure inherent in the acquired business and incorporate these risks into its overall distribution and marketing operations. We could retain assets and the other portions of the acquired business that do not have direct commodity price exposure. As a result of our affiliation with our Parent, we believe we will be able to aggressively pursue acquisitions that otherwise would not be attractive to us or other midstream service providers because of the commodity price risk inherent in the acquired business' operations.

> *        *        *

> We will not take title to, or marketing responsibility for, the liquid asphalt cement that we will terminal and store. As a result, our liquid asphalt cement terminalling and storage operations will have minimal direct exposure to changes in commodity prices, but the volumes of liquid asphalt cement we will terminal or store will be indirectly affected by commodity prices.

163.   The Secondary Offering Documents also contained untrue or misleading statements describing purported key strategic benefits that the Acquired Asphalt Assets would provide to SGLP, including that "[t]he acquisition will enhance our ability to generate stable and predictable cash flows and broaden our service capabilities consistent with our business strategies" and that "the acquisition will increase the scale of our operations as well as expand and diversify the geographic markets and the lines of business in which we operate."

164.   Similarly, the Secondary Offering Documents contained untrue or misleading statements describing the purported "stable, fee-based, contracted cash flows" SGLP generated through the Throughput and Terminalling Agreements with its Parent as a competitive strength, stating, in relevant part:

> We believe our fee structure enhances our ability to generate stable and predictable cash flows.  Pursuant to the Throughput Agreement and the Terminalling Agreement, our Parent has committed to services at a level that will provide us with minimum monthly fees totaling $135.0 million annually.  Our operations have minimal direct exposure to commodity price fluctuations because we do not own or take title to any of the crude oil or liquid asphalt cement that we gather, transport, terminal or store in these operations, but the volumes of crude oil or liquid asphalt cement we gather, transport, terminal or store are indirectly affected by commodity prices.

165.   The Secondary Offering Documents also contained untrue or misleading statements claiming that the following "Competitive Strengths," among others, positioned SGLP well "to successfully achieve [its] primary business objectives and execute [its] business strategies":

- following this offering, substantially all of our operations will generate fee-based revenues, including contracted minimum revenues under the Throughput Agreement and the Terminalling Agreement;

- our relationship with our Parent enhances our ability to make strategic acquisitions and to access other business opportunities;

- we will have the financial flexibility through the available capacity under our amended credit facility and our ability to access the capital markets to pursue expansion and acquisition opportunities; and

- our Parent has a knowledgeable management team with significant experience in the energy industry and in executing acquisition and expansion strategies.

166.    In the Secondary Offering Documents, SGLP represented no less than four times that its Parent was obligated to pay SGLP minimum monthly fees totaling $76.1 million annually in respect of the minimum commitments under the Throughput Agreement, and $58.9 million annually in respect of the minimum commitments under the Terminalling Agreement, regardless of whether such services were actually used by the Parent.  This picture of financial stability created by the Secondary Offering Documents, however, presented a false picture of SemGroup's financial condition and prospects and omitted material information that would have alerted investors to, among other things, the following:

(1) SemGroup was engaged in an extremely risky, speculative trading strategy that had begun to fail and created an undisclosed risk to SemGroup's liquidity and its ability to meet its guarantees and obligations under the Throughput and Terminalling Agreements;

(2) SemGroup was increasingly required to post cash collateral to cover its short positions, which it was rolling forward during the Class Period to avoid recognizing losses and draining its capital position, and the money Defendants raised from SGLP through the Secondary Offering was used to pay debts from margin calls;

(3) the cash drain from margin calls associated with Kivisto's and SemGroup's speculative trading practices imposed a serious undisclosed risk to the overall liquidity of SemGroup which made the operation of the Parent's business "extremely difficult;"

(4) the Parent was exposed to commodity price volatility from massive commodities trading that was not tied to or resulting from its ownership of crude oil, liquid asphalt or other commodities;

(5) SemGroup's exposure to commodity price fluctuations arising from its undisclosed speculative trading directly impacted SemGroup and all facets of SGLP's business and operations and also exposed SGLP to commodity price

risk, as a result, the Parent's future liquidity and ability to survive as a going concern was in serious jeopardy; and

(6) SemGroup's impaired liquidity, breach of financial covenants and high-risk trading operations seriously reduced SGLP's ability to make distributions to unit holders.

167.   Indeed, in light of SGLP's dependency on its Parent, and its concomitant exposure to its Parent's speculative trading practices, commodity price risk and liquidity issues, Defendants were obligated to disclose in the Secondary Offering Documents, *inter alia*, that: (1) SGLP's Parent was engaged in an undisclosed speculative trading strategy that that went well beyond merely managing risks and hedging against crude oil supplies and pricing and rendered the likelihood of stable, consistent revenues from its Parent highly unpredictable; (2) despite the fact that SLGP did not take title to or marketing responsibility for the crude oil or liquid asphalt cement assets it would terminal and store for its Parent, it was still highly exposed to commodity price fluctuation because of its heavy dependence upon its Parent for revenues, and Kivisto's undisclosed speculative hedging strategy; (3) Kivisto's and SemGroup's trading strategy had begun to fail and SGLP's ability to grow and, indeed, to survive, became seriously hampered by its Parent's wildly speculative bets on oil prices; and (4) the Parent was in desperate need of additional cash to post as collateral for its trading positions, which adversely impacted its ability to satisfy its obligations to SGLP under the Throughput and Terminalling Agreements.

168.   Defendants negligently breached their duties to disclose the true nature of SemGroup's business and liquidity problems, and that investors in SGLP were investing in a high-risk gambling enterprise with virtually unlimited exposure to increasing oil prices, instead of a stable energy company that was well-hedged against exposure to commodities price risk and supply volatility as the Secondary Offering Documents otherwise indicated.

169.    Defendants further negligently failed to disclose that the Individual Defendants, Carlyle/Riverstone, Ritchie and others received distribution payments from the Secondary Offering totaling more than $85 million.

170.    The Secondary Offering Documents also contained the following statements that were substantially similar to those set forth in the IPO Documents:

a.    a general warning that SGLP's partnership structure and management, may pose potential conflicts of interest, all-the-while touting the benefits of being led by some of the same members of SemGroup's "experienced" management team (¶¶137,145);

b.    a general warning of SGLP's dependence on its Parent for revenues and its attendant exposure to the business risks of its Parent, including its Parent's credit risk and inability to manage commodity price risk, and that its Parent's obligations under the Throughput and Terminalling Agreements may be reduced or suspended in certain circumstances and of the potential impact of the resultant reduction in revenues to SGLP (¶139, 141);

c.    a general warning of the adverse effect of SGLP's general partner failing to develop or maintain an effective system of internal controls (¶143);

171.    These foregoing boilerplate warnings were materially untrue or misleading for the reasons set forth above in ¶¶138, 140, 142, 144, 146 and 166-67.

172.    The Secondary Offering Documents also discussed the Company's credit facility and the impact of an event of default under the terms of its credit agreement.  Specifically, the Secondary Offering Documents stated:

If an event of default exists under the credit agreement, the lenders will be able to accelerate the maturity of the credit agreement and exercise other rights and

remedies.  Each of the following could be an event of default under the credit agreement:

- failure to pay any principal when due or any interest or fees within three business days of the due date;

- failure to perform or otherwise comply with the covenants in the credit agreement;

- failure of any representation or warranty to be true and correct in any material respect;

- failure to pay debt;

- a change of control of us or our Parent; and

- other customary defaults, including specified bankruptcy or insolvency events, the Employee Retirement Income Security Act of 1974, or ERISA, violations, and material judgment defaults.

173.    The foregoing statements were materially untrue or misleading, however, for the reasons set forth above at ¶¶ 109-110, 136, 138, 142 and 166-67.  Further, Defendants failed to disclose that Kivisto's trading business had impaired the liquidity of SemGroup at the time of the Secondary Offering and that proceeds of the Secondary Offering (and borrowings under SGLP's credit facility) were being used to pay down SemGroup's borrowings under its credit facilities to pay for margin calls and collateral for SemGroup's massive NYMEX trading positions and unrealized losses.  Defendants negligently saddled SGLP with debt to monetize SemGroup's assets and funnel cash to the Parent to fuel an undisclosed high-risk trading operation that Kivisto and other Defendants allowed to consume all of SemGroup's cash until the Parent (who was SGLP's key customer) ran out of cash and was forced to file bankruptcy, leaving SGLP without its main source of revenue.

## V.    VIOLATIONS OF THE EXCHANGE ACT

174.    The Exchange Act claims are brought by Lead Plaintiff individually and on behalf of other Class members who purchased or otherwise acquired SGLP common units during the Class Period, in reliance on the materially false and misleading statements issued and omissions

by SGLP and the Individual Defendants, as set forth herein.  Beginning with the dropdown of assets from SemGroup in SGLP's IPO, and continuing until the time when SemGroup's liquidity crisis was publicly disclosed one year later, Defendants engaged in a series of acts and a scheme of deceitful and fraudulent conduct that caused purchasers of SGLP's units to suffer harm when the true nature of SGLP's and its Parent's speculative trading business, dire financial condition and risks and losses related to the trading scheme were exposed.  Unbeknownst to investors in SGLP's common units, Kivisto was running a high-risk trading operation that in years prior to SGLP's IPO had generated as much as 50% of SemGroup's revenue.  SemGroup was a far cry from the conservative energy company that used trading strictly to hedge the commodity price exposure inherent in its midstream energy services operations, as Kivisto attempted to use SemGroup's commodities trading to generate revenue and enhance its margins.  But the speculative trading – that SemGroup denied engaging in during the Class Period – devoured SemGroup's cash and ultimately propelled SemGroup and most of its subsidiaries into bankruptcy, seriously jeopardizing SGLP's vitality along with it.

175.    Indeed, in 2007 and 2008, Kivisto's "take no losses" speculative trading strategy doomed SemGroup and all of its direct and indirect subsidiaries, including SGLP, when undisclosed "all-in" bets that oil prices would fall proved wrong, and Kivisto and his trading emissaries refused to adjust or unwind SemGroup's trades.    Instead, Kivisto directed SemGroup's traders to double down SemGroup's oil-price bets by selling additional options and causing SemGroup to roll forward trades to avoid taking a loss and in a desperate attempt to generate revenue from the sale of options via premiums on the risky oil bets paid by counterparties that bet (correctly) that oil prices would increase during 2007 and 2008 when oil reached unprecedented price levels.

176.     SGLP, the General Partner and the Individual Defendants knowingly and recklessly masked the true high-risk nature of SemGroup's business from purchasers of SGLP's common units, and others at the helm of SemGroup and SGLP, as well as the Individual Defendants, recklessly failed to monitor SemGroup's trading activities and failed to ensure that true and accurate information was being disseminated to shareholders after SGLP was taken public.

## A.     Defendants' Materially False and Misleading Statements and Material Omissions During the Class Period

177.     Defendants' false statements and material omissions during the Class Period, including the false statements and material omissions in the IPO and Secondary Offering Documents as set forth above in ¶¶126-147 and 159-173, give rise to liability under the Exchange Act.

### 1.     SGLP's Second Quarter 2007 Reports

178.     On August 16, 2007, the Company filed its 2Q07 10-Q.  SGLP reported over $19 million in revenue for the first six months of 2007.  The 2Q07 10-Q was signed by Defendants Brochetti and Stallings, in their capacity as Chief Financial Officer and Chief Accounting Officer, respectively, of the General Partner.  Defendants Foxx and Brochetti also falsely certified that the financial statements contained in the 2Q07 10-Q "fairly present in all material respects the financial condition" of SGLP for second quarter 2007, and submitted false SOX certifications attesting to the same.

179.     The 2Q07 10-Q contained substantially similar statements to those set forth in the IPO and Secondary Offering Documents regarding the extensive business relationship between the SGLP and its Parent, including, *inter alia*, statements that:

- under the Throughput Agreement, the gathering services and pipeline transportation services SGLP provides its Parent are subject to minimum

throughput requirements each month, regardless of the amount of such services actually used by the Parent;

- its Parent has committed to use services constituting 80% of its total storage capacity;

- based on these minimum throughput, trucking and storage requirements, the Parent is obligated to pay SGLP an aggregate minimum monthly fee of $6.4 million for its gathering, transportation, terminalling and storage services under the Throughput Agreement;

- the Company derives a substantial majority of its revenues from services provided to its Parent under the Throughput Agreement; and

- in providing services under the Throughput Agreement, SGLP does not take title to, or marketing responsibility for the crude oil it gathers, transports, terminals or stores and, therefore, has minimal direct exposure to changes in crude oil prices.

180.    The 2Q07 10-Q made no disclosure, however, that the Parent had a dangerously increasing margin balance that impaired the Parent's liquidity and threatened SemGroup's overall financial condition and prospects.  The 2Q07 10-Q also failed to disclose the true nature of SemGroup's business, which was heavily dependent upon commodities gambling for revenue, and was based upon an undisclosed speculative trading strategy that exposed the Parent and all of its direct and indirect subsidiaries, including SGLP, to risks and unlimited losses from wrong-way bets on crude oil prices in 2007.  The 2Q07 10-Q also omitted material information regarding the true use of funds generated by the IPO, which unbeknownst to investors, were used to pay down SemGroup's credit lines that were being drawn down to funnel cash to support margin calls on billions of dollars in unrealized losses from commodities trades that Kivisto, and traders working under his direction, were constantly rolling forward as set forth above.

181.    SGLP's 2Q07 10-Q also falsely stated that SGLP was not exposed to risks from commodity price or related volatility, when nothing could be further from the truth at the time because of the reckless trading scheme directed by Kivisto at SGLP's Parent.  In addition, options executed by Eaglwing on behalf of Westback also resulted in large losses in early 2007;

Defendants failed to disclose Westback's existence or massive trading loss improperly attributed to SemGroup.

182.    In addition, despite noting that a change of control of SGLP or its Parent could constitute an event of default under the Company's credit facility, the 2Q07 10-Q omitted any mention of the fact that the Parent's highly-speculative crude oil trades rendered the likelihood of a change in control at SemGroup and SGLP's General Partner a very real and imminent possibility.

183.    Finally, the 2Q07 10-Q stated that the Company's "disclosure controls and procedures, as of the end of the period covered by th[e] report, were effective" all-the-while Defendants knew that the Company lacked adequate internal controls to prevent its Parent's speculative trading and unchecked margin balance.   Defendants also failed to implement adequate internal controls to prevent SemGroup from violating its lender covenants, which it violated during 2007 on numerous occasions and further subjected SGLP to risks that SemGroup would, and did eventually, run out of money to support its operations or meet its obligations to SGLP under the Throughput Agreement.   To the contrary, the Examiner also reported that SemGroup had installed a Risk Director in March 2007 that had no commodities trading experience.   The effects of the absence of any internal controls was summarized by the Examiner, as follows:

> SemGroup's virtually blind deferral to Kivisto on trading matters, and its failure to develop or implement a suitable risk management policy, was central to its problems.  As SemGroup's "rolled forward" trading positions and its unrealized losses increased, and as the price of oil and volatility of the price of oil increased, the margin requirements it needed to pay to maintain its trading accounts also increased. Although SemGroup was desperately using funds from various sources to meet its escalating margin and margin call requirements in 2007 and 2008, to keep the ball afloat, so to speak – generally without the full knowledge or assent of its lenders and investors – it eventually ran out of the money to do so and to continue its business operations.

184.     According to the Examiner's Report, by no later than July 2007, the escalating price of crude oil had placed a substantial stress on SemGroup's balance sheet.  SGLP and the Individual Defendants failed to disclose any change, much less a material change, in the financial condition of its Parent in the 2Q07 10-Q.  SGLP stated only that "SemGroup Holdings used the net proceeds of $257.6 million received by it from the sale of the common units [in the IPO] to repay outstanding indebtedness of [SemGroup, L.P.]"  In fact, SGLP's disclosures in its 2Q07 10-Q failed to provide any warnings or alert investors to any risks relating to its Parent's liquidity problems or the true reasons that SemGroup needed to monetize assets through the MLP structure to raise desperately-needed cash.

185.     In connection with SGLP's quarterly earnings report, on August 16, 2007, the Company also hosted a conference call to discuss its earnings for the second quarter 2007 ("8/16/07 Conference Call").  Defendants Stallings, Foxx and Brochetti participated in the 8/16/07 Conference Call, on behalf of SGLP.  During the 8/16/07 Conference Call, Defendant Brochetti stated, in relevant part:

> I want to make sure that everyone understands how SGLP revenues will be determined going forward.  SGLP has in place a seven-year Throughput Agreement with our parent company, SemGroup LP, which became effective July 20, just prior to the July 23 close of the IPO.  This agreement is projected to represent more than 80% of our total revenue.

186.     Pursuant to the foregoing statements, Defendants SGLP, Foxx, Brochetti and Stallings knowingly and recklessly gave investors the false impression that SGLP had a stable base of revenue for 7 years arising from the Throughput Agreement.  SemGroup's speculative trading in 2007 and margin calls generated as a result of such trading, however, were draining all of the Parent's cash, impairing its liquidity and threatening its ability to meet its obligations under the Throughput Agreement.  Defendants SGLP's, Foxx's, Brochetti's and Stallings's

failure to disclose this material information on the 8/16/07 Conference Call is an actionable omission and rendered the other statements during the 8/16/07 Conference Call described herein materially misleading.

187.    Defendants' statements in the 2Q07 10-Q and related 8/16/07 Conference Call were further materially false or misleading at the time they were made for the reasons set forth above in ¶¶132, 134-36

188.    In the days following SGLP's second quarter 2007 financial results, the market reacted favorably to the news, and SGLP's common unit price traded in the range of $29.50 to $30.35, which was approximately 35% higher than its IPO price of $22 per common unit and close to its Class Period high.

### 2.      SGLP's Third Quarter 2007 Reports

189.    On November 14, 2007, the Company filed its 3Q07 10-Q.  For the nine months ended September 30, 2007, SGLP reported strong revenues of $44.38 million.  Defendants Brochetti and Stallings signed the 3Q07 10-Q in their capacity as Chief Financial Officer and Chief Accounting Officer, respectively, of SemGroup GP.  Defendants Foxx and Brochetti also falsely certified that the financial statements contained in the 3Q07 10-Q "fairly present, in all material respects, the financial condition" of SGLP for third quarter 2007, and submitted false SOX certifications attesting to the same.

190.    The 3Q07 10-Q contained substantially similar statements to those set forth in the 2Q07 10-Q regarding (1) the extensive business relationship between the SGLP and its Parent (¶139); (2) the guaranteed and steady stream of revenues expected from its Parent under the Throughput Agreement (¶179); (3) the Company's insulation from commodity price risk as a result of its relationship with its Parent (¶¶179, 181); (4) that a change of control of SGLP or its

Parent could constitute an event of default under the Company's credit facility; and (5) the adequacy of the Company's internal disclosure controls (¶183).

191.    These statements were materially false or misleading at the time they were made for the reasons set forth above in ¶¶180-82, 183-84 and 187.  Defendants' statements were further materially false and misleading because SGLP held fast to its position that its operations had "minimal direct exposure to commodity prices," notwithstanding that its operations were comingled with SemGroup's operations, and the multi-billion-dollar margin balance and derivative trading losses, and related drain on cash needed to support SemGroup's and SGLP's operations, were quickly causing SemGroup to run out of money to fund its and SGLP's operations.

192.    The 3Q07 10-Q further failed to disclose that the impairment to SemGroup's liquidity was deepening from margin calls and that SemGroup, at the direction of Kivisto, was engaging in extremely speculative trading aimed at generating premiums for sales of options to mask undisclosed losses from options transactions on which Kivisto had bet the wrong way on the price of crude oil, at the same time that crude oil prices were increasing and putting a severe strain on SemGroup's balance sheet and cash flow.

193.    According to the Examiner's Report, SemGroup's trading counterparties, *e.g.* BOK (Bank of Oklahoma), monitored the Parent's trading and informed Kivisto and others that in September 2007, SemGroup had exceeded its $50 million trading limit.  The Examiner reported that BOK was concerned in October 2007 because SemGroup was engaged in deep "in-the-money" rolled trades in which the strike price (the option to buy oil at a certain price in the future) was "relatively low compared to the current price of oil."  SemGroup rolled trades forward – selling options with prices further removed from the current price of oil – to generate

premiums and avoid taking a loss, which further increased SemGroup's mark-to-market exposure.

194.    The 3Q07 10-Q also disclosed numerous related-party transactions, including the receipt of $20.2 million from the Parent under the Throughput Agreement for the 3 and 9 months ended September 30, 2007, but Defendants failed to disclose that the options executed by Eaglwing on behalf of Westback had also resulted in hundreds of millions of dollars of losses in early 2007. According to the Examiner's Report, the receivable amount from Westback to SemGroup "increased to $136.3 million as of December 31, 2006, and to *$323.8 million* as of December 31, 2007."

195.    Defendants failed to disclose Westback's existence or that SemGroup was funding Kivisto's personal trading operation, and that Kivisto had failed to reimburse SemGroup for Westback's losses in SemGroup's trading accounts.

### 3.    The Secondary Offering Conference Call

196.    On January 16, 2008, SGLP hosted a conference call to discuss its intent to acquire asphalt assets from SemMaterials (the "1/16/08 Conference Call"). Defendants Stallings, Foxx and Brochetti participated in the 1/16/08 Conference Call on behalf of the Company. During the 1/16/08 Conference Call, Defendant Foxx reiterated that "SGLP's July 2007 IPO prospectus stated that our primary business objectives are, number one, to maintain stable cash flows....One of our strategies to achieve those objectives is to leverage our relationship with SemGroup LP, our parent, and to acquire additional assets directly from the parent." Defendant Foxx also "want[ed] to point out" that, in connection with the asphalt asset acquisition:

> SGLP will not take title to any asphalt in storage or engage in any asphalt marketing activities. As a result, our asphalt and residual fuel operations will have a minimal direct exposure to changes in commodity prices. In our asphalt

and residual fuel oil business, we will generate revenues by charging a fee-for-service provided as asphalt and residual fuel oil are terminaled [sic] and stored in our facilities. SemMaterials will be our primary customer.

In connection with the closing of this offering, we will enter into a terminaling [sic] storage agreement with a SemMaterials. This agreement has an initial seven-year term that expires on December 31, 2014, with additional automatic one-year renewals unless either party terminates the agreement upon one year's prior notice. The agreement specifies minimum throughput in storage requirements. SemMaterials will commit to use our terminaling [sic] and storage facilities at a level that will provide SGLP with minimum fee-based annual revenues of approximately $60 million, and that's exclusive of reimbursement of energy costs.

197. Regarding the acquisition, Defendant Brochetti added that "[w]e're excited about this acquisition, which essentially doubles the size of SGLP and is consistent with our objective to create unitholder value by growing the asset base on a foundation of steady fee-based cash flows while minimizing direct commodity price exposure." Further, Brochetti stated:

On the revenue side of the equation, over 95% of the forecast revenues are **guaranteed** under the take-or-pay arrangement created by the terminaling [sic] and storage agreement. Under the agreement, there are two sources of revenue for SGLP. The first is a storage fee based upon the number of barrels SGLP stores on behalf of SemMaterials each month, and the second is a throughput fee based on actual volumes of liquid asphalt cement that SemMaterials moves through the terminals each calendar quarter. SemMaterials has agreed to certain minimum use commitments with respect to these services and will be obligated to pay us a fee in respect to these minimum use commitments regardless of whether they actual[ly] use the services.

*     *     *

Now I'll spend a few moments discussing our accretion estimate and address our financing plans. *As we stated in the press release, we expect the acquisition will be immediately and highly accretive to our unitholders.* Based on projected annual revenues of approximately $60 million, which excludes reimbursement for fuel and power expenses and an operating margin in the range of 55% to 60%, which is inclusive of annual depreciation and amortization expense of approximately $12 million, we expect this transaction to increase our annual distribution capacity by approximately $0.40 to $0.50 per unit. This represents more than a 35% increase in the annualized distribution since our Initial Public Offering only about six months ago.

Our accretion estimate is based on minimum contracted storage volumes and approximately 90% of SemMaterials' actual historical 2007 throughput volumes. (Emphasis added.)

198.    Defendant Foxx echoed some the foregoing statements by Defendant Brochetti during the 1/16/08 Conference Call, stating, in relevant part:

We believe that this acquisition will provide SGLP with several key strategic benefits. Number one, as Mike mentioned, it enables us to immediately increase our distributable cash flow per unit. Secondly, it enhances our ability to generate stabling and predictable cash flows.

199.    The foregoing statements were materially false or misleading at the time they were made for the reasons set forth above in ¶¶166-67, 173.  The statements were further materially false and misleading because they omitted that SemGroup was using proceeds of the Secondary Offering to pay for margin calls and to post margin to its NYMEX account to support massive unrealized losses from Kivisto's speculative trading in SemGroup's and his own trading accounts.  According to the Examiner's Report, on February 20-21, 2008, SemGroup made a payment of approximately $325 million, which SemGroup obtained from proceeds of the Secondary Offering, to pay down its credit facilities.  Defendants knowingly and recklessly failed to disclose that the credit facilities were being depleted to funnel cash to SemGroup's NYMEX account for margin deposits.  Defendants also knowingly and recklessly failed to disclose that SemGroup's financial condition had materially worsened since the IPO and that there was, far from a "guarantee," a substantial doubt that SemGroup would be able to honor its obligations under the Throughput and Terminalling Agreements because the Parent's speculative trading had impaired SemGroup's liquidity and created a cash crisis that jeopardized all of its operations, including the asphalt business that was being transferred to SGLP.

200.    SGLP's unit price ticked up slightly in response to the favorable news of the Secondary Offering and transfer of the Acquired Asphalt Assets, closing up from $27.02 on January 15, 2008, to a close of $27.52 on January 17, 2008, on heavy trading.

### 4.    SGLP's Report for Year-End 2007

201.    On March 6, 2008, the Company filed the 2007 10-K.  The 2007 10-K was signed by Defendants Stallings, Foxx, Brochetti, Kivisto, Wallace, Bishop and Billings in their respective capacities as officers or directors of SemGroup GP.  Defendants Foxx and Brochetti also falsely certified that the financial statements contained in the 2007 10-K "fairly present in all material respects the financial condition" of SGLP for fiscal 2007, and submitted false SOX certifications attesting to the same.

202.    The 2007 10-K contained substantially similar statements to those set forth above in the IPO and the Secondary Offering Documents, as well as in the Company's Quarterly Reports on Form 10-Q for the second and third quarters of 2007, extolling the virtues of SGLP's relationship with its Parent, including the transfer from SemGroup of SGLP's crude oil business consisting of 6.7 million barrels of storage capacity and 1,150 miles of crude oil gathering and transportation pipelines and 200 owned or leased crude oil tanker trucks.  These statements were materially false and misleading for the reasons set forth above at ¶¶ 187, 191.  SGLP did not disclose that the transfer of the crude oil business was deliberately structured in a manner that allowed SemGroup to maintain control over virtually all of the transferred assets and that the assets were transferred to monetize the Parent's assets to generate cash needed to post margin as collateral for SemGroup's speculative trades.

203.    SGLP dedicated a significant portion of its 2007 10-K to a discussion of the operations of its Parent and SGLP's relationship with the Parent:

**Our Parent's Operations**

Our Parent provides gathering, transportation, storage, distribution, marketing and other midstream services primarily to independent producers and refiners of petroleum products located along the North American energy corridor from the Gulf Coast region to central Canada. Our Parent has a significant asset base consisting primarily of pipelines, gathering systems, processing plants, storage facilities, terminals and other distribution facilities located between North American production and supply areas, including the Gulf Coast, Mid−Continent and Alberta, and areas of high demand such as the Midwest region of the United States. Our Parent also has storage, terminal and marine facilities at Milford Haven in the United Kingdom with pipeline connectivity to nearby refiners that enables it to supply product to the East Coast of the United States. **Our Parent's assets and operations are configured to provide a counter−cyclical and counter−seasonal balance between its asset−based and marketing activities.** (Emphasis added.)

**Our Relationship with our Parent**
Substantially all of our revenues are generated by providing services to our Parent's crude oil purchasing, marketing and distribution operations and finished asphalt processing and marketing operations...Since our Parent's inception in April 2000 through December 31, 2007, our Parent has completed 59 acquisitions at an aggregate purchase price of approximately $1.1 billion, excluding amounts paid for working capital. Our Parent has indicated that it intends to use us as a growth vehicle to pursue the acquisition and expansion of midstream energy businesses and assets. As a publicly traded limited partnership, we have greater liquidity, which we believe will enhance our valuation. In addition, as a publicly traded partnership, we have the ability not only to access the public capital markets (which we believe enables us to have lower overall capital cost than available in private markets resulting in a lower cost of capital and funding costs) but also to use our units as consideration for potential future acquisitions.

204.     The statements in ¶203 were materially false and misleading and recklessly disregarded that SemGroup's assets and operations had not been adequately hedged with counter-cyclical and counter-seasonal marketing (*i.e.* commodities trading) activities. Rather, undisclosed to investors, Kivisto had been and was engaged in a speculative trading strategy that was not based upon SemGroup's assets or directly tied to its operations. Defendant Stallings admitted to the Examiner that SemGroup's "physical inventory became unlinked from the financial trades." Defendants also failed to disclose that SemGroup was digging an even deeper hole by using speculative trades to try improve its margins, generate

revenues and disguise trading losses.   Unbeknownst to Lead Plaintiff and other Class members, during the Class Period SGLP's Parent's operations were heavily tied to high-risk trading activities, which were draining all of SemGroup's available cash and impairing its liquidity.

205.   SGLP also reported in its 2007 Form 10-K that on February 20, 2008, the Company had purchased substantially all of SemGroup's U.S. liquid asphalt storage assets for $378.8 million, including 46 terminals located in 23 states with an aggregate storage capacity of 6.6 million barrels.  SGLP again emphasized that the Company did "not take title to, or marketing responsibility for, the crude oil or liquid asphalt cement that we gather, transport, terminal and store.  As a result, ***our operations have minimal direct exposure*** to changes in crude oil and liquid asphalt prices, but the volumes of crude oil and liquid asphalt cement we gather, transport, terminal or store are indirectly affected by commodity prices." (emphasis added.)

206.   In the 2007 10-K, SGLP also repeatedly emphasized that SemGroup was obligated to pay SGLP "minimum monthly fees totaling $135 million pursuant to the Throughput and Terminalling Agreement, regardless of whether SemGroup actually used services provided by SGLP.  SGLP also emphatically stated that "Our Parent's crude oil purchasing, marketing and distribution operations and its finished asphalt processing and marketing operations are substantially dependent on our services and assets."  Defendants further stated that as a result of competitive strengths, including SGLP's relationship with its Parent, SGLP was "well positioned to successfully achieve [its] primary business objectives and execute our business strategies."

207.   SGLP's 2007 10-K also stated that its expected the Company's relationship with its Parent to "provide [SGLP] with significant business opportunities."   SGLP further emphasized the SemGroup held a "significant economic interest" in SGLP through: (1) "a 36.4% limited partnership interest…represented by subordinated units;" (2) "a 2% general partner interest;" and (3) "incentive distribution rights."   SGLP also reported that "[o]ur Parent has indicated that it intends to use us as a growth vehicle to pursue the acquisition and expansion of midstream energy businesses and assets."   SGLP similarly stated that its ability to access the capital markets along with its total borrowing capacity positioned the Company with a "flexible financial structure that will facilitate our organic expansion and acquisition strategy."

208.   SGLP's statements in its 2007 10-K were materially false and misleading and omitted material information necessary to make its statements not false and misleading at the time they were made.  At the time SGLP issued the 2007 10-K, SemGroup was having severe liquidity problems and was not in any position to expand or acquire additional assets through SGLP.   SGLP also could not access the capital markets because of SemGroup's massive margin balance and multi-billion dollar unrealized losses from speculative trading.  SGLP's relationship with SemGroup provided no strategic or flexible financial arrangements for the Company, as the 2007 10-K suggests.

209.   SGLP also repeated its often-issued statements regarding its intention to "pursue acquisition opportunities as well as organic growth opportunities" with SemGroup, which otherwise would not be available to SGLP because of the "element of commodity price risk inherent" in the energy industry that SGLP could rely upon SemGroup to manage. These statements omitted material information that SemGroup, at the time these statements

were made, had not been able to manage its exposure to commodities price risks and that its speculative trading and lack of risk controls had generated massive margin calls and trading losses that threatened the ability of both SemGroup and SGLP to continue their operations.

210.   SGLP reported in the 2007 10-K that "[s]ubstantially all of our revenues are generated by providing services to our Parent's crude oil purchasing, marketing and distribution operations and finished asphalt processing and marketing operations."  SGLP further stated that the Omnibus Agreement, which contractually obligated SemGroup to provide employees and administrative services to SGLP, Throughput Agreement and Terminalling Agreement governed its relationship with SemGroup.  SGLP also stated that approximately 600 of SemGroup's employees were "dedicated to supporting our operations" and that SGLP "[does] not have any employees."  Clearly, SGLP was dependent upon SemGroup for substantially all of its revenues and all of its operations, as even its physical assets were intermingled with SemGroup's assets.

211.   With respect to "Risks Factors," SGLP generally stated that the Company "may not have sufficient cash from operations…to enable us to make cash distributions to holders of our common units…at our current distribution rate."  SGLP further disclosed that to make its cash distribution at the rate of $0.3375 per unit, the Company required available cash of approximately $11.7 million per quarter, or $46.6 million per year.  SGLP also warned in boilerplate fashion that "we depend upon our Parent for substantially all of our revenues and any reduction in these revenues would have a material adverse effect on our results of operations and our ability to make distributions to our unitholders."  Consequently, SemGroup's ability (or inability) to meet its obligations to pay $135 million annually to SGLP was highly material to SGLP's unitholders; however, SGLP failed to disclose any

risks related to SemGroup's existing and historical speculative and dangerous commodities trading, impaired liquidity, or increasing inability to meet margin calls on its trading losses, which were depleting all of SemGroup's cash and imperiling its ability to continue its operations.

212.    As set forth above in ¶¶ 14, 65, and 97, SemGroup's margin balance had increased to $1.7 billion and its mark-to-market liability had increased to $2.04 billion by December 31, 2007.   The Examiner's Report quotes from an e-mail by Mark Lietzke, SemGroup's Controller, which states that SemGroup incurred *$1 billion* in unrealized loss in 2007 from the increase in commodities prices, and SemGroup had to post about the same amount in margin requirements as it typically is 100% collateralized on its derivative positions.  **Lietzke's e-mail admitted that the margin deposits posed a liquidity risk for SemGroup.**  The Westback receivable also stood at $323.8 million on December 31, 2007, and going into the first quarter of 2008, oil prices continued to surge, which "continued to stress SemGroup's liquidity position," as stated by the Examiner.

213.    The continued increase in oil prices also caused Kivisto's options trades, which he directed to be "rolled" forward, to generate revenue from premiums and disguise losses, which dangerously increased SemGroup's mark-to-market exposure.   According to the Examiner's Report, Kivisto's sales of options for SemGroup generated over $100 million dollars in premiums in early 2007, and had increased significantly by year-end 2007, but this aspect of SemGroup's business and operations was not disclosed to Lead Plaintiff or other members of the Class.

214.    An accountant for Kivisto with responsibility for reconciling options trades by Kivisto and Eaglwing, explained the shift in Kivisto's business strategy for SemGroup, as follows:

> Price stated that in 2007, after years of very good profits, he began to observe significant losses for the first time. The losses carried over into 2008 and worsened. While the profits associated with physical barrel trading seemed to be steady, Kivisto appeared to have a mindset to continue to grow through the use of options trading. Price stated that the crude barrel trading seemed modest by comparison, and became "a nice little sideline." He stated that he never felt he could have confronted Kivisto or even Pens regarding the growth of the options trading and the associated losses. He was not informed about the trading losses by Kivisto or Pens, although he stated that he observed the numbers.

> Price stated that he saw huge losses in the November and December 2007 timeframe and had the feeling that something was going on as he worked on the closing book entries for those months. The losses continued into 2008. He stated that he would see a $2 million profit on the physical barrel marketing and a $30 million loss for the options trading.

215.    Although the 2007 10-K warned of purported risks the Company faced as a result of its dependence on its Parent, including its Parent's inability to manage its commodity price risk resulting from its ownership of crude oil, liquid asphalt cement and petroleum products, it made no mention of SemGroup's extremely risky speculative trading practices that had caused SemGroup to rack up a $1.7 billion-dollar margin balance by December 2007, as a result of knowingly and recklessly betting the wrong way on commodity prices and which exposed SGLP to its Parent's commodity price risk.

216.    The 2007 10-K also contained statements regarding potential conflicts of interest with its Parent and its General Partner's ability to develop a sufficient system of internal controls and the effectiveness of those controls, substantially similar to those set forth in the Registration Statements for the IPO and the Secondary Offering at ¶¶143, 170.   These statements were materially false and misleading for the reasons set forth above at ¶¶144, 171.

5.        **The Year-End 2007 Conference Call**

217.    The Company also hosted a conference call on March 6, 2008, to discuss its

year-end 2007 financial results ("3/6/08 Conference Call").   Defendants Stallings, Foxx, and

Brochetti, as well as Peter Schwiering, SGLP Executive Vice President Crude Operations and

Jerry Parson, SGLP Executive Vice President Asphalt Operations, participated in the 3/6/08

Conference Call, on behalf of the Company.   During the 3/6/08 Conference Call, Defendant

Foxx "reiterate[d] a couple of primary stated goals," stating, in relevant part:

> Our primary stated business objectives are to maintain stable cash flows and
> increase distributable cash flow per unit over time.   We expect to accomplish
> these goals by leveraging our relationship with SemGroup LP – our parent,
> pursuing both strategic and accretive acquisitions, pursuing organic expansions
> through opportunities, and increasing the profitability through our existing
> assets.

218.    Defendant Brochetti also addressed the Company's liquidity and capital

structure during the 3/6/08 Conference Call, stating, in relevant part:

> Given the overall weakness in the credit markets that we're all well aware of,
> I'm pleased to report that ***SGLP is well positioned***.   We ended the year with a
> strong credit profile, capital structure and excellent liquidity. (Emphasis added.)

219.    Defendant Foxx also commented on the Company's Terminalling Agreement

with its Parent during the 3/6/08 Conference Call, stating, in relevant part:

> Concurrent with the acquisition, we entered into a terminaling agreement with
> our parent, under which we will provide our parent with liquid asphalt cement
> terminaling and storage services for a minimum of 7 years.   This is consistent
> with our existing business, and is expected to provide us with continuing stable
> and consistent cash flows.

> This was a highly accretive transaction, and as Mike mentioned, we expect to
> recommend to the board of directors of SGLP's general partner an increase of
> $0.40 to 0.50 per unit in the annual cash distribution rate over the current
> annualized rate of $1.35 per unit.

*        *        *

> We continue to pursue and evaluate acquisition opportunities from both
> SemGroup LP and from third parties.   Our parent has current plans to invest

more than $500 million in capital expenditures – inclusive of the previously discussed White Cliffs pipeline project over the next two years.

This signals that our parent will continue to add assets – not shrink in size.  We believe SemGroup's expansion program will continue to benefit SGLP – particularly in this sluggish credit market.

220.    Further, in response to a question from Wachovia Securities Analyst, Michael Blum, regarding whether the slowing economy and declining demand for gasoline had had any impact on SGLP's business, Defendant Foxx replied "we don't really see that as affecting our business in any way."  Indeed, even as Foxx acknowledged that "these energy prices continue to get higher and higher," he reiterated that "we don't really see any impact on our business."

221.    Foxx's statements were blatantly false.  He has admitted to the Examiner that he was "very concerned" about SemGroup's "margin amount," which Foxx stated was $1 billion at the end of 2007.  Brochetti's glowing statements about SGLP's strong liquidity also falsely presented the true financial condition and prospects of SGLP in light of SemGroup's liquidity crisis and massive margin balance at the time the statements were made.

### 6.    SGLP's First Quarter 2008 Report

222.    On May 8, 2008, the Company filed its 1Q08 10-Q.  The 1Q08 10-Q was signed by Defendants Brochetti and Stallings in their respective capacities as Chief Financial Officer and Chief Accounting Officer of SemGroup GP.  The Company reported $40.2 million in revenue and net income of $9.8 million for the three-months-ended March 31, 2008. Defendants Foxx and Brochetti also falsely certified that the financial statements contained in the 1Q08 10-Q "fairly present in all material respects the financial condition" of SGLP for first quarter 2008, and submitted false SOX certifications attesting to the same.

223.    The 1Q08 10-Q stated that for the three months ended March 31, 2008, 89% of SGLP's revenue was derived from it Parent.  The 1Q08 10-Q also contained materially false and

misleading statements discussing the Company's relationship with its Parent, including that contracts with its Parent "guaranteed" the Company minimum annual revenues of $135 million, substantially similar to those set forth above in the Registration Statements for the IPO and Secondary Offering, as well as the Company's 2Q07 10-Q, 3Q07 10-Q and 2007 10-K. These statements were materially false or misleading at the time they were made for the reasons set forth above in ¶¶132, 134-36, 166-67, 173, 180, 184, 187 and 199, including by virtue of Defendants' omission that SGLP's Parent's speculative trading strategy jeopardized SGLP's purportedly guaranteed stream of revenue from SemGroup and put the Company's future at grave risk.

224.    Defendants also stated in the 1Q08 10-Q that, as of May 2, 2008, the Company "had $297.0 million in outstanding borrowings under our credit facility." Defendants failed to disclose in the 1Q08 10-Q that virtually all of SGLP's borrowings under its credit facilities had been up-streamed to its Parent, ostensibly as consideration for the asphalt assets acquired under the Terminalling Agreement, to post margin deposits for Kivisto's secret reckless speculative trading.

225.    Under its "Risk Factors," SGLP stated in the 1Q08 10-Q that "[i]nformation about risk factors for the three months ended March 31, 2008 does not differ materially from that set forth in Part I, Item 1A, of our Annual Report on Form 10-K for the year ended December 31, 2007." This statement was materially false and misleading and omitted material information regarding the dire financial condition at SemGroup and facts and circumstances that caused Foxx, Ronan and other SGLP and SemGroup executives to be alarmed about SemGroup's liquidity. The Examiner's Report states that in first quarter 2008, SemGroup executed a "larger

volume" of roll-forward options transaction to manage its "residual position." These increased options positions dangerously increased SemGroup's mark-to-market exposure.

226.    In fact, according to the Examiner's Report, beginning in December 2007 and continuing in first quarter 2008, SemGroup had begun to look for an investor and to explore a private securities offering through Goldman Sachs to raise at least $700 million (which eventually was raised to $1.5 billion) in capital.  The Examiner reported that Foxx and others questioned Kivisto regarding how he, when seeking investors for SemGroup, intended to explain SemGroup's $1 billion unrealized loss.  Stallings also stated that "going into First Quarter 2008, the price of crude continued to increase, which continued to stress SemGroup's liquidity position.  [Stallings] also stated that SemGroup's margin payments and margin calls were becoming the focus of its liquidity problems."

227.    SGLP also stated in the 1Q08 10-Q that "[w]e derive a substantial majority of our revenues from services provided to our Parent, and as such, ***our liquidity is affected by the liquidity and credit risk of our Parent. There have been no changes to our Parent's credit ratings as disclosed in our 2007 Form 10-K.***"  These statements were materially false and misleading at the time that they were made because Defendants knew, or recklessly disregarded that, according to the Examiner's Report, in first quarter 2008, Moody's (SemGroup's credit rating agency) became alarmed at SemGroup's financial situation when oil prices rose and SemGroup continued to increase its borrowings, while refusing to "roll off" trading positions, as requested by Moody's.  Defendants' statements that there had been no change in the Parent's credit rating were intended to and did mislead SGLP investors as to the true financial condition and prospects of SGLP and the ongoing liquidity crisis faced by its Parent.

228.    The Examiner reported that Don Spaugy (SemGroup's Vice President of Financial Services) also became concerned about SemGroup's liquidity in January 2008 when its cash on the daily report dropped below $200 million.   The Examiner further stated that Ronan also expressed concern in March 2008 about SemGroup's liquidity.

229.    SGLP further failed to disclose in the 1Q08 10-Q that SemGroup had solicited lenders to provide desperately-needed cash to SemGroup, without disclosing the true financial condition of the Parent or its inability to meet margin calls on wrong-way bets placed on soaring oil prices.   SemGroup had also surreptitiously placed trading losses on various SemGroup subsidiaries' balance sheets, even though the losses were generated by trades purportedly on behalf of SemCrude at Kivisto's direction.   According to the Examiner, when balking at $125 million of mark-to-market losses erroneously placed on SemEuro's books in May 2008 by Oven, SemEuro Managing Director, John Spencer ("Spencer"), aptly noted in an e-mail to Wallace that Spencer had "*important legal duties not to recklessly allow the company to trade itself into insolvency or continue to trade if insolvency cannot be avoided.*" (emphasis in original).

230.    Defendants also caused SGLP to violate SEC disclosure requirements.   Under SEC regulations, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."   The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."

231.    In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

232.    The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

233.    In discussing results of operations, Item 303 of Regulation S-K requires the Company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

234.    Defendants failed to disclose in SGLP's Class Period public statements the true nature of SemGroup's commodities trading business and attendant risks for SGLP.  Defendants' concealment of the magnitude of SemGroup's trading losses and the impact of known trends in rising oil prices on its trading strategy, mark-to-market exposure and illiquidity was particularly significant for SGLP investors because it deprived them of the knowledge that SemGroup had suffered significant losses due to speculative trading and of knowledge that it had insufficient cash to post required margin deposits, mitigate recognized losses and to continue to meet its "take or pay" obligations to SGLP – which generated over 80% of SGLP's revenue.

235.    In response to the positive news release by Defendants on May 8, 2008 in the 1Q08 10-Q, SGLP's units closed at $26.54, which was slightly higher than the prior day's close of $25.98.

7.      **The May 2008 Drop Downs and Press Releases**

236.    On May 12, 2008, SGLP issued a press release that was filed with the SEC on Form 8-K (the "5/12/08 8-K"), announcing that it had acquired from its Parent a 130-mile pipeline in Ardmore, Oklahoma for $45 million.  According to the Examiner's Report, the $45 million price for the acquired assets was derived, in part, by the fact that SGLP "received a seven year throughput agreement that would secure a stream of revenue" from SemGroup.  The 5/12/08 8-K was signed by SGLP's General Partner and Defendant Stallings as its Chief Accounting Officer.  According to the Examiner's Report, Defendants Thane Ritchie, Ward and Jones, as members of the General Partner's Management Committee, signed a memorandum of action authorizing the transaction for SemGroup.

237.    SGLP and Stallings disclosed in the 5/12/08 8-K that the May 12, 2008 acquisition had been funded with borrowings from the Company's credit facility, but they knowingly and recklessly failed to disclose that the assets were overvalued because SemGroup was not in a position to honor its obligations to provide a "stream of revenue" to SGLP.  SGLP and Stallings further failed to disclose that SGLP was being used improperly as a vehicle to monetize assets of SemGroup to fund margin calls and undisclosed speculative trading.

238.    Eight days later, on May 20, 2008, SGLP issued another press release that was filed with the SEC on Form 8-K (the "5/20/08 8-K") and signed by SGLP's General Partner and Stallings as its Chief Accounting Officer.  SGLP announced that SemGroup was dropping down additional crude oil storage assets located at the Cushing Interchange for $90 million.  Defendant Foxx admitted to the Examiner that he was responsible for this drop down to SGLP.  The press release disclosed that SGLP was using borrowings from its credit facilities to finance the acquisition.

239.    Defendants Thane Ritchie, Ward and Jones, in their capacity as members of the General Partner's Management Committee, authorized the transaction for SemGroup, according to a memorandum of action reviewed by the Examiner, Also, according to the Examiner's Report, SemGroup made a payment to its credit facility in the amount of $111 million on or about May 20-21, 2008, and another $33 million around May 30, 208, when the final SGLP drop down transaction closed.  The statements in the 5/20/08 8-K were materially false and misleading for the reasons set forth above in ¶166-67, 173, 180, 184 and 199.

240.    Between May 12 and 20, 2008, SGLP's units traded in the $26 to $27 range in response to the Company's announcements of the additional drop downs and other positive news released by the Company.

241.    Analysts also reacted favorably to the Company's first quarter 2008 earnings reports and dropdown acquisitions from SemGroup, which caused analysts at RBC to *increase* the price target for SGLP's units to $38 per unit.

## 8.    The May 22, 2008 Investor Conference

242.    On May 22, 2008, SGLP and Foxx hosted a "Master Limited Partnership Investor Conference" in New York City.  The published materials from the conference were made publicly available on SGLP's website.  In the materials used at the investor conference, SGLP states that its Parent had $4.937 billion in total assets and was a "diversified midstream energy business" with $396 million in planned "major 2008 capital projects."  SGLP failed to disclose that SemGroup's assets included massive margin deposits or that SemGroup business generated revenue from high-risk commodities trades that had impaired its liquidity in 2007 and 2008 and consumed virtually all of its available cash.  SGLP and Foxx further failed to disclose to investors the adverse impact that SemGroup's dire financial condition had on

SGLP's ability to generate revenue from the assets that SemGroup had dropped down to the Company during the Class Period.

243.    SGLP's and Foxx's investor presentation was materially false and misleading and presented a false picture of SGLP's financial condition and prospects, and stood in stark contrast to the dire financial condition of SemGroup, as summarized as follows by Coen to the Examiner:

> During the spring and early summer of 2008, options positions became much larger and more challenging due to the incredible volatility and one way price movement of the oil market. Coen stated that at this point the market simply overwhelmed SemGroup's investment strategy and that market conditions were outside of what the strategy was prepared to handle. He stated that the financial situation worsened and that, in May and June 2008, SemGroup's ability to maintain its margin payments grew increasingly problematic on a day-to-day basis. Coen stated that in the last one or two months prior to the filing of its bankruptcy petitions, on a daily basis, SemGroup was on the verge of not being able to make its margin payments.

**B.     Investors Belatedly Learn That SemGroup Is Insolvent And SGLP Is In Dismal Financial Condition**

244.    The true facts were first revealed to the market on Thursday, July 17, 2008, when, after the close of the market, SGLP issued a statement disclosing that its Parent "is experiencing liquidity issues" and is considering alternatives, including "a voluntary petition for reorganization under Chapter 11."  SGLP confirmed in the announcement that it generated a "substantial majority" of its revenue from the Parent.  In fact, it was reported on *Bloomberg News* that "about 80% of [SGLP's] cash flows via throughput and terminal agreements" were derived from its Parent.  On news of illiquidity for SGLP's affiliates and Moody's severe downgrades of SemGroup, on July 17, 2008, SGLP lost 52% of its market value, falling $11.80 to $11.00 per unit on high volume.

245.    The Company's precipitous one-day freefall in unit price made it the top percentage stock loser on NASDAQ, according to the online *Wall Street Journal*.

246.    On Tuesday, July 22, 2008, the Parent and two dozen of its affiliates filed bankruptcy petitions in the U.S. Bankruptcy Court in Wilmington, Delaware.

247.    Information revealed in the Declaration of Ronan, filed in the bankruptcy matter of *In re SemCrude, L.P.*, Case No. 108-11525 (BLS) (Bankr. D. Del.), demonstrates that the true facts evidencing the Parent's declining financial conditions were in existence prior to the IPO and Secondary Offering:

> Historically, the SemGroup Companies and their affiliates aimed to establish a margin on their anticipated purchases of product inventory by selling that product for physical delivery to customers or by entering into future delivery obligations under futures contracts on the NYMEX and OTC markets. Through these transactions, the SemGroup Companies and their affiliates sought to maintain a position that is substantially balanced between purchases and sales or future delivery obligations. Such transactions were always subject to a degree of risk. Rising commodity prices or an expectation of rising prices increased the cash needed to manage commodity price exposure and thereby increased liquidity requirements, limited amounts available through borrowing, and reduced the volume of petroleum products to be purchased. The volatility experienced in petroleum product prices during the last two years has been unprecedented. As a result, the SemGroup Companies' trading strategy began to fail. For example, from January 2006 to June 2008, the NYMEX West Texas Intermediate benchmark price increased $66.75 per barrel. During the three months ended March 31, 2008, the SemGroup Companies and their affiliates posted $1.96 billion to satisfy margin deposit requirements, a 115% increase over the three months ended March 31, 2007. During the twelve months ended December 31, 2007, the SemGroup Companies and their affiliates posted $1.70 billion to satisfy margin deposit requirements, a 159% increase over the twelve months ended December 31, 2006.

248.    On July 21, 2008, SGLP also announced that on July 18, 2008, SGLP had been taken over by creditors of SemGroup as a result of SemGroup defaulting on a secured loan to Manchester Securities ("Manchester") and Alerian Capital Management ("Alerian") (together, "New Controlling Owners").  Defendants had never disclosed to the unit holders the existence of this secured loan.   The press release entitled "Manchester Securities and Alerian Capital

Management Assume Control of SGLP; Appoints New Board to Focus on Future of Company," stated in pertinent part:

> SemGroup Energy Partners, L.P., today announced that the holders of a secured loan to SemGroup Holdings, L.P. ('Holdings'), Manchester Securities and Alerian Capital Management, have acted on their rights under their loan documents to vote as the sole members of the general partner of SGLP. They remain fully supportive of existing management.

> "These actions are necessary to protect SGLP and allow SGLP to focus on its future and best interests. Despite the challenges faced by SGLP given the uncertainty at its main customer, Semgroup L.P., the board and management are enthusiastic about the Company's strategic assets and future in a robust energy market," Chief Executive Officer Kevin Foxx said.

> Manchester and Alerian have reconstituted a five-member board of directors at SGLP's general partner to include two representatives from Manchester, one from Alerian, and two existing independent directors. The new board and management believe this is the beginning of a new era for SGLP, and they will be working together to maximize the long-term utilization of the Company's assets.

249. In the accompanying Form 8-K filed with the SEC on July 21, 2008, SGLP described the events leading up to the takeover of the Partnership in pertinent part:

Item 5.01. Changes in Control of Registrant.

On the evening of July 18, 2008, Manchester Securities Corp. and Alerian Finance Partners, LP (the "New Controlling Owners"), exercised certain rights under a Loan Agreement, dated June 25, 2008 (the "Holdings Credit Agreement"), with SemGroup Holdings, L.P. ("Holdings"), the sole member of SemGroup Energy Partners G.P., L.L.C. (the "General Partner"), which is the general partner of SemGroup Energy Partners, L.P. (the "Partnership"). Under the Holdings Credit Agreement, the New Controlling Owners have the right to direct the vote of all of the membership interests of the General Partner upon an event of default under the Holdings Credit Agreement. The New Controlling Owners exercised these voting rights on July 18, 2008 and effectively took control of the General Partner (the "Change of Control").

The Change of Control resulted in an event of default under the Partnership's Amended and Restated Credit Agreement, dated February 20, 2008 (the "Credit Agreement"), among the Partnership, Wachovia Bank, National Association, as Administrative Agent, L/C Issuer and Swing Line

Lender, Bank of America, N.A., as Syndication Agent and the other lenders from time to time party thereto. Under the terms of the Credit Agreement, the lenders may, among other remedies, declare all outstanding amounts under the Credit Agreement immediately due and payable. The Partnership is in productive dialogue with the agent for the lenders regarding this matter.

Item 5.02.     Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

In connection with the Change of Control, on July 18, 2008, the New Controlling Owners reconstituted the Board of Directors of the General Partner (the "Board"). Messrs. Thomas L. Kivisto, Gregory C. Wallace, Kevin L. Foxx, Michael J. Brochetti and Andy Bishop were removed from the Board. Mr. Bishop had also served as a member of the conflicts committee, audit committee and compensation committee of the Board. Messrs. Sundar S. Srinivasan, David N. Bernfeld and Gabriel Hammond were appointed as directors on the Board. Mr. Srinivasan has been elected as Chairman of the Board. Messrs. Brian J. Billings and Edward F. Kosnik remained as directors of the Board and will continue to serve as members of the conflicts committee, audit committee and compensation committee of the Board.

250.     According to Gabriel Hammond, new director of SGLP's General Partner and Managing Partner of Alerian, the "spirit" of the loan agreement was that "if for whatever reason our collateral (*i.e.* the subordinated units) was in jeopardy, we would have the ability to control our own destiny."  As a result of the Parent's default on its loan obligations, SGLP's General Partner's Board is now controlled by Manchester and Alerian who are now debt holders, and not merely unit holders, whose interests are in direct conflict with the public unit holders.

251.     As a result of all the foregoing, including Defendants' non-disclosure of pertinent material information, the U.S. Trustee's Office (through the Examiner), U.S. Attorney's Office, SEC, FBI and other federal regulators have initiated investigations into the Parent and SGLP. The focus of those investigations include the Parent's unauthorized and speculative trading transactions, as well as a probe of SGLP's disclosure practices.

252.     On July 24, 2008, the Company filed a Current Report on Form 8-K with the SEC ("7/24/08 8-K") revealing, *inter alia*, that (1) SGLP received a letter from the SEC on July 21, 2008, notifying SGLP that the SEC was conducting an inquiry relating to SGLP's disclosures respecting its Parent's liquidity issues that were the subject of SGLP's July 17, 2008 press release, and requesting the preservation and production of documents to the SEC regarding the same; (2) on July 23, 2008, SGLP and its General Partner received Grand Jury subpoenas from the United States Attorney's Office in Oklahoma City, Oklahoma requiring SGLP and its General Partner to produce financial and other records relating to SGLP's July 17, 2008 press release; and (3) due to the bankruptcy of its Parent and the resulting change of control that took place at SGLP's General Partner on July 18, 2008, the Parent's obligation to provide SGLP with services under the Amended Omnibus Agreement had terminated.

253.     The 7/24/08 8-K further revealed that, while the Parent continued to provide services to SGLP since the change of control, if the Parent stops providing services to SGLP and SGLP is unable to replace these services in a timely manner, the Parent's adverse actions will have a material adverse effect on SGLP's business and results of operations.  The 7/24/08 8-K also reported that SGLP was in discussions with its lenders regarding events of default that had occurred under its Credit Agreement as a result of its Parent's bankruptcy.

254.     On August 1, 2008, *The Wall Street Journal* reported on the takeover of SGLP by Alerian and Manchester in an article entitled "How Funds' SemGroup Bet May Yet Pay – Default Terms on $150 Million Loan Give Public Affiliate to Alerian, Manchester." Specifically, it stated:

> SemGroup LP's collapse could make winners out of two little-known hedge funds that tossed the energy company a lifeline shortly before it filed for bankruptcy protection.

In late June, Alerian Capital Management LLC, of Dallas, and Manchester Securities Corp., of New York, agreed to lend $150 million to SemGroup. The hedge funds, both experienced energy investors, were approached by SemGroup at a time when it needed cash to meet margin calls on futures contracts and derivative trades that went against the closely held Tulsa, Okla., company.

The loan came with steep terms. Defaulting would give the two hedge funds SemGroup's interest in a profitable, publicly traded affiliate that owns more than 1,200 miles of pipelines and a large collection of energy-storage facilities at a delivery hub in Cushing, Okla., among other assets….Days before filing for bankruptcy protection on July 22, SemGroup defaulted on the loan, giving Alerian and Manchester control of SGLP.

While the parent's demise surprised some people at the hedge funds, they have been reassuring other shareholders that SGLP will stay in business, even though more than 80% of SGLP's revenue comes from SemGroup, whose main business is running pipelines and storage facilities for oil and natural gas. SGLP didn't file for protection from its creditors…The shares have plunged 66% since June 25.  In 4 p.m. NASDAQ Stock Market composite trading Thursday, they rose 3.2%, or 27 cents, to $8.72.

The loan by Alerian and Manchester could emerge as a source of contention in SemGroup's bankruptcy proceedings.  Some of SemGroup's other lenders- owed a total of more than $3 billion - said they were unaware of the loan or not fully informed of its terms.

*   *   *

"By the time SemGroup reached out to the two hedge funds for capital, management had probably exhausted other options," such as raising capital from banks or existing investors, said Mark Easterbrook, an analyst at RBC Capital Markets.  In a recent report, he said SGLP's pipeline, storage and terminal assets should remain viable with contracts from other energy companies, though cash flows could be impaired in the near term.

## C.    Additional Post-Class Period Disclosures And Developments

255.    On August 8, 2008, the Company filed a Current Report on Form 8-K with the

SEC ("8/8/08 8-K") reporting, *inter alia*, that on August 7, 2008, SGLP received a Staff

Deficiency Letter from NASDAQ stating that the reconstitution of the General Partner's Board

had caused SGLP to fail to satisfy NASDAQ Rules, which require that the Company's Audit

Committee be composed of at least three independent directors.  According to the 8/8/08 8-K,

SGLP was required to regain compliance with this rule by the earlier of SGLP's next annual unitholders' meeting or July 18, 2009; or if the next annual unitholders' meeting is held before January 14, 2009, then by January 14, 2009.

256.     On August 11, 2008, SemGroup confirmed that it immediately had begun laying off employees nationwide.  SemGroup's spokesperson confirmed to Tulsa World that it had "let go" of 250 workers, including 110 of those in Tulsa, Oklahoma.

257.     On August 20, 2008, the Company filed a Current Report on Form 8-K with the SEC ("8/20/08 8-K") reporting, *inter alia*, that on August 15, 2008, SGLP notified NASDAQ that it had not timely filed its Quarterly Report on Form 10-Q for the period-ended June 30, 2008 and, therefore, that SGLP was not in compliance with NASDAQ Rules and filing requirements. Consequently, according to the 8/20/08 8-K, on August 19, 2006, SGLP "received a Staff Determination Letter from NASDAQ indicating that, as a result of not having timely filed the Form 10-Q as required by Marketplace Rule 4310(c)(14), [SGLP's] common units … would be delisted from NASDAQ at the opening of business on August 28, 2008 unless [SGLP] requests a hearing…to appeal the staff's determination to delist its securities."  As the Company reported in the 8/20/08 8-K, SGLP "intends to request such a hearing."

258.     On September 9, 2008, the Company filed a Current Report on Form 8-K with the SEC ("9/9/08 8-K") reporting, *inter alia*, that on September 9, 2008, the Bankruptcy Court entered an order relating to the settlement of certain matters between SGLP and its Parent.  As set forth in a press release, attached as an Exhibit to the 9/9/08 8-K, the settlement stipulates that, among other things:

- payments made to SGLP under the Asphalt Terminalling and Storage Agreement will be netted against related amounts due to the Parent under the Amended Omnibus Agreement;

- the Parent will provide SGLP with a $4.9 million letter of credit to secure future obligations under the Asphalt Terminalling and Storage Agreement;

- the Parent will make payments under the Crude Oil Throughput Agreement for the month of August based upon the monthly contract minimums in the Crude Oil Throughput Agreement, which payments will be netted against related amounts due under the Amended Omnibus Agreement;

- the Parent will make payments under the Crude Oil Throughput Agreement for the months of September and October based upon actual volumes and at a rate equal to the average rate charged by SGLP to third party shippers in the same geographical area, which payments will be netted against related amounts due under the Amended Omnibus Agreement; and

- the Parent will continue to provide services in accordance with the Amended Omnibus Agreement through at least November 30, 2008.

259.    In the press release attached to the 9/9/08 8-K, Defendant Foxx stated, "This decision provides SGLP with certain assurances that it will be paid for post-bankruptcy services provided to the [Parent].  It also provides additional clarity around its relationship with the [Parent] on a prospective basis and allows SGLP to focus on its own independent business plan."

260.    On September 22, 2008, the Company filed a Current Report on Form 8-K with the SEC ("9/22/08 8-K") reporting, *inter alia*, that, effective September 18, 2008, SGLP and certain of its lenders entered into a Forbearance Agreement and Amendment to Credit Agreement (the "Forbearance Agreement"), pursuant to which SGLP's lenders agreed to forbear, until the earlier of (i) December 11, 2008, (ii) the occurrence of any default or event of default under the Credit Agreement other than those specified in the Forbearance Agreement, or (iii) the failure of SGLP to comply with any of the terms of the Forbearance Agreement (the "Forbearance Period"), from exercising their rights and remedies arising from SGLP's events of default under the Credit Agreement as a result of its Parent's bankruptcy.  In addition, according to the 9/22/08 8-K, the Forbearance Agreement permanently reduced SGLP's revolving credit

facility under the Credit Agreement from $350 million to $300 million and prohibits SGLP from borrowing additional funds under its revolving credit facility during the Forbearance Period.

261.   On October 29, 2008, the Company filed a Current Report on Form 8-K, announcing that the SEC had issued a subpoena pursuant to a formal order of investigation requesting that the Company produce certain documents relating to, among other things, its Parent's liquidity issues.

262.   On November 20, 2008, the Company filed a Current Report on Form 8-K with the SEC ("11/20/08 8-K") reporting, *inter alia*, that on November 17, 2008, SGLP notified NASDAQ that it had not timely filed its Quarterly Report on Form 10-Q for the quarter-ended September 30, 2008 and, therefore, SGLP was not in compliance with NASDAQ Rules and filing requirements.  According to the 11/20/08 8-K, "[c]onsequently, on November 18, 2008, [SGLP] received an Additional Staff Determination Letter from NASDAQ indicating that the failure to timely file the Third Quarter Form 10-Q serves as an additional basis for delisting [SGLP's] common units … from NASDAQ."  The 11/20/08 8-K further stated that SGLP appealed the Staff Determination and attended a hearing before the NASDAQ Listing Qualifications Panel on October 16, 2008, during which SGLP requested that the Panel grant additional time to regain compliance with NASDAQ's filing requirement.

263.   On November 25, 2008, the Company filed a Current Report on Form 8-K with the SEC ("11/12/08 8-K") reporting, *inter alia*, that on November 21, 2008, the NASDAQ Hearings Panel granted SGLP's request for an extension of time to file its Quarterly Reports on Form 10-Q for the quarters-ended June 30, 2008 and September 30, 2008, and that SGLP's common units would continue to be listed on NASDAQ, subject to the filing of its late Form 10-Qs on or before February 17, 2009.

264.    On December 12 and 19, 2008, the Company filed two separate Current Reports on Form 8-K with the SEC, reporting, *inter alia*, that SGLP and certain of its lenders entered into the First and Second Amendments to Forbearance Agreement and Amendment to Credit Agreement (the "Amendments"), under which the Forbearance Period set forth in the original Forbearance Agreement and Credit Agreement was extended until March 18, 2009, unless SGLP failed to comply with any of the terms of the Forbearance Agreement.   The Amendments reduced SGLP's revolving credit facility under the Credit Agreement from $300 million to $220 million and also prohibited SGLP from borrowing additional funds under its revolving credit facility during the Extended Forbearance Period.

265.    On February 11, 2009, the Company filed a Current Report on Form 8-K with the SEC ("2/11/09 8-K") reporting, *inter alia*, that on February 6, 2009, its Parent filed a motion in the Bankruptcy Court requesting approval of the sale of its asphalt-related assets, via auction. The 2/11/09 8-K further reported that, if the auction is not successful, the Parent intended to immediately reject the Terminalling Agreement and begin liquidating its remaining asphalt inventory and wind down its asphalt business.  According to the 2/11/09 8-K,

> If the contract is rejected, there is significant uncertainty as to [SGLP's] revenues related to its asphalt assets and there is substantial risk that [SGLP's] asphalt assets may be idle during 2009 and subsequent years.  Without revenues from its asphalt assets, [SGLP] may be unable to meet the covenants, including the minimum liquidity and minimum receipt requirements, under its forbearance agreement with its senior secured lenders pursuant to which such lenders have agreed to forbear from exercising their rights and remedies arising from [SGLP's] events of default under its credit agreement. Even if the auction is successful, SGLP may have to negotiate a new terminalling and storage contract with the buyer of the [Parent's] asphalt assets and such agreement may not be on as favorable terms as the Terminalling Agreement.

266.    On February 18, 2009, the Company filed a Current Report on Form 8-K with the SEC ("2/18/09 8-K") reporting, *inter alia*, that the Company received that day, a letter from the

Hearings Panel of NASDAQ "providing the Panel's decision to delist [SGLP's] common units from NASDAQ, with trading being suspended effective at the open of trading on Friday, February 20, 2009," after the Company failed to file its Quarterly Reports on Form 10-Q for the quarters-ended June 30, 2008 and September 30, 2008, by February 17, 2009.  The Company further reported that, as a result of the delisting of its common units from NASDAQ, SGLP "expects that its common units will be quoted in the "Pink Sheets" beginning on February 20, 2009."  The Company also reported that it "intends to promptly seek the re-listing of its common units on NASDAQ as soon as practicable, although the shares have not been re-listed on NASDAQ."

267.    On March 10, 2009, the Company filed a Current Report on Form 8-K with the SEC ("3/10/09 8-K") reporting, *inter alia*, that on March 6, 2009, SGLP had entered into a Settlement Term Sheet with its Parent summarizing the principal terms of a settlement of certain items between SGLP and its Parent, including, among other things, that:

(1) SGLP will transfer certain crude storage oil assets located in Kansas to a subsidiary of its Parent;

(2) a subsidiary of the Parent will transfer ownership of 355,000 barrels of crude oil tank bottoms and line fill to the Partnership;

(3) the Parent will reject the Throughput Agreement as part of the Bankruptcy Cases;

(4) SGLP and its affiliates will have a $20 million unsecured claim against certain of the Parent's subsidiaries and affiliates relating to its rejection of the Throughput Agreement;

(5) a subsidiary of the Parent will transfer its asphalt assets that are connected to SGLP's asphalt assets to SGLP or one of its affiliates (unless the Parent executes a definitive agreement to sell substantially all of its asphalt assets or business as a going concern to a third-party purchaser and SGLP enters into a terminalling and storage agreement with such purchaser);

(6) the Parent will reject the Terminalling Agreement as part of the Bankruptcy Cases;

(7) a subsidiary of SGLP will have a $35 million unsecured claim against certain affiliates of the Parent relating to rejection of the Terminalling Agreement;

(8) the Parent will reject the Amended and Restated Omnibus Agreement as part of the Bankruptcy Cases;

(9) the Parent and SGLP will resolve certain remaining issues related to the contribution of crude oil assets to SGLP in connection with SGLP's IPO, SGLP's acquisition of certain asphalt assets, SGLP's acquisition of the Eagle North Pipeline System and SGLP's acquisition of certain crude oil storage assets at Cushing, including the release of claims relating to such acquisitions.

268.   In the 3/10/09 8-K, the Company further reported that the Parent filed the Settlement Term Sheet with the Bankruptcy Court on March 6, 2009, but that it was conditioned not only upon approval by the Bankruptcy Court, but also upon consent by SGLP's lenders under its credit agreement.

269.   On March 12, 2009, the Bankruptcy Court approved SemGroup's settlement to transfer some of the assets of its asphalt unit, SemMaterials, to SLPG.   SemGroup announced that it was winding down its SemMaterials business and laying off most of the SemMaterials subsidiary's 550 employees, including 135 in Tulsa, Oklahoma.

270.   On March 19, 2009, the Company filed a Current Report on Form 8-K with the SEC reporting, *inter alia*, that SGLP and its lenders had entered into a Third Amendment to the Forbearance and Credit Agreements.   The forbearance Period was extended, and subsequently events of default were settled.

271.   On March 23, 2009, the Company late filed its Quarterly Report on Form 10-Q with the SEC for the period-ended June 30, 2008 ("2Q08 10-Q").   Among other things, the 2Q08 10-Q reported that, "[d]ue to the events related to the Bankruptcy Filings described herein, including the uncertainty relating to future cash flows and the existing events of default under the Partnership's credit facility, [SGLP] faces substantial doubt as to its ability to continue as a going concern."

272.     The 2Q08 10-Q also discussed the results of an internal review undertaken by a subcommittee created by the General Partner's Board in July 2008 to determine whether SGLP participates in businesses other than as described in its filings with the SEC, stating, in relevant part:

> The subcommittee has investigated a short-term financing transaction involving two subsidiaries of the [Parent]. This transaction was identified as a potential source of concern in a whistleblower report made after the [Parent] filed for bankruptcy.  Although the transaction did not involve us or our subsidiaries, it was investigated because it did involve certain senior executive officers of our general partner who were also senior executive officers of the [Parent] at the time of the transaction.  Based upon its investigation, counsel for the subcommittee found that, subject to the subcommittee's lack of access to [Parent] documents and electronic records and witnesses, although certain irregularities occurred in the transactions, the transaction did not appear to cause the relevant officers to understand or believe that the [Parent] had a lack of liquidity that imperiled the [Parent's] ability to meet its obligations to us and that certain aspects of the documentation of the transaction that were out of the ordinary did not call into question the integrity of any of the relevant officers.

> The subcommittee also investigated whether certain senior executive officers of our general partner who were also senior executive officers of the [Parent] knew and understood, beginning as early as July 2007 and at various times thereafter, about a lack of liquidity at the [Parent] that imperiled the [Parent's] ability to meet its obligations to us.  **Based upon this investigation, and subject to the subcommittee's lack of access to [Parent] documents and electronic records and witnesses, counsel for the subcommittee found that each of the officers had access to and reviewed [Parent] financial information, including information regarding the [Parent's] commodity trading activities, from which they could have developed an understanding of the nature and significance of the trading activities that led to liquidity problems at the [Parent] well before they say they did.**  While the officers each stated sincerely that they did not understand the nature or extent of the [Parent's] trading-related problems until the first week of July 2008 or later, **objective evidence suggests that they showed at least some indifference to known or easily discoverable facts and that they failed to adhere to procedures under the [Parent's] Risk Management Policy created expressly to ensure that the [Parent's] trading activities were properly monitored.**  Nonetheless, counsel for the subcommittee was not persuaded by the documents and other evidence it was able to access that the officers in fact knew and understood that the [Parent's] liquidity or capital needs were a significant cause for alarm until, at the earliest, the second quarter of 2008.  Moreover, while it appeared to counsel that the officers developed a growing awareness of the nature and severity of the [Parent's] liquidity issues over the second quarter of 2008, counsel was unable to identify with any more

precision the specific level of concern or understanding these individuals had prior to July 2008. (emphasis added).

\*     \*     \*

After completion of the internal review, a plan was developed with the advice of the Audit Committee of the Board to further strengthen our processes and procedures. This plan includes, among other things, reevaluating executive officers and accounting and finance personnel (including a realignment of officers as described elsewhere in this report) and hiring, as deemed necessary, additional accounting and finance personnel or consultants; reevaluating our internal audit function and determining whether to expand the duties and responsibilities of such group; evaluating the comprehensive training programs for all management personnel covering, among other things, compliance with controls and procedures, revising the reporting structure so that the Chief Financial Officer reports directly to the Audit Committee, and increasing the business and operational oversight role of the Audit Committee.

273.   The 2Q08 10-Q also reported that there had been a change of control effectuated at its Parent. According to the 2Q08 10-Q:

On December 15, 2008, Red Apple Group Inc. ("Red Apple"), which is chaired by John Catsimatidis, announced that it controls five of the nine seats on the management committee of the general partner of the Private Company and therefore effectively controls the [Parent]…In addition, the [Parent] Change of Control may lead to additional uncertainty regarding our continued relationship with the [Parent]. We are unsure what impact, if any, the [Parent] Change of Control will have on us and our operations.

274.   On April 15, 2009, the Examiner's Report was filed with the bankruptcy court overseeing SemGroup's bankruptcy proceedings. The Examiner's Report states that the Examiner interviewed Defendants Foxx, Brochetti, Stallings and many other current and former SGLP and SemGroup officers, directors, Management Committee members and employees.

275.   SGLP's common unit holders have not received any quarterly cash distribution since April 24, 2008.

**D.   Additional Facts Supporting Defendants' Scienter**

276.   As alleged herein, SGLP and its General Partner and executive officers and/or directors thereof, including each of the Individual Defendants, acted with scienter during the

Class Period.  SGLP's executive officers were employed both by SGLP's General Partner and its Parent and co-managed the business and affairs of SGLP and SemGroup.   Specifically, Brochetti, Foxx and Stallings were, respectively, CFO, CEO and CAO of the General Partner. Foxx, Kivisto, Wallace, Brochetti, Bishop and Billings were Directors of SGLP's General Partner.   In addition, Defendants Foxx, Wallace and Kivisto were member of SemGroup's Management Committee during the Class Period.   Through their executive positions and management and other responsibilities at SemGroup, Foxx, Kivisto, Brochetti, Stallings, and Wallace each and all had actual knowledge of SemGroup's undisclosed speculative trading, critically increasing margin balance during the Class Period and the Parent's cash-strapped position resulting from margin calls and cash collateral requirements associated with Kivisto's and others' failed speculative trading strategy.  The scienter of each of SGLP's executive officers and directors also is attributable to SGLP and its General Partner during the Class Period.

277.   SGLP, the General Partner, and the Individual Defendants knew or recklessly disregarded that the public statements and documents SGLP issued or disseminated to shareholders and investors were materially false and misleading.   Foxx, Kivisto, Brochetti, Stallings, Wallace, and Bishop each signed the IPO and Secondary Offering Documents as well as SGLP's 2007 10-K.   Billings signed the Secondary Offering Documents and SGLP's 2007 10-K.   Defendants SemGroup G.P., Brochetti and Stallings also signed SGLP's Quarterly Reports on Form 10-Q during the Class Period.   These executive officers and directors: (1) knew, or recklessly disregarded, that such statements and documents filed with the SEC would be issued or disseminated to the investing public; (2) had a duty to ensure the accuracy of the reports they signed; and (3) knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements and documents as primary violations of the federal securities laws.

278.    As detailed above, SGLP's General Partner's executive officers and directors by virtue of their receipt of information reflecting the true facts regarding SGLP and the Parent, as set forth herein, and their control over, receipt and/or modification of the Company's materially misleading statements, and their knowledge of confidential proprietary information concerning SemGroup, participated in the fraudulent scheme alleged herein.

279.    SGLP's General Partner's Board of Directors operated as a collective entity through periodic meetings held and various communications in which the Board discussed and approved the issuance of SGLP's Registration Statements, Prospectuses and quarterly, annual and current reports to the SEC and to unit holders.  Because the Board acted collectively and conducted SGLP's business pursuant to agreements and formal memoranda as a Board, and received collectively the same information about SGLP's and its Parent's business at or about the same time, the Individual Defendants are jointly and severally liable for the wrongdoing alleged herein. All statements of SGLP as alleged herein are equally the statements of all Individual Defendants.

280.    All of the Individual Defendants had a duty to assess and monitor the financial condition and liquidity of SemGroup, as a major client and substantial source of revenue to SGLP, and its ability to honor its obligations under the Throughput and Terminalling Agreements and other agreements, in light of the material concentration and dependence of SGLP's business operations on SemGroup.  The Individual Defendants knowingly or recklessly failed to disclose that SemGroup's margin balance and speculative trading posed a serious risk to SemGroup's ability to fulfill its contractual obligations to SGLP.  Nevertheless, the Individual

Defendants caused SGLP to purchase assets from SemGroup for hundreds of millions of dollars during the Class Period, when they knew or recklessly disregarded that there was a serious risk that SemGroup could not provide the steady stream of "take or pay" revenue, which was touted as guaranteed in all of SGLP's and the Individual Defendants' public statements.

281.    In addition, Foxx, Wallace, Kivisto, and Ward and Jones (at the designation of Riverstone) and Thane Ritchie (at the designation of Ritchie) were members of SemGroup's Management Committee and, as such, were charged with a duty to be aware of and monitor SemGroup's business, financial and operating condition, including its undisclosed speculative trading practices; critically increasing margin balance; cash-strapped position resulting from margin calls; and cash collateral requirements from Kivisto's failed speculative trading strategy. Similarly, Kivisto, Wallace, Brochetti, Foxx and Stallings, as executive officers of SemGroup during the Class Period, had actual knowledge of or deliberately and recklessly disregarded SemGroup's speculative trading, increasing margin calls and collapsing financial condition, which directly impacted SGLP's own financial stability.   Moreover, these Defendants' overlapping executive and director positions at SemGroup and SGLP provided them with access to information regarding the Parent's deteriorating financial condition and its adverse impact on SGLP.   Armed with this information, these Defendants had access to and knowledge of SemGroup's financial records, trades and margin balance during the Class Period, and therefore had the opportunity, but failed, to ensure that SGLP's public statements and SEC filings were not misleading and to correct any material misstatements or omissions.

282.    Defendants' knowledge of SemGroup's undisclosed generation of revenue from speculative trading; increasing margin balance; dangerous level of unrealized losses; debilitating cash burn (including cash received from SGLP public offerings and asset dropdowns) from

margin calls and trading during the Class Period was so obviously material that all of the Defendants must have been aware both of the materiality of this information to SGLP investors and that non-disclosure of the information would likely mislead investors.

        1.    **Defendants' Knowledge of Kivisto's Speculative Trading Strategy, the Rise in Margin Calls Attendant Thereto, and the <u>Company's Increasing Liquidity Issues</u>**

        283.    Defendants Kivisto, Foxx and Wallace were aware that Kivisto: (1) established all of SemGroup's commodities trading strategies; and (2) directed his traders, including Oven, Coen and Shimonov (of SemCanada), to engage in a speculative trading strategy at SemGroup and SemGroup-related entities, pursuant to which options were sold without matching inventory for an actual hedge, and were managed to avoid recording any recognized losses as the options neared expiration with bets the wrong way for oil prices.  As part of Kivisto's strategy of managing options to expiry, traders continued to roll forward in-the-money options, with increasing price and mark-to-market risks, to disguise trading losses.

        284.    At the direction of Kivisto, Oven and Coen transacted options sales in 2007 and 2008 for SemGroup related entities, but recklessly failed to account accurately for mark-to-market losses on various entities' books and records, and instead spread losses around various SemGroup affiliates' balance sheets to mask the massive increasing concentration of unrealized losses from failure to close out positions at a loss in trading accounts controlled by Kivisto.

        285.    At various points in time, Kivisto, Wallace, Cooper and Stallings each had actual and direct knowledge that Kivisto caused SemGroup to fund speculative trades that Kivisto transacted for his own personal benefit, which added to the critical cash drain on SemGroup, yet failed to stop it, as evidenced by, *inter alia*, the following findings of the Examiner:

a.      Oven and Coen both stated that they acted at the direction of Kivisto and entered into commodities transactions for Westback from January 2007 through early 2008;

b.      A June 16, 2008, e-mail exchange between Kivisto and Steffen van Keppel, a representative of Newedge Financial, Inc., through whom Westback traded, demonstrates that Kivisto actively traded in Westback's account;

c.      Stallings stated that PwC identified the Westback receivable as a potential problem back in 2005 and suggested that SemGroup enter into a written agreement documenting the relationship between SemGroup and Westback.  Stallings prepared such an agreement, on Eaglwing letterhead, dated March 20, 2006, which Kivisto and Wallace (as Vice President and Secretary of Eaglwing Trading, L.P.) signed;

d.      In 2006, for book-keeping purposes, Wallace told Kathy Lewallen (SemGroup's Controller) that she would observe that an entity named Westback was conducting commodities trades through Eaglwing in SemGroup's ConAgra trading account, but that the trading contracts would indicate that the trades were being done by Eaglwing, rather than Westback.  Lewallen soon after reported the Westback situation to Stallings, and expressed concern to Stallings that it was difficult for her to distinguish Westback transactions from Eaglwing transactions;

e.      Stallings stated that SemGroup's receivable from Westback continued to grow, and increased significantly from June 2007 to September 2007.  During this period, PwC also inquired about the growth of the Westback receivable from $19.8 million at December 31, 2005, to $136.3 million at December 31, 2006, to $323.8 million at

December 31, 2007, and Stallings discussed PwC's concern about the receivable with Wallace in early 2007;

      f.      In February 2008, PwC told Stallings that Wallace had not addressed the Westback receivable with PwC in sufficient detail.  Accordingly, Stallings decided to speak to Kivisto about the receivable.  At this time, Stallings learned that Kivisto was the sole owner of Westback.

      g.      Stallings stated that at the end of 2007, he asked Lewallen to track the Westback receivable balance on a daily basis and to send e-mails to Kivisto, Wallace, himself and possibly others detailing the balance.  Lewallen confirmed that either Stallings or Wallace asked her to provide information regarding Westback's daily balances for 2008 to Kivisto, Wallace, Stallings, Cooper and others by e-mail, which she did;

      h.      By the week of July 14, 2008, the Westback receivable stood at $290 million.  Stallings stated that Wallace asked him to prepare an invoice for the Westback receivable to Kivisto.

286.    Defendants also knew or recklessly disregarded the effects of rising oil prices on SemGroup's trading positions and relationships with its counterparties, including facts demonstrating that as the price and volatility of oil rose in 2007 and 2008, it became increasingly more costly, and SemGroup was forced by Kivisto's reckless trading strategy, which was designed to disguise and avoid any recognized loss, to purchase additional options at "deep in-th-money" strike prices, which exacerbated trading risks and exposed SemGroup and SGLP to dangerous trading losses.  Further, Defendants knew or recklessly disregarded increasing negative mark-to-market losses and margin requirements from SemGroup's trading activities that

created a liquidity crisis for SemGroup, as evidenced by, *inter alia*, the following findings of the Examiner:

a.      Foxx stated that Kivisto managed SemGroup's margin needs along with Cooper and SemGroup's Treasury group;

b.      SemGroup insiders, including Kivisto, Wallace and Foxx were aware of billions of dollars in losses resulting from SemGroup's trading activities in 2007. Management Committee member Thane Ritchie also stated that during a telephonic Management Committee meeting in late 2007, a large unrealized loss from SemGroup's trading was discussed;

c.      Foxx stated that SemGroup's margin balance was $1 billion at the end of 2007.  Foxx indicated he was very concerned about the margin balance and finally asked Kivisto about it in June 2008, at which point Kivisto indicated he was in the process of shrinking the size of his trading book;

d.      Lee Bullock (Coordination Manager for SemEuro's hedge commodities trading) also stated that near the end of 2007, option trades made by Oven and Coen for SemEuro were no longer profitable and SemEuro incurred high negative mark-to-market losses that were too high compared to what was in storage at SemEuro or what was in transit.  Bullock stated that during the first quarter of 2008, Spencer asked Wallace to make an adjustment on SemEuro's books to correct a mark-to-market trading loss in excess of $100 million.  On June 17, 2008, Spencer e-mailed Wallace concerning large negative mark-to-market losses in the amount of approximately $125 million on SemEuro's financial statements as of the end of May 2008, which were placed on

SemEuro's books as a result of Tulsa-based options trading activities and which exceeded SemEuro's assets by $69 million;

e.      Beginning in March 2008, PBC (Prudential Bache Commodities) had several conversations or e-mail communications with Kivisto regarding certain trading positions SemGroup held with PBC and concerns PBC had due to the volatility of the credit and futures markets and the large exposures SemGroup had with PBC.  In May and June 2008, PBC asked SemGroup to reduce some of its trading positions and, by June 19, 2008, SemGroup began winding down its PBC account.

f.      Also in March 2008, Calyon representatives determined not to make any additional trades with SemGroup, based on its due diligence review meeting with Cooper, Oven, Brochetti, Kivisto and others, without further information regarding SemGroup's trading practices.  In June 2008, SemGroup attempted to roll its January trades at Calyon at the original strike price.  Calyon refused.  On June 30, 2008, during a meeting with Kivisto, Ronan and others, SemGroup renewed its request that Calyon roll the January trades at the original strike price.  Calyon advised SemGroup that it would consider rolling the trades only after examining SemGroup's trading book and physical inventory on hand to determine that the trades were not speculative.  SemGroup failed to provide this information to Calyon and filed for bankruptcy a few weeks later.

g.      In June 2008, SemGroup's trading with J. Aron increased, and J. Aron requested financial data from SemGroup, including its most recent quarterly statements. An analysis of this financial data revealed that SemGroup was facing liquidity and credit constraints.  J. Aron's credit department called Wallace about the Company's financial status.  Wallace falsely stated that the Company's liquidity issues were exaggerated.

h. Brochetti stated to the Examiner that he repeatedly heard comments at SemGroup in May, June and July of 2008 about adding trading positions to help with margin calls;

i. Coen, Oven and Shimonov, at the direction of Kivisto, were responsible for the growth in SemGroup's mark-to-market liability from sold options, from $2.4 billion at the end of 2007 to $4 billion in July 2008; no options transactions were executed by anyone other than Coen, Oven and Shimonov in 2008;

j. SemGroup's loan agreements expressly stated that "[d]omestic crude option writing program is limited to the volume of physical storage available to SemCrude, L.P. and Eaglwing, L.P." and lists a storage capacity of 8 million barrels of crude oil for the United States and Canada. *As of May 12, 2008, SemCrude and SemFuel had a combined delta equivalent short position of 56,464 barrels of crude oil from the sale of call options. With each contract being equal to 1,000 barrels of oil, SemCrude and SemFuel had sold the equivalent of 56 million barrels of crude oil via sales of call options as of May 12, 2008.* (emphasis in original).

287. Defendants also knew or recklessly disregarded SemGroup's perilous impaired liquidity during the Class Period, as set forth by the following findings of the Examiner:

a. By late 2007, SemGroup personnel began to feel uneasy about SemGroup's liquidity. Frank Panzer, President of SemMaterials repeatedly tried to talk to Kivisto about his concerns; Kivisto told him not to worry. Stallings also stated that going into the first quarter of 2008, the price of crude continued to increase, which continued to stress SemGroup's liquidity position. Further, according to the Examiner, Ronan stated that SemGroup personnel, including Ronan, Kivisto, Cooper, Foxx,

Wallace and others, held a series of meetings after the cumulative margin posted had reached $2.5 billion;

b.      Ronan voiced concerns to Wallace in a May 6, 2008 e-mail regarding SemGroup's liquidity.  SemStream President Larry Payne also stated that in late May or early June 2008, liquidity and cash for SemGroup were "tight" and Kivisto, Wallace and Foxx instructed Payne to cease purchasing inventory;

c.      In June 2008, SemGroup suspended employee and executive bonus payments;

d.      Also in June 2008, Ward stated that SemGroup told the Management Committee that it had liquidity issues and that it might need additional capital;

e.      Coen stated that during the spring and early summer of 2008, options positions became much larger and more challenging due to the incredible volatility and one way price movement of the oil market.  Coen stated that at this point, the market overwhelmed SemGroup's investment strategy, with market conditions exceeding what Kivisto's strategy was prepared to handle.  Coen further stated that the financial situation worsened and that, in May and June 2008, SemGroup's ability to maintain its margin payments grew increasingly problematic on a day-to-day basis.  Coen further stated that in the last one or two months prior to the filing of its bankruptcy petitions, on a daily basis, SemGroup was on the verge of not being able to make its margin payments; and

f.      Ronan stated that he became concerned about SemGroup's liquidity and trading and spoke to Kivisto about it in June 2008.  As an example of Kivisto's adherence to his trading philosophy, Kivisto told Ronan that his number one rule was to "never call the market." Ronan replied that his number one rule was to "never run out of money."

### 2.       **Defendants' Compensation Creates a Strong Inference of Scienter**

288.    During the Class Period, Defendants were motivated to engage in the acts and practices detailed herein, and to conceal the false and misleading statements and omissions alleged herein, in order to protect their positions at the SemGroup-related entities, and the lucrative compensation packages attendant thereto, including millions in salary, bonus, distributions and other payments generated through SGLP's master limited partnership framework.  In SemGroup's bankruptcy filings, the Parent disclosed that compensation payments made to SemGroup insiders totaled over $517 million during the one-year period of July 22, 2007 through July 21, 2008, which substantially overlaps with the Class Period alleged herein.

289.    In the IPO alone, Defendants distributed more than $150 million in distribution payments to themselves and their affiliates.   In the Secondary Offering, notwithstanding SemGroup's impaired liquidity and desperate need for cash, SemGroup's Management Committee members, including Kivisto, Wallace, Foxx, Thane Ritchie, Ward and Jones, authorized a $100 million distribution to themselves and other partners.  The Examiner noted that key SemGroup personnel and their affiliated trusts received $26 million from the distribution.  According to the Examiner's Report, Foxx stated that it was "Riverstone's idea to distribute a portion of the dropdown to the shareholders instead of keeping it all in working capital."

290.    Defendants Kivisto and Wallace also distributed to themselves exorbitant bonuses totaling over $11 million for Kivisto and $7.5 million for Wallace during the Class Period, without Management Committee approval.  These massive bonuses created strong incentives for Kivisto and Wallace to conceal Kivisto's failed speculative trading strategy and the true financial condition of SemGroup.

291.     As illustrated by documents produced in the Examiner's Report, during the Class

Period, Defendants received, among other forms of compensation, the following:

| DEFENDANT | COMPENSATION | |
|---|---|---|
| **Kivisto**<br><br>SemGroup CEO<br><br>SGLP Director | **Direct Compensation** | |
| | Salary Payments | $350,000 |
| | Bonus Payments | $11,034,000 |
| | IPO Distribution Payments | $14,686,767 |
| | MLP Dropdown Payments | $16,318,630 |
| | Total | $42,200,000 |
| | **Other Forms of Indirect Compensation** | |
| | Westback Purchasing Co. Receivable | $309,000,000 |
| | Eaglwing Energy LLC IPO and MLP Dropdown Payments | $7,300,000 |
| | Total | $316,300,000 |
| **Wallace**<br><br>SemGroup CFO, Vice President and Secretary<br><br>SGLP Director | **Direct Compensation** | |
| | Salary Payments | $325,000 |
| | Bonus Payments | $7,534,000 |
| | IPO Distribution Payments | $3,843,861 |
| | MLP Dropdown Payments | $4,270,957 |
| | Total | $15,973,818 |
| **Foxx**<br><br>SemGroup COO, Vice President and Management Committee Member, Eaglwing Senior Vice President<br><br>SGLP CEO, President and Director | **Direct Compensation** | |
| | Salary Payments | $450,000 |
| | Bonus Payments | $3,034,000 |
| | IPO Distribution Payments | $4,105,553 |
| | MLP Dropdown Payments | $4,561,726 |
| | Total | $12,151,279 |
| **Stallings**<br><br>SemGroup CAO<br><br>SGLP CAO | **Direct Compensation** | |
| | Salary Payments | $276,736 |
| | Bonus Payments | $413,000 |
| | IPO Distribution Payments | $60,123 |

| | MLP Dropdown Payments | $66,803 |
|---|---|---|
| | Total | $816,662 |
| **Brochetti**<br><br>SemGroup Senior Vice President - of Finance<br><br>SGLP CFO and Director | **Direct Compensation** | |
| | Salary Payments | $300,000 |
| | Bonus Payments | $342,000 |
| | IPO Distribution Payments | $29,828 |
| | MLP Dropdown Payments | $33,142 |
| | Total | $704,970 |
| **Carlyle/Riverstone**<br><br>SemGroup 29.3% Ownership Interest | **Direct Compensation** | |
| | IPO Distribution Payments to C/R SemGroup Investment | $24,417,168 |
| | IPO Distribution Payments to C/R Energy Co-Investment | $2,280,564 |
| | MLP Dropdown Payments to C/R SemGroup Investment | $27,130,187 |
| | MLP Dropdown Payments to C/R Energy Co-Investment | $2,533,959 |
| | Total | $56,361,878 |
| **Ritchie**<br><br>SemGroup 25.2% Ownership Interest | **Direct Compensation** | |
| | IPO Distribution Payments to Ritchie SG Holding | $10,612,866 |
| | IPO Distribution Payments to SGLP Holding | $9,275,630 |
| | IPO Distribution Payments to SGLP US Holding | $3,029,972 |
| | MLP Dropdown Payments to Ritchie SG Holding | $11,792,073 |
| | MLP Dropdown Payments to SGLP Holding | $10,306,256 |
| | MLP Dropdown Payments to SGLP US Holding | $3,366,635 |
| | Total | $48,383,432 |
| **Total for All Insider Defendants** | **$492.59 million** | |

### 3.   Defendants' Failure Monitor Known Trading Risks at SemGroup Raises a Strong Inference of Scienter

292.   The Individual Defendants also recklessly failed to implement any controls over SemGroup's and Kivisto's commodities trading and failed to staff adequately risk controls and measures that were supposed to be in place regarding SemGroup's commodities trading.  As the Examiner found, Wallace, Kivisto and Cooper failed to integrate properly the commodities trading function into SemGroup's financial controls, which subjected SemGroup to additional risk.  Further, Foxx, Wallace and Kivisto failed to develop a suitable risk management policy or to integrate one into SemGroup's business controls, and failed to comply with the Risk Management Policy ("RMP") that did exist.

293.   For example, Kivisto hired Coen and Oven and was responsible for recruiting Shimonov to execute his trading strategy, even though he knew that these individuals had little, if any, prior commodity options trading experience.

294.   Kivisto also hired William Allen as SemGroup's Risk Director, even though Allen had no prior risk management experience, particularly in the area of commodities trading, according to the Examiner's report.  Stallings stated that he was unsure if Allen was ever able to tie SemGroup's financial position to its physical inventory.  Foxx and Brochetti both expressed their belief, to the Examiner, that Allen had neither the authority nor the courage to question or challenge Kivisto regarding Kivisto's trading strategy.

295.   In addition, the RMP that SemGroup had in place was insufficient to combat the risks associated with SemGroup's trading activities, and largely was unknown or recklessly ignored by SemGroup executives and traders.  The RMP required that trading violations be reported to Kivisto, rather than an impartial oversight function – meaning that Kivisto was responsible for monitoring and addressing defects in his own trading plan.  The RMP also

required SemGroup to form a Risk Management Committee ("RMC"), consisting of SemGroup's CEO, COO, CAO, and CFO, and mandated that the RMC meet at least once a month to evaluate SemGroup's trading activity.  According to the Examiner, however, "Foxx, Allen, Stallings, Brochetti, Oven, Shimonov and Coen, stated that they did not remember a single RMC meeting ever being held."  Purported controls over SemGroup's trading referenced in the RMP, including position limits and stop-loss limits, and a requirement that trading be supported by physical inventory, thus precluding trading in "naked options," were frequently violated.  Moreover, as the Examiner found, "SemGroup's RMP was never integrated into SemGroup's policies and procedures and its day-to-day trading decisions," and "the vast majority of SemGroup's personnel did not see and were, at best, only vaguely familiar with SemGroup's RMP."  These personnel included (1) Coen, a trader, who only had a copy sent to him on July 1, 2008, immediately preceding the Parent's bankruptcy filing; (2) Darrell Weakland, another trader, who never saw the RMP and was unaware that it had any trading limits; (3) Shimonov, a trader at SemCanada who was also unaware of the existence of the RMP and of SemGroup's RMC.

296.    In addition, according to the Examiner, Oven admitted that up until May 2008, volatility in commodities prices was not considered as a risk factor by SemGroup traders or risk management.  Similarly, "Coen admitted that volatility wasn't focused upon as much as it should have been and that it was only after [the Parent's] bankruptcy petitions that SemGroup calculated the effects of volatility on a daily basis."

297.    Risk controls that Allen implemented were also ineffective, the Examiner found. For example, "Risk Graph" analyses Allen began performing in June 2007 to assess the profit and loss effects of upward or downward price movements by +/- 20% did not consider the

dramatic rise in the price of crude oil from $50 in January 2008 to more than $140 a barrel in July 2008. Similarly, the "Delta Swing Analysis" Allen began performing in February 2008 to quantify the change in the delta of certain SemGroup commodity positions with the upward or downward change in the market price of each commodity, did not consider the increase in market volatility as a risk factor and, consequently, did not anticipate the consequences of extreme market price moves such as that which occurred in crude oil prices between January and July 2008.

298.   Finally, "stress tests" Allen devised to help SemGroup traders and management understand the financial impact on the company of market price movements were similarly ineffective as they were not created prior to January 30, 2008 and were not performed regularly until April 2008. Nevertheless, SemGroup's massively increasing, multi-billion-dollar margin balance put all SemGroup and SGLP executives on notice of the unacceptable and undisclosed risks imposed by Kivisto's trading strategy, which was not adjusted during the Class Period despite unprecedented rises in oil prices.

### 4.   Other Indicia of Defendants' Scienter

299.   In a post-mortem review of the collapse of SemGroup and events leading to the abrupt change in control at SGLP, independent directors on SGLP's General Partner's Board of Directors conducted an internal review and concluded, as disclosed in the Company's SEC filings, that the Individual Defendants deliberately ignored facts that demonstrated SemGroup's liquidity problems at the time that they caused SGLP or its General Partner to enter into certain transactions during the Class Period.

300.    The departure of certain key executives involved in the fraud alleged herein, during and at the end of the Class Period, also supports a strong inference of scienter including that:

a.    On July 16, 2008, Wallace went to the Management Committee and, after discussing Westback's receivable, resigned from SemGroup;

b.    On July 17, 2008, Cooper e-mailed Kivisto and resigned from SemGroup;

c.    Effective July 18, 2008, SemGroup placed Kivisto on administrative leave;

d.    Brochetti, who was employed by both SemGroup and SGLP from July 2007 through February 2008, resigned as SemGroup's Vice President of Finance on March 1, 2008; and

e.    On July 21, 2008, Foxx resigned his position at SemGroup and as a member of its Management Committee.

301.    The centrality of commodities trading to SemGroup also supports a strong inference of scienter.  According to the Examiner, Defendants Foxx and Brochetti both stated that commodities trading contributed significantly to SemGroup's revenue.  As a result of this profit-driving activity, SemGroup was able to expand and, ultimately, dropdown assets to SGLP.

302.    In addition, the fact that Defendants Kivisto, Wallace and Cooper refused to cooperate with the Examiner's investigation of the facts and circumstances giving rise to SemGroup's collapse, and that each invoked his Fifth Amendment privilege against self-incrimination when questioned under oath in depositions by the Examiner regarding SemGroup's secret trading operations, supports a strong inference of scienter.

E.     **Additional Causation Allegations**

303.     As set forth herein, during the Class Period, Defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the price of SGLP common units and operated as a fraud or deceit on Class Period purchasers of SGLP common units by misrepresenting to and omitting material information from the public about, *inter alia*: (1) SGLP's Parent's speculative trading strategy; (2) the value of servicing and storage contracts with SGLP's Parent; (3) SGLP's guaranteed ability to generate stable and consistent monthly revenues from its Parent; and (4) SGLP's and its Parent's overall business and operating condition.

304.     These misstatements and omissions caused and maintained artificial inflation in the price of SGLP's common units throughout the Class Period, reaching as high as $31 per common unit, before the first corrective disclosure came to light.  As the price of SGLP's common units increased, Class members, unwittingly and in reliance on SGLP's false and misleading statements purchased SGLP common units at artificially-inflated prices.  But for Defendants' material misrepresentations and omissions, Lead Plaintiff and other Class members would not have purchased SGLP common units, or would not have purchased them at the artificially-inflated prices at which they traded during the Class Period.  As Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market in disclosures at the end of the Class Period, the price of  SGLP's common units fell precipitously as the concealed risks and facts related to Defendants' fraud became known and the inflation was removed from the share price.  Due to their purchases of SGLP common units during the Class Period, and as a direct and proximate result of the conduct alleged herein, Lead Plaintiff and

other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

305.   On the morning of July 17, 2008, *Bloomberg News* reported that SGLP's shares were trading down approximately 30% relating to "chatter that the weakness in SGLP is related to a rumor about an affiliated [company]."   Later the same day, before the market closed, Moody's published a report regarding liquidity challenges at SemGroup, including "very large liquidity needs for cash margin deposits," and downgraded SemGroup's "corporate family" rating and its debt and probability of default rating. Moody's also placed SemGroup's new ratings under review for further downgrade.

306.   The market reacted quickly and severely to this adverse news, and SGLP's common units reached an intra-day low of $10.16 per share and closed on July 17, 2008, at $11.00 per share, which was a 51.75% drop from the prior day's close of $22.80 per share.  Also, by the end of the day, SGLP had lost hundreds of millions of dollars in market value on unusually heavy trading – more than 5.7 million shares changed hands.

307.   After the market closed on July 17, 2008, the Company shocked investors when it announced that SemGroup – one of the nation's largest private businesses – was "experiencing liquidity issues" and was considering alternatives, including "a voluntary petition for reorganization under Chapter 11."  SGLP also confirmed in the release that SGLP generated a "substantial majority" of its revenue from its Parent.  The same day, the *Tulsa World* reported that SGLP's "livelihood depends on the private company."

308.   News regarding SemGroup's debt and cash flow problems, and the significant problems these issues posed to SGLP, continued to trickle out into the market over the next few

days as set forth above in Section VI. B.  On July 18, 2008, SGLP's shares closed at $8.30 per share, which was a 24.5% drop.

309.    On July 21, 2008, the Company announced that Manchester and Alerian had seized control of SGLP and "reconstituted" the Board of Directors of SGLP's General Partner. Defendants Kivisto, Foxx, Bishop and Brochetti were all ousted from the Board. On July 22, 2008, SGLP announced that SemGroup had filed for bankruptcy, and SGLP's shares closed down at $8.28 per share.

310.    Two days later, on July 24, 2008, SGLP filed a press release announcing, among other adverse news, that the abrupt change in control at SGLP's General Partner had terminated SemGroup's obligation to provide services to SGLP under the Company's Omnibus Agreement with SemGroup, and consequently triggered an event of default under SGLP's credit facility. SGLP's common units closed at $7.72 per share on July 24, 2008, and continued to fall and closed at $7.55 per share on July 25, 2008.

311.    Between July 17 and July 25, 2008, as a result of SGLP's disclosures, the Company's common units lost more than 65% of their value, falling from $22 to $7.55 per share. To date, the Company's common unit price has not recovered from these disclosures – and prior to being delisted from NASDAQ in February 2009 – closed as low as $0.91 per common unit in November 2008.

## VII.    FRAUD ON THE MARKET APPLICABILITY OF PRESUMPTION OF RELIANCE

312.    The market for SGLP's common units was at all times relevant hereto, an open, well-developed and efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the price of these securities.

313.    Lead Plaintiff is entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine because:

(a)    SGLP common units met the requirements for listing and were listed and actively traded on the NASDAQ, a highly-efficient and automated market, during the Class Period;

(b)    As a regulated issuer, SGLP filed period public reports with the SEC during the Class Period;

(c)    Defendants regularly communicated with public investors during the Class Period via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

(d)    During the Class Period, a number of national securities analysts who issued publicly available reports, followed and reported on SGLP including, but not limited to: Wachovia Capital Markets, LLC; RBC Capital Markets, SMH Capital, Citigroup and Lehman Brothers.

(e)    Defendants made public misrepresentations and omitted material facts during the Class Period, as alleged herein;

(f)    the misrepresentations and omissions were material;

(g)    the market reacted to public information disseminated by SGLP and the other Defendants, causing the price of SGLP common units to move up or down as Defendants disseminated public information;

(h)     the misrepresentations and omissions alleged herein induced the stock markets and reasonable investors to misjudge the value of SGLP common units; and

(i)     without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and the other members of the Class purchased SGLP common units between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which time the price of SGLP common units was inflated by Defendants' misrepresentations and omissions.

314.    The change in the price of SGLP's common units in response to the release of unexpected material positive and negative information about the Company and its Parent shows there was a cause and effect relationship between the public release of the unexpected information about SGLP and the price movement in the Company's common units.

315.    As a result of the foregoing, the market for SGLP common units promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's common unit price.  Under these circumstances, all purchasers of SGLP common units during the Class Period suffered similar injury through their purchase of SGLP common units at artificially inflated prices and the subsequent revelations concerning declines in price.

316.    Based upon the foregoing, Lead Plaintiff and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for purposes of class certification, as well as for ultimate proof of the claims on the merits.  Similarly, Lead Plaintiff and the other members of the Class are entitled to a presumption of reliance with respect to the misrepresentations and omissions alleged herein.

## VIII.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

317.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities who purchased or otherwise acquired SGLP common units during the Class Period, July 17, 2007 through and including July 17, 2008, including all persons who purchased or otherwise acquired SGLP common units pursuant or traceable to IPO Documents or the Secondary Offering Documents. Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of SGLP, the Parent, the General Partner, SemGroup Holdings or any of the Underwriter Defendants at the time of the IPO or the Secondary Offering or during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

318.    The Class is so numerous that joinder of all Class members is impracticable. Throughout the Class Period, SGLP units were actively traded on the NASDAQ, an efficient national securities market.  While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number in the thousands.  As of May 2, 2008, there were 21,275,000 common units of SGLP issued and outstanding.  SGLP units are followed by securities analysts employed by major brokerage firms who wrote reports that were disseminated to the sales force and to certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

319.    Lead Plaintiff's claims are typical of the claims of other Class members.  Lead Plaintiff and all Class members acquired their SGLP units pursuant or traceable to one of the IPO Offering Documents or Secondary Offering Documents or on the open market, and sustained

damages as a result of Defendants' wrongful conduct complained of herein in violation of the federal securities laws.

320.    Lead Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation. Lead Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Lead Plaintiff seeks to represent.

321.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

322.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether documents, press releases and public statements made by the Defendants during the Class Period concerning SGLP's financial and operational position, including statements concerning SGLP's Parent and its financial liquidity, contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)     whether SGLP and the Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(d)     whether the market price of SGLP common units during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

(e)     whether the Class members have sustained damages and, if so, the appropriate measure thereof.

323.   Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

324.   The names and addresses of record owners of SGLP common units purchased pursuant or traceable to the IPO and Secondary Offering and during the Class Period are available from records maintained by SGLP or its transfer agent.  Notice may be provided to such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions.

325.   In bringing these claims, Lead Plaintiff and the members of the Class have established the element of loss causation under the United States Supreme Court standard annunciated in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), and are entitled to the presumption of reliance established by the fraud-on-the-market doctrine, for the reasons set forth above in ¶¶303-316.

**COUNT I**
**Violations of §11 of the Securities Act**
**(Against Defendant SGLP, the Individual Defendants, except Cooper,**
**SemGroup GP, and the Underwriter Defendants)**

326.   This Count is asserted against SGLP, the Individual Defendants, except Cooper, SemGroup GP, and the Underwriter Defendants for violations of § 11 of the Securities Act, 15

U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the SGLP securities issued in the IPO or the Secondary Offering.  SemGroup Holdings also would be named in this Court as a primary violator of § 11 of the Securities Act, but for its bankruptcy filing subsequent to the IPO.

327.     This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Lead Plaintiff does not allege that SGLP, the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a § 11 claim.

328.     The Registration Statements for the IPO and the Secondary Offering, and the Prospectuses incorporated therein, were false and misleading, contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as described above.

329.     SGLP is the registrant for the IPO.  As issuer of the common units that were registered, SGLP is strictly liable to Lead Plaintiff and members of the Class who purchased or otherwise acquired the SGLP securities issued in the IPO and Secondary Offering, pursuant to the Registration Statements, for the misstatements and omissions contained therein.

330.     The Individual Defendants were executive officers and/or directors and representatives of SGLP and its General Partner at the time the Registration Statements became effective and were responsible for the contents and dissemination of the Registration Statements. Further, all of the Individual Defendants and SemGroup GP signed or authorized the Registration Statements.  As such, the Individual Defendants and SemGroup GP issued, caused to be issued, and participated in the issuance of materially false and misleading written statements that were contained in the Registration Statements, which misrepresented or failed to disclose, among

other things, the facts set forth above. By reason of the conduct alleged herein, each of these Defendants violated § 11 of the Securities Act.

331.   As officers and/or directors of SGLP's General Partner, the Individual Defendants owed to the purchasers of the securities issued in the IPO and the Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially false and misleading.  The Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading at the time that they were made.  Accordingly, SemGroup GP and the Individual Defendants, except Cooper, are liable to Lead Plaintiff and the other members of the Class who purchased SGLP securities issued in the IPO and Secondary Offering pursuant to the Registration Statements.

332.   As underwriters of the IPO and the Secondary Offering, the Underwriter Defendants owed to the purchasers of the securities issued in the IPO and Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially false and misleading at the time that they were made.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.  Accordingly, the Underwriter Defendants are liable to

Lead Plaintiff and the other members of the Class who purchased SGLP securities issued in the IPO and Secondary Offering pursuant to the Registration Statements.

333.    Lead Plaintiff and other members of the Class who acquired the securities in the IPO and Secondary Offering pursuant to the Registration Statements, did not know of the wrongful conduct alleged herein or of the facts concerning the false and misleading statements and omissions alleged herein, and could not have reasonably discovered such facts or wrongful conduct.

334.    None of the misrepresentations or omissions alleged herein was a forward-looking statement but, rather, concerned existing facts. Moreover, Defendants did not properly identify any of these statements as forward-looking statements and did not disclose information, known to them, that undermined the validity of those statements.

335.    Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based and less than three years have elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

336.    Lead Plaintiff and the other members of the Class have sustained damages. The value of SGLP common units sold in the IPO and Secondary Offering has declined substantially subsequent to and due to the violations of § 11 of the Securities Act by SGLP, the Individual Defendants and the Underwriter Defendants.

337.    By reason of the foregoing, SGLP, the Individual Defendants, except for Cooper, and the Underwriter Defendants named in this Count are liable for violations of § 11 of the Securities Act to Lead Plaintiff and the other members of the Class who purchased or

otherwise acquired SGLP common units in the IPO and Secondary Offering pursuant to the Registration Statements.

## COUNT II
### Violations of § 12(a)(2) of the Securities Act
### (Against Defendants SGLP and the Underwriter Defendants)

338.   This Count is asserted against SGLP and the Underwriter Defendants for violations of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff and all members of the Class who purchased or otherwise acquired securities in the IPO and Secondary Offering.

339.   This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Lead Plaintiff does not allege for purposes of this Count that the Underwriter Defendants had scienter or fraudulent intent, or that SGLP's liability under this Count arises from any scienter or fraudulent intent which are not elements of a § 12(a)(2) claim.

340.   SGLP issued the Prospectuses and was an offeror and/or solicitor of sales of securities offered pursuant to the Prospectuses for the IPO and Secondary Offering.   The Prospectuses contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as set forth above.  SGLP's actions and solicitations included participating in the preparation of the materially false and misleading Prospectuses.

341.   As the issuer of the securities, SGLP is strictly liable for the materially false and misleading statements contained in the Prospectuses for the IPO and Secondary Offering.

342.   The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to Prospectuses in the IPO and Secondary Offering.  The Prospectuses

contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as set forth above. The Underwriter Defendants' actions and solicitations included participating in the preparation of the materially false and misleading Prospectuses.

343.    The Underwriter Defendants are sellers within the meaning of the Securities Act because they: (a) transferred title to Lead Plaintiff and other members of the Class who purchased SGLP common units; (b) transferred title of SGLP common units to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants; and (c) solicited the purchase of SGLP common units by Lead Plaintiff and other members of the Class, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of SGLP, including but not limited to commissions on their own sales of SGLP securities and separate commissions and fees on the sale of those securities by non-underwriter broker-dealers.

344.    The Underwriter Defendants owed to Lead Plaintiff and all other purchasers or other acquirers of securities in the IPO and Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading.   The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Prospectuses were true and without omissions of any material facts and were not misleading.   Accordingly, the Underwriter Defendants are liable to Lead Plaintiff and the other members of the Class who purchased SGLP securities in the IPO and Secondary Offering.

345.    Lead Plaintiff and other members of the Class purchased or otherwise acquired securities in the IPO and Secondary Offering pursuant to the materially false and misleading Prospectuses and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

346.    Lead Plaintiff and other members of the Class offer to tender, and hereby tender, to SGLP and the Underwriter Defendants those SGLP securities that the members of the Class continue to own in return for the consideration paid for those securities, together with interest thereon.

347.    By virtue of the conduct alleged herein, SGLP and the Underwriter Defendants violated §12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiff and other members of the Class who purchased in the IPO or the Secondary Offering pursuant to the Prospectuses have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to SGLP and the Underwriter Defendants.  Lead Plaintiff and the members of the Class who have sold their securities purchased in the IPO or Secondary Offering are entitled to rescissory damages.

## COUNT III

### Violations of § 15 of the Securities Act
### (Against Defendants SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones)

348.    This Count is asserted against the Individual Defendants, SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones for violations of § 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Class who purchased or otherwise acquired securities in connection with the IPO and Secondary Offering pursuant to the Registration Statements and Prospectuses.

- 134 -

349.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of this Count, Lead Plaintiff does not allege that SemGroup GP's, Ritchie's, Carlyle/Riverstone's, Thane Ritchie's, Ward's or Jones' liability under this Count arises from any scienter or fraudulent intent, which are not elements of a § 15 claim.

350.    At all relevant times, Defendants SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones were "controlling persons" of SGLP within the meaning of Section 15 of the Securities Act.  Defendants Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones also were at all relevant times "controlling persons" of SemGroup Holdings within the meaning of Section 15 of the Securities Act.

351.    SemGroup GP controls SGLP as its General Partner, owning a 2% General Partner Interest in SGLP.  At all relevant times, SemGroup GP managed the operations and activities of SGLP, and SemGroup GP's Board of Directors made decisions on SGLP's behalf. SemGroup GP participated in the preparation and dissemination of the Registration Statements and Prospectuses for the IPO and Secondary Offering, and otherwise participated in the process necessary to conduct the IPO and Secondary Offering.  SemGroup GP's executive officers and directors also signed the Registration Statements for the IPO and the Secondary Offering. Through its position of control and authority over SGLP, SemGroup GP was able to, and did, control the contents of the Registration Statements for the IPO and Secondary Offering which contained materially false financial information.

352.    At all relevant times, Ritchie and Carlyle Riverstone controlled SGLP through their designated members of SemGroup's Management Committee (Thane Ritchie, Ward and Jones) and through their 25.2% and 29.3% ownership interest in SemGroup, which maintained a

100% ownership interest in SemGroup Holdings, which maintained a 100% ownership interest in the General Partner, at the time of the IPO and Secondary Offerings.  Pursuant to the IPO, SemGroup Holdings sold 14,375,000 common units to the public (amounting to a 52.3% Limited Partner Interest in SGLP) and 511,643 General Partner Units to SemGroup GP (amounting to a 2% General Partner Interest) while retaining 12,570,504 Subordinated Units (amounting to a 45.7% Limited Partner Interest).  SemGroup, as 100% owner of SemGroup Holdings, controlled a 45.7% Limited Partner Interest in SGLP.

353.    By reason of the aforementioned conduct, SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones are liable under § 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under §§ 11 and 12(a)(2) of the Securities Act, to Lead Plaintiff and the other members of the Class who purchased units in the IPO and Secondary Offering.   As a direct and proximate result of SemGroup GP's, Ritchie's, Carlyle/Riverstone's, Thane Ritchie's, Ward's and Jones' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisition of SGLP common units.

### COUNT IV
### Violations of §15 of the Securities Act
### (Against the Individual Defendants)

354.    This Count is asserted against the Individual Defendants for violations of § 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiff and the other members of the Class who purchased or otherwise acquired securities in connection with the IPO and Secondary Offering pursuant to the Registration Statements and Prospectuses.

355.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Lead Plaintiff does

not allege that the Individual Defendants had scienter or fraudulent intent, which are not elements of a §15 claim.

356.    At all relevant times, the Individual Defendants were "controlling persons" of the Company within the meaning of § 15 of the Securities Act.  Each of the Individual Defendants served as an executive officer and/or director of SGLP.

357.    Each of the Individual Defendants at all relevant times participated in the operation and management of SGLP, and conducted and participated, directly and indirectly, in the conduct of SGLP's business affairs.   As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SGLP's financial condition and results of operations.  The Individual Defendants participated in the preparation and dissemination of the Registration Statements and Prospectuses, and otherwise participated in the process and in transactions between SemGroup and SGLP necessary to conduct the IPO and Secondary Offering.  Because of their positions of control and authority as senior officers and directors of SGLP's General Partner, and Cooper's position of authority with SGLP's Parent, the Individual Defendants were able to, and did, control the contents of the Registration Statements and Prospectuses which contained untrue statements and material omissions.

358.    By reason of the aforementioned conduct, each of the Individual Defendants named in this Count is liable under § 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under §§ 11 and 12(a)(2) of the Securities Act, to Lead Plaintiff and the other members of the Class who purchased securities in the IPO and Secondary Offering.  As a direct and proximate result of the conduct of the Individual Defendants, Lead

Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisition of SGLP common units.

### COUNT V
### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### (Against SGLP, SemGroup GP and the Individual Defendants)

359.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.  This Count is asserted against SGLP, SemGroup GP and the Individual Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule l0b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.  SemGroup and SemGroup Holdings also would be named in this Court as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but for their bankruptcy filings subsequent to the Class Period.

360.    Prior to and throughout the Class Period, SGLP, SemGroup GP, SemGroup and SemGroup Holdings, and each of the Individual Defendants, individually and in concert with others, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and a national securities exchange, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and, during the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding, among other things, the Parent's adverse financial condition, and specifically its speculative, dangerous and unauthorized trading and resultant liquidity issues as early as July 2007; (ii) fail to disclose the existence of a

secured loan to the Parent which, upon Parent's seeming default, allowed the transfer of control of SGLP to creditors, Manchester and Alerian, whose interests are in direct conflict with Lead Plaintiff and the members of the Class; (iii) artificially inflate and maintain the market price of SGLP common units; and (iv) cause Lead Plaintiff and other members of the Class to purchase SGLP common units at artificially-inflated prices.

361.   Defendant SGLP and the Individual Defendants, as the top executive officers and/or directors of SGLP, SemGroup GP and SemGroup, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of SGLP's General Partner and SemGroup, the Individual Defendants were able to control and did control the content of the public statements contained herein and, with knowledge or in reckless disregard, they caused the above complained-of public statements to contain misstatements and omissions of material facts as alleged herein.

362.   Defendant SGLP is liable for each of the materially false and misleading statements set forth herein, including each of the statements of the Individual Defendants.

363.   In addition, the false and misleading statements made in SGLP's published documents (including but not limited to its press releases and SEC filings) constitute group published information, which the Individual Defendants were responsible for creating.  During their respective terms of employment at SGLP, the Individual Defendants had direct involvement in the daily business of SGLP and participated in the dropdown of assets from SemGroup to SGLP and the preparation and dissemination of SGLP's group published information.

364.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for SGLP common units. Lead Plaintiff and the other members of the Class would not have purchased SGLP common units at

the price they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

365. The Individual Defendants, SGLP and SemGroup GP acted with scienter, and they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of SGLP were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding SemGroup and SGLP, their control over, and/or receipt and/or modification of SGLP's allegedly materially misleading misstatements and/or their associations with SemGroup and SGLP which made them privy to confidential proprietary information concerning SemGroup and SGLP, participated in the fraudulent scheme alleged herein.

366. Defendants also acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding SGLP, their control over, and/or receipt and/or modification of SGLP's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning SGLP, participated in the fraudulent scheme alleged herein.

367.    The motive of the Individual Defendants, SGLP and SemGroup GP was to raise substantial capital in the IPO and Secondary Offering to provide cash to the Individual Defendants, SemGroup's investors and other insiders and to the Parent to ease its undisclosed material liquidity problems caused by its risky speculative trading strategy. In furtherance of this scheme, the Defendants caused SGLP to disseminate the IPO and Secondary Offering Documents so as to raise hundreds of millions of dollars from the investing public, plus borrowed funds, which would be paid to the Parent.

### COUNT VI
### Violation of §20(a) of the Exchange Act
### (Against the Individual Defendants, SemGroup GP,
### Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones)

368.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.  This Count is asserted against the Individual Defendants, SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones for violations of §20(a) of the Exchange Act.

369.    SGLP committed a primary violation of § 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5,17 C.F.R. § 240.10b-5, promulgated thereunder, by making the false and misleading statements of material facts and material omissions, identified above, in connection with the purchase or sale of securities, which constituted a fraud on the market and were, therefore, presumed to have been relied upon by Lead Plaintiff and the other members of the Class.  At the time that SGLP issued materially false and misleading statements, the Individual Defendants either knew of, or recklessly disregarded, their falsity.

370.    Each of the Individual Defendants, as well as SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones had direct control and/or supervisory involvement in the operations of SemGroup, SemGroup GP, SemGroup Holdings and/or SGLP

prior to and during the Class Period, and therefore had the power to control or influence the particular transactions giving rise to the violations of the Exchange Act by SemGroup, SemGroup GP, SemGroup Holdings and SGLP as alleged herein, and exercised the same.

371.    By reason of their status as officers and/or directors of SGLP's General Partner during the Class Period, the Individual Defendants had the power and influence to cause SGLP to engage in the unlawful conduct complained of herein and, as such, are "controlling persons" of SGLP within the meaning of §20(a) of the Exchange Act.

372.    The Individual Defendants each signed or authorized the Registration Statements and Prospectuses for the IPO and Secondary Offering and thereby controlled their contents and dissemination, including the dissemination of the false or misleading statements contained therein.  The Individual Defendants participated in the preparation and dissemination of the Registration Statements and Prospectuses, and otherwise participated in the process necessary to conduct the IPO and Secondary Offering.  Because of their positions of control, these Defendants were able to, and did, directly or indirectly, control the conduct of the IPO and Secondary Offering and the information contained in the Registration Statements and Prospectuses, and the dissemination thereof.  By reason of their status as directors of SGLP's General Partner and SemGroup, and Cooper's high-level position at SemGroup, at the time of the IPO and Secondary Offering and/or their signing or authorizing of the Registration Statements, these Defendants had the power and influence to cause SGLP to engage in the unlawful conduct complained of herein and, thus, were "controlling persons" of SGLP within the meaning of §20(a) of the Exchange Act as of the time of the IPO and Secondary Offering.

373.    By reason of the facts that SemGroup GP was the General Partner of SGLP and managed SGLP's operations and activities, as well as the fact that its Board of Directors and

officers made decisions on SGLP's behalf, SemGroup GP had the power and influence to cause SGLP to engage in the unlawful conduct complained of herein and, as such, is a "controlling person" of SGLP within the meaning of §20(a) of the Exchange Act. By reason of each of their respective 25.2% and 29.3% ownership interest in SemGroup, which wholly-owned SemGroup Holdings' 45.7% Limited Partnership Interest in SGLP, Ritchie and Carlyle/Riverstone had the power and influence to cause SGLP to engage in the unlawful conduct complained of herein and, as such, are "controlling persons" within the meaning of §20(a) of the Exchange Act.

374.   By reason of each of their ownership and control over Ritchie and Carlyle/Riverstone, and their power and influence to SemGroup through their Management Committee positions, Thane Ritchie, Ward and Jones each caused SemGroup and SGLP to engage in the unlawful conduct complained of herein and, as such, are "controlling persons" within the meaning of §20(a) of the Exchange Act.

375.   Because of their positions of control, the Individual Defendants, SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones were able to, and did, directly or indirectly, control the conduct of SGLP's business, the information contained in its filings with the SEC, and public statements about its business.

376.   Each of the Individual Defendants, SemGroup GP, Ritchie, Carlyle/Riverstone, Thane Ritchie, Ward and Jones were provided with or had access to copies of SGLP's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

377.   As set forth above, each of the Individual Defendants, SemGroup GP, Ritchie, Carlyle/Riverstone Thane Ritchie, Ward and Jones controlled SGLP, which violated § 10(b) of

the Exchange Act and Rule l0b-5 promulgated thereunder by its acts and omissions as alleged in this complaint.  By virtue of their positions as "controlling persons," these Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate cause of the wrongful conduct set forth in this Count, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of SGLP's common units in the IPO, Secondary Offering and during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as a class representative;

C.     Awarding compensatory damages in favor of Plaintiff and the other Class members against the Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment interest thereon;

D.     Awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     Awarding plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: July 16, 2009                    */s/  Lauren Wagner Pederson*

**BARROWAY TOPAZ KESSLER**
 **MELTZER & CHECK, LLP**
Stuart L. Berman (*admitted pro hac vice*)
Gregory Castaldo (*admitted pro hac vice*)
Lauren Wagner Pederson (*admitted pro hac vice*)
Sharan Nirmul (*admitted pro hac vice*)
Naumon A. Amjed (*admitted pro hac vice*)
Michelle M. Newcomer (*admitted pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel:    610.667-7706
Fax:    610.667-7056
Lead Counsel

**NELSON, ROSELIUS, TERRY**
**O'HARA & MORTON**
Douglas A. Terry (Bar Number 15855)
Jason E. Roselius (Bar Number 16721)
Guy R. Wood (Bar Number 15875)
P. O. Box 138800
Oklahoma City, Oklahoma 73113-8800
Tel:    405.705.3600
Fax:    405.705.2573

Liaison Counsel