IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE: SEMGROUP ENERGY ) 
PARTNERS, L.P. SECURITIES )     Case No. 08-MD-01989 GKF-FHM
LITIGATION )

## DEFENDANT GREGORY C. WALLACE'S
## MOTION TO DISMISS AND BRIEF IN SUPPORT

Orrin L. Harrison III
*pro hac vice*
Lisa S. Gallerano
*pro hac vice*
Edwin T. Aradi
*previously admitted*
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

Clark O. Brewster
Oklahoma Bar Number 1114
Mark B. Jennings
Oklahoma Bar Number 10082
BREWSTER & DE ANGELIS, PLLC
2617 East 21st Street
Tulsa, Oklahoma 74114
Telephone: (918) 742-2021
Facsimile: (918) 742-2197

ATTORNEYS FOR DEFENDANT
GREGORY C. WALLACE

Dated:  July 22, 2009

TABLE OF CONTENTS

Preliminary Statement ............................................................................................................1

Statement of Facts ..................................................................................................................3

    A.    The creation of SGLP ............................................................................3

    B.    SemGroup's commodities trading ..........................................................4

    C.    The unprecedented run-up in crude oil prices ........................................5

    D.    SemGroup's auditors and SGLP's July public announcement ...............7

    E.    Public statements attributable to Wallace ..............................................8

    F.    Wallace's SGLP compensation and acquisition of SGLP units .............8

Argument & Authorities ........................................................................................................9

I.    Adoption Of Arguments ................................................................................9

II.    Harvest Fund Cannot Bring Section 11 Claims On Either Of The Challenged
Offerings ........................................................................................................9

    A.    Harvest Fund has no conceivable damages for the shares it bought and
sold between the initial and secondary offerings ..................................10

    B.    Harvest Fund cannot trace units purchased after the secondary offering
specifically to either the intitial or secondary offering .........................10

III.    Harvest Fund Has Not Pleaded Misstatements Or Omissions Actionable Under
Either Section 11 or Section 10(b) ................................................................13

    A.    Increasing margin calls and their subsequent effect on liquidity do not
reasonably lead to the conclusion that SGLP had a duty to disclose that
SemGroup's trading platform was "gambling" or "speculative" ...........13

        1.    SGLP had no duty to disclose SemGroup's trading strategy ........14

        2.    Harvest Fund has not pleaded sufficient facts
demonstrating that SemGroup's "speculative" trading was
the cause of its liquidity issues ......................................................15

        3.    Harvest Fund's claim that Wallace failed to properly
monitor trading activity cannot constitute a failure-to-
disclose claim ...............................................................................22

i

IV.   SGLP Had No Duty To Disclose Anything About SemGroup's Liquidity Position
      Prior to July 2008, At Which Time A Disclosure Was Properly Made .............................23

      A.   SGLP had no duty to disclose an affiliate's liquidity position ..............................23

      B.   Assuming that SGLP had a duty to report on SemGroup, the allegedly
           undisclosed facts did not exist at the time of SGLP's SEC filings ......................24

      C.   SGLP had a duty to disclose SemGroup's liquidity position only when it
           became certain that SemGroup would be unable to perform its contracts, at
           which time a timely disclosure was made..............................................................27

V.    The Risk Of Rising Commodity Prices And Its Impact On Liquidity Was Fully
      Disclosed In SGLP's Public Filings.....................................................................................27

VI.   Harvest Fund Has Not Adequately Pleaded That Wallace Acted With The
      Fraudulent Intent Required By Section 10(b) ...................................................................29

      A.   Harvest Fund has not alleged with particularity that Wallace knew any
           potentially material facts or that Wallace knew the failure to reveal such
           facts would likely mislead investors ....................................................................30

      B.   Allegations relating to Wallace's position at SemGroup are inadequate to
           raise a strong inference of scienter.......................................................................30

VII.  Control Person Claims Against Wallace Must Be Dismissed...........................................34

Conclusion ......................................................................................................................................35

## TABLE OF AUTHORITIES

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ..................................34

*In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005)...................11, 29

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................15, 19, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................16, 19

*Caprin v. Simon Transp. Servs., Inc.*, 99 Fed. Appx. 150, 159-60 (10th Cir. 2004) ....................19

*In re CFS-Related Securities Fraud Litig.,* No. 99-CV-829 (N.D. Okla., Dec. 21, 2001) ......13, 31

*City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245 (10th Cir. 2001)..............24, 25, 30, 31, 32, 34

*In re Cryomedical Scis., Inc. Sec. Litig.*, 884 F. Supp. 1001 (D. Md. 1995) ................................35

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ........................................29

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006) ...................................29

*In re FleetBoston Fin. Corp. Sec. Litig.*, 253 F.R.D. 315 (D.N.J. 2008)........................................12

*In re FX Energy, Inc. Sec. Litig.*, 2009 WL 1812828 (D. Utah June 25, 2009) .....................16, 26

*In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003)................10, 12, 13

*Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008).......................................12

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997).........................................24, 25, 29, 33

*In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217 (N.D. Cal. 1994) ...........................................35

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) .................................................26

*In re IPO Sec. Litig.*, 227 F.R.D. 65 (S.D.N.Y. 2004).................................................................12

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ......................................................10

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ..........................................................................................26, 27

*J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384 (6th Cir. 2008)..........................................14

*J&R Mkt'g, SEP v. Gen. Motors Corp.*, 2007 WL 655291 (E.D. Mich. Feb. 27, 2007) ..............23

*Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508 (D.C. Cir. 1986)......................................22

*Krim v. pcOrder.com*, 402 F.3d 489 (5th Cir. 2005) ...............................................................11, 12

*Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832 (S.D. Tex. March 30, 2002)...........26

*Lillard v. Stockton*, 267 F. Supp. 2d 1081 (N.D. Okla. 2003) ......................................................31

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998)...................................................34

*McNamara v. Pre-Paid Legal Servs., Inc.*, 189 Fed. Appx. 702, 716 (10th Cir. 2006) ...............34

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008)............................................................4

*New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273 (D. Kan. 2008)................................................30

*In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991 (N.D. Cal. 2001).........33

*Osio v. DeMane*, 2006 WL 2129460 (D.N.J. June 20, 2006).........................................................24

*Prescott Group Aggressive Small Cap, L.P. v. Blackwell*, 2003 U.S. Dist. LEXIS 27079
(N.D. Okla. Aug. 25, 2003) .......................................................................................................13

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130 (D. Colo. 2005)...................31

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987)..............................................................24

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).....................................................................22

*In re SeaChange Int'l, Inc.*, 2004 WL 240317 (D. Mass. Feb. 6, 2004).........................................24

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004) .....................30

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) ...................................................21

*In re Suprema Specialties, Inc. Sec. Litig.*, 334 F. Supp. 2d 637 (D.N.J. 2004)............................33

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ......................................33

*T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330 (10th
Cir. 1983) ...................................................................................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007)....4, 19, 30, 32

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989)...........................................24

*In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206 (N.D. Okla. 2003)..............................................22

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 77k....................................................................................................................10

15 U.S.C. § 78u-4 ...........................................................................................................1, 29

17 C.F.R. § 229.001, *et seq* …………………………………………………………...26

17 C.F.R. § 229.303 ..............................................................................................................23

Fed. R. Civ. P. 8.....................................................................................................................2

Fed. R. Civ. P. 9.....................................................................................................................1

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1

Defendant Gregory C. Wallace ("Wallace") respectfully submits this Motion to Dismiss and Brief In Support, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("Reform Act"), to dismiss the Amended Consolidated Securities Class Action Complaint ("Complaint" or "CAC") of Lead Plaintiff Harvest Fund Advisors LLC ("Harvest Fund").

## PRELIMINARY STATEMENT

Wallace was an outside director of SemGroup Energy Partners G.P., L.L.C., the general partner of SemGroup Energy Partners, L.P. ("SGLP"), the issuer of the securities in dispute in this lawsuit. Wallace did *not* have any internal job title or responsibilities at SGLP. While he was the CFO of SemGroup, L.P. ("SemGroup"), an affiliate of SGLP, SGLP had its own CFO and Chief Accounting Officer:

| Company | Wallace's Position |
|---|---|
| SemGroup, L.P. ("SemGroup") | Chief Financial Officer |
| SemGroup Energy Partners G.P., L.L.C. | Director |
| SemGroup Energy Partners, L.P. ("SGLP") | None |

Notably, Harvest Fund does not allege that SemGroup — the company for which Wallace was actually an officer — made any material misstatements or failed to disclose material facts; indeed, because SemGroup is a *private* company it did not have public reporting requirements. Instead, Harvest Fund alleges that everything SGLP stated during the class period was false or misleading because it did not disclose that *another company*, *i.e.*, SemGroup, supposedly engaged in speculative commodities trading that endangered SemGroup's liquidity. This theory of liability by attribution fails for at least four reasons.

*First*, Harvest Fund fails to allege facts tending to demonstrate that SemGroup's liquidity challenges in mid-2008 were caused by a "gambling" or "speculative" commodities trading

strategy. Initially, there is no requirement under the federal securities laws that SGLP disclose the business operations of an affiliated company like SemGroup. And even if there was any disclosure duty, the well-pleaded facts more reasonably show that SemGroup's liquidity challenge was caused by what Harvest Funds concedes was an unprecedented and unpredictable rise in oil prices in 2007 and the first half of 2008. Indeed, SemGroup's liquidity drain has a near-perfect correlation with the rise in crude oil prices. Recent Supreme Court pronouncements on the pleading standards under Rule 8 demonstrate that a claim fails when, as here, its conclusions are belied by facts that logically lead to a non-culpable explanation. The law simply does not require that SemGroup be clairvoyant.

*Second*, SGLP had no duty to disclose anything about SemGroup's liquidity or going-concern challenges until mid-July 2008, when, in fact, a disclosure was made. The case law and SEC rules are clear in not imposing a duty to disclose the liquidity position of an affiliated company as if the private affiliate was itself a public company. Rather, a disclosure only was required when it became certain that SemGroup would not be able to perform its material contracts with SGLP, and such a disclosure was timely made by SGLP in mid-July 2008.

*Third*, everything Harvest Fund complains of here — the risk posed by commodities trading, fluctuating oil prices, and SemGroup's inability to perform its contracts with SGLP — was fully disclosed and cautioned against in SGLP's public filings. The materialization of disclosed risks cannot be the basis for claims under the federal securities laws.

*Fourth*, Harvest Fund can not plead particularized facts raising the requisite *strong* inference that Wallace acted with fraudulent intent. The well-pleaded facts show that: (1) SemGroup's trading platform was audited by two separate companies retained by SemGroup's banking syndicate —neither one of which ever raised "red flags" that would have put Wallace on

2

notice that the trading program was "gambling" or "speculative"; (2) SemGroup's banking syndicate, which received weekly reports showing whether SemGroup was in compliance with its risk management policies and commodities trading limitations in its lending agreements, never once claimed that SemGroup was out of compliance; (3) Wallace was never shown a document or otherwise told that SemGroup's liquidity position was so challenged that it could not perform its material contracts until July 2008, when a disclosure properly was made; and (4) Wallace personally invested heavily in SGLP in 2007 and 2008 but never sold any of his units, thus himself incurring a multi-million dollar loss. These *facts* — straight from the allegations in the Complaint, the documents it relies on, and SGLP's public filings — militate against any showing that Wallace intended to deceive SGLP's investors by hiding the "true facts" about SemGroup's trading and liquidity.

In short, Harvest Fund improperly attempts to impose on Wallace through litigation disclosure obligations that otherwise do not exist: a public company like SGLP is not required to disclose the affairs of a private company like SemGroup, even if the companies are affiliates and counterparties to material contracts. Moreover, Wallace cannot be liable as a director of SGLP for failing to disclose the impact that the unprecedented, unforeseeable, and unpredictable volatility in crude oil prices would have on SemGroup's trading platform and liquidity.

**STATEMENT OF FACTS**

**A.**     **The creation of SGLP**

Wallace was the CFO of SemGroup but an outside director of SGLP, which had its own CFO and Chief Accounting Officer, and its own set of directors who had inside officer positions. CAC ¶¶ 25-31. As early as 2003, SemGroup considered a strategy of dropping down assets into master limited partnerships ("MLPs") that would in turn be taken public. Defendants' Request

3

for Judicial Notice ("RJN") Exh. 1, Examiner's Report, at 162;[1] CAC ¶¶ 7, 61.  SGLP was created in 2007 when SemGroup dropped down certain crude oil assets and the parties entered into a Throughput Agreement wherein SemGroup agreed to pay SGLP a minimum monthly use fee.  CAC ¶¶ 61, 122, 127.  The first offering of SGLP limited partnership common units was consummated in July 2007 (the "Initial Offering" or "IPO") pursuant to a set of documents filed with the SEC that became effective July 17, 2007 (the "IPO Offering Documents").  *Id.* ¶¶ 112-13, 122.  Subsequently, SemGroup dropped down certain a second set of assets and the parties entered into a Terminalling Agreement wherein SemGroup again agreed to pay SGLP a minimum monthly use fee.  *Id.* ¶¶ 148-49, 158.  A second offering of SGLP limited partnership common units was consummated in February 2008 (the "Secondary Offering") pursuant to a set of documents filed with the SEC that became effective February 13, 2008 (the "Secondary Offering Documents").  *Id.* at ¶ 152.  Together, the Throughput Agreement and Terminalling Agreement accounted for 80% of SGLP's revenue.  *See* CAC ¶ 244.

### B.    SemGroup's commodities trading

Among its other business lines, SemGroup bought crude oil and natural gas from producers and contracted to deliver to refiners in the future.  *Id.* at ¶¶ 7, 56.  SemGroup's credit facility agreements required that it manage these contracts to protect against price fluctuations (because SemGroup was buying at Point A at Time A and delivering at a different Point B and a

---

[1] Wallace relies on documents contained in an appendix to Defendants' Request for Judicial Notice (cited to as "RJN Exh.___").  These documents include: (1) SGLP's public filings; (2) documents cited to or relied on in the Complaint, and (3) other publicly-available material whose authenticity is not in dispute (such as SGLP's unit price and the price of crude oil).  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007) (court may rely on documents referenced in complaint); *In re New Century,* 588 F. Supp. 2d 1206, 1221 (C.D. Cal. 2008) (court may rely on entirety of documents referenced in complaint, including a Bankruptcy Examiner's report, not just portions cited by plaintiff).

later Time B).  *See id*. at ¶ 66 (SemGroup "engaged in trades of forward contracts and other arrangements to hedge its exposure to fluctuations in the price of crude oil").  SemGroup's price risk management was extremely successful and profitable from 2000 through 2006, when crude oil prices were within prevailing historical ranges with prevailing historical volatility.  *Id*. at ¶ 77; RJN Exh. 1, Examiner's Report, at 4 ("profits realized from a successful commodities trading program from 2000 to 2006").[2]  While any commodities trading is inherently speculative to some degree (*see* CAC ¶ 66), SemGroup's trading risk was governed by limitations in the lending facility agreements with its banking syndicate, part of which was the creation and implementation of a Risk Management Policy ("RMP").  RJN Exh. 1B, Examiner's Report Exhibit 6 - Risk Management Policy.

### C.     The unprecedented run-up in crude oil prices

Harvest Fund itself characterizes the rise in crude oil prices in 2007 and 2008 as "unprecedented" both in the amount of the rise and in the volatility the oil market experienced. *See, e.g.*, CAC ¶ 74.  Similarly, the Examiner called it "a turbulent time in commodities trading in 2007 and 2008."  RJN Exh. 1, Examiner's Report, at 5.  During that time frame, SemGroup's margin account had a corresponding increase:

| Timeframe | Spot Price of Crude Oil | Margin Account |
|---|---|---|
| Jan. 1, 2007 – July 2008 (period covered in examiner's report) | $57 to $147 (157% increase) | $1.0B to $2.3B (130%) |
| July 17, 2007 – July 2008 (approximate time of class period) | $72 to $147 (104%) | $1.0B to $2.3B (130%) |

---

[2] Similarly, the trader who the Examiner relied on to explain the trading strategy stated that he "back tested this trading strategy and that it seemed to have worked over time."  *See* RJN Exh. 1, Examiner's Report, at 70.

Jan. 1, 2008 – July 2008        $98 to $147 (50%)              $1.7B to $2.3B (35.3%)
        (time when plaintiff alleges margin was spiraling out of control)

Mar 31, 2008 – July 2008       $104 to $147 (41.5%)          $1.96B to $2.3B (17.3%)
        (approaching time of SemGroup's bankruptcy)

CAC ¶¶ 14, 64, 65, 74, 97, 99, 102; RJN Exh. 26, Charts of DOE WTI Spot Prices for Periods in

2007 and 2008.  These judicially-noticeable *facts* demonstrate that SemGroup's margin account

closely tracked the price of crude oil, and that the margin account actually grew at a *lower* rate

than the price of crude oil in 2008, especially from March 31 onward.

        The margin account represented the amount of cash SemGroup was required to post when

the price of oil rose above the price of its futures contracts.  CAC ¶ 90; RJN Exh. 1, Examiner's

Report, at 150-51 ("a company would be required to post a maintenance margin if the MTM loss

on a futures contract exceeded the dollar value of the initial margin").  As an over-simplified

example, if SemGroup was short an option contract at $75/bbl and the market moved to

$100/bbl, SemGroup had to post as margin $25 for each barrel until the contract expired (this

number would move based on the intrinsic value of the option, the volatility, and the time value).

*Id*. ("As market prices went up, the corresponding margin accounts per contract increased as

well.").

        Concurrently, under applicable accounting rules, SemGroup had a mark-to-market loss

equal to that of its additional margin requirements, while its inventory was valued at cost (*i.e.*,

SemGroup's physical oil could not be marked-to-market as the price of oil rose).  CAC

¶¶ 102, 286.  When oil prices tripled, so did the cost of SemGroup's purchases from suppliers;

meantime, it could not mark-to-market the oil it had in inventory, the value of which was also

rising.  Therefore, when oil prices continued to rise in the Spring and early Summer of 2008,

SemGroup's margin posting requirement and mark-to-market losses rose in tandem, without an

offset from the increased value of inventory. SemGroup essentially ran out of cash in July 2008 when its credit facility was pulled by Bank of America and it consequently was no longer able to make its margin payments. *See* CAC ¶¶ 74, 175. In short, SemGroup's trading strategy, successful from 2000 to 2006, purportedly "failed" only after the price of oil tripled, SemGroup's margin requirement similarly rose (though did not triple), and SemGroup did not have the room in its credit facility to meet that increasing margin (and was not able to close the GS TRuE offering, referenced *infra*, or get additional credit in the barren credit markets of July 2008). Shortly before it filed for bankruptcy, SemGroup novated its trading book to Barclays, which stood to make billions on SemGroup's trades when the price of oil normalized and sunk to $40/bbl by November. CAC ¶ 103; RJN Exh. 19, Chart of DOE WTI Spot Prices.

D.    **SemGroup's auditors and SGLP's July public announcement**

During the first half of 2008, Wallace was travelling extensively in the Middle East securing a $500 million "anchor investor" commitment for a $1.5 billion private placement offering of SemGroup equity on Goldman Sachs's GS TrUE platform (Tradable Unregistered Equity). RJN Exh. 1, Examiner's Report, at 100, 130, 224. All this while and before, the lenders in SemGroup's credit facility engaged two consultants to conduct annual audits of SemGroup's trading program — including the adequacy of the RMP, SemGroup's compliance with the RMP, the accuracy of SemGroup's bank reporting, and SemGroup's compliance with its commodities-related bank covenants. RJN Exh. 1D, Examiner's Report Exhibit 19 - Bowen Report; *see also id.* Exh. 1E, Examiner's Report Exhibit 35 - Evergreen Report.

Nowhere is it alleged that either auditor raised any "red flags" or found any material deficiencies. Harvest Fund cannot make such allegations because these auditors found that SemGroup's RMP was adequate (in fact, "exceeded industry standards" in several respects),

SemGroup rarely deviated from the RMP, SemGroup's bank reports were accurate, and SemGroup was in compliance with its bank covenants. RJN Exh. 1D, Examiner's Report-Exhibit 19 - Bowen Report; *see also id.* Exh. 1E, Examiner's Report Exhibit 35- Evergreen Report. No allegations are made to the contrary. Similarly, there is no allegation that SemGroup's independent auditor (PricewaterhouseCoopers), its lawyers (Hall Estill), or anyone else ever told Wallace that SemGroup was out of compliance with its RMP or its credit facility. Nor is it alleged that anyone — PwC, lawyers, accounting staff, *etc.* — ever informed Wallace that SemGroup was illiquid or unable to perform its contracts until July 2008, and SGLP made such an announcement on July 17, 2008. CAC ¶ 244.

### E.    Public statements attributable to Wallace

Wallace signed three documents — the July 2007 IPO Offering Documents, the February 2008 Secondary Offering Documents, and a March 2008 Form 10-K. These documents contained copies of the Throughput Agreement and/or Terminalling Agreement, described the relationship between SemGroup and SGLP, and disclosed the risks that a rise in the price and volatility of commodities would have directly on SemGroup and indirectly on SGLP if SemGroup was unable to perform under the agreements. *See infra* at pp. 28-29. Wallace did not sign any of SGLP's quarterly reports issued on SEC Form 10-Q, nor did he speak during any of SGLP's conference calls with analysts or investors. CAC ¶¶ 185-86, 217-21, 236-43.

### F.    Wallace's SGLP compensation and acquisition of SGLP units

Wallace received no compensation from SGLP. While Harvest Fund alleges that Wallace was paid bonuses in the amount of $7.5 million during the class period, these were paid by SemGroup, not by SGLP. CAC ¶¶ 290-91. Meanwhile, Wallace invested heavily in SGLP, acquiring 85,000 units following the IPO with his family acquiring another 40,000 units.

Wallace also acquired an additional 20,000 shares following the Secondary Offering. The total cost to Wallace and his family was $3.25 million. RJN Exh. 12A, 12B, 12C, Gregory Wallace Form 4s. Harvest Fund has not alleged that Wallace sold any of his SGLP units.

## ARGUMENTS & AUTHORITIES

Harvest Fund brings the following claims against Wallace:

- Under Section 11 for the July 2007 IPO offering documents and February 2008 offering documents, which Wallace signed;

- Under Section 10(b) for the July 2007 IPO offering documents, the February 2008 offering documents, and the March 2008 Form 10-K (which Wallace signed) and for various other SGLP public statements under the "group publication" doctrine;

- Under Sections 15 and 20(a) as a "control person" of SGLP

CAC ¶¶ 326, 356, 359, 370. As shown below, Harvest Fund cannot plead a claim against Wallace under any theory.

## I.    Adoption Of Arguments

Wallace incorporates by reference and adopts as if fully set forth herein the legal standards and authority and arguments applicable to him contained in the briefs supporting the motions to dismiss of the SGLP Defendants, the Underwriter Defendants, Brian F. Billings and W. Anderson Bishop, Thomas Kivisto, and Brent Cooper.

## II.    Harvest Fund Cannot Bring Section 11 Claims On Either Of The Challenged Offerings

Section 11 claims must be dismissed if the plaintiff either has no damages or cannot plead standing as a matter of law. Here, as to units purchased after the July 2007 initial offering, but before the February 2008 secondary offering, Harvest Fund cannot bring a Section 11 claim because those units were sold above the offering price, negating any claim for damages. As for units purchased following the secondary offering, Harvest Fund cannot sufficiently plead standing because SGLP units issued pursuant to the initial and secondary offerings were

9

commingled in the open market, precluding the ability to trace units specifically to either offering, as is required by Section 11.

### A.    Harvest Fund has no conceivable damages for the shares it bought and sold between the initial and secondary offerings

Harvest Fund purports to own two funds that purchased SGLP units between the Initial and Secondary Offerings, all of which were sold before the Secondary Offering: (1) Harvest Infrastructure Partners Fund purchased and sold 35,549 units between 7/18/2007 and 2/12/2008, and (2) Harvest MLP Fund purchased and sold 22,850 units between 7/18/2007 and 2/12/2008.[3] Because Harvest Fund sold these units for more than the $22.00/unit offering price, it has no damages under Section 11.  *See* 15 U.S.C. § 77k(e) (Section 11 damages not recoverable if securities are sold for greater than offering price); *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003) ("all Section 11 claims brought by Plaintiffs who sold securities at prices above the offering price must be dismissed because these Plaintiffs have no damages").

### B.    Harvest Fund cannot trace units purchased after the secondary offering specifically to either the initial or secondary offering

Harvest Fund purports to own three funds that purchased SGLP units after the secondary offering became effective.  *See* Dkt. No. 26-2, Case No. 4:08-cv-425 (N.D. Okla.), Ex. A at 3-5. At the time of these purchases, the market for SGLP units included units from both the initial and secondary offerings, which had separate sets of offering documents.  Clearly, any units purchased after the secondary offering documents became effective were issued pursuant to — *i.e.*, are "traceable" to — *either* the initial *or* secondary offering documents.  But, courts are equally clear

---

[3] Harvest Fund's alleged trading history is listed in a Certification of Named Plaintiff Pursuant to Federal Securities Laws filed September 19, 2008 [Dkt. No. 26-2, Case No. 4:08-cv-425 (N.D. Okla.), Ex. A].  The Court may consider the plaintiff's trading history on a motion to dismiss.  *See, e.g., In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207-08 (S.D.N.Y. 2003).

that the ability to trace to one offering *or* to a subsequent offering is insufficient to satisfy Section 11's tracing requirement. While it appears that no court in the Tenth Circuit has spoken directly to this issue, at least one circuit court and numerous district courts have concluded that, where there have been multiple offerings of the same security, unit holders cannot, as a matter of law, plead standing by tracing their shares to one offering as opposed to another.

For example, in *Krim v. pcOrder.com*, the Fifth Circuit held that plaintiffs could not trace shares purchased after a secondary offering of the same securities because it became impossible to determine whether particular shares were traceable to either the secondary or initial offering. 402 F.3d 489 (5th Cir. 2005). Thus, securities in subsequent offerings are indistinguishable from securities from a prior offering. *Id*. at 498. ("given the fungible nature of stocks within a street name certificate, it is virtually impossible to differentiate PO shares from non-PO shares"). Once the same securities issued in different offerings are commingled in the market, plaintiffs cannot possibly demonstrate whether the securities they purchased are traceable to the initial offering documents or to subsequent offering documents. *Id*. at 497-99.

The Circuit Court in *Krim* also made clear that plaintiffs cannot resort to statistical probability to meet the tracing requirement, *i.e.,* that some percentage of their holdings should be attributed to the initial offering and the rest to the secondary offering based on the number of securities in the market issued in each offering. *Id*. at 496-97 (dismissing claim where 91% of outstanding shares were traceable to offering because Section 11 requires certainty that all shares for which a plaintiff seeks recovery were offering shares); *see also In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 864 (N.D. Tex. 2005) (granting motion to dismiss Section 11 claims because "mere probability that a plaintiff can trace shares is clearly insufficient"). Similarly, pleading that shares are traceable to one set of actionable offering documents *or* to

another set of actionable offering documents is insufficient to plead Section 11 standing.  *Krim*, 402 F.3d at 496 ("[t]he most significant of the procedural standards [of Section 11] is the requirement that a plaintiff be able to trace the security for which damages are claimed to the *specific* registration statement at issue"); *In re FleetBoston Fin. Corp. Sec. Litig.*, 253 F.R.D. 315, 343 (D.N.J. 2008) (holding that standing under Section 11 requires a shareholder to "trace his/her purchases to a *specific* offering"); *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1373 (M.D. Fla. 2008) (holding that standing for aftermarket purchasers must be based on tracing to a "*specific* faulty registration statement") (emphasis added in all).

Here, Harvest Fund claims it purchased SGLP units following the secondary offering on dozens of occasions at varying prices.  As *Krim* and other cases demonstrate, identical securities (*e.g.*, SGLP units) registered under separate offering documents are indistinguishable from one another.  Accordingly, Harvest Fund cannot trace its post-secondary offering purchases specifically to either the initial or secondary offering, negating standing under Section 11.  *See, e.g., Grand Lodge*, 550 F. Supp. 2d at 1376 (surveying cases and holding that issue of Section 11 standing could be decided on motion to dismiss, and dismissing Section 11 claim because plaintiff did not plead facts showing it could trace open market purchases to secondary offering); *In re Global Crossing*, 313 F. Supp. 2d at 207-08 (dismissing Section 11 claim where plaintiff's certification showed purchases within weeks of secondary offering but did not otherwise show that shares were issued under secondary offering as opposed to earlier offering); *In re IPO Sec. Litig.*, 227 F.R.D. 65, 117-18 (S.D.N.Y. 2004), *vacated in part on other grounds*, 471 F.3d 24 (2d Cir. 2006) (holding that class period must terminate when shares from different offerings enter the market because "[t]he modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it

12

virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market").[4]

## III.    Harvest Fund Has Not Pleaded Misstatements Or Omissions Actionable Under Either Section 11 Or Section 10(b)

The cornerstone of any securities claim, whether under Section 11 or Section 10(b), is an actionable misstatement or omission.  Harvest Fund alleges dozens upon dozens of alleged misstatements and/or omissions, though they all boil down to the same two purported omissions: (1) SemGroup's trading strategy was "gambling" or "speculative" (CAC ¶¶ 5, 6, 71, 75-76, 95); and (2) SemGroup's trading strategy caused "substantial liquidity concerns" (CAC ¶ 10). Neither purported omission serves as an actionable predicate to a securities claim.[5]

### A.    Increasing margin calls and their subsequent effect on liquidity do not reasonably lead to the conclusion that SGLP had a duty to disclose that SemGroup's trading platform was "gambling" or "speculative"

Harvest Fund claims that absolutely everything SGLP said during the class period was false or misleading because SGLP did not simultaneously disclose that SemGroup's business model included a commodities hedging model that Harvest Fund alleges was "gambling" or

---

[4] It is not enough for Harvest Fund to simply plead that it can trace, or that it is a member of, or brings claims on behalf of, a class of those who can trace.  *See, e.g., In re Global Crossing*, 313 F. Supp. 2d at 207.

[5] Wallace is alleged only to have signed the two sets of offering documents and the 2007 Form 10-K.  While Harvest Fund attempts to include Wallace in the "group" of individual defendants responsible for SGLP's public statements, there are no allegations that he had any role in the creation of SGLP's public statements, and thus he cannot be part of the "group" responsible for SGLP's group publications.  *See* RJN Exh. 22, Report and Recommendation from *In re CFS-Related Sec. Fraud Litig.,* No. 99-CV-825 et al., (N.D. Okla., Dec. 21, 2001) (Dkt. No. 209), at 57 ("the group published doctrine is applicable only to clearly cognizable corporate insiders with active operation involvement in the company"); *see also Prescott Group Aggressive Small Cap, L.P.  v. Blackwell*, 2003 U.S. Dist. LEXIS 27079, at *19 (N.D. Okla. Aug. 25, 2003) (holding that plaintiff must plead facts showing that the targeted defendant was "involved in the day-to-day operations of the company").  Here, Wallace is not alleged to have any day-to-day, active involvement in SGLP — the company that had disclosure obligations.

"speculative" and the cause of a liquidity crisis.  This allegation is inactionable both because SGLP had no duty to disclose an affiliated company's business model and because the well-pleaded facts show that SemGroup's liquidity drain was raised by a spike in oil prices, not a speculative trading program.

### 1.    SGLP had no duty to disclose SemGroup's trading strategy

Harvest Fund alleges that once SGLP disclosed that it relied on SemGroup for 80% of its revenue, SGLP imposed on itself a duty to disclose everything about SemGroup as if SemGroup itself was a public company.  In an analogous case, the Sixth Circuit Court of Appeals recently affirmed that a public company had no duty to disclose material information of an affiliated company:

> GMAC's statement regarding its 'inextricable links' with [its parent company] GM was similarly not materially misleading.  The plaintiffs' main error in believing the statement misleading is their misconception of the law as imposing a broader duty of disclosure than it actually does.  The plaintiffs believe that if GMAC says 'anything about [a topic] or []discusse[s] the 'subject,' that GMAC then must disclose all 'material, non-public, adverse information' about that general topic or subject….For instance, plaintiffs claim that when GMAC raised the issue of GM's performance being important to GMAC, GMAC was then required to disclose all 'material, non-public, adverse' information it knew about GM.  This is surely not the law.

*J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 394 (6th Cir. 2008).  Here, SGLP properly disclosed that it was affiliated with SemGroup, that SGLP was dependent on SemGroup for 80% of its revenue, and that SemGroup's performance was important to SGLP.  As in *GMAC*, those disclosures were all true, and once made did not then require that SGLP disclose all "material, non-public, adverse" information about SemGroup in order to not be misleading.[6]

---

[6] As shown below, SGLP similarly had no duty to disclose SemGroup's trading or liquidity position based on SemGroup's status as a counterparty to a material contract.

2. **Harvest Fund has not pleaded sufficient facts demonstrating that SemGroup's "speculative" trading was the cause of its liquidity issues**

Harvest Fund claims that SemGroup faced a liquidity crisis caused by its "gambling" or "speculative" trading platform, but has not pleaded sufficient facts supporting that conclusion. Recent Supreme Court decisions have reiterated that plaintiffs must plead "factual content that allows the court to draw the reasonable inference" leading to the conclusion plaintiff asserts. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Here, the well-pleaded facts and the documents relied on in the Complaint more reasonably demonstrate that SemGroup's liquidity tightened because of an unprecedented rise in the price of crude oil that tripled the cost of SemGroup's inventory and led to massive margin calls. Indeed, Harvest Fund's own allegations show the contradictory nature of its theory: while it claims that "SemGroup predictably collapsed" after "oil prices continued to escalate in 2007 and 2008" (CAC ¶ 19) it also claims that oil prices escalated at "unprecedented" levels and with "unprecedented" volatility (CAC ¶ 74) — things that were not at all predictable.[7]

As shown above, SemGroup attempted to manage price risk by engaging in certain commodity financial transactions. CAC ¶ 4. These transactions were governed by SemGroup's credit facility lending agreements, which included the RMP. As support for its allegation that SemGroup's trading was "speculative," Harvest Fund relies on its allegation that SemGroup violated the requirement in those two agreements that trades be "backed by physical inventory." Notably, nowhere do these documents contain the alleged requirement, either literally or in substance, and Harvest Fund cannot rely on the breach of a covenant that does not exist. *See In*

---

[7] Under plaintiff's theory, every officer of a company is charged with being able to predict the future price of oil, and every oil company that did not make billions in the futures market would be liable for securities fraud for not disclosing its inability to predict the future.

*re FX Energy, Inc. Sec. Litig.*, 2009 WL 1812828, at \*6 (D. Utah June 25, 2009) ("[i]f the documents on which the Plaintiffs rely contradict the allegations of the…complaint, the documents control and [a] Court need not accept as true the allegations in the…complaint"). Harvest Fund's assertion that any trading where "the entity does not possess the commodity being traded" is "speculative" is unsupported not only by any citation but by common sense: would SemGroup's lending syndicate loan SemGroup $3 billion based on loan agreements that did not require trades to be based on "physical possession of the commodity being traded" if that, indeed, was considered speculative? *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that plaintiff's assertion that a contract was "unlawful" was a legal conclusion and thus not entitled to the assumption of truth).

Instead, the bank documents required SemGroup's financial transactions to be "delta neutral," not "backed by physical inventory." *See* RJN Exh. 1A, Examiner's Report Exhibit 5- Glossary of Trading Terms, at 2 ("option positions calculated on a delta equivalent basis").[8]  This meant that SemGroup had to offset positive and negative deltas, *i.e.*, that it maintain offsetting long and short positions so that rises and declines in commodities prices would balance out (thus "delta neutral").  While not mentioning "inventory," the RMP states that options can be sold "to offset other positions" — *i.e.*, to maintain delta neutrality.  It was delta positions, not trades versus inventory, that were reported to the banks:

- "the position and MtM reports provided delta-adjusted positions"; RJN Exh. 1, Examiner's Report, at 36;

---

[8] *See also* RJN Exh. 1A, Examiner's Report Exhibit 5- Glossary of Terms (defining "delta" as "the measure of the relationship between an option price and the underlying futures contract or stock price").  This exhibit is a glossary of commodities trading terms, as relied upon by the Examiner, on which Harvest Fund in turn relies.  *See* CAC at p.1.

- "a positive value in the position field of the report did not necessarily indicate that SemGroup had that quantity of the commodity on hand, in tank storage, unhedged"; *Id.*

- "[w]hen reporting outright position limits and spread position limits, SemGroup personnel reported delta-adjusted positions," which was "not against industry practice"; *Id.* at 37.

All of the banks in the lending syndicate and SemGroup's outside equity investors received copies of the reports. RJN Exh. 1, Examiner's Report, at 197-98. And it was delta-neutrality that drove SemGroup's traders. *See* RJN Exh. 1, Examiner's Report, at 70 ("Kivisto was always seeking to get back to a delta-neutral position."). The offsetting positions could be of different commodities (*e.g.*, oil versus natural gas) and of different types of commodities (a paper contract versus physical oil). *See* RJN Exh. 1C, Examiner's Report Exhibit 11- Open Position Limitations; *see also id.* Exh. 1E, Examiner's Report Exhibit 35- Evergreen Report, at 8-11.[9] Also, the bank documents put in place "position limits" — limiting the number of positions SemGroup could have on outstanding contracts — which also were reported to the lending syndicate weekly. Again, these limits were not tied to inventory, but rather to *capacity*. RJN Exh. 1C, Examiner's Report Exhibit 11 - Open Positions Limitations.

As shown above, when the price of products rises, the company is required to post "margin," *i.e.*, something akin to the difference between the contract price and the current market price. CAC ¶ 66.[10] One can easily see how, when the price of oil rose from $50/bbl to $147/bbl

---

[9] Harvest Fund makes a big to-do about the Examiner's finding that SemGroup had "delta equivalent short position" of 56,464 bbls of crude oil. CAC ¶ 286(j). This statement means nothing — SemGroup could be short on one commodity and long on another, or be short on paper oil and long on physical oil, and maintain delta neutrality. It was SemGroup's trading program *as a whole* that maintained delta neutrality — not one commodity or one type of transaction.

[10] Notably, SemGroup's use of its credit facility to post margin was expressly authorized in its loan covenants. *See* RJN Exh. 1, Examiner's Report, at 198 ("to provide margins or similar

in July 2008 — the timeframe covered by the Complaint — SemGroup's available cash was being eaten up by increasing margin requirements.  As shown in the table above, SemGroup's margin account closely tracked the rise in the price of crude oil in the time period covered by the Examiner's Report (January 2007 through July 2008), the class period (July 2007 through July 2008), and the first half of 2008 (January 2008 through July 2008).  *See supra* at 5-6; *see also* RJN Exh. 1, Examiner's Report, at 157 (in which management committee member Bartow Jones states "SemGroup's liquidity constraints were not unexpected, as other similar companies were also experiencing liquidity problems due to market conditions").

These undisputed facts show that when commodities prices rose, so did SemGroup's margin requirements — at correspondingly "unprecedented" levels.  While delta neutrality required SemGroup to have offsetting positions, SemGroup's margin requirements did not decrease based on these offsetting contracts (which could be, and often were, of physical oil or with over-the-counter contracts that did not have margin requirements).  Thus, as long as the price of oil was rising — as Harvest Fund alleges, "to unprecedented levels" and with "extreme volatility" — SemGroup's margin requirements continued to grow.  *See* CAC ¶ 74.  SemGroup was simply unable to get past a liquidity "hump" long enough for enough contracts to expire to recoup its margins and for the price of oil to normalize.[11]

Thus, the objective facts lead more reasonably to the conclusion that SemGroup's liquidity challenges were caused by the unprecedented and unforeseeable rise in commodities

---

support in connection with NYMEX obligations, *i.e.*, to pay margin calls on NYMEX").  As well, SGLP expressly disclosed that the proceeds from both the IPO and Secondary Offering would be used to pay down SemGroup's debt.  RJN Exh. 2A, Amendment 5 to Form S-1/A filed June 29, 2008, at 37 and RJN Exh. 5A, Amendment 1 to Form S-1 filed Feb. 12, 2008, at 36.

[11] *See* RJN Exh. 1E, Examiner's Report Exhibit 35- Evergreen Report, at 4 ("The derivative loss will not likely be realized since the contracts will execute at maturity.").

prices, not because the trading program itself was speculative or gambling. Indeed, it is illogical to believe that SemGroup's trading was "gambling" or "speculative" when it was extremely profitable from 2000 through 2006. No one can flip a coin or bet on roulette that well for that prolonged a period. This reasonable inference from the facts trumps any reliance on Harvest Fund's conclusory allegation that SemGroup's trading strategy was speculative and that this speculation caused SemGroup's liquidity crunch.[12]  *See Tellabs*, 127 S.Ct. at 2510 ("The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"). Here, the more reasonable and logical conclusion is that SemGroup faced liquidity challenges because of unprecedented price increases and volatility causing corresponding margin calls (without a corresponding increase in its credit facility), not a speculative trading program. *See Twombly*, 127 S.Ct. at 1955 (rejecting plaintiff's assertion that conduct was unlawful because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior); *Iqbal*, 129 S.Ct. at 1952 (rejecting allegation of misconduct in light of "obvious alternative explanation").

That SemGroup's commodities trading was not "gambling" or "speculative" is similarly borne out by the documentary evidence wholly ignored by Harvest Fund but that the Court may take judicial notice of. SemGroup had its trading program and risk management program audited on an annual basis by two independent companies, Bowen Consulting and Evergreen Collateral Consulting. *See* RJN Exh. 1, Examiner's Report, at 53, 203. Evergreen (which

---

[12] Even if SemGroup's trading strategy violated its bank covenants, which is not established in the Complaint or the judicially-noticeable documents, that does not create an actionable securities violation for failing to make such a disclosure. *See Caprin v. Simon Transp. Servs., Inc.*, 99 Fed. Appx. 150, 159-60 (10th Cir. 2004) (affirming dismissal of securities claim where plaintiff alleged that company failed to disclose that revenue was inflated from income derived by employees who violated company policies and federal regulations).

conducted annual commercial financial examinations) audited SemGroup's position reports and found "[o]verall the Company had adequate controls in place."    RJN Exh. 1E, Examiner's Report Exhibit 35- Evergreen Report, at 4.    Evergreen did not report that SemGroup's bank reports were inaccurate or that SemGroup was out of compliance with its lending agreements. RJN Exh. 1, Examiner's Report, at 204 ("the Evergreen report did not disclose any serious findings").

Similarly, Bowen (who did reports in 2004, 2005, 2006, and 2007) reported that SemGroup's risk management practices "exceeded common industry standards in several areas," that its efforts were "almost heroic," and "cutting-edge among its peer group."  RJN Exh. 1D, Examiner's Report Exhibit 19- Bowen Report, at 2, 6.  The risk management and commodities trading Harvest Fund puts at issue here is precisely what Bowen reported on:

> This report summarizes my findings and recommendations related to the management of SemGroup's risks, particularly those risks related to commodity and derivative trading.   The company's approach is SATISFACTORY in comparison to the industry, and is superior in several respects.

*Id*. at 7 (emphasis in original).  Bowen also concluded that SemGroup "deviated very little from the RMP."  RJN Exh. 1, Examiner's Report, at 54.[13]  Bowen also touted the ability of those who reported the trading function to the banks: "The Treasurer has supervised the risk management function for many years and is knowledgeable of the financial treatment of commodity and derivative positions").  RJN Exh. 1D, Examiner's Report Exhibit 19- Bowen Report, at 4.

As well, while Harvest Fund repeatedly alleges that SemGroup's practice of "rolling trades to expiry" was speculative, gambling, unauthorized, *etc*., Bowen expressly recognized this

---

[13] With Bowen, PwC, SemGroup's banking syndicate, and its outside equity investors all parsing through and approving the RMP, it is difficult to see how Harvest Fund can claim that the RMP was insufficient.  Nor can Harvest Fund demonstrate that Wallace, as a financial officer, knew or should have known otherwise.

practice at SemGroup, and found no such flaws.  RJN Exh. 1, Examiner's Report, at 55 ("Bowen was aware that SemGroup rolled hedges from one month to the next as they were about to expire").  If Bowen knew about "trading to expiry," then SemGroup's banks knew about it, and obviously none of them thought it was speculative: again, it would defy reason for the banks to lend SemGroup $3 *billion* if they knew about "trading to expiry" (which they obviously did) and thought it was speculative (which they obviously did not).  RJN Exh. 1, Examiner's Report, at 201 ("Bowen's report, which indicated that SemGroup's risk management was satisfactory, was delivered to BOA").

Harvest Fund cannot conclusorily allege that SemGroup's trading strategy was speculative, that it frequently violated its RMP and lending covenants, or lacked adequate controls and oversight when those allegations are contradicted by contemporaneous documentation.  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (court not required to accept as true conclusory allegations contradicted by documents referred to in the complaint).  In the end, Harvest Fund alleges — looking backward — that the trading strategy must have been speculative or gambling because it required SemGroup to post cash margins for a sufficiently long enough time for SemGroup's trades to be in the money, which it eventually could no longer do.  That strategy, however, worked extremely well for 7 years, and only failed when oil prices spiked to unprecedented levels with unprecedented volatility and commensurately high margin payments, and SemGroup's credit line was suspended by Bank of America — at the height of the oil crisis that hit dozens of oil trading companies and millions of American consumers at the pump.

These are not facts showing speculative trading, but lead to the more reasonable conclusion that SemGroup's liquidity challenges were caused by an out-of-control market that

was impossible to predict beforehand and to anticipate going forward.  SGLP, and thus Wallace, certainly had no duty to disclose that SemGroup's trading program was speculative or that SemGroup would not be able to weather the storm of the June and July 2008 price spikes when that was inherently unpredictable in July 2007 (IPO offering documents), February 2008 (secondary offering documents), and March 2008 (2007 Form 10-K).  *See Iqbal*, 129 S.Ct. at 1949 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief").  As a matter of *fact*, crude oil prices were relative stable from July to August 2007 (at the time of the IPO) and between November 2007 and February 2008 (before the Secondary Offering).  RJN Exh. 26, Charts of DOE WTI Spot Prices for Periods in 2007 and 2008.

### 3.    Harvest Fund's claim that Wallace failed to properly monitor trading activity cannot constitute a failure-to-disclose claim

At worst, Harvest Fund's allegation is that Wallace failed to adequately monitor Kivisto's trading or that SemGroup did not have adequate risk controls (which is contrary, of course, to what Bowen and Evergreen concluded).  But even *assuming* the veracity of those "facts," such allegations of mismanagement or breach of fiduciary duty (and the failure to disclose them) cannot be artfully pleaded into a violation of the federal securities laws.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 465 (1977); *Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("Though *Santa Fe* does not bar a claim related to a breach of fiduciary duty if there has been a material misrepresentation or omission, a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty."); *accord In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1218 (N.D. Okla. 2003) ("Section 10(b) does not provide a remedy for

corporate mismanagement or breach of corporate fiduciary duty, and the Court will not allow legal draftsmanship to avoid this requirement.").

IV.     **SGLP Had No Duty To Disclose Anything About SemGroup's Liquidity Position Prior To July 2008, At Which Time A Disclosure Was Properly Made**

As shown above, SGLP had no duty to disclose the nature of SemGroup's trading strategy, much less that it was "speculative" or "gambling."  Likewise, SGLP had no duty to disclose SemGroup's liquidity position, as either an affiliate or as a counterparty to material contracts, until it became certain that SemGroup could no longer perform the Throughput and Terminalling Agreements.

A.     **SGLP had no duty to disclose an affiliate's liquidity position**

There is no authority — case law or SEC rule — that requires a public company to disclose the financial condition of affiliated companies or contract counterparties.  Indeed, Harvest Fund's theory that a public company has a duty to disclose the financial condition of affiliated companies has been squarely rejected.  *See J&R Mkt'g, SEP v. Gen. Motors Corp.*, 2007 WL 655291, at *6 (E.D. Mich. Feb. 27, 2007) ("[t]o hold that firm-specific information also comprises that of other affiliated entities would dramatically enlarge the scope of required disclosures under federal securities law, and this would not comport with the general focus of Regulation S-K, which is on the registrant himself, not all of its corporate affiliates").  Likewise, the specific SEC regulation requires disclosure only of a "material change" in "*the registrant's*" liquidity.  *See* Regulation S-K Item 303 (17 C.F.R. § 229.303) (emphasis added).  There is no requirement that the issuer disclose material changes in the liquidity of parents, subsidiaries, affiliates, or counterparties to material contracts.  Had the SEC thought such disclosures should be made to investors, it easily could have done so.

Where, as here, the SEC has stated what disclosure is required on a specific subject, litigation plaintiffs cannot attempt to impose additional or expanded duties. *See City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (finding defendants could not be liable for not disclosing information about pending litigation when the company's disclosures met SEC reporting requirements); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) (holding that plaintiff could not state omission claim when defendant "revealed all that Item 103 requires"); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 n.2 (1st Cir. 1987) (stating that the SEC was given "complete discretion" to require in corporate reports only such information as it deems necessary or appropriate in the public interest or to protect investors); *In re SeaChange Int'l, Inc.*, 2004 WL 240317, at *10 (D. Mass. Feb. 6, 2004) (holding that plaintiffs could not state omission claim when issuer complied with SEC requirements).

### B. Assuming that SGLP had a duty to report on SemGroup, the allegedly undisclosed facts did not exist at the time of SGLP's SEC filings

To the extent Harvest fund alleges that SGLP was required to report on SemGroup's liquidity position in SGLP's own periodic filings, that theory of liability is also unsupportable. At the very earliest, SemGroup's continuing liquidity became an "issue" (not "impaired") in April of 2008. *See* RJN Exh. 1, Examiner's Report, at 159-60. This was *after* the offering documents became effective and after the 2007 10-K was issued.[14]  SGLP had no duty to disclose facts that did not exist at the time of the offering. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (indicating that a securities plaintiff must set forth "an explanation as to why the disputed statement was untrue or misleading *when made*") (emphasis added); *Osio v.*

---

[14] Harvest Fund's allegations that SemGroup was facing liquidity "challenges" is not sufficient, as shown in detail below, to show a material fact that SemGroup was illiquid or otherwise had to disclose its liquidity position.

*DeMane*, 2006 WL 2129460, at *12 (D.N.J. June 20, 2006) (allegations regarding the company's poor liquidity position inactionable where it concerned events that occurred after the allegedly false statements were made).

Likewise, SGLP had no duty to disclose anticipated future events, such as a negative impact on SemGroup's liquidity that would be caused by an increase in energy commodities prices. *Fleming*, 264 F.3d at 1260. Because the material facts required to be disclosed do not include *anticipated* future events, there certainly can be no duty to disclose unprecedented, unanticipated future events. *Grossman*, 120 F.3d at 1124 ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice").

Harvest Fund relies on the affidavit of Terrance Ronan, who claims that SemGroup was facing a liquidity crisis beginning in July 2007. CAC ¶ 97. But Ronan became a SemGroup employee in March 2008 — eight months *later*. Before then, he was an executive at Bank of America and Merrill Lynch — the lead agent and a member of the syndicate, respectively, of SemGroup's credit facility. If Mr. Ronan really believed SemGroup was illiquid in July 2007, logically he would have pulled the plug on the facility; certainly, he would not have joined SemGroup as an employee in March 2008 if he thought SemGroup was "teetering" on insolvency. Moreover, if SemGroup was illiquid in March 2008 when Ronan came on board, one would think that he would have made that disclosure to his former employer himself (as he was the VP of Finance whose duties included interfacing with the banking syndicate). Either way, Mr. Ronan's averments are contradictory, and cannot form the basis for a securities violation.

To the extent Harvest Fund attempts to rely on its Confidential Witness No. 1 to support its allegation that SemGroup was facing a liquidity crisis prior to July 2008, this allegation can be given no weight.  *See, e.g., Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("[f]ollowing *Tellabs*, courts must discount allegations from confidential sources…Such sources afford no basis for drawing the plausible competing inferences required by *Tellabs*"); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (indicating that confidential witnesses may "have axes to grind," could be "lying," or might not "even exist" and hence should be given little, if any, weight); *In re FX Energy Sec. Litig.*, 2009 WL 1812828, at *10 (agreeing with statements in *Higginbotham*).  Indeed, "CW1" is alleged to have left SemGroup in June 2007 — *before* the class period and events put at issue in the Complaint.  CAC ¶ 68.  And, while CW 1 is alleged to have said that SemGroup's liquidity was "impaired" in or around June 2007 (CAC ¶ 91), such an assertion is belied by the *fact* that SemGroup's auditors, PwC (CAC ¶ 90), did not come to that conclusion either in June 2007 or when SemGroup's financial statements were prepared.  Likewise, anecdotal allegations of impaired liquidity fail absent any contemporaneous evidence.  *See Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *7 (S.D. Tex. March 30, 2002) (refusing to credit plaintiffs' allegation that sales declined by as much as 30-40% where plaintiffs "fail[ed] to identify a single report showing such a decline" and "do not identify on what the report was supposedly based or explain how firm its numbers were").

### C.     SGLP had a duty to disclose SemGroup's liquidity position only when it became certain that SemGroup would be unable to perform its contracts, at which time a timely disclosure was made

Under SEC Regulation S-K and Items 1.01 and 1.02 to Form 8-K, a party must disclose when it has entered into a material contract, and when it has terminated a material contract.  17 C.F.R. § 229.001, *et seq*.  Here, SGLP indisputably disclosed the execution of its material

contracts with SemGroup, the Terminalling and Throughput Agreements. There was no corresponding duty to then disclose that at some point in the indeterminate future SemGroup would encounter a liquidity crisis triggered by an unprecedented rise in commodities prices, curtailing SemGroup's ability to perform on the relevant contracts. Harvest Fund's theory — that a party disclosing the existence of a contract has "guaranteed" performance by the other party, and a breach of the contract makes the "guarantee" false and thus actionable as a misrepresentation — is not supported by SEC Rule, case law, or common sense.

Rather, SGLP was required to make a disclosure only when it became clear that SemGroup would not be able to get additional funding or extend its credit line, and thus it was *known* that SemGroup would not be able to perform on the contracts. That was in mid-July 2008, and that is when a disclosure was made. CAC ¶ 244 (disclosure made July 17, 2008); *Ind. Elec.*, 537 F.3d at 541 (holding that issuer had no duty to disclose problems with material contracts until it was certain that contract would not be performed).

## V.     The Risk Of Rising Commodity Prices And Its Impact On Liquidity Was Fully Disclosed In SGLP's Public Filings

The documents signed by Wallace — the IPO and Secondary Offering Documents and Form 10-K — cautioned investors against the exact risks that Harvest Fund alleges materialized in July 2008. For example:

- "For the year ended December 31, 2006 and the three months ended March 31, 2007, our Parent accounted for approximately 82.5% and 82.4%, respectively, of our pro forma revenues....[w]e are indirectly[15] subject to the business risks of our

---

[15] Harvest Fund alleges that SGLP falsely stated that it had "minimal direct exposure to commodity price fluctuations." *See, e.g.*, CAC ¶¶ 8, 11, 131, 164, 191. That statement is absolutely true: SemGroup was *directly* exposed to commodity price fluctuations as it bought, sold, and traded petroleum products, while SGLP was *indirectly* at risk because it was dependent on SemGroup for much of its revenue via the Throughput and Terminalling Agreements.

Parent, many of which are similar to the business risks we face. In particular, these business risks include the following:

The inability of our Parent to generate adequate gross margins from the purchase, transportation, storage and marketing of petroleum products

the inability of our Parent to manage its commodity price risk resulting from its ownership of crude oil and petroleum products" RJN Exh. 2, July 18, 2007 Prospectus, at 19

- "If our Parent is unable to make the minimum commitment payments to us required by it under the Throughput Agreement for any reason…our results of operation would be adversely impacted if we were not otherwise able to replace the revenues attributable to our Parent with revenues from other customers." *Id.* at 50

- "We depend upon our Parent for a substantial majority of our revenues and any reduction in these revenues would have a material adverse effect on our results of operations and our ability to make distributions to our unitholders." *Id.* at 4, 19

- "We are exposed to the credit risk of our Parent and any material nonperformance by our Parent could reduce our ability to make distributions to our unitholders….These speculative ratings signify a higher risk that our Parent will default on its obligations, including its obligations to us, than does an investment grade credit rating. Any material nonperformance under the Omnibus Agreement and the Throughput Agreement by our Parent could materially and adversely impact our ability to operate and make distributions to our unitholders." *Id.*

- "neither our partnership agreement nor any other agreement requires our Parent to pursue a business strategy that favors us." *Id.* at 28.[16]

Thus, an objective, reasonable investor would have known that: (1) SGLP was dependent on SemGroup for a majority of its revenue; (2) SemGroup faced risks related to its management of its own commodities price risks; (3) SGLP was indirectly faced with those same risks; (4) SemGroup had a speculative investment rating; and (5) SemGroup's inability to perform the Throughput or Terminalling Agreement would have a material adverse effect on SGLP.

---

[16] The February 2008 secondary offering documents contained similar risk disclosures, *see* CAC ¶ 170, as did the March 2008 Form 10-K. *Id.* ¶¶ 202, 211, 215.

These were not "generic" disclosures applicable to any public company, but instead addressed the specific risks that Harvest Fund claims materialized. The materialization of disclosed risks is not actionable under federal securities laws. *See Grossman*, 120 F.3d at 1120 (statements are immaterial "when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue"); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289 (5th Cir. 2006) (holding that plaintiffs could not allege a material misstatement where "what Amresco warned might happen, did indeed happen"); *In re Alamosa Holdings*, 382 F. Supp. 2d at 844-45 (granting motion to dismiss where "the 2001 10-K expressly addressed the very risk that Plaintiffs allege was not disclosed").[17]  As the Supreme Court recently recognized, the securities laws do not provide investment insurance for the materialization of disclosed risks. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (noting that securities actions are not available "to provide investors with broad insurance against market losses"); *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330, 1333 (10th Cir. 1983) (noting that the securities laws do not "establish a scheme of investors' insurance") (quotations omitted).

## VI.    Harvest Fund Has Not Adequately Pleaded That Wallace Acted With The Fraudulent Intent Required By Section 10(b)

The Reform Act mandates dismissal of a Section 10(b) claim if the plaintiff fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). The "requisite state of mind" for a Section 10(b) claim is "scienter," *i.e.*, "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*,

---

[17] The Tenth Circuit in *Grossman* made it clear that consideration of cautionary language "provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment)." 120 F.3d at 1120 (quotation omitted).

127 S.Ct. at 2507.  In considering whether plaintiffs have met that standard, the Court does not simply accept plaintiff's allegations as true, but must instead weigh the strength of the suggested inferences *and* consider facts negating such an inference, arriving at a subjective determination as to whether plaintiffs have met their burden.  *Id.* at 2509-10 ("a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" and in so doing "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations"); *see also New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1280 (D. Kan. 2008) (noting that *Tellabs* raised the pleading requirements in the Tenth Circuit).

> **A.** **Harvest Fund has not alleged with particularity that Wallace knew any potentially material facts or that Wallace knew the failure to reveal such facts would likely mislead investors**

"[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that the failure to reveal the potentially material fact would likely mislead investors."  *Fleming*, 264 F.3d at 1261 (emphasis added).  Harvest Fund must therefore show that Wallace knew a fact that was so obviously material that he must have been aware both of its materiality and that its non-disclosure would likely mislead investors.  *Id.*; *see also id.* at 1264 ("The important issue in this case is *not* whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the [facts] posed substantial likelihood of misleading a reasonable investor.") (emphasis in original).[18]

---

[18] The Tenth Circuit has never addressed whether securities plaintiffs are allowed to attribute conduct to "Defendants" as a whole under the PSLRA.  Other circuits have forbidden just this type of "group scienter" as inconsistent with the specificity requirements of the PSLRA and require securities plaintiffs to plead the specific actions allegedly taken by each defendant. *See Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 363 (5th Cir. 2004).  So,

Here, Harvest Fund has not pleaded much about Wallace at all. Instead, it lumps him in with a group that includes those directly responsible for the trading, the officers of SGLP, the independent directors of SGLP, and fellow officers of SemGroup — and conveniently refers to all of them as the "Individual Defendants." The PSLRA does not allow for such convenience. *See Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1094 (N.D. Okla. 2003) ("where fraud is alleged against multiple defendants, blanket allegations of fraud couched in language such as by the defendants are insufficient. Instead, the specifics of the alleged fraudulent activity of each defendant must be set forth."); RJN Exh. 22, Report and Recommendation from *In re CFS-Related Sec. Fraud Litig.*, at 57-58 (recognizing that the group pleading doctrine has nothing to do with scienter). Nowhere does Harvest Fund plead that Wallace was told or exposed to contemporaneous documents showing that SemGroup was out of compliance with its RMP or bank covenants. *See Fleming*, 264 F.3d at 1266 (noting that there were no facts establishing that the individual defendants "were actually aware" of the non-disclosed information). Indeed, the judicially-noticeable facts show just the opposite:

- Bowen issued a report stating that SemGroup's RMP met or exceeded industry standards and was rarely violated;

- Evergreen issued a report stating that SemGroup's risk controls were adequate, and never reported that SemGroup's bank reports were false or that SemGroup was violating its bank covenants;

- SemGroup distributed weekly position reports and mark-to-market reports to its lenders and was never told it was out of compliance with the RMP or its bank covenants;

---

even if group "pleading" is permitted in the Tenth Circuit, "there must be some indication that an individual defendant involved in a group published statement was aware of the falsity of the statement…. Absent such awareness, there is no basis to conclude that the defendant acted with scienter concerning that statement." *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1145 (D. Colo. 2005).

- SemGroup's auditors and lawyers never told Wallace that SemGroup was out of compliance with the RMP or its bank covenants;

- Nowhere does Harvest Fund allege that anyone ever told Wallace that SemGroup was out of compliance with the RMP or was violating its bank covenants;

- In the Examiner's timeline of "liquidity events," the first time liquidity was raised as being an issue (not that it was illiquid) was May 6, 2008 (after any document signed by Wallace), and two weeks later SemGroup still had $300 million in liquidity.  RJN Exh. 1, Examiner's Report, at 160;

- The $1.5 billion equity raise with Goldman Sachs was not abandoned until *July 2008*, shortly before the disclosure by SGLP was made; and

- Wallace did not sell *any* of his SGLP units.

These exculpatory facts, coupled with a complete lack of specific facts in the CAC raising any inference of scienter, conclusively demonstrate that Harvest Fund has failed to plead facts raising the requisite strong inference of fraudulent intent.  *See Tellabs*, 127 S.Ct. at 2510 (to qualify as "strong" an "inference of scienter must be more than simply plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").

**B.     Allegations relating to Wallace's position at SemGroup are inadequate to raise a strong inference of scienter**

The vast majority of Harvest Fund's scienter allegations focus on Wallace's positions at SGLP and SemGroup, and the "duties" associated with those positions.  *See, e.g.*, CAC ¶ 279 ("Because the Board acted collectively … and received collectively the same information … the Individual Defendants are jointly and severally liable for the wrongdoing alleged herein."); CAC ¶ 281 ("… Wallace … [was a] member of SemGroup's Management Committee and, as such, [was] charged with a duty to be aware of and monitor SemGroup's business, financial and operating condition ….").  Such because-of-his-position allegations are routinely rejected.  *See Fleming*, 264 F.3d at 1264 (rejecting scienter allegations based on motives of executives to

protect their positions, compensation, or value of their stock because these are motives "shared by all company executives").

Likewise, the Tenth Circuit has expressly rejected a plaintiff's attempt to plead a strong inference of scienter based on the allegation that, given the spectacular nature of the failure of the company, the defendant must have known of adverse information yet chose to stay silent in order to deceive investors. *Grossman*, 120 F.3d at 1124 ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *see also In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1004 (N.D. Cal. 2001) (finding no scienter where plaintiff alleged that the defendants knew of deteriorating financial condition but issued public statements anticipating the benefits of a merger where the statements were "no more than a failure by defendants to fully anticipate the difficult times that would befall the Internet industry in late 2000").[19]

Finally, Harvest Fund alleges — just like every securities fraud plaintiff has in every securities fraud case — that Wallace was motivated to commit fraud by the desire to retain his position at SemGroup and the promise of large compensation and bonuses. *See* CAC ¶ 288. But

---

[19] There is no authority in the Tenth Circuit permitting Harvest Fund to rely on an invocation of Wallace's Fifth Amendment privilege against self-incrimination to plead a "strong inference of scienter" under Section 10(b). In fact, one district court has specifically found that permitting a plaintiff to establish scienter based on the invocation of the Fifth Amendment in a bankruptcy proceeding was impermissible. *In re Suprema Specialties, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 656 n.5 (D.N.J. 2004) ("drawing a negative inference in this case could unduly penalize [defendant] for his invocation of the Fifth Amendment, particularly considering that the Fifth Amendment was invoked in the bankruptcy proceeding and not in this case"). While this case was reversed in part on other grounds, 438 F.3d 256 (3d Cir. 2006), it was on the grounds that defendants' insider securities transactions were suspicious in timing and amount. Here, in contrast, Harvest Fund has not pleaded any suspicious securities transactions, nor could it given that Wallace never sold his SGLP units and lost millions of dollars.

the desire to maintain a corporate position is a motive shared by all executives, and is thus insufficient to raise a strong inference of scienter. *Fleming*, 264 F.3d at 1269-70 ("alleged motives…which are generalized motives shared by all companies and which are not specifically and uniquely related to [the company] in particular, are unavailing"). In fact, Wallace's trading history in SGLP units — investing over $3 million of his own money in SGLP units, as late as February/March 2008, and never selling those units — negates any inference of scienter. *See Fleming*, 264 F.3d at 1270 ("Plaintiffs make no concrete allegations that any of the Defendants sold Fleming stock at an inappropriately inflated price, or that they in any other way benefitted in some concrete and personal manner from making the alleged misrepresentations and/or omissions"); *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 Fed. Appx. 702, 716 (10th Cir. 2006) (observing stock purchase as the "most compelling" argument in favor of dismissal).

## VII.    Control Person Claims Against Wallace Must Be Dismissed

Harvest Fund's "control person" claims under Section 15 and Section 20(a) must also be dismissed. Initially, control person claims are derivative, and Harvest Fund's failure to plead a primary claim mandates dismissal. Secondly, Harvest Fund fails to plead any facts showing that Wallace asserted "control" over SGLP. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998) (dismissing control person claim). Here, without elaboration, Plaintiff alleges that Wallace (collectively with the "Individual Defendants") was a control person because of his high-ranking positions at SemGroup and SGLP. This is not enough to plead control person liability. Plaintiffs must plead facts supporting the conclusion that Wallace had actual power and influence over the controlled person and that he induced or participated in the alleged violation, not simply that he was a director of the issuer or an officer of an affiliated company. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) ("The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually

exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that a person is a control person."); *In re Cryomedical Scis., Inc. Sec. Litig.*, 884 F. Supp. 1001, 1012 (D. Md. 1995) (holding that a defendant must be a culpable participant in some meaningful sense to be liable under Section 20(a)) (collecting cases).[20]

## CONCLUSION

For the foregoing reasons, Wallace respectfully requests that the Court enter an Order dismissing the claims in the Consolidated Class Action Complaint asserted against him.

---

[20] While Harvest Fund alleges — without any factual support — that Wallace had access to copies of SGLP's reports, press releases, and public filings prior to or shortly after these statements were issued (CAC ¶¶ 35, 376), such conclusory allegations that a director had "access to corporate documents…do not demonstrate the day-to-day involvement with corporate affairs" necessary to state a claim for control person liability. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1242 (N.D. Cal. 1994).

DATED: July 22, 2009

*/s/ Orrin L. Harrison*

Orrin L. Harrison III (admitted *pro hac vice*)
oharrison@akingump.com
Lisa S. Gallerano (admitted *pro hac vice*)
lgallerano@akingump.com
Edwin T. Aradi (previously admitted)
earadi@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675
214.969.2800 / Fax: 214.969.4343

-and-

Clark O. Brewster
cbrewster@brewsterlaw.com
Mark B. Jennings
mjennings@brewsterlaw.com
BREWSTER & DEANGELIS PLLC
2617 E. 21st St.
Tulsa, OK 74114
918-742-2021 / Fax: 918-742-2197

**Attorneys for Gregory C. Wallace**

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of July, 2009, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Oklahoma, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case who have consented in writing to accept this Notice as service of this document by electronic means.

I hereby further certify that service was made on this 22nd day of June, 2009, by regular mail on the following, who are not registered participants in the ECF system:

Ramzi Abadou
Darren J. Robbins
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
655 N. Broadway, Suite 1900
San Diego, CA 92101

David A. Rosenfeld
Samuel H. Rudman
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
58 S. Service Rd. Suite 200
Melville, NY 11747

Moshe Balsam
Mark D. Smilow
Joseph H. Weiss
WEISS & LURIE
551 Fifth Ave
New York, NY 10176

**Attorney for Michael Rubin**

Kim Elaine Miller
Michael Swick
KAHN GAUTHIER SWICK LLC
12 E 41st, 12th Floor
New York, NY 10017

**Attorney for The Aziz Group, Kanto Lezaj,
Parviz Pourfarid, and Samaan Aziz**

Roy L. Jacobs
ROY JACOBS & ASSOCIATES
60 E 42nd St., 46th Floor
New York, NY 10165

Laurence D. Paskowitz
PASKOWITZ & ASSOCIATES
60 E 42nd St., 46th Floor
New York, NY 10165

**Attorney for Craig Carson**

Gabor Balassa
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654

**Attorneys for PriceWaterhouseCoopers, LLP**

Robert Craig Finkel
Natalie Marie Mackiel
WOLD POPPER LLP
845 3rd Ave
New York, NY 10022

**Attorneys for Charles D. Maurer SIMP Profit Sharing Plan**

Steven J. Toll
Daniel S. Sommers
Jason M. Leviton
COHEN MILSTEIN SELLERS & TOLL PLCC
1100 New York Ave NW Suite 500
Washington, DC 20005

Catherine A. Torell
COHEN MILSTEIN HAUSFELD & TOLL PLLC
150 E. 52nd St., 30th Floor
New York, NY 10022

**Attorneys for Meng Guangzhong, Micheal McGonigal, Individual Investor Group, and Dharam V. Jain**

Roger W. Kirby
Ira M. Press
Mark A. Strauss
Richard L. Stone
KIRBY MCINERNEY LLP
825 Third Ave., 16th Floor
New York, NY 10022

**Attorneys for Woerner Securities, Ltd., Woerner Holdings, Inc.**

Penny P. Reid
WEIL GOTSHAL & MANGES LLP
767 5th Ave
New York, NY 10153

**Attorneys for SemGroup Holdings, LP**

Darren J. Check
Steven D. Resnick
BARROWAY TOPAZ KESSLER MELTZER & CHECK LLP
280 King of Prussia Rd
Radnor, PA 19087

**Attorneys for Harvest Fund Advisors LLC**

   /s/ Edwin T. Aradi