IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: SEMGROUP ENERGY PARTNERS, L.P., SECURITIES LITIGATION | )<br>)     Case No. 08MD-01989 GKF-FHM<br>) |

## THE SGLP DEFENDANTS' MOTION TO DISMISS
### AND BRIEF IN SUPPORT

**HOLLADAY & CHILTON, PLLC**
Don G. Holladay, OBA # 4294
Heidi J. Long, OBA# 17667
One City Place
204 N. Robinson, Suite 1550
Oklahoma City, Oklahoma  73102
Telephone:  (405) 236.2343
Facsimile:  (405) 236.2349

*Attorneys for Defendants SemGroup Energy*
*Partners, L.P., and SemGroup Energy*
*Partners G.P. LLC, Kevin L. Foxx, Alex G.*
*Stallings, and Michael J. Brochetti (the*
*"SGLP Defendants")*

**KING & SPALDING LLP**
Michael W. Youtt (*admitted pro hac vice*)
William R. Burns (*admitted pro hac vice*)
1100 Louisiana, Suite 4000
Houston, Texas  77002-5214
Telephone:  (713) 751.3200
Facsimile:  (713) 751.3290

Michael R. Smith (*admitted pro hac vice*)
B. Warren Pope (*admitted pro hac vice*)
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309-3521
Telephone:  (404) 572.2600
Facsimile:  (404) 572.5100

*Attorneys for Defendants SemGroup Energy*
*Partners, L.P., and SemGroup Energy*
*Partners G.P. LLC, Kevin L. Foxx, Alex G.*
*Stallings, and Michael J. Brochetti (the*
*"SGLP Defendants")*

**GORDON & REES LLP**
Barry G. Flynn
3D/ International Tower
1900 West Loop South, Suite 1000
Houston, Texas 77027
Telephone:  (713) 961.3366
Facsimile:  (713) 961.3938

*Of Counsel To Defendant Kevin L. Foxx*

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     STATEMENT OF FACTS ................................................................................ 3

        A.      Overview of the SGLP Defendants and Harvest Fund's Complaint ...................... 3

        B.      The Master Limited Partnership Structure and the "Dropdown" Transactions ...... 6

        C.      The Private Company's Financial Difficulties Were Unforeseen ......................... 8

                i.       At the time of July 2007 IPO, the future looked bright for SGLP and
                         the market and sophisticated investors agreed. ........................................... 8

                ii.      The Private Company's trading program and risk management regime
                         was blessed by industry experts and disclosed to outsiders. ....................... 8

                iii.     The 2008 rise in oil prices that ultimately caused the Private
                         Company's liquidity problems was completely unprecedented and
                         unforeseen. ............................................................................................... 9

                iv.      The individual SGLP Defendants acquired units well into 2008 and
                         lost too. ................................................................................................... 10

        D.      Harvest Fund is a Savvy Institutional Investment Manager and is Charged
                with All of the Prior Warnings and Disclosures in SGLP's Public Filings
                About Substantial, Specific Risks Associated with the Private Company ........... 11

        E.      SGLP Has Survived the Private Company's Bankruptcy ..................................... 13

III.    ARGUMENT & AUTHORITIES ..................................................................... 13

        A.      Legal Standard Governing Motion to Dismiss ..................................................... 13

        B.      Plaintiff Has Failed to State a 10(b) Claim Against the SGLP Defendants .......... 15

                i.       Plaintiff does not adequately allege that the SGLP Defendants made
                         false and misleading statements. ............................................................... 15

                         a.      SGLP accurately stated its exposure to commodity price
                                 fluctuation. ................................................................................... 16

                         b.      SGLP did not misrepresent the nature of its revenues from the
                                 Private Company. .......................................................................... 18

                         c.      SGLP did not "falsely omit" that the purpose of the IPO and
                                 other transactions between SGLP and the Private Company
                                 was to raise capital to feed the Private Company's need for
                                 cash to post margin on trading accounts. ....................................... 20

                         d.      SGLP had no duty to disclose the alleged liquidity concerns of
                                 the Private Company ...................................................................... 21

                         e.      SGLP was not required to make disclosures regarding the
                                 Private Company's trading program or accounting practices. ....... 24

ii.    Plaintiff's claims must be dismissed because the alleged misrepresentations were protected by the bespeaks caution doctrine or are otherwise immaterial................................................................. 26

    a.    The statements were immaterial in light of the bespeaks caution doctrine............................................................. 26

    b.    Certain of the statements are inactionable as a matter of law....... 28

iii.    Plaintiff has failed to plead sufficient facts raising a strong inference of scienter................................................................................... 29

    a.    The MLP structure was a legitimate business decision, not a fraudulent scheme as plaintiff alleges........................................... 31

    b.    The allegations regarding the Private Company's trading program and RMP are at most a claim of mismanagement of the Private Company, not securities fraud against the SGLP Defendants. .................................................................. 32

    c.    The individual SGLP Defendants' compensation does not create a strong inference of scienter............................................... 34

    d.    The departure of executives does not create a strong inference of scienter...................................................................... 35

    e.    Defendant Stallings's alleged knowledge of the Westback receivable does not create a strong inference of scienter.............. 36

C.    Plaintiff Fails To State Claims For Violations of Sections 11 and 12(a)(2) of the Securities Act ................................................................................ 37

D.    Plaintiff Has Failed to Establish Control Person Liability Against the SGLP Defendants Under Section 15 of the Securities Act or Section 20(a) of the Exchange Act ..................................................................................... 39

# TABLE OF AUTHORITIES

**CASES**

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ..........................................................................................18

*Adams v. Kinder Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ...........................................................14, 22, 29, 39

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007)...............................................................25, 33

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)...............................................................................................39

*Caprin v. Simon Transp. Servs., Inc.*,
  99 Fed Appx. 150 (10th Cir. 2004).........................................................................29

*City of Phila. v. Fleming Cos.*,
  264 F.3d 1245 (10th Cir. 2001) ....................................................................... *passim*

*Connett v. Justus Enters. of Kan., Inc.*,
  68 F.3d 382 (10th Cir. 1995) ...................................................................................26

*Cozzarelli v. Inspire Pharms., Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...................................................................................38

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989)......................................................................................37

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .............................................................................25, 36

*First Interstate Bank of Denver v. Pring*,
  969 F.2d 891 (10th Cir. 1992), *rev'd on other grounds sub nom. Cent. Bank v. First
  Interstate Bank*, 511 U.S. 164 (1994) ....................................................................39

*Gallagher v. Abbott Labs.*,
  269 F.3d 806 (7th Cir. 2001) ......................................................................... 23-24, 38

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ...............................................................................35

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ................................................................*Passim*

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................... 22-24

*In re Airgate PCS, Inc. Sec. Litig.*,
389 F. Supp. 2d 1360 (N.D. Ga. 2005) ........................................... 37-38

*In re BearingPoint, Inc. Sec. Litig.*,
525 F. Supp. 2d 759 (E.D. Va. 2007) ..............................................31, 35

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..............................................................23

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................................24

*In re Digital Island Sec. Litig.*,
357 F.3d 322 (3d Cir. 2004)................................................................30

*In re FX Energy, Inc. Sec. Litig.*,
2009 WL 1812828 (D. Utah June 25, 2009)................................... 20-22

*In re ICN Pharms., Inc. Sec. Litig.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004) ...............................................36

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002)...............................................................18

*In re Party City Sec. Litig.*,
147 F. Supp. 2d 282 (D.N.J. 2001) .....................................................34

*In re Radian Sec. Litig.*,
612 F. Supp. 2d 594 (E.D. Pa. 2009) .....................................31, 33, 35

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ..............................................................34

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ......................................... 15-16

*In re Time Warner, Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ...................................................................26

*In re Williams Sec. Litig. WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ..........................................................13

*J & R Mktg., SEP v. Gen. Motors Corp.*,
    549 F.3d 384 (6th Cir. 2008) ........................................................................24, 29

*Kapur v. USANA Health Scis., Inc.*,
    2008 WL 2901705 (D. Utah July 23, 2008) .................................................... 26-27

*Knauff v. Utah Constr. & Mining Co.*,
    408 F.2d 958 (10th Cir. 1969) ...........................................................................25

*Lillard v. Stockton*,
    267 F. Supp. 2d 1081 (N.D. Okla. 2003) ............................................................30

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998) ..........................................................................37

*McDonald v. Kinder-Morgan, Inc.*,
    287 F.3d 992 (10th Cir. 2002) ...........................................................................22

*McNamara v. Pre-Paid Legal Servs., Inc.*,
    189 Fed Appx. 702 (10th Cir. 2006).....................................................................34

*Melder v. Morris*,
    27 F.3d 1097 (5th Cir. 1994) .............................................................................34

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)..............................................................................23

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) .............................................................................25

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) .....................................................................18, 28

*Plevy v. Haggertys*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998) ..................................................................27

*Pommer v. Medtest Corp.*,
    961 F.2d 620 (7th Cir. 1992) .............................................................................18

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .............................................................................34

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................................38

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .............................................................................37

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)................................................................38

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996)..............................................................37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007).................................................................6, 15

*Tripp v. Indymac Fin., Inc.*,
   2007 WL 4591930 (C.D. Cal. Nov. 29, 2007)................................. 33-34

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 77l(a)(2)...........................................................................37

15 U.S.C. § 77z-2(b)(2) .....................................................................26

15 U.S.C.  § 78u-4(b)(3) .....................................................................15

15 U.S.C. § 78u-4(b)................................................................ 1, 4-5, 14-15

Fed. R. Civ. P. 8 ...............................................................................38

Fed. R. Civ. P. 9(b) .................................................................1, 14, 32, 38

Fed. R. Civ. P. 12(b)(6)...............................................................1, 6

Pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the SGLP Defendants[1] file this Motion to Dismiss all claims brought against them by Plaintiff Harvest Fund Advisors, LLC ("Harvest Fund" or "Plaintiff") in the Corrected Consolidated Securities Class Action Complaint for Violations of Federal Securities Laws (the "CAC" or "Complaint") (Doc. No. 188).

## I.  INTRODUCTION

The Complaint is classic "fraud by hindsight": Plaintiff alleges that the SGLP Defendants must have known as early as July 2007 that SGLP's primary customer—SemGroup, L.P. (the "Private Company")—would later become insolvent in July 2008 and not be able to perform its obligations to SGLP.  However, for Plaintiff's theory to work, the SGLP Defendants must have known in July 2007: (1) that oil prices would later reach "unprecedented" highs in March-July 2008; and (2) that, as a result, the Private Company would lose key sources of financing and seek bankruptcy protection in July 2008.  The problem for Plaintiff is that these 2008 "facts" were not knowable in 2007; indeed, the July 2007 scene was quite different than Plaintiff—through the all-knowing lens of hindsight—now paints it: (1) the Private Company was on an upward and profitable trajectory, and its trading strategy had been examined by outside experts and its lenders; (2) oil prices were far lower, and had even declined just after SGLP's IPO; (3) SGLP had signed lucrative, long-term contracts and had modeled a series of "drop down" transactions to expand its footprint; and (4) the individual SGLP Defendants themselves were heavily invested in SGLP units, evidencing their belief that the future was quite bright for SGLP.

Against this backdrop, the Complaint offers little in the way of well-pled facts to show that the challenged disclosures were false when made, but much in the way of conclusory

---

[1] The SGLP Defendants are SemGroup Energy Partners, L.P. ("SGLP"), SemGroup Energy Partners G.P., LLC, Kevin L. Foxx, Alex G. Stallings, and Michael J. Brochetti.

verbiage—colored by hindsight—that history has proven the disclosures inadequate and that the SGLP Defendants must thus be held to account for the discrepancy. Unfortunately for Plaintiff, the securities laws are designed to prevent fraud and falsity, not punish lack of clairvoyance and provide investor insurance, and the Complaint should be dismissed for several reasons.

First, the Complaint fails to show that the disclosures made to SGLP investors were false *when made*. Reduced to its essence, Plaintiff's "falsity" theory is that SGLP failed to disclose that the *Private Company* was "teetering on insolvency" in July 2007 and beyond,[2] but there are no well-pled facts to support such a conclusion. It was the unprecedented and unforeseen rise in oil prices in March-July 2008 that caused the Private Company's liquidity problems and caused it to seek bankruptcy protection. Plaintiff's attempt to back-date these issues to July 2007 is revisionist history, belied by the very document upon which Plaintiff most heavily relies: the Bankruptcy Examiner's Report, whose timeline is markedly different than Plaintiff's.

Second, the allegedly omitted disclosures concerning the *Private Company's* trading, accounting, and liquidity were not *material* to SGLP investors—who were investing in *SGLP*, not the Private Company, and who received repeated *cautionary disclosures and specific warnings* that SGLP provided its investors regarding the *Private Company's* speculative credit rating and its exposure to the risk of commodity price fluctuation. Indeed, the fact that SGLP continues to exist despite the bankruptcy of the Private Company undermines Plaintiff's attempt to conflate SGLP and the Private Company into one entity for disclosure purposes.

Third, Plaintiff has not (and cannot) plead any facts giving rise to a *strong inference* that any of the SGLP Defendants acted with fraudulent intent. The Complaint alleges no specific facts suggesting that the SGLP Defendants were aware—prior to July 2008—that the Private

---

[2] CAC ¶ 19.

Company would become unable to honor its obligations to SGLP and that they nevertheless remained quiet to profit illegally from SGLP investors. In fact, the materials before the Court suggest precisely the opposite conclusion: that the SGLP Defendants were themselves blindsided by the sudden demise of the Private Company, as vividly shown by the fact that the individual SGLP Defendants never sold their SGLP units and themselves lost millions when the Private Company declared bankruptcy.

In addition to its "fraud" claim under Section 10(b), Plaintiff also asserts claims under Sections 11 and 12(a)(2) of the Securities Act based on many of the same challenged statements: namely those contained in the offering documents in connection with SGLP's July 2007 and February 2008 public offerings. But as explained below and in the other Defendants' briefing adopted herein, Plaintiff simply has no standing to assert any Securities Act claims against the SGLP Defendants. Further, despite attempting to dress the same basic fraud claim in a different costume, the Securities Act allegations suffer from many of the same defects identified above, including the failure to plead falsity or materiality.

Finally, because Plaintiff has failed to state a claim for primary liability under Section 10(b) of the Exchange Act or Sections 11 and 12 of the Securities Act, the Complaint does not state a claim for control person liability under Section 20(a) of the Exchange Act or Section 15 of the Securities Act. Accordingly, all of the claims against the SGLP Defendants should be dismissed.

## II.      STATEMENT OF FACTS

### A.    *Overview of the SGLP Defendants and Harvest Fund's Complaint*

Defendant SGLP is a publicly traded Delaware limited partnership that was formed in 2007 by its indirect parent—and non-party in this action—SemGroup, L.P., a private energy company (the "Private Company"). SGLP provides terminalling, storage, gathering, and

transportation services for companies that purchase, sell, distribute, and market crude oil, such as the Private Company.[3]

On March 9, 2007, the Private Company announced a planned initial public offering of limited partnership interests in SGLP.[4]   The terms of the offering proposed that SemGroup Holdings would offer 12,500,000 common units in SGLP to the public, plus an over-allotment option for underwriters to purchase an additional 1,875,000 common units.[5]   At the close of the offering, the Private Company was to transfer ownership of certain crude oil assets, including two pipelines and crude oil transports used to gather oil at remote wellhead locations, to SGLP.[6] SGLP also entered into a contract with the Private Company, known as the Throughput Agreement, that required SGLP to provide crude oil gathering, transportation, terminalling, and storage services for the Private Company, which, pursuant to the Throughput Agreement, required the Private Company to pay SGLP minimum monthly fees of $6.4 million, totaling $76.8 million annually.[7]   SGLP disclosed that it was informed by the Private Company that the net proceeds from the offerings would be used to pay down the Private Company's debt.[8]

---

[3] SGLP's operations are managed by its general partner, Defendant SemGroup Energy GP, L.L.C. (the "General Partner").  *Id*. ¶ 25.  Defendants Kevin L. Foxx, Michael Brochetti, and Alex Stallings served as executive officers (CEO, CFO, and CAO, respectively) of the General Partner during the Class Period.  *Id.* ¶¶ 26-28.

[4] *Id.* ¶ 61.

[5] *Id.*  In a series of public filings with the SEC, SGLP's Registration Statement was amended and declared effective by the SEC on July 17, 2007.  *Id.* ¶ 112.  On July 18, 2007, SGLP filed an additional amendment to the IPO Registration Statement to increase the price per common unit to $22, and a final prospectus was also filed on July 18, 2007.  *Id.* ¶ 113.  SGLP's initial public offering will be referred to as the "July 2007 IPO."

[6] *Id.*

[7] *Id.* ¶ 122.

[8] *Id.* ¶¶ 115-16.

On January 14, 2008, SGLP issued a press release announcing that it had agreed to acquire 46 U.S. liquid asphalt cement and residual fuel oil terminalling and storage facilities from SemMaterials, L.P. ("SemMaterials"), a subsidiary of the Private Company, for $378.8 million.[9]  SGLP announced that it had filed a Registration Statement with the SEC for a public offering of six million common units to raise money to consummate the SemMaterials transaction in a follow-on offering in February 2008.[10]  SGLP also entered into a terminalling and storage agreement with SemMaterials known as the "Terminalling Agreement" that required SemMaterials to provide SGLP with minimum monthly fee-based revenues for its liquid asphalt cement terminalling and storage services.[11]

Plaintiff alleges that SGLP's public filings and public statements from July 2007 through July 2008 were materially false and misleading because Defendants failed to disclose to potential investors that "SGLP's financial condition was premised entirely upon undisclosed speculative commodities 'gambling'" by the Private Company, and because Defendants "touted various aspects of SGLP's business, particularly the significant advantages it possessed by virtue of its ongoing relationship" with the Private Company, but failed to disclose that the Private "was suffering from substantial liquidity concerns."[12]  Although the Complaint purports to rely on a variety of public sources, the allegations rely almost exclusively upon the statements contained in SGLP's public filings and public communications and a report published in April 2009 by Louis J. Freeh, the Examiner appointed by the judge in the bankruptcy proceeding of the Private

---

[9] *Id.* ¶ 148.

[10] *Id.* ¶ 151 (the "February 2008 Offering").  SGLP's Registration Statement issued in connection with its follow-on offering became effective on February 13, 2008.  *Id.* ¶ 151-52.

[11] *Id.* ¶¶ 149, 151.

[12] *Id.* ¶¶ 6, 8, 10.

Company to analyze and identify any potential claims against the former directors and officers of the Private Company (the "Examiner's Report").[13]

**B.      The Master Limited Partnership Structure and the "Dropdown" Transactions**

SGLP is a master limited partnership ("MLP"), a type of publicly traded limited partnership in which ownership interests are referred to as units, and generally operates in the natural resource and real estate industries.  Unlike a corporation, however, an MLP combines the tax advantages of a partnership with the liquidity of a publicly traded stock.  An MLP is frequently sponsored by a parent company, which contributes assets to a partnership that is then taken public.  The parent receives cash and a subordinated partnership interest, and outside investors receive a yield from the cash flow created by the "dropped-down" business.  If there is a shortfall in cash flow, the parent, as the owner of the subordinated units, gets paid last, and only after the public common unit holders.  As cash flows in the MLP increase, the parent gets to share in the growth, receiving amounts in excess of the cash flow yields paid to the public common unit holders.[14]

An MLP business model was suggested to the Private Company as early as 2003, and was eventually implemented by it in 2007.[15]  As the Examiner observed, "[t]he MLP business

---

[13] *See* Defendants' Joint Request for Judicial Notice, Appendix Exhibit 1. When ruling on a Motion to Dismiss, the Court may consider documents that are referenced in the Complaint, even if not physically attached to the pleading, as well as matters that may be judicially noticed.  *See* Defendants' Joint Request for Judicial Notice at 1-2; *see also*, *e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action,  . . . courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").  All further citations to the Exhibits in the Appendix to Defendants' Joint Request for Judicial Notice will be referred to as "RJN App. Ex. __."

[14] *See, e.g.*, RJN App. Ex. 1 at 178 (discussing MLP structure).

[15] *Id.* at 13.

model is commonly used in the energy industry," and it "was a reasonable business decision by SemGroup to utilize the concept."[16]  The Private Company's adoption of the MLP business model resulted in the July 2007 formation of SGLP, and the subsequent "dropdown" of assets to it in January and May 2008.[17]  These dropdowns were part of a long-term MLP planning process developed in early 2007 by the Private Company, and additional dropdowns were scheduled by SemGroup to occur in the fourth quarter of 2008, as well as in 2009 and 2010.[18]  Preparing a dropdown transaction typically would take several months of planning, and consummating such transactions could not, as a practical matter, be used as a way to manage the Private Company's daily margin requirements on its crude oil trading.[19]  Each of the dropdown transactions were accompanied by fairness opinions by independent, credible financial advisors.  Thus, as the Examiner concluded, the MLP structure and dropdown transactions with SGLP were legitimate, well-planned, bona fide business transactions.[20]

---

[16] *Id.* at 162; *see also id.* at 165 ("The MLP business model strategy was not unique to SemGroup.  It was common in the energy industry.").

[17] *Id.* 167.  The January 14, 2008 dropdown allowed SemMaterials to sell six million barrels of storage capacity to help it raise capital for growth, and provided income producing assets to SGLP, which consisted of all of SemMaterials' liquid asphalt cement terminalling and storage assets located in the United States.  *Id.* at 721.  The next dropdown occurred on May 12, 2008, when SemCrude transferred additional crude oil assets (the Eagle North Pipeline) valued at $45 million to SGLP and certain of its affiliates pursuant to a Purchase and Sale Agreement, dated May 12, 2008.  *Id.* at 174-75.  Finally, SemCrude transferred additional crude oil and terminalling facilities valued at $90 million to SGLP and certain of its affiliates in a transaction that closed on May 30, 2008.  *Id.* at 176-77.

[18] *Id.* at 13, 167-68.

[19] *Id.* at 162.

[20] *E.g.*, *id.* at 14 (concluding that "the MLP business strategy was not planned or designed for the purpose of managing or paying required margins.  There is also no evidence that the valuation of the dropdown assets were unreasonable.  Fairness opinions from independent, credible entities, and MC and SGLP Board of Director authorizations, were obtained prior to the dropdowns").

**C.**     ***The Private Company's Financial Difficulties Were Unforeseen***

    **i.**     *At the time of July 2007 IPO, the future looked bright for SGLP and the market and sophisticated investors agreed.*

At the time of the July 2007 IPO, the market was bullish on SGLP's prospects. SGLP's strategy was seen as attractive because acquisitions were to be primarily undertaken by the Private Company, and then transferred to SGLP when the asset was mature and the cash flow stream had stabilized—a strategy that allowed SGLP to avoid the execution risk associated with new acquisitions and the attendant financing burden.[21] Although SGLP would be indirectly affected by commodity prices through its relationship with the Private Company, it would only have minimal direct exposure to commodity price fluctuations because it would not own or take title to any of the crude oil it gathered, transported or stored.[22] In addition, the Private Company had just experienced a record year in 2006, and had boasted an average growth rate of more than 100% going back to 2002.[23] As a result, SGLP was seen by analysts and sophisticated investors as a particularly attractive investment.

    **ii.**     *The Private Company's trading program and risk management regime was blessed by industry experts and disclosed to outsiders.*

In May 2007, James Bowen, an expert who had previously examined the Private Company's trading program for Fleet Bank, did a full examination of the Private Company's trading program and Risk Management Policy ("RMP") for Bank of America, the Private Company's primary lender.[24] Bowen concluded that the Private Company "exceed[ed] common

---

[21] RJN App. Ex. 18 at 1.

[22] *E.g.*, RJN App. Ex. 2 at 84; RJN App. Ex. 5 at 74.

[23] *See* RJN App. Ex. 18 at 5; *see also id.* at 7 (noting that the Private Company's management "has a stellar track record of growth . . . [and that] this bodes well for SGLP").

[24] *See* RJN App. Ex. 1(D) (Bowen Report).

industry standards in several areas" and stated that "[t]he Company's approach is SATISFACTORY in comparison to the industry, and is superior in several respects."[25]  Bowen further concluded that the Private Company "deviated very little from the RMP," and understood that the Private Company rolled its hedges from one month to the next, noting that "doing so could be very profitable if done properly."[26]

The RMP was instituted as part of the Private Company's lending covenants with private banks, and the Private Company's major investors received copies of the RMP, as did Bank of America, the administrative agent for the Private Company's lending group.[27]  These lenders also received weekly borrowing base reports and position reports from the Private Company along with monthly financial statements.[28]  The Private Company's trading program and risk management regime was therefore no secret to sophisticated financial institutions with large stakes in it.

    iii.    *The 2008 rise in oil prices that ultimately caused the Private Company's liquidity problems was completely unprecedented and unforeseen.*

At the time of the February 2008 Offering, the Private Company had just had another successful year in 2007, and no one anticipated the continued, unprecedented volatility in crude oil prices.[29]  In fact, crude oil prices actually *decreased* from July to August 2007 (at the time of

---

[25] *Id.* at 2, 7.  As the Examiner noted, when Bowen issues an opinion, it is either "satisfactory" or "not satisfactory."  *See* RJN App. Ex. 1 at 53.

[26] *See* RJN App. Ex. 1 at 54-55.

[27] *See, e.g.*, *id.* at 188-90, 194, 201.

[28] *Id.* at 184.

[29] Indeed, Plaintiff acknowledges that the Private Company's trading strategy failed only "when oil prices rose to **unprecedented** levels and experienced extreme volatility." CAC ¶ 74 (emphasis added); *see also id.* ¶ 296 ("[U]p until May 2008, volatility in commodities prices was <u>not</u> considered as a risk factor by SemGroup traders or risk management.") (emphasis in original).

the IPO).[30]  From February 2008 to July 2008, however, oil prices experienced extreme

volatility, skyrocketing from $90 per barrel to over $140, only to then fall back below $40 per

barrel by November 2008.[31]  It was this unprecedented and anomalous spike in prices that

ultimately caused the Private Company's margin and liquidity issues.  In fact, according to the

Examiner's timeline, no serious liquidity concerns existed at the Private Company at the time of

the July 2007 IPO or the February 2008 Offering—it was only after that, when prices spiked so

substantially, that serious liquidity issues began to arise.[32]

       *iv.*     *The individual SGLP Defendants acquired units well into 2008 and lost too.*

Moreover, far from being aware that the Private Company was ever in severe financial

jeopardy, the SGLP Defendants consistently acquired SGLP units, reflecting their belief that the

prospects for SGLP were promising.[33]  The SGLP Defendants also continued to own and acquire

SGLP units well into 2008, with Defendant Foxx purchasing units in March 2008.[34]  Perhaps

even more importantly, *none of the individual SGLP Defendants sold any* of their units during

the putative class period.

---

[30] *See* RJN App. Ex. 19.

[31] *Id.*

[32] *See* RJN App. Ex. 1 at 159-61.

[33] *See* RJN App. Exs. 13-15.

[34] Foxx purchased 20,000 units in March 2008 for $509,799 and acquired 65,000 phantom units on June 20, 2008, bringing his holdings to 255,000.  *See* RJN App. Exs. 13A and 13B.  Brochetti acquired 60,000 phantom units on June 20, 2008, brining his holdings to 140,000 units.  *See* RJN App. Ex. 14.  Stallings acquired 45,000 units on June 20, 2008, brining his holdings to 115,000 units.  *See* RJN App. Ex. 15.

**D.** *Harvest Fund is a Savvy Institutional Investment Manager and is Charged with All of the Prior Warnings and Disclosures in SGLP's Public Filings About Substantial, Specific Risks Associated with the Private Company*

Harvest Fund is not an unsophisticated investor. Rather, it is a savvy investment fund management company that manages pooled investment vehicles for institutional investors and specifically focuses on U.S. midstream energy assets and energy infrastructure companies under the master limited partnership structure, like SGLP.[35] Harvest Fund, like all of SGLP's investors, received extensive, detailed information about the risks facing SGLP's business, including risks arising out of its relationship with the Private Company. For instance, the prospectus issued in connection with the July 2007 IPO contained the following candid disclosures about the significant risk associated with investing in SGLP, namely that:

- *We are exposed to the credit risk of our Parent and any material nonperformance by our Parent could reduce our ability to make distributions to unitholders*.[36]

- The Private Company's credit ratings were "***speculative.*** These speculative ratings signify *a higher risk that our Parent will default on its obligations, including its obligations to us*, than does an investment grade credit rating. *Any material nonperformance under the Omnibus Agreement and the Throughput Agreement by our Parent could materially and adversely impact our ability to operate and make distributions to our unitholders.*"[37]

- "*We depend upon our Parent for a substantial majority of our revenues and any reduction in these revenues would have a material adverse effect on our results of operations and our ability to make distributions to our unitholders.*"[38]

- "*If our Parent is unable to make the minimum commitment payments to us required by it under the Throughput Agreement for any reason our revenues*

---

[35] *See* Plaintiff's Memorandum of Law in Support of its Motion to be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel, at 11 (Doc. No. 26 in 4:08-cv-00425).

[36] *E.g.*, RJN App. Ex. 2 at 19 (emphasis in original).

[37] *Id.* (emphasis added).

[38] *Id.* (emphasis in original).

***would decline and our ability to make distributions to unitholders would be reduced."***[39]

- "Therefore, we are ***indirectly*** subject to the business risks of our Parent, many of which are similar to the business risks we face.  In particular, these business risks include the following:

  o the inability of our Parent to generate adequate gross margins from the purchase, transportation, storage and marketing of petroleum products;

  o material reductions in the supply of crude oil and petroleum products;

  o a material decrease in the demand for crude oil and petroleum products in the markets served by our Parent;

  o ***the inability of our Parent to manage its commodity price risk resulting from its ownership of crude oil and petroleum products;***

  o contract non-performance by our Parent's customers; and

  o various operational risks to which our Parent's business is subject[.]"[40]

- "Because the officers and certain of the directors of our general partner are also directors and/or officers of our Parent, ***such directors and officers have fiduciary duties to our Parent that may cause them to pursue business strategies that disproportionately benefit our Parent or which otherwise are not in our best interests.***"[41]

  Accordingly, investors in SGLP like Harvest Fund were well aware of the significant

risks to their investment in SGLP if the Private Company did not perform under its contracts.

---

[39] *Id.* (emphasis added); *see also id.* at 50 ("If our Parent is unable to make the minimum commitment payments to us required by it under the Throughput Agreement for any reason, our results of operations would be adversely impacted if we were not otherwise able to replace the revenues attributable to our Parent with revenues from other customers.").

[40] *Id.* (emphasis added); *see also id.* at 72 ("Although our current operations will have minimal direct exposure to commodity prices, the volumes of crude oil we gather, transport, terminal or store are indirectly affected by commodity prices.").

[41] *Id.* at 116 (emphasis added).  Later public filings contained substantially identical disclosures as well.  *See, e.g.*, RJN App. Ex. 3 at 15 (incorporating the disclosures and risk identified in the July 2007 Form S-1); *id.* at 18 ("We intend to pursue both strategic and accretive acquisitions within the midstream industry both independently and jointly with our Parent. These acquisition efforts may involve assets that, if acquired, would have a material effect on our financial condition and results of operations. ***We can give no assurance that our current or future acquisition efforts will be successful or that any such acquisition will be completed on terms considered favorable to us.***") (emphasis added); *see also* RJN App. Ex. 5 at 16-35 (discussing risk factors).

E.      *SGLP Has Survived the Private Company's Bankruptcy*

Nonetheless, despite the disclosed risks having materialized, SGLP has not only survived the Private Company bankruptcy, but generated $192.2 million in revenues in 2008.[42]  SGLP has also added third-party customers and has contracts in place on 45 of its 46 asphalt plants through the end of 2011,[43] and was successful in recontracting much of its Cushing, Oklahoma storage within months of the Private Company's bankruptcy at rates similar to that which the Private Company had been paying.[44]  Thus, despite SGLP's (extensively disclosed) reliance on the Private Company as its primary customer, SGLP continues today, a year after the Private Company declared bankruptcy—an accomplishment all the more notable given that the MLP market in general suffered massive decline during the third quarter of 2008.[45]

## III.    ARGUMENT & AUTHORITIES

A.      *Legal Standard Governing Motion to Dismiss*

To successfully plead a claim for violation of Section 10(b) and Rule 10b-5, Plaintiff must allege with the requisite particularity that the SGLP Defendants: (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss.[46]  Plaintiff must not only do so

---

[42] *See* RJN App. Ex. 10 at 57.

[43] *Id.* at 10.

[44] *Id.* at 60.

[45] *See* RJN App. Ex. 20 (showing MLP Index drop from 273.31 on August 29, 2008 to 152.68 on November 21, 2008).  As of market close on July 21, 2009, SGLP units were trading at $5.90 per unit.  RJN App. Ex. 25; *Cf.* CAC ¶ 18 (stating that SGLP's units in November 2008 were trading at less than $1.00 per unit).

[46] *E.g.*, *In re Williams Sec. Litig. WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009).

with the particularity required by Fed. R. Civ. P. 9(b), but has two additional burdens under the PSLRA as well.

First, a complaint shall "specify *each statement alleged to have been misleading*, the *reason or reasons why* the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the *complaint shall state with particularity all facts on which that belief is formed*."[47]   This means that a court must "evaluat[e] the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."[48]   A plaintiff sufficiently pleads with sufficient facts only if, after considering these factors the court concludes that a reasonable person would believe that the defendant's statements were false or misleading.

Second, rather than pleading scienter generally, as allowed in other fraud cases, plaintiffs alleging securities fraud must "state *with particularity facts giving rise to a strong inference* that the defendant acted with the *required state of mind*,"[49] which generally means "a mental state embracing intent to deceive, manipulate or defraud'   . . . [and] 'knowing or intentional misconduct.'"[50]   This is a "stringent" requirement,[51] and an inference of scienter is "strong"

---

[47] *E.g., City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quoting 15 U.S.C. § 78u-4(b)(1)) (emphasis added).

[48] *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003).  Relevant factors in making this determination include: (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.  *Id.* (citation omitted).

[49] *Id.* at 1096 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added).

[50] *Fleming*, 264 F.3d at 1258 (quotation and citation omitted).

[51] *Adams*, 340 F.3d at 1096.

under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged."[52]  In determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences, an inherently comparative inquiry that "cannot be decided in a vacuum."[53]  A court must consider plausible non-culpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff, and in so doing, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."[54]  Finally, the PSLRA requires that a court *must dismiss* complaints that do not meet all of these requirements.[55]

**B.**     ***Plaintiff Has Failed to State a 10(b) Claim Against the SGLP Defendants***

      **i.**     **Plaintiff does not adequately allege that the SGLP Defendants made false and misleading statements.**

Although the Complaint's allegations are spread over 377 paragraphs,[56] the basic thrust is that SGLP's disclosures about the relationship between SGLP and the Private Company were

---

[52] *Tellabs*, 127 S. Ct. at 2510 (emphasis added).

[53] *Id.* at 2509-10.

[54] *Id.*

[55] 15 U.S.C. § 78u-4(b)(3).

[56] Indeed, for this reason alone, the CAC should be dismissed as a puzzle-style pleading.  It uses copious block quotes from public filings and uncited quotes and references to the Examiner's Report and then provides cross-referenced lists purporting to explain why these statements are fraudulent.  This does not satisfy the PSLRA.  *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001) (dismissing complaint with prejudice that "refer[s] to various documents . . . and then provide[s] a list of between five and nineteen 'reasons' that the statements were false").

false or misleading. The allegedly misleading statements can be generally grouped into the following categories:[57]

> (a) SGLP falsely stated that it (as opposed to the Private Company) had minimal "direct" exposure to commodity price fluctuations;

> (b) SGLP falsely stated that its revenues from the Private Company were "guaranteed";

> (c) SGLP failed to disclose that the purpose of the IPO and the "dropdown" transactions between SGLP and the Private Company was to raise capital to feed the Private Company's need for cash to post margin on commodities trading accounts;

> (d) SGLP failed to disclose that the Private Company's trading program was substantially impairing its liquidity; and

> (e) SGLP failed to disclose the allegedly unreasonably risky nature of the Private Company's commodities trading program.

Despite well-established pleading standards, however, the Complaint fails to identify with particularity the reasons why the challenged statements were false and misleading, especially why such statements were false and misleading *when they were made*.

> a.    *SGLP accurately stated its exposure to commodity price fluctuation.*

Plaintiff attacks SGLP's statement that it had "'minimal direct risk to commodity prices."[58] Contrary to Plaintiff's contentions, however, SGLP's public filings *repeatedly* warned that, given its dependence on the Private Company, SGLP was subject to the business risks of the Private Company, specifically including *commodity price risk and volatility*. For example,

---

[57] A chart grouping all of the alleged misstatements—and explaining why they are not actionable—is attached to this motion as Exhibit 1. For the sake of brevity and efficiency, the brief focuses on the major categories of alleged misstatements and shows why they are deficient as a matter of law. The chart addresses the rest.

[58] *E.g.*, CAC ¶ 11; s*ee also id.* ¶ 181 (claiming that SGLP "falsely stated that SGLP was not exposed to risks from commodity price or related volatility, when nothing could be further from the truth at the time because of the reckless trading scheme directed by Kivisto at SGLP's Parent").

SGLP specifically listed as one of the business risks that SGLP faced: "***the inability of our Parent to manage its commodity price risk resulting from its ownership of crude oil and petroleum products***."[59]

SGLP further stated that while it has "minimal direct exposure to commodity price fluctuations because we do not own or take title to any of the crude oil [unlike its Parent] . . . the volumes of crude oil . . . we gather, transport or store . . . are ***indirectly*** affected by commodity prices."[60]   This was so because the *Private Company* was engaged in the buying, selling, and trading of crude oil, and as SGLP's primary *customer*, the Private Company (not SGLP) was *directly* subject to price volatility.   SGLP was thus *indirectly* subject to the risks that the Private Company faced, including commodity price volatility, which could ultimately affect the Private Company's ability to honor its obligations to SGLP.   Thus, the statement that SGLP had minimal *direct* exposure to commodity price fluctuations was not materially misleading to investors. Rather, it was a true statement.

Plaintiff's principal criticism is not that SGLP misstated the type of risk associated with commodity prices, but rather that SGLP *failed to disclose* to unit holders the *magnitude* of that risk if it materialized in a certain, historically anomalous way—*i.e.*, what would occur if oil prices hit unprecedented price highs for a sustained period of time without a rapid return to "normalized" levels.   The flaw in Plaintiff's logic is that it assumes the SGLP Defendants were required to foresee—and disclose—anomalous future events, such as the "unprecedented" rise in

---

[59] *E.g.*, RJN App. Ex. 2 at 19, 72; RJN App. Ex. 5 at 17 (emphasis added).

[60] *Id.* (emphasis added).  In fact, each time SGLP said it had no direct exposure, it also said that it did have indirect exposure.

oil prices in 2008 and their "extreme volatility."[61]   The securities laws do not require clairvoyance, or even rank speculation about "unprecedented" future events.

Tellingly, Plaintiff alleges no facts that the SGLP Defendants knew—or were reckless in not knowing—that oil prices would skyrocket from $90 per barrel in February 2008 to over $140 per barrel in July 2008 and that such an historic phenomenon would bankrupt the Private Company.   It is only with the benefit of hindsight that Plaintiff now alleges that the magnitude of the commodity price risk facing the Private Company—and by derivation SGLP—was materially understated.[62]  But pleading falsity by hindsight is not an acceptable method of stating securities fraud claims,[63] and Plaintiff has pled no facts that make SGLP's statements regarding the risks associated with commodity prices false or misleading when they were made.

> **b.**    *SGLP did not misrepresent the nature of its revenues from the Private Company*

Plaintiff also claims that SGLP committed fraud by touting revenues from contracts with the Private Company as "guaranteed."[64]   SGLP, however, never stated that such a revenue

---

[61] CAC ¶ 74.

[62] Indeed, the financial institutions who received constant position reports, and who themselves *were directly* exposed to these risks, did not raise any such concerns or object to the Private Company's trading strategy—a strategy that would have paid off once prices fell, as they did from July 2008 to December 2008.  *See* RJN App. Ex. 19.

[63] *See, e.g.*, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."); *Pommer v. Medtest Corp.*, 961 F.2d 620, 625 (7th Cir. 1992) (noting that the "truth (or falsity) of defendants' statements, and their materiality, must be assessed at the time the statements are made, and not in light of hindsight"); *see also, e.g.*, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (observing that "defendant's failure to anticipate future events did not constitute securities fraud").

[64] *E.g.*, CAC ¶¶ 10, 125, 127, 159-61, 190, 223, 280, 303.  The offering documents, however, did not use the word "guaranteed" revenues; rather, they referred to them as "[s]table, fee-based, contracted cash flows."  *E.g.*, RJN App. Ex. 2 at 84; RJN App. Ex. 5 at 74.  Plaintiff instead points to a statement by Defendant Brochetti during a conference call relating to the Secondary

stream was "guaranteed" without any contingencies; instead, SGLP specifically alerted investors that the Private Company's contractual obligations "***may be reduced or suspended in some circumstances***," that certain of those circumstances were "within the exclusive control of our Parent," and that SGLP was "***exposed to the credit risk of our Parent***," which had speculative credit ratings, and that "***any material nonperformance by our Parent could reduce our ability to make distributions*. . . .**"[65]  SGLP further disclosed that:

- "***If our Parent is unable to make the minimum commitment payments to us required by it under the Throughput Agreement for any reason . . . our results of operations would be adversely impacted*** if we were not otherwise able to replace the revenues attributable to our Parent with revenues from other customers."

- "We depend upon our Parent for a substantial majority of our revenues and ***any reduction in these revenues would have a material adverse effect on our results of operations and our ability to make distributions to our unitholders.***"

- The Private Company's credit ratings were "***speculative.*** These speculative ratings signify ***a higher risk that our Parent will default on its obligations, including its obligations to us***, than does an investment grade credit rating. ***Any material nonperformance under the Omnibus Agreement and the Throughput***

---

Offering in which he allegedly stated that "95% of the forecast revenues are ***guaranteed*** under the ***take-or-pay*** arrangement created by the terminalling and storage agreement." *E.g.*, CAC ¶ 197 (emphasis added).  Aside from the fact that Plaintiff does not allege that it participated in any of the calls and does not explain how it knows what was said on the calls, see *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1189–90 (10th Cir. 2003) (affirming dismissal of allegations based on statements allegedly made by defendants during conference calls because plaintiff did not plead specific facts indicating that they participated in the call or otherwise indicate how they were aware of the substance of the calls), the statement is non-actionable because it is obviously nothing more than a shorthand recitation of the *take-or-pay* arrangement with the Private Company and is protected by all of the accompanying warnings in the February 2008 Offering materials.  *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122-23 & n.10 (10th Cir. 1997) (noting that an investor may not rely on oral misstatements when the risks of an investment are adequately disclosed in an accompanying private placement memorandum or were all closely proximate in time to the registration statement and obviously directly related to the transactions described in great detail in the registration statement); *see also* sect. B(ii)(a) (discussing "bespeaks caution" doctrine).

[65] *E.g.*, RJN App. Ex. 2 at 4; RJN App. Ex. 5 at 6; *see also* sect. II(D), *supra*.

***Agreement by our Parent could materially and adversely impact our ability to operate and make distributions to our unitholders.***"[66]

The claim that SGLP somehow misled investors into believing the Private Company's performance was subject to no risks whatsoever—thereby making its payments to SGLP "guaranteed"—is thus belied by plain language in the documents, and in no way can constitute a material misrepresentation of fact. Plaintiff's "guaranteed" payment theory is completely at odds with the acknowledged risks associated with these markets and related investment vehicles.

> c.    *SGLP did not "falsely omit" that the purpose of the IPO and other transactions between SGLP and the Private Company was to raise capital to feed the Private Company's need for cash to post margin on trading accounts.*

A core premise of Plaintiff's theory is that the decision to employ an MLP structure and to drop down assets to SGLP was just a scheme to funnel money to the Private Company to make margin calls associated with its trading activities. Such a theory, however, is not only insufficiently pled under the PSLRA's heightened pleading standards, but is *expressly contradicted* by the very document upon which Plaintiff most heavily relies, the Examiner's Report, a deficiency which is fatal to this allegation.[67]  In fact, the Examiner's findings on this point could not be clearer: "the MLP business model strategy was *not* planned or designed for the purpose of managing or paying required margins" related to the trading program, and there

---

[66] *Id.*; *see also* RJN App. Ex. 6 at 23-24 (emphasis added).

[67] *See, e.g.*, *In re FX Energy, Inc. Sec. Litig.*, 2009 WL 1812828, at *6 (D. Utah June 25, 2009) ("If the documents on which the Plaintiffs rely contradict the allegations of the . . . complaint, the documents control and [a] Court need not accept as true the allegations in the . . . complaint.") (quotation omitted).

was "no evidence that the valuations of the dropdown assets were unreasonable."[68]  Nor was the

timing of the dropdowns accelerated due to liquidity issues, especially considering that they had

been planned months in advance.[69]   As such, Plaintiff's claim that these transactions were not

bona fide and were instead designed to predict or manage daily margin requirements must fail.

> d.   *SGLP had no duty to disclose the alleged liquidity concerns of the Private Company*

Ultimately, the gravamen of the Complaint is that the SGLP Defendants committed

securities fraud by failing to disclose liquidity concerns arising from a growing margin balance at

the Private Company during the entire one-year period following the July 2007 IPO.[70]  There is a

simple reason that such concerns were not disclosed to unit holders, however: such concerns *did*

*not exist* during almost all of the relevant time period.  In fact, the Examiner's Report heavily

relied on by Plaintiff *once again contradicts this theory entirely*, as that Report concluded that

serious liquidity concerns did not even exist until the *March/April 2008* timeframe, well after the

February 2008 Offering and almost all of the challenged public filings and statements in this

case.[71]

To get around this problem, Plaintiff relies on a lone and mysterious confidential witness,

known only as "CW 1," to support its allegation that liquidity concerns at the Private Company

---

[68] RJN App. Ex. 1 at 14 (emphasis added); *see also id.* at 162 (noting that "[t]he MLP business model is commonly used in the energy industry, and it was a reasonable business decision by SemGroup to utilize the concept").

[69] *Id.* at 168.

[70] *E.g.*, CAC ¶¶ 126, 134, 173, 177, 184, 187, 211, 218, 220-21, 225, 227, 242.

[71] In citing the Report, the SGLP Defendants, of course, in no way concede the truth or accuracy of any of the Examiner's conclusions in this regard; rather, the SGLP Defendants merely rely on the Report to the extent that it renders Plaintiff's allegations deficient.  *See, e.g., In Re FX Energy*, *Inc. Sec. Litig.,* 2009 WL 1812828 at *6.

related to the need to post margin requirements went back as far as March 2007.[72]  Such an unidentifiable source is not only utterly unreliable "given that such a witness may 'have axes to grind,' could be 'lying' or maybe '[doesn't] even exist,'"[73] but such a person's allegations are entitled to no weight because they directly contradict the findings of the Examiner, who created a timeline relating to "[l]iquidity [c]oncerns" with the Private Company after "review[ing] more than 100,000 hard copy documents and more than 200,000 electronic documents" and "interview[ing] more than 100 people."[74]  That timeline reflects that serious concerns did not mount until at least March or April of 2008, and not in June 2007 as "CW 1" supposedly claims, and as a result, all of the alleged omissions from the July 2007 IPO Documents, the February 2008 Offering Documents, the 2Q07 10-Q, the 3Q07 10-Q, the February 2008 Offering Conference Call, the 2007 10-K, and the Year-end 2007 Conference Call regarding the Private Company's alleged liquidity issues and margin issues are not actionable because, according to the Examiner's Report on which Plaintiff relies, the allegedly omitted facts did not exist during the times that Plaintiff claims disclosure was required.[75]

---

[72] CAC ¶ 91.

[73] *E.g.*, *In re FX Energy, Inc. Sec. Litig.*, 2009 WL 1812828, at *10 (quotation omitted); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (noting, in ruling on motion to dismiss, that "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences"); *Adams*, 340 F.3d at 1103 (emphasizing that "where a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading").

[74] *See* RJN App. Ex. 1 at 159-61.

[75] Plaintiff also fails to allege how SGLP's failure to disclose purported liquidity concerns at the Private Company actually made SGLP's challenged statements misleading.  For instance, Plaintiff claims that one of the allegedly fraudulent statements was that SGLP's "primary business objectives" was to "maintain stable cashflows and to increase distributable cash flow per unit over time by becoming a leading provider of midstream services to the energy industry."

And even assuming (without conceding) that serious concerns about the *Private Company's* liquidity began in March/April 2008, Plaintiff has pled no specific facts that the *SGLP Defendants* were aware of any such concerns at this time.[76]  Furthermore, even if such facts had been alleged (which they have not), absent a statutory requirement[77] or other specific periodic reporting requirement, there is no general duty on the part of a company to provide the public with all material information, and certainly not any duty to do so the moment such

---

CAC ¶ 129.  But Plaintiff does not explain how failure to disclose any alleged liquidity concerns actually made this statement untrue or misleading.  *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998-99 (10th Cir. 2002) (rejecting argument that failure to disclose the existence of the "keep whole" contracts and their attendant risks because of disclosure that Kinder-Morgan "uses energy financial instruments to minimize its risk of price changes in the spot and fixed price natural gas and NGLs market," because "failure to disclose the risks associated with the 'keep whole' contracts did not make the statements [in the SEC filings] any less true").

[76] Plaintiff cites an email from Mark Lietzke, SemGroup's comptroller, as evidence that the trading program posed a liquidity risk to SemGroup in late 2007, and thus presumably should have been included in the 2007 10-K.  CAC ¶ 212.  But the email, which was sent on *May 15, 2008*, also states that the Private Company had taken derivative positions which were intended to act as "insurance or protection from liquidity risk for our margin deposits [and that] *this has been working effectively for the past several months.*"  RJN App. Ex. 1 at 141 n.11.  Indeed, as the Examiner noted, a May 2008 Private Company Conference Call presentation document entitled "Liquidity Discussion" noted that although a dramatic increase in commodity prices had caused margin deposits to increase, liquidity was still at a healthy $300,000,000 level as of the close of March 2008.  *Id.* at 160.

[77] Plaintiff points to Item 303 of SEC Regulation S-K, claiming that this created a duty to disclose "the true nature of SemGroup's commodities trading business and attendant risks for SGLP" in the 2007 10-K.  CAC ¶¶ 233–34.  The disclosure obligations in Regulation S-K, however, are different from those imposed by the Exchange Act and thus, even assuming that SGLP violated the disclosure obligations in Item 303 (which the SGLP Defendants deny), such nondisclosures would not be actionable as securities fraud in a Rule 10b-5 claim by a private plaintiff.  *See, e.g., Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) (Alito, J.) (rejecting the argument that Item 303 imposes an independent duty to disclose and noting that the test of materiality in Item 303 "varies considerably from the general test for securities fraud materiality").

information comes into its possession.[78]  In *Higginbotham*, for example, the Seventh Circuit held

that even when *the defendant actually learned* that profits that it had reported for its Brazilian

subsidiary were overstated and did not disclose the problem for several months, such a failure

was not actionable.[79]  Here, Plaintiff can point to no facts creating a duty on the part of the SGLP

Defendants to make any disclosures to SGLP unit holders about any liquidity issues at the

Private Company at the time any of the challenged statements were made.

> e.    *SGLP was not required to make disclosures regarding the Private*
> *Company's trading program or accounting practices.*

Plaintiff relatedly claims that SGLP failed to disclose the Private Company's trading

strategy and risk management policies to SGLP unit holders in the offering documents or in

---

[78] *E.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432-33 (3d Cir. 1997); *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) (Easterbrook, J.) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work.  We do not have a system of continuous disclosure.  Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."). Furthermore, the allegedly omitted information did not involve SGLP's financial condition, but that of the Private Company—the parent company and a customer of SGLP.  *See, e.g., J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 394 (6th Cir. 2008) ("The plaintiffs believe that if GMAC says "'anything' about [a topic] or [ ] discusse[s] the 'subject,' that GMAC then must disclose all 'material, non-public, adverse information" about that general topic or subject.  *For instance, plaintiffs claim that when GMAC raised the issue of [its parent company] GM's performance being important to GMAC, GMAC was then required to disclose all 'material, non-public, adverse' information it knew about GM.  This is surely not the law.*") (emphasis added) (citation omitted).

[79] *See* 495 F.3d at 760–61 ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. . . .  Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies, but are entitled to investigate for a reasonable time until they have a full story to reveal."); *see also, e.g., Gallagher*, 269 F.3d at 809-10 ("[J]udges have no authority to scoop the political branches and adopt continuous disclosure under the banner of Rule 10b-5.  *Especially* not under that banner, for Rule 10b-5 condemns only fraud, and a corporation does not commit fraud by standing on its rights under a periodic-disclosure system."); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (no duty to disclose risks associated with Enron-related investment banking activities because defendant was "not required to make disclosures predicting" outcomes that were not "substantially certain" to occur).

other public filings.[80]  Yet again, however, it is only by improperly deploying a theory of fraud

by hindsight that Plaintiff attacks the trading program of the Private Company.[81]  As explained

*supra*, the unprecedented spike in oil prices—and the remarkable way in which they continued to

escalate in 2008—amplified and accelerated the Private Company's trading losses to a level that

the SGLP Defendants—for their part—could not have been expected to foresee, much less

foresee and disclose.

Furthermore, even putting aside the fact that an outside consultant hired by Bank of

America (Mr. Bowen) actually blessed and commended the Private Company's trading operation

in a written report that found the Private Company's risk management practices were

"satisfactory" and "exceeded common industry standards in several areas,"[82] federal securities

laws simply do *not* provide redress for "mismanagement of corporate affairs,"[83] and certainly not

mismanagement of an organization that is *not even the corporate defendant, but a customer of*

*the defendant*.  Thus, even assuming reasonable people could disagree about the effectiveness of

the Private Company's trading strategy, accounting practices with respect to the Westback

receivable, or its RMP, such a claim, if any, would be one of negligence and mismanagement

---

[80] CAC ¶¶ 76, 108, 124, 126-27, 133, 134-36, 143-44, 159, 167-68, 180-83, 192, 194, 199, 204, 209, 215, 223, 234, 303-04.

[81] *See, e.g.*, *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (observing that "[t]here is no 'fraud by hindsight,' in Judge Friendly's felicitous phrase . . . and hindsight is all the [plaintiff] offer[s]") (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).

[82] RJN App. Ex. 1(D) at 2, 7.

[83] *E.g.*, *Knauff v. Utah Constr. & Mining Co.*, 408 F.2d 958, 961 (10th Cir. 1969); *see also Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981) (noting that "if the central thrust of a claim or a series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law"); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) (dismissing claim on this basis and collecting cases); *see also* scienter discussion, *infra* sect. II B(iii).

directed to activities at the *Private Company*, and not properly the subject of a securities fraud lawsuit against the SGLP Defendants.

ii.    **Plaintiff's claims must be dismissed because the alleged misrepresentations were protected by the bespeaks caution doctrine or are otherwise immaterial.**

Plaintiff's claims additionally fail because all of the allegedly fraudulent statements are immaterial as a matter of law, either because they contained adequate cautionary disclosures or because they are the type of vague and immeasurable statements on which no reasonable investor would rely.[84]

a.    *The statements were immaterial in light of the bespeaks caution doctrine*

The "bespeaks caution" doctrine provides a mechanism by which a court can rule as a matter of law that defendants' representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.[85]  Here, the allegedly misleading statements at issue were forward-looking statements and were accompanied by

---

[84] *See*, *e.g.*, *Connett v. Justus Enters. of Kan., Inc.*, 68 F.3d 382, 385 (10th Cir. 1995) ("Liability for failure to disclose only arises when the duty to disclose exists and the withheld information is material."); *see also*, *e.g.*, *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("But a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. . . .  The undisclosed information is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.")  (quotation omitted).

[85] *See Grossman*, 120 F.3d at 1120 (representations that are "forward looking" are "considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect").  While the PSLRA Safe Harbor provision for forward looking statements does not technically apply to statements made in connection with an initial public offering or an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program, see 15 U.S.C. §§ 77z-2(b)(2); 78u-5(b)(2), it normally serves as a separate, independent statutory defense against securities fraud liability, in addition to the "bespeaks caution" doctrine.  *See*, *e.g.*, *Kapur v. USANA Health Scis., Inc.*, 2008 WL 2901705, at *9 (D. Utah July 23, 2008).

meaningful cautionary language.[86]  For example, the following statements relied on by Plaintiff in the Complaint relate to SGLP's future economic performance and many of the challenged statements contain the words "believe," "intend," and "expect."[87]

Not only were the forward-looking statements clearly identified, but they were accompanied by meaningful cautionary language.[88]  These "risk factors" included in the Registration Statements clearly warned investors of the risks involved in the Parent's business

---

[86] The statements in paragraphs 126-31, 137, and 145 (IPO Documents); 161-62 and 164-65 (Feb. 2008 Offering Documents); 185 (2Q07 10-Q Conference Call); 197-98 (Feb. Offering Conference Call); 203, 207, and 209 (2007 10-K); and 217 and 219 (Year-end 2007 Conference Call) of the CAC are forward-looking statements and are accompanied by meaningful cautionary language.  *See also* sect. II; Ex. 1 (chart of allegedly misleading statements).

[87] *E.g.*, CAC ¶ 126 ("As a publicly traded limited partnership, we will have greater liquidity, which we *believe* will enhance our valuation."); *id.* ¶ 127 ("We *intend* to acquire and construct a significant amount of additional midstream energy asserts, including acquisitions from our Parent and jointly with our Parent.  . . .  We *believe* we are well positioned to successfully achieve our primary business objectives and execute our business strategies based on the following competitive strengths: Stable, fee-based, contracted cash flows. We *believe* our fee structure enhances our ability to generate stable and predictable cash flows."); *id.* ¶ 128 ("We *expect* that our relationship with our Parent will provide us with significant business opportunities."); *id.* ¶ 129 ("We *intend* to pursue acquisition opportunities as well as organic growth opportunities with our Parent."); *id.* ¶ 130 ("We *believe* the available capacity under this new facility combined with our ability to access the capital markets should provide us with a flexible financial structure that will facilitate our organic expansion and acquisition strategy.") (emphases added).  Potential investors were clearly warned that the disclosures contained forward-looking statements.  *E.g.*, RJN App. Ex. 2 at 159.  SGLP's 10-Q for the Second Quarter 2007 also stated that it must be read in conjunction with the July 2007 Form S-1 (and its cautionary language) and provided new cautionary language about, *inter alia*, the possible effect of commodities prices on SGLP's operations and possible acquisitions from SemGroup that may not "be completed on terms considered favorable to" SGLP.  *See* RJN App. Ex. 3 at 15, 18.

[88] *Grossman*, 120 F.3d at 1120; *see also Plevy v. Haggertys*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) ("[W]here a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies.").

and the impact potential changes in the Parent's business could have on the Company.[89]  The

2007 10-K, whose cautionary statements apply to the 2007 Year-end Conference Call, contains

17 pages of "Risk Factors" that specifically caution investors about various aspects of SGLP's

business, including more than four pages dedicated to risk factors related to the Parent

Company's business and its possible conflicts with SGLP's business.[90]  Each of these cautionary

statements therefore renders the corresponding forward-looking statements identified above

inactionable.

        b.      *Certain of the statements are inactionable as a matter of law.*

       The bespeaks caution doctrine aside, many of the challenged statements are immaterial as

a matter of law.  For instance, Plaintiff cites as objectionable SGLP's statement that its "primary

business objectives" were to "maintain stable cashflows and to increase distributable cash flow per

unit over time by becoming a leading provider of midstream services to the energy

---

[89] *See* sect. II(D), *supra*.  Plaintiff also points to oral statements by individual defendants allegedly made during conference calls with investors and analysts.  For example, Plaintiff points to the 2Q07 10-Q Conference Call in which Defendant Brochetti allegedly committed fraud by stating, "I want to make sure that everyone understands how SGLP revenues will be determined going forward.  SGLP has in place a seven-year Throughput Agreement with our parent company, SemGroup LP, which became effective July 20, just prior to the July 23 close of the IPO.  This agreement is **projected** to represent more than 80% of our revenue."  *E.g.*, CAC ¶ 185 (emphasis added).  But besides being an utterly true statement, and one which *itself* contains classic bespeaks caution-type language, it in no way can be considered materially misleading because it is *also* protected both by all of the meaningful cautionary language in the July 2007 prospectus and the language in the 2Q07 10-Q.  *See, e.g.*, *Grossman*, 120 F.3d at 1122-23 & n.10.  And here again, Plaintiff's allegations based on each of the various conference calls should be disregarded entirely because Plaintiff does not allege that it participated in any of the calls and does not explain how it knows what was said on the calls.  *See Pirraglia*, 339 F.3d at 1189–90.

[90] *See* RJN App. Ex. 6 at 23-40.  The cautionary language in the 2007 10-K is substantially similar to that in the July 2007 prospectus and is directly relevant to and limiting of the forward-looking statements made in the 2007 Year-end Conference Call. The May 22, 2008 Investor Conference Presentation also contained significant cautionary language.  *See* RJN App. Ex. 8 at 2.

industry."[91]  Aside from being utterly true, such a statement is nothing more than reciting the

company's goals as routinely seen in public filings.  Similarly, the allegation regarding SGLP's

statements that "our operations have minimal direct exposure to changes in crude oil prices" and

that operations "are indirectly affected by commodity prices," aside from being completely

accurate, could not be material because they are simply immeasurable or incapable of

verification.[92]

> ### iii.     Plaintiff has failed to plead sufficient facts raising a strong inference of scienter.

Plaintiff's 10(b) claim also fails because it fails to plead with particularity facts sufficient

to establish a strong inference that the SGLP Defendants acted with scienter, which is "a

conclusion logically based upon particular facts that would convince a reasonable person that the

defendant knew a statement was false or misleading."[93] As the Tenth Circuit has cautioned:

> [O]ften there is no reason to assume that what is true at the moment plaintiff
> discovers it was also true at the moment of the alleged misrepresentation . . . .
> Securities fraud cases often involve catastrophic events occurring between the
> time the complained of statement was made and the time a more sobering truth is
> revealed . . . .  Such events might include . . . a decline in other markets affecting
> the company's product . . . .[94]

---

[91] *E.g.*, CAC ¶129; *see also, e.g.*, *id.* at ¶¶ 165, 177 (claiming that the Secondary Offering
Documents falsely claimed that certain "Competitive Strengths" (*e.g.*, SGLP's relationship with
SemGroup) positioned SGLP well "to successfully achieve [its] primary business objectives
and execute [its] business strategies.").

[92] *See, e.g.*, *J & R Marketing*, 549 F.3d at 396 (rejecting plaintiff's argument that GMAC's
representation that its parent company's [General Motors] pension funding progress was
"significant" was actionable).

[93] *Adams*, 340 F.3d at 1105; *Fleming*, 264 F.3d at 1261 (plaintiff must show that defendant *knew
that failure to reveal* the potentially material fact would likely mislead investors); *Caprin v.
Simon Transp. Servs., Inc.*, 99 Fed Appx. 150, 159-60 (10th Cir. 2004) (observing that even
knowledge of facts is not the same as knowledge that failing to reveal them would likely mislead
investors).

[94] *Grossman*, 120 F.3d at 1124.

While Plaintiff makes multiple unsupported assertions of "knowing and reckless" misrepresentations arising out of SGLP's publicly filed financial statements, offering documents, and conference calls, all of the allegations of scienter essentially come back to Plaintiff's allegation that "the Individual Defendants"[95] *recklessly* masked the true high-risk nature of the Private Company's business from purchasers of SGLP's common units, and *recklessly* failed to monitor the Private Company's trading activities and failed to ensure that accurate information was being disseminated to unit holders after SGLP was taken public.[96]  Although recklessness can satisfy the scienter requirement, the Tenth Circuit "[has] been cautious about imposing liability for securities fraud based on reckless conduct,"[97] and to establish "scienter by recklessness" in 10b-5 claims alleging non-disclosure of material facts, a plaintiff must show "the defendant had knowledge of a fact that was 'so *obviously material* that the defendant must have been *aware both of its materiality and that its non-disclosure would likely mislead*

---

[95] As discussed in further detail in section III.A.5.c of Defendant Kivisto's brief, Plaintiff's allegations fail to plead motive as to *each particular defendant*, as required by the PSLRA.  *See, e.g.*, *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1094 (N.D. Okla. 2003) ("[W]here fraud is alleged against multiple defendants, blanket allegations of fraud couched in language such as *by the defendants* are insufficient.  Instead, the specifics of the alleged fraudulent activity of each defendant must be set forth.") (emphasis added).

[96] CAC ¶ 176.  Indeed, Plaintiff notably omits from its allegations in paragraph 272 of the CAC that the subcommittee of SGLP independent directors that was formed to investigate the situation in July 2008 and hired outside counsel to review, issued a report concluding that "***no information came to counsel's attention during its investigation that suggested to counsel that the officers intended to deceive or to mislead any third parties.  In addition, in connection with the investigation, counsel for the subcommittee did not express any findings of intentional misconduct or fraud on the part of any officer or employee of the Partnership.***"  RJN App. Ex. 7 at 28-29 (emphasis added).

[97] *Fleming*, 264 F.3d at 1260; *see also id.* ("[A]llegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud.").

*investors.*'"[98]  As shown above, however, Plaintiff has not pled any facts showing that any of the challenged statements were materially misleading, and it certainly cannot show a strong inference of scienter on the part of the SGLP Defendants—a point highlighted by recent analogous cases.[99]

> a.      *The MLP structure was a legitimate business decision, not a fraudulent*
> *scheme as plaintiff alleges.*

When it comes to specifics, Plaintiff alleges that the SGLP MLP structure was part of a fraudulent scheme and that "[u]nbeknownst to investors, SemGroup was tapping the public markets to raise capital to feed its Parent's massive need for cash to post collateral for a margin balance on its New York Mercantile Exchange . . . and other trading accounts . . . ."[100]  Plaintiff conveniently ignores the Examiner's conclusions, however, because they provide a

---

[98] *E.g.*, *Lillard*, 267 F. Supp. 2d at 1107 (quoting *Fleming*, 264 F.3d at 1261) (emphasis added); *see also In re Digital Island Securities. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004) ("This standard requires a misrepresentation to be "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.").

[99] For example, in *In re Radian Securities Litig.*, 612 F. Supp. 2d 594 (E.D. Pa. 2009), the court rejected plaintiff's claim that defendants made false and misleading statements about the profitability and liquidity position of C-BASS, a corporation in which Radian held a large equity interest and that was heavily exposed to the credit risk of subprime residential mortgages. Plaintiffs claimed that defendants "knew or must have known" of this danger because of their positions at Radian and C-BASS, because C-BASS was one of Radian's core activities, and because defendants had knowledge of the risky nature of C-BASS's business and adverse subprime conditions and high-risk operations resulting in margin calls to C-BASS from its creditors, which drained C-BASS of liquidity, leaving C-BASS without sufficient cash to operate and impairing the value of Radian's investment.  There, like here, however, the court rejected such allegations, and dismissed the complaint because plaintiff had failed to plead sufficient facts regarding the scienter of defendants.  *See also In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 770 (E.D. Va. 2007) (rejecting argument that defendants "must have known" about magnitude of impairment charge and concealed such information from the market to buy time and avoid disrupting private securities offering because allegations did not meet the *Tellabs* standard of being at least as likely as competing inference of non-culpability).

[100] CAC ¶ 64.

nonfraudulent explanation for the MLP structure and the asset dropdowns that is more compelling than the tale spun by the Complaint.

The Private Company initially began to consider the MLP structure in 2003, and seriously did so in 2006, well before Plaintiff's confidential witness claims that he first became concerned about the margin balance related to the trading strategy.[101]  Thus, for the entire MLP structure to be a fraudulent scheme as Plaintiff alleges, the SGLP Defendants would have to have known years in advance that (1) commodities prices in the years ahead would be higher and more volatile than at any other time in history; and (2) the Private Company's trading program would change in the years ahead in such a way that it would require large influxes of capital. A far more likely conclusion, however, and the one reached by the Bankruptcy Examiner, is that the MLP structure and the related dropdown transactions *were not* fraudulent, but were a "reasonable business decision" that was "commonly used in the energy industry,"[102] that "the MLP business model strategy was not planned or designed for the purpose of managing or paying required margins" related to the trading program, and there was "no evidence that the valuations of the dropdown assets were unreasonable."[103]

        b.     *The allegations regarding the Private Company's trading program and RMP are at most a claim of mismanagement of the Private Company, not securities fraud against the SGLP Defendants.*

The concerns about the Private Company's trading program loom large in hindsight only because the liquidity issues arising out of the program were a contributing factor to the Private Company's bankruptcy, but that does not mean that the SGLP Defendants were aware (or as

---

[101] *Compare* RJN App. Ex. 1 at 13, 165 *with* CAC ¶ 70.

[102] RJN App. Ex. 1 at 162.

[103] *E.g.*, *id.* at 14.

Plaintiff essentially contends, "must have been aware")[104] of such concerns during the time of the challenged statements.  It is only through hindsight that Plaintiff can now allege that the margin balance and liquidity concerns were knowingly material because it is only through hindsight that the world now knows that oil prices would reach unprecedented heights and experience extreme volatility.[105]  And again, even assuming without conceding that the Private Company should have been more vigilant in monitoring its trading program,[106] such a claim would be one of negligence or mismanagement against the Private Company,[107] and not a securities fraud claim against the SGLP Defendants.[108]

---

[104] *See Fleming*, 264 F.3d at 1264 ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts] . . . have determined to be inadequate to withstand Rule 9(b) scrutiny.'") (citation omitted).

[105] *See In re Radian*, 612 F. Supp. 2d at 616 ("Although the plaintiffs allege that Radian maintained an 'active involvement in strategic activities at C-BASS,' the plaintiffs have not alleged, specifically, that the defendants knew of any accounting irregularities at C-BASS or that C-BASS's own representations that it was meeting margin calls in the regular course of business were false, such that their behavior was an extreme departure from the standards of ordinary care").

[106] Of course, even this inference is hardly the more plausible one considering that the Private Company's RMP was actually given a clean bill of health by an outside expert.

[107] *See In re Radian*, 612 F. Supp. 2d at 618 n.24 (noting that "[t]he defendants here are also further removed from the alleged risky business decisions" and that "here, the defendants are officers of a corporation that invested in the corporation that is alleged to have pursued a risky business strategy").

[108] *See, e.g.*, *Tripp v. Indymac Fin., Inc.*, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) ("Those statements certainly admit mistakes, but this is a fraud case, not a mismanagement case. They fall well short of evidencing a 'strong inference' of the necessary intent for Plaintiffs to be able to maintain the instant action"); *Andropolis*, 505 F. Supp. 2d at 680 ("Plaintiff does not allege the existence of a single written document showing that Red Robin was actually aware that it was utilizing improper accounting procedures that threatened the financial viability of the company; nor does Plaintiff allege sufficient facts to show that Red Robin's accounting failures were so obvious as to support an inference that the Company harbored an intent to artificially inflate its financial forecast.").

        c.     *The individual SGLP Defendants' compensation does not create a strong inference of scienter.*

Plaintiff alleges that the Individual SGLP Defendants (Messrs. Foxx, Brochetti, and Stallings) were motivated to engage in the alleged fraud "in order to protect their positions at the SemGroup-related entities, and the lucrative compensation packages attendant thereto . . . ."[109] Plaintiff, however, provides no facts that support scienter, preferring instead to list the amounts of various executives' bonus payments and stock distributions, as if the amounts, in and of themselves, were probative of scienter. It is well-settled that an executive's desire to protect his position within a company or increase his compensation does not create a strong inference of scienter because a desire for additional compensation can be attributed to essentially every executive at every for-profit company.[110] Furthermore, Plaintiff tellingly does not allege that the individual SGLP Defendants made any money by selling SGLP units during the Class Period. Not only did the individual SGLP Defendants not profit from selling their units, but they *lost millions invested in SGLP*.[111] In fact, Kevin Foxx purchased SGLP units as late as March 2008,

---

[109] CAC ¶ 288.

[110] *See Fleming,* 264 F.3d at 1269-70 (rejecting scienter allegations based on motives of executives to protect their executive positions, their compensation, or the value of their stock because these are motives "shared by all company executives"); *see also, e.g.*, *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 Fed Appx. 702, 714-15 (10th Cir. 2006) (receipt of bonuses is an insufficient motive to support scienter allegations because it is a generalized motive shared by all company executives); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) ("Accepting the plaintiffs' allegation of motive—basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants."); *accord PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (collecting cases).

[111] Foxx purchased 20,000 units in March 2008 for $509,799 and acquired 65,000 phantom units on June 20, 2008, bringing his total holdings to 255,000. *See* RJN App. Exs. 13A and 13B. Brochetti acquired 60,000 phantom units on June 20, 2008, bringing his holdings to 140,000 units. *See* RJN App. Ex. 14. Stallings acquired 45,000 phantom units on June 20, 2008, bringing his holdings to 115,000 units. *See* RJN App. Ex. 15. Thus, as of July 18, 2008, Foxx, Brochetti, and Stallings suffered a $9 million loss in the value of their SGLP holdings. These

right at the time when the allegedly serious liquidity concerns at the Private Company supposedly began.[112]

        *d.      The departure of executives does not create a strong inference of scienter.*

Plaintiff baldly alleges that the departure of certain SGLP Defendants shows scienter,[113] but does not explain why. For instance, Plaintiff claims that the departure of Defendant Brochetti, who resigned from the Private Company on March 1, 2008, is suggestive of fraud, yet does not explain how Brochetti's departure from the Private Company months *before* its bankruptcy, while he remains a Senior Vice President at the General Partner,[114] creates a strong inference of scienter. Indeed, a much more plausible, and nonfraudulent explanation is that Brochetti's growing responsibilities at the General Partner necessitated a shift in his responsibilities to the General Partner exclusively.[115] Plaintiff has offered no explanation why

---

facts defeat any inference of scienter. *See Tripp*, 2007 WL 4591930, at *4 (finding that "an inference of scienter is functionally negated" where defendants retain "a large percentage of their stock"). Indeed, courts faced with stock sales constituting a substantial percentage of an individual's holdings have concluded that such sales were insufficient to raise a strong inference of scienter. *See, e.g.*, *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (finding no inference of scienter even though defendant sold 100% of his holdings); *see also In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 987-88 (9th Cir. 1999) (no strong inference of scienter for defendants who sold 43.6% and 75.3% percent of holdings).

[112] Plaintiff also repeatedly attempts to imply that the SGLP Defendants signing of Sarbanes-Oxley certifications suggests something particularly ominous. However, "the mere act of signing SOX Certifications does not suggest culpability." *BearingPoint*, 525 F. Supp. 2d at 773; *see also In re Radian*, 612 F. Supp. 2d at 620 (noting that courts addressing the issue of whether SOX certifications contribute to scienter have found that SOX certifications themselves are not actionable, and that to support an inference of scienter, something more is needed); *accord Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-68 (11th Cir. 2006).

[113] CAC ¶ 300.

[114] CAC ¶ 28.

[115] That decision resulted in the Private Company's hiring of Terrance Ronan, an executive from Bank of America who then took over Brochetti's responsibilities at the Private Company.

these departures create an inference of scienter—let alone an explanation "at least as compelling" as a nonfraudulent explanation.[116]

Plaintiff also points to the departure of Defendant Foxx that took place during the week of SemGroup's liquidity announcement on July 18, 2008. But even ignoring that this could be nonfraudulently explained as being removed as director when outside investors took control of the board, this makes no sense given that the CAC alleges that Foxx too *remains as CEO* as the General Partner[117]—a fact hardly consistent with the notion that these individuals were ousted for committing fraud.

e.    *Defendant Stallings's alleged knowledge of the Westback receivable does not create a strong inference of scienter.*

Plaintiff alleges that Stallings's knowledge of the Westback receivable—(a debt payable to the Private Company, not SGLP), and disclosed on the Private Company's financial statements[118]—provides a strong inference of scienter.[119]  Plaintiff notably omits that the Examiner's Report establishes that Stallings *took appropriate steps to ensure that the Westback receivable was accounted for and collectible.*  In fact, once Stallings became aware of any concern regarding the Westback receivable, he reduced the receivable to a written agreement that Kivisto signed on February 25, 2008 and updated on March 18, 2008, and helped arrange for Kivisto to sign an agreement stating that Kivisto's net worth of $252 million was "available to

---

[116] *See In re Radian*, 612 F. Supp. 2d at 621 ("The plaintiffs seem to suggest that the timing of Casale's departure is suspicious. However, it is unclear, and the plaintiffs have provided no allegations or evidence to suggest, that the resignation was at all related to any fraudulent conduct on Casale's part or on the part of Radian or the other defendants.").

[117] *E.g.*, CAC ¶ 26.

[118] *See* RJN App. Ex. 1 at 116.

[119] CAC ¶¶ 285–86.

support the creditworthiness of the outstanding [Westback] account receivable."[120]  Far from

being reckless, Stallings took steps to investigate the Westback receivable and addressed it.[121]

C.    *Plaintiff Fails To State Claims For Violations Of Sections 11 and 12(a)(2) of the Securities Act*

The SGLP Defendants specifically incorporate all of the arguments from the motion to

dismiss of the Underwriter Defendants, and sections II(a)-(b) of the motion to dismiss of

Defendant Wallace with respect to the issues of Plaintiff's ability to pursue a claim under the

Securities Act, which require dismissal of these claims.[122]  Even putting all of these threshold

---

[120] *See* RJN App. Ex. 1 at 118–21.  Per Stallings's request, Kivisto provided information about his personal assets and copies of his tax returns to back up his representations about his net worth.  *Id.* at 121.  Indeed, "[a]fter 'testing' the Westback receivable as of December 31, 2007, PwC concurred with SemGroup's assessment that no impairment of the Westback receivable balance was required."  *Id.*

[121] In any event, "a delinquent write-down of impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision."  *E.g.*, *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004); *see also DiLeo*, 901 F.2d at 627 ("If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.").

[122] In addition to all of the arguments raised in those briefs regarding Plaintiff's lack of standing and injury, the section 12(a)(2) claim against the SGLP Defendants fails because it was *SemGroup Holdings*, a non-party, who *sold* units to the public, and not any of the SGLP Defendants.  *See* 15 U.S.C. § 77l(a)(2) (stating that "[a]ny person who . . . sells . . . shall be liable . . . to the person purchasing such security *from him* . . . .") (emphasis added).  Because none of the SGLP Defendants directly sold any units to Plaintiff, it must demonstrate "*direct and active participation in the solicitation* of the immediate sale to hold the issuer liable as a § 12[(a)](2) seller," *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) (emphasis added), and mere conclusory recitations, like those in the CAC, that Defendants "solicited" are not enough.  *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998); *see also, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (no active solicitation where seller in firm commitment underwriting signed Registration Statement); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir. 1996) *superseded by statute on other grounds as recognized by Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999) (preparation of the registration statement, prospectus, or activities relating to the sale of the securities, standing alone, is insufficient to establish seller status); *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1368 (N.D. Ga. 2005) (dismissing 12(a)(2) claim for failure to sufficiently allege "active solicitation").

issues aside, however, the counts asserted against the SGLP Defendants under the Securities Act fail to state a claim on the merits.  To avoid application of a heightened pleading standard, Plaintiff states that the causes of action under the Securities Act "do not sound in fraud" and that "[a]ll of the preceding allegations of fraud or fraudulent conduct and/or motives are specifically excluded from" the causes of action under the Securities Act.[123]  But such an attempt must fail because the Complaint repeats the *exact factual* allegations that purportedly apply to claims under the Exchange Act in its allegations regarding liability under the Securities Act.[124] Regardless of the labels it uses, Plaintiff cannot avoid the heightened standard of Rule 9(b) because the Securities Act claims sound in fraud every bit as much as the Exchange Act claim.[125]

---

[123] CAC ¶¶ 327, 339, 349, 355; *see also id.* ¶¶ 125, 159 (alleging that the Registration Statements issued in connection with the July 2007 IPO and the February 2008 SPO "were negligently prepared" and "contained untrue statements of material facts and omitted material facts regarding the negative impact that [the Parent's] undisclosed speculative trading and increased margin requirements had on [the Parent's] liquidity position").

[124] *E.g.*, CAC ¶ 174 ("***Beginning with*** the dropdown of assets from SemGroup ***in SGLP's IPO, and continuing until the time when SemGroup's liquidity crisis was publicly disclosed one year later***, Defendants engaged in a series of acts and a ***scheme of deceitful and fraudulent conduct*** that caused purchasers of SGLP's units to suffer harm when the true nature of SGLP's and its Parent's speculative trading business, dire financial condition and risks and losses related to the trading scheme were exposed.") (emphasis added); *see also id.* ¶ 19 ("In sum, ***at the time of the IPO, and continuing for one year***, Defendants made materially false and misleading statements concerning SGLP's financial condition.  Undisclosed to investors, but ***known or recklessly disregarded by Defendants***, SemGroup — the primary source of revenues and the key to SGLP's financial viability — was teetering on insolvency as its financial existence was predicated upon billions of dollars in improper and speculative 'bets' that oil prices would plummet in the immediate future.") (emphasis added).

[125] *See, e.g.*, *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 287–89 (3d Cir. 1992) (holding that Securities Act claims are subject to Rule 9(b) when the allegations sound in fraud); *see also Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) ("Although claims under Sections 11 and 12(a)(2) may not have fraud as an element, Rule 9(b) refers to 'alleging fraud,' not to causes of action or elements of fraud.  When a plaintiff makes an allegation that has the substance of fraud, therefore, he cannot escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability.").

Even under ordinary Rule 8 standards,[126] however, Plaintiff's allegations still suffer from all of the infirmities identified above.[127] Simply put, because Plaintiff can point to no materially misleading statements in either the registration statements or the prospectuses issued under the July 2007 IPO or the February 2008 Offering, its Securities Act claim against the SGLP Defendants must be dismissed.

**D.    Plaintiff Has Failed to Establish Control Person Liability Against the SGLP Defendants Under Section 15 of the Securities Act or Section 20(a) of the Exchange Act**

To properly plead control person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act, a plaintiff must allege (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person.[128]  Plaintiff's Section 20(a) claim requires that Plaintiff first properly plead a violation of Section 10(b) or Section 10b-5.[129]  Plaintiff's failure to sufficiently allege a primary violation under Section 11

---

[126] When evaluating a motion to dismiss even under the most elementary standard of review in Fed. R. Civ. P. 8, a complaint will only survive a motion to dismiss if it contains "enough facts to state a claim for relief that is plausible on its face," which means the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *E.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A plaintiff must allege facts showing more than a "sheer possibility" of wrongdoing.  *Id.*

[127] *See supra*, sect. B(i)-(ii); *see also Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (dismissing Section 11 claims where "Plaintiffs do not identify any materially false statements in the registration statement that were false or misleading when made"); *Gallagher*, 269 F.3d at 809 ("The 1933 Act requires firms to reveal information only when *they issue securities*, and the duty is owed only to persons who buy from the issuer or an underwriter distributing on its behalf; every other transaction is exempt under § 4") (citing 15 U.S.C. § 77d) (emphasis added).

[128] *E.g.*, *Adams*, 340 F.3d at 1107.  Sections 15 and 20(a) control person analyses are interpreted identically.  *See, e.g.*, *First Interstate Bank of Denver v. Pring*, 969 F.2d 891, 897 (10th Cir. 1992), *rev'd on other grounds sub nom. Cent. Bank v. First Interstate Bank*, 511 U.S. 164 (1994).

[129] *E.g., Fleming*, 264 F.3d at 1271 ("Because we find that the district court properly dismissed Plaintiffs' claims relating to primary violations of the Act, we conclude that Plaintiffs' controlling person liability claims were properly dismissed as well.").

and 12(a)(2) of the Securities Act requires dismissal of Plaintiff's Section 15 claim.  As set forth above, Plaintiff has not stated an underlying violation on any of its claims, and therefore the control person liability claims alleged in Counts IV and VI of the CAC must be dismissed as well.

## IV.    CONCLUSION

For all of these reasons, the SGLP Defendants request that the Court grant their Motion to Dismiss all claims brought against them in the Complaint, and they further pray for all other relief to which they may be justly entitled.

<table>
<tr><td>

s/ Don G. Holladay
Don G. Holladay, OBA # 4294
Heidi J. Long, OBA# 17667
**HOLLADAY & CHILTON, PLLC**
One City Place
204 N. Robinson, Suite 1550
Oklahoma City, Oklahoma  73102
Telephone:  (405) 236.2343
Facsimile: (405) 236.2349

</td><td>

Michael W. Youtt (*admitted pro hac vice*)
William R. Burns (*admitted pro hac vice*)
**KING & SPALDING LLP**
1100 Louisiana, Suite 4000
Houston, Texas  77002-5214
Telephone:  (713) 751.3200
Facsimile:  (713) 751.3290

Michael R. Smith (*admitted pro hac vice*)
B. Warren Pope (*admitted pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309-3521
Telephone:  (404) 572.2600
Facsimile:  (404) 572.5100

***Attorneys for Defendants SemGroup Energy
Partners, L.P., and SemGroup Energy
Partners G.P. LLC***

**GORDON & REES LLP**
Barry G. Flynn
3D/ International Tower
1900 West Loop South, Suite 1000
Houston, Texas 77027
Telephone:  (713) 961.3366
Facsimile:  (713) 961.3938

***Of Counsel To Defendant Kevin L. Foxx***

</td></tr>
</table>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on July 22, 2009, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Acord, Stacy L.
Ahart, Christopher
Amjed, Naumon
Aradi, Edwin T.
Berman, Stuart L.
Bessette, Paul R.
Biles, Michael J.
Brewster, Clark O.
Burns, William R.
Casey, Anthony J.
Castaldo, Gregory
Chilton, Gary S.
Collins, Bruce W.
Davis, Kimberly G.
Dorwart, Frederic
Emmons, Stuart W.
Federman, William
Gallerano, Lisa S.
Handler, Sean M.
Harrison, Orrin
Holladay, Don G.
Jennings, Mark B.
Jorgenson, James
Kirschner, Michael
Lincecum, Gideon
Long, Heidi J.
Long, Randall E.
Lovoi, Gerald J.
Main, Edward J.
McCall, Emily C.
McDaniel, Archer
McLaughlin, Daniel
Newcomer, Michelle
Nirmul, Sharan
O'Neill, Nora R.
Oran, Ronald L.
Pederson, Lauren
Pietrzak, Alfred R.
Pinkerton, Laurence
Pope, B. Warren

Quinn-Cooper, Mary
Rabinovitz, Joshua
Raines, Carolyn R.
Secrest, James K.
Smith, Michael R.
Smith, Owen H.
Terry, Douglas A.
Todd, Douglas M.
Tucker, Colin H.
Tucker, John H.
Warner, James E.
Weiss, Jesse Z.
Witherspoon, Joe
Youtt, Michael W.

s/ Don G. Holladay