## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE SEMGROUP ENERGY PARTNERS, L.P., SECURITIES LITIGATION

CASE NO. 08-MD-1989-GKF-FHM

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**NELSON, ROSELIUS, TERRY O'HARA & MORTON**
Douglas A. Terry (Bar Number 15855)
Jason E. Roselius (Bar Number 16721)
Guy R. Wood (Bar Number 15875)
P. O. Box 138800
Oklahoma City, Oklahoma 73113-8800
Tel: (405) 705-3600
Fax: (405) 705-2573
*Liaison Counsel for Lead Plaintiff
and the Class*

**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
Stuart L. Berman (*admitted pro hac vice*)
Lauren Wagner Pederson (*admitted pro hac vice*)
Sharan Nirmul (*admitted pro hac vice*)
Naumon A. Amjed (*admitted pro hac vice*)
Michelle M. Newcomer (*admitted pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056

and

Ramzi Abadou (*admitted pro hac vice*)
Erik D. Peterson (*admitted pro hac vice*)
580 California Street, Suite 1750
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
*Lead Counsel for Lead Plaintiff and the Class*

# TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    FACTUAL BACKGROUND ................................................................... 5

III.   LEGAL STANDARDS............................................................................ 9

   A.    Rule 12(b)(6)................................................................................... 9

   B.    Section 10(b) and Rule 10b-5 (Count V)......................................... 10

   C.    Section 20(a) (Count VI) ................................................................ 11

IV.    ARGUMENT ......................................................................................... 12

   A.    The Complaint Adequately Pleads Materially False and Misleading Statements
         and Omissions ................................................................................ 12

   B.    SemGroup's Speculative Trading, Rising Margin Balance and Impaired Liquidity
         were Material to SGLP's Investors .................................................. 17

   C.    The Bespeaks Caution Doctrine Does Not Shield Defendants From
         Liability........................................................................................... 22

   D.    The Group Pleading Doctrine Survived the PSLRA's Enactment ...... 26

         1.    Billings and Bishop are Liable as Outside Directors............... 27

         2.    Cooper is Liable for Statements Directed at SGLP's Shareholders.......... 28

   E.    Defendants' Statements Are Not Inactionable "Puffery"................... 30

   F.    The Complaint Pleads Compelling Facts that Give Rise to a Strong
         Inference of Scienter........................................................................ 32

         1.    Legal Standards for Pleading Scienter.................................... 32

         2.    The Complaint Supports a Strong Inference of Scienter ......... 33

               a.    Defendants' Positions within SemGroup Support a Strong
                     Inference of Scienter ......................................................... 34

               b.    Defendants' SOX Certifications Support a Strong Inference
                     of Scienter ......................................................................... 35

               c.    Defendants' Public Offerings Support Inference of
                     Scienter ............................................................................. 38

               d.    The Proximity in Time Between Defendants' Last
                     Misstatements and the Disclosure of Fraud Also Supports
                     a Strong Inference of Scienter............................................ 39

i

e.      Defendants Lucrative Distributions and Bonuses Supports
        an Inference of Scienter ............................................................. 40

f.      Defendants' Resignations, Invocations of the Fifth
        Amendment and the SEC and DOJ Investigations
        Support a Strong Inference of Scienter ...................................... 43

g.      The Magnitude of Kivisto's Speculative Trading and
        Margin Balance is Further Evidence of Scienter ........................ 44

h.      Plaintiff's Allegations Demonstrate Scienter for Billings
        and Bishop and Defendants' Scienter Can Be Imputed
        to SGLP ..................................................................................... 45

i.      The Totality of Lead Plaintiff's Allegations Strongly
        Infer Scienter and Defendants' Arguments to the
        Contrary Are Neither Cogent Nor Compelling............................ 46

G.      The Complaint Adequately Pleads Loss Causation ............................................. 51

H.      The Complaint Adequately Pleads Claims Under Section 20(a)......................... 53

1.      Defendants Bishop and Billings, Kivisto, Wallace, and Cooper are
        Control Persons of SGLP ......................................................... 54

2.      Defendants Ritchie Capital, Thane Ritchie, Carlyle/Riverstone,
        Ward and Jones are Control Persons of SGLP ......................... 55

V.      CONCLUSION............................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ..................................................................................*passim*

*Affiliated Ute Citizens of Utah v. U. S.*,
   406 U.S. 128 (1972) .......................................................................................................... 26

*Alaska Elec. Pension Fund v. Olofson*,
   No. 08-2344-CM, 2009 U.S. Dist. LEXIS 46564 (D. Kan. June 3, 2009) ........................... 52

*Albert Fadem Trust v. Am. Elec. Power Co.*,
   334 F. Supp. 2d 985 (S.D. Ohio 2004) ............................................................................. 43

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................... 55

*In re Alstom SA Sec. Litig.*,
   454 F. Supp. 2d 187 (S.D.N.Y. 2006) ...............................................................................*passim*

*In re Am. Italian Pasta Co. Sec. Litig.*,
   2006 U.S. Dist. LEXIS 40548 (W.D. Mo. June 19, 2006) ................................................... 36

*Asher v. Baxter Int'; Inc.*,
   377 F.3d 727 (7th Cir. 2004) ............................................................................................ 24

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ...................................................................................................... 9

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................................................... 35

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .....................................................................................................20, 31

*Batwin v. Occam Networks, Inc.*,
   2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ....................................................... 42

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ............................................................................................ 15

*In re Cabletron Sys. Inc.*,
   311 F.3d 11 (1st Cir. 2002) .............................................................................................. 27

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) ............................................................................... 22

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ..................................................................... 21

*In re Cardinal Health, Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................... 46

*In re Charles Schwab Corp. Sec. Litig.*,
No. C 08-01510 WHA, 2009 U.S. Dist. LEXIS 8125 (N.D. Cal. Feb. 4, 2009) ................... 56

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ............................................................... 32-33, 41

*In re Complete Mgmt. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001) ................................................................. 38

*Connett v. Justus Enterprises of Kansas, Inc.*,
68 F.3d 382 (10th Cir. 1995) ............................................................................. 20

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989) .................................................................................. 35

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................16, 48

*Croker v. Carrier Access Corp.*,
No. 05-cv-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603 (D. Colo. Jul. 18, 2006) ....*passim*

*Danis v. USN Commc'ns, Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999) .................................................................... 36

*In re Donna Karan Int'l Sec. Litig.*,
No. 07 Civ. 2011, 1998 U.S. Dist. LEXIS 22435 (E.D.N.Y. Aug. 14, 1998) ...................... 21

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................... 4-5, 53, 54

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
No. MDL-1446, 2005 U.S. Dist. LEXIS 41240 (S.D. Tex. Dec. 22, 2005) ...................49, 54

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006) ................................................................... 50

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
466 F.3d 1 (1st Cir. 2006) ................................................................................. 40

iv

*In re Faro Techs. Sec. Litig.*,
    534 F. Supp. 2d 1248 (M.D. Fla. 2007)........................................................................21, 38

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995).......................................................................................... 39

*First Interstate Bank v. Pring*,
    969 F.2d 891 (10th Cir. 1992)................................................................................ 11, 55-56

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001)........................................................................................34, 41

*Fogarazzo v. Lehman Bros., Inc.,*
    341 F. Supp. 2d 274 (S.D.N.Y. 2004) ............................................................................ 15

*Frank v. Dana Corp.*,
    547 F.3d 564 (6th Cir. 2008).......................................................................................... 34

*Freeland v. Iridium World Commc'ns, Ltd.,*
    233 F.R.D. 40 (D.D.C. 2006) ........................................................................................ 53

*FSP Stallion 1 v. Luce*,
    No. 2:08-CV-01155-PMP-PAL, 2009 U.S. Dist. LEXIS 41592 (D. Nev. May 1,
    2009) ............................................................................................................................. 25

*In re Fuwei Films Sec. Litig.*,
    No. 07 Civ. 9416 (RJS), 2009 U.S. Dist. LEXIS 59658 (S.D.N.Y. Jul. 10, 2009)................ 20

*Garcia v. Cordova*,
    930 F.2d 826 (10th Cir. 1991).....................................................................................18, 20

*In re Giant Interactive Group, Inc. Sec. Litig.*,
    No. 07-10588(RWS), 2009 U.S. Dist. LEXIS 69414
    (S.D.N.Y. Aug. 5, 2009) ......................................................................................... 19, 24-26

*In re Grand Casinos, Sec. Litig.*,
    988 F. Supp. 1273 (D. Minn. 1997)................................................................................ 39

*Gross v. Medaphis Corp.*,
    977 F. Supp. 1463 (N.D. Ga. 1997)................................................................................ 38

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)............................................................................................ 31

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007).......................................................................................... 51

*Hix Corp. v. National Screen Printing Equp., Inc.*,
  No. 00-211-KHV, 2000 U.S. Dist. LEXIS 10543 (D. Kan. Jul. 6, 2000) ............................ 43

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ...................................................................................37, 39

*Hubbard v. BankAtlantic Corp.*,
  No. 07-61542-CIV, slip op. (S.D. Fla. May 12, 2009) .......................................................... 42

*In re ICG Commc'ns, Inc. Sec. Litig.*,
  No. 00-RB-1864-BNB, 2006 U.S. Dist. LEXIS 6695 (D. Colo. Feb. 7, 2006).................... 52

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  154 F. Supp. 2d 741 (S.D.N.Y. 2001) ................................................................................. 22

*J&R Mktg., SEP v. General Motors Corp.*,
  549 F.3d 384 (6th Cir. 2008)....................................................................................... 18-19

*Kalin v. Xanboo, Inc.*,
  526 F. Supp. 2d 392 (S.D.N.Y. 2007) ................................................................................. 56

*Lane v. Page*,
  581 F. Supp. 2d 1094 (D.N.M. 2008)..........................................................................*passim*

*Lane v. Page*,
  No. CIV 06-1071 JB/ACT, 2009 U.S. Dist. LEXIS 65544 (D.N.M. July 27, 2009)............... 9

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................................. 31

*In re Lason, Inc. Sec. Litig*,
  143 F. Supp. 2d 855 (E.D. Mich. 2001).............................................................................. 38

*In re Lattice Semiconductor Corp. Sec. Litig.*,
  No. 04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006)............................... 36-37

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230, 1247 (N.D. Cal. 2008) .................................................................... 41

*Lillard v. Stockton*,
  267 F. Supp. 2d 1081 (N.D. Okla. 2003)........................................................................... 29

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005)............................................................................................. 22

*In re Loewen Group Inc. Sec. Litig.*,
  No. 98-6740, 2004 U.S. Dist. LEXIS 16601 (E.D. Pa. Jan. 3, 2006).................................... 42

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009).................................................................................*passim*

*Maher v. Durango Metals, Inc.*,
   144 F.3d 1302 (10th Cir. 1998)...................................................................... 54-55

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F. 3d 702 (7th Cir. 2008)..........................................................................35, 50

*In re McKesson Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................ 43

*Menkes v. Stolt-Nielsen S.A.*,
   No. 03-cv-409(DJS), 2006 U.S. Dist. LEXIS 42644 (D. Conn. June 19, 2006)............... 28-29

*In re Mesa Airlines, Inc.*,
   No. 94-690 JC/WWD, 1996 U.S. Dist. LEXIS 22820 (D.N.M. May 31, 1996) ................. 15

*In re MicroStrategy Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................... 38

*Middlesex Ret. Sys*,
   527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007)....................................................... 42

*Miller v. Material Scis. Corp.*,
   9 F. Supp. 2d 925 (N.D. Ill. 1998)...................................................................... 37

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ................................................................. 30

*In re Mutual Funds Inv. Litig.*,
   566 F.3d 111 (4th Cir. 2009)........................................................................... 53-55

*N.J. v. Sprint Corp.*,
   314 F. Supp. 2d 1119 (D. Kan. 2004).................................................................. 54-55

*N.J. v. Sprint Corp.*,
   No. 03-2071-JWL, 2004 U.S. Dist. LEXIS 17765 (D. Kan. Sept. 3, 2003)..................... 19-21

*N.J. v. Sprint Corp.*,
   531 F. Supp. 2d 1273 (D. Kan. 2008).................................................................. 33-34

*In re Nash Finch Co. Sec. Litig.*,
   323 F. Supp. 2d 956 (D. Minn. 2004)................................................................... 40

*In re Nature's Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007)...............................................................*passim*

vii

*In re New Century,*
588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................................. 12

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) .............................................................. 35-36

*Norfolk County Ret. Sys. v. Ustian,*
No. 07 C 65731, 2009 U.S. Dist. LEXIS 65731 (N.D. Ill. July 28, 2009) ........................... 48

*In re NPS Pharms., Inc., Sec. Litig.,*
No. 2:06-cv-00570, 2007 U.S. Dist. LEXIS 48713(D. Utah July 3, 2007)....................*passim*

*In re Nuko Info. Sys. Sec. Litig.,*
No. 97-cv-20471, 2000 U.S. Dist. LEXIS 16362 (N.D. Cal. 2000)...................................... 42

*In re Oxford Health Plan, Inc. Sec. Litig.,*
51 F. Supp. 2d 290 (S.D.N.Y. 1999) .............................................................. 43

*In re Parmalat Sec. Litig.,*
375 F. Supp. 2d 278 (S.D.N.Y. 2005) .............................................................. 56

*Parsons & Whittemore Enters. Corp. v. Schwartz,*
387 F. Supp. 2d 368 (S.D.N.Y. 2005) .............................................................. 44

*In re Pfizer Inc. Sec. Litig.,*
584 F. Supp. 2d 621 (S.D.N.Y. 2008) .............................................................. 26

*In re Philip Servs Corp. Sec. Litig.,*
383 F. Supp. 2d 463 (S.D.N.Y. 2004) .............................................................. 28

*Pirraglia v. Novell, Inc.,*
339 F.3d 1182 (10th Cir. 2003)..............................................................9, 31, 49

*Prescott Group Aggressive Small Cap, L.P. v. L. Keith Blackwell, et al.,*
No. 02-CV-0517-EA (M), 2003 U.S. Dist. LEXIS 27079 (N.D. Okla. Aug. 25, 2003) ........ 28

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.,*
2 F. Supp. 2d 1345 (D. Colo. 1998) .............................................................. 38

*In re Qwest Comm'ns Int'l, Inc.,*
396 F. Supp. 2d 1178 (D. Colo. 2004).............................................................. 34

*In re Radian Sec. Litig.,*
612 F. Supp. 2d 594 (E.D. Pa. 2009).............................................................. 48

*In re Rent-Way Sec. Litig.,*
209 F. Supp. 2d 493 (W.D. Pa. 2002).............................................................. 36

viii

*In re Res. Am. Sec. Litig.*,
No. 98-5446, 2000 U.S. Dist. LEXIS 10640 (E.D. Pa. July 26, 2000) ................................. 38

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
119 F. Supp. 2d 1156 (D. Colo. 2000)................................................................................ 32

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
209 F. Supp. 2d 1106 (D. Colo. 2002).........................................................................32, 47

*Richardson v. MacArthur*,
451 F.2d 35 (10th Cir. 1971).............................................................................................. 11

*Rosenbaum Capital, LLC v. McNulty*,
549 F. Supp. 2d 1185 (N.D. Cal. 2008) .............................................................................. 22

*S.E.C. v. Merrill Scott & Assoc., Ltd.*,
505 F. Supp. 2d 1193 (D. Utah 2007)................................................................................. 43

*In re Sadia, S.A. Sec. Litig.*,
No. 08 Civ. 9528(SAS), 2009 U.S. Dist. LEXIS 66998 (S.D.N.Y. Jul. 29, 2009)...........25, 44

*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977)............................................................................................................ 50

*Sawant v. Ramsey*,
570 F. Supp. 2d. 336 (D. Conn. 2008) ............................................................................... 47

*Schaffer v. Evolving Sys. Inc.*,
29 F. Supp. 2d 1213 (D. Colo. 1998)...........................................................................*passim*

*Schnall v. Annuity and Life Re (Holdings) Ltd.*,
No. 3:02 CV 2133(GLG), 2004 U.S. Dist. LEXIS 1601 (D. Conn. Feb. 4, 2004) ............... 28

*Schwartz v. Celestial Seasonings, Inc.*,
124 F.3d 1246 (10th Cir. 1997).....................................................................................12, 26

*South Ferry LP #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008).............................................................................................. 35

*In re Sprint Corp. Secs. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002).............................................................................30, 46

*Steinbeck v. Sonic Innovations, Inc.*,
2:00-CV-00848PGC, 2003 U.S. Dist. LEXIS 2378 (D. Utah Feb. 10, 2003) ............12, 26, 54

*In re Stellent, Inc. Sec. Litig.*,
326 F. Supp. 2d 970 (D. Minn. 2004).................................................................................. 3

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) ............................................................... 22

*Suez Equity Equity Investors, L.P. v. Tornonto Bank*,
   250 F.3d 87(2d. Cir. 2001)............................................................... 48

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)........................................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................*passim*

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000) ................................................. 38

*U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,
   472 F.3d 702 (10th Cir. 2006) ........................................................... 29

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................. 21

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006)........................................................ 36

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   No. 05-cv-01265-WDM-MEH, 2008 U.S. Dist. LEXIS 90278 (D. Colo. Nov. 6,
   2008) ............................................................................................ 21

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   2008 U.S. Dist. LEXIS 47748 (D. Colo. Mar. 28, 2008) ..........................*passim*

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1206 (N.D. Okla. 2003)............................................*passim*

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1242 (N.D. Okla. 2003)............................................*passim*

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ...........................................24, 26

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(2) ................................................................. 10

15 U.S.C. § 78u-4(b)(1)(B).................................................................. 10

15 U.S.C. § 78u-4(b)(2)....................................................................... 32

**OTHER AUTHORITIES**

17 C.F.R. § 229.303.................................................................................................. 21

17 C.F.R. § 240.10b-5 ............................................................................................. 10

SEC Act Release No. 8124, Pt. II.B.6, 2002 SEC LEXIS 2240 (Aug. 28, 2002) ...................... 36

Harvest Fund Advisors LLC ("Lead Plaintiff" or "Plaintiff") respectfully submits this omnibus memorandum of law in opposition to the motions to dismiss Plaintiff's Securities Exchange Act of 1934 (the "Exchange Act") claims filed by:[1] (i) the SGLP Defendants;[2] (ii) Brian F. Billings and W. Anderson Bishop; (iii) Thomas Kivisto; (iv) Brent Cooper; (v) Gregory C. Wallace; (vi) A.R. Thane Ritchie and Ritchie Opportunistic Trading, Ltd. ("Ritchie Opportunistic"); and (vii) Carlyle/Riverstone Global Energy and Power Fund II, L.P., C/R SemGroup Investment Partnership, L.P., C/R Energy Coinvestment II, L.P. (collectively, "Carlyle/Riverstone"), Andrew Ward, and E. Bartow Jones.  For the reasons set forth herein and in Lead Plaintiff's Securities Act Opposition, defendants' motions should be denied *in toto*.[3]

## I.    PRELIMINARY STATEMENT

The Complaint tells a simple story of a breathtaking fraud perpetrated on Lead Plaintiff and the putative class by SemGroup, L.P. ("SemGroup" or "Parent") and the individuals who controlled it.  Plaintiffs allege that, during the Class Period (July 17, 2007 – July 17, 2008), Defendants knowingly and recklessly disseminated materially false and misleading information to the investing public about SGLP's and SemGroup's financial condition and prospects to create a market for, and artificially inflate the price of, SGLP's publicly-traded units.  ¶¶174-316.  By July 2008, defendants' fraudulent scheme unraveled and SGLP's investors were left holding the

---

[1]       Contemporaneously herewith, Lead Plaintiff is filing a separate omnibus response in opposition to defendants' motions to dismiss claims under the Securities Act of 1933 ("Securities Act Opposition").  "Complaint" refers to the Corrected Consolidated Securities Class Action Complaint for Violation of the Federal Securities Laws [Dkt. No. 188].  Citations in the form "¶__" are to the Complaint.

[2]       The "SGLP Defendants" include SemGroup Energy Partners, L.P. ("SGLP"), SemGroup Energy Partners G.P., LLC, Kevin L. Foxx, Alex G. Stallings, and Michael J. Brochetti.  The "Individual Defendants" are defined herein as they are in ¶34 of the Complaint.

[3]       The Complaint alleges violations of § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against the SGLP Defendants, Kivisto, Wallace, Cooper, Bishop and Billings for knowing and reckless conduct, (Count V, ¶¶359-67), and against the SGLP Defendants (except SGLP), Kivisto, Wallace, Cooper, Ritchie, Carlyle/Riverstone, Thane Ritchie, Andrew Ward and E. Bartow Jones for their control over the individuals and entities that engaged in such conduct, in violation of Section 20(a) of the Exchange Act. (Count VI, ¶¶368-77).

proverbial bag of virtually worthless SGLP common units.  The Individual Defendants, by contrast, fared far better – pocketing nearly *half-a-billion dollars* from their fraudulent scheme on SGLP's investors during the year-long Class Period.  *See* ¶291.

By deliberately concealing SemGroup's risky operations, defendants induced Lead Plaintiff and the class into investing in a high-risk gambling enterprise with virtually unlimited exposure to increasing commodities prices.  SemGroup was not a stable energy company that was well-hedged against exposure to commodities price and supply volatility, as defendants repeatedly had represented.  In one form or another, throughout the Class Period, defendants unwaveringly touted SGLP's relationship with its Parent as providing SGLP with stable, "guaranteed" contracted cash flows.  In doing so, defendants extracted hundreds of millions of dollars from the public through two public offerings.  But even this was insufficient to bail out a cash-deprived SemGroup.  When the truth about SemGroup's gambling-room business model finally came to light in July 2008, the price of SGLP's units collapsed, causing investors – like Lead Plaintiff – to sustain massive losses.

Since the end of the Class Period, SGLP's common units have been delisted from the NASDAQ.  Kivisto, Wallace and Cooper have refused to answer questions by investigators under the protections afforded to them by the Fifth Amendment.  There are ongoing investigations into SemGroup, the Individual Defendants and SGLP by the U.S. Attorney's Office (issuance of Grand Jury subpoenas), the SEC (ongoing formal securities fraud investigation), and other federal regulators.  SGLP has itself acknowledged that former FBI Director Louis J. Freeh (the "Examiner") issued a report identifying "a number of potential

claims or causes of action against Mr. Kivisto and Gregory C. Wallace . . . including, without limitation . . . *fraud and false statements*."[4]

Undaunted, defendants filed 250+ pages of 12(b)(6) briefing and 2000+ pages of exhibits, claiming that the Complaint fails to allege a case of fraud and false statements – or any other cause of action for that matter. Of course, they do so largely by ignoring the allegations of the Complaint and offering their own version of events, one where they were all merely hapless victims of unpredictable commodities markets. Defendants waste much time discussing the pleading standards and then suggest the Complaint does not contain *any* allegations to meet those standards. Their arguments, however, do little more than "kick up dust." *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 975 n.1 (D. Minn. 2004).

Rather than identifying a single pleading defect in the Complaint, defendants recast Plaintiff's allegations to create the impression that Plaintiff's theory is one tied to the price of oil. Of course, based on defendants' version of Plaintiff's allegations, *none* of the defendants were under any obligation to disclose SemGroup's speculative trading activities to drive its business. But this is not what is pled in the Complaint. The Complaint alleges that defendants knew, but failed to disclose, that SemGroup could not provide SGLP the stable contracted cash flows its investors were told to expect. Facts pled in the Complaint and uncovered by the Examiner detail these allegations.

SemGroup's financial health – SGLP's primary source of revenue – was crucial to the investment case for SGLP. Knowing this, defendants made numerous false statements touting SemGroup's ability to provide SGLP "[s]table, fee-based, contracted cash flows." ¶127. Defendants' decision to voluntarily discuss the Parent's ability to provide stability to SGLP

---

[4]    *See* SGLP 10-K (filed Jul. 2, 2009) at 5 (emphasis added).  On April 15, 2009, the Examiner filed a report (the "Examiner's Report") summarizing the findings of his investigation with the Bankruptcy Court. *See* ¶14.

created a duty to speak fully and to inform SGLP's shareholders that the Parent was engaged in unauthorized highly speculative commodities trading – which the Examiner described as akin to a game of "roulette." *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1256 (N.D. Okla. 2003) (discussing duty to disclose material information) ("*Williams II*"). SGLP's investors were left in the dark about these and other risks at the time of SGLP's initial public offering in July 2007 ("IPO") and throughout the Class Period. *See Croker v. Carrier Access Corp.*, No. 05-cv-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603, at *19 (D. Colo. Jul. 18, 2006) ("Carrier created for itself a duty to disclose information that belied its putative optimism").

In addition to adequately pleading material false statements and omissions, the Complaint also adequately pleads scienter. It specifically alleges that each defendant knew or recklessly ignored the Parent's precarious financial health while simultaneously causing SGLP to assure its investors of the benefits flowing to the Company from its ties to the Parent. In addition to placing direct knowledge of the Parent's speculative trading at the Parent's highest levels, the Court is permitted to draw adverse scienter inferences from Messrs. Kivisto's, Wallace's and Cooper's invocations of the Fifth Amendment. *See In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208, n.17 (S.D.N.Y. 2006) ("The Court also notes that . . . it is permitted to draw an adverse inference from [the defendant's] invocation of the Fifth Amendment . . .").

All of the defendants – except Kivisto – concede that loss causation is adequately pled. SGLP's common units lost more than 50% of their value in a single day as news of the Parent's liquidity problems leaked into the market on July 17, 2008. The immediate and sharp decline in the price of SGLP's common units resulted from the materialization of the very risk defendants failed to disclose. Accordingly, the Complaint meets the notice pleading requirements for alleging loss causation set forth by the Supreme Court. *See Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 347 (2005) (holding that, at the pleading stage, all a plaintiff need do is "provide a defendant with *some indication* of the loss and the causal connection that the plaintiff has in mind.") (emphasis added); §IV.I., *infra*.

While defendants half-heartedly raise other arguments – such as whether defendants' false statements constitute "puffery" or whether the defendants possessed sufficient control over primary violators – these merit little more than passing mention. Predominantly, defendants raise questions of fact that cannot be decided here. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003). And, in those rare instances where such arguments could be decided on a motion to dismiss, defendants utterly fail to carry their burden. For all these reasons, defendants' motions to dismiss should be denied.

## II.    FACTUAL BACKGROUND

SGLP was partially spun off from SemGroup as a public concern through an IPO of SGLP common units in July 2007. ¶¶1, 112-14. In February 2008 (a mere five months before SemGroup filed for bankruptcy), SGLP issued an additional six million common units through a secondary offering (the "Secondary Offering" with the IPO the "Offerings"). ¶152. Through the IPO and the Secondary Offering, defendants raised hundreds of millions of dollars from the public, while the majority of these funds were up-streamed by the Individual Defendants to both the Parent and themselves. ¶109. All significant decisions relating to SGLP during the Class Period were made by its General Partner, which in turn was controlled by SemGroup and the Individual Defendants. ¶¶25, 145, 351. In fact, SGLP and SemGroup maintained overlapping officers and directors, including Kivisto, Wallace, Foxx, Stallings and Brochetti. ¶¶8, 26-30, 121, 281.

While undisclosed at the time of the IPO, defendants and their affiliates pocketed more than $150 million in proceeds from distributions in connection with the IPO. ¶289. At the time

of the Secondary Offering, SemGroup insiders obtained an additional $100 million.  ¶289.  By forming SGLP, and thereby accessing additional lines of credit (secured by all of SGLP's assets), the Individual Defendants raised capital to fund a high-risk commodities trading scheme that they had implemented in order to supplement SemGroup's operating revenue.  ¶¶61-84, 115, 154, 157, 213, 236-41.

In May 2008, defendants caused SemGroup to drop down assets purportedly valued at $135 million to SGLP.  ¶¶236-38.  Like the IPO and Secondary Offering dropdowns, these transactions were funded with borrowings from SGLP's credit facilities, and, in part, were consummated with an express agreement for a secured revenue stream from SemGroup.  *Id.*  On the heels of the May 2008 dropdown transactions, SemGroup immediately made $144 million in payments to its credit facilities.  ¶239.  SemGroup also entered into a Throughput Agreement (for crude oil), a Terminalling Agreement (for asphalt) and an Omnibus Agreement (for administrative services performed by SemGroup's employees).  ¶¶8-9, 115, 158.  Under these agreements, SGLP's investors were told that SemGroup was contractually obligated to pay SGLP over $135 million annually for crude oil and asphalt gathering, transportation and storage services, regardless of whether the services were actually used.  ¶¶151, 179, 206.

Indeed, SGLP and its investors were told they could rely on SemGroup to provide more than 80% of SGLP's revenue during the Class Period.  ¶¶185, 244, 254.  Hence, SemGroup's financial condition and ability to meet its obligations to SGLP were highly material to SGLP's investors.  Unbeknownst to investors at the time of the IPO, however, the reality of the Parent's business was vastly different than disclosed.  ¶¶19, 64.  Indeed, at the direction of its CEO, Kivisto, SemGroup was engaging in undisclosed speculative trading in crude oil.  ¶¶66-101.  This fact went undisclosed until July 2008.  By then, however, it was too late.  As a result of

news of SemGroup's liquidity crisis entered the market, SGLP's common unit price plummeted, and the units ultimately were delisted from NASDAQ. ¶¶5, 18, 102, 104, 266, 311. When SemGroup collapsed under the weight of more than *$3 billion* in trading losses (¶¶5, 102, 247, 254, 287), SGLP and its investors were left moribund and in massive debt. ¶¶109, 173, 260, 265-66, 269, 271.

As was first disclosed publicly in Semgroup's bankruptcy petition, Kivisto's massive bets on the price of oil drained all of SemGroup's operating capital, borrowings and the capital that it had siphoned from SGLP's public offerings and credit facilities. ¶¶102-06. SemGroup further revealed that its bankruptcy was caused, in substantial part, by a severe "liquidity crisis" arising from massive margin calls related to its futures and options crude oil trades. ¶¶208-09. In addition, Kivisto's personal trading operation was finally exposed as SemGroup disclosed for the first time that a trading company, "wholly owned" by Kivisto, (*i.e.*, Westback Purchasing Co. LLC), owed SemGroup $290 million from trading losses. ¶¶5, 86, 94. SGLP's investors were never informed that SemGroup operated a commodities trading division during the Class Period, or that Kivisto contemporaneously ran a personal trading operation using SemGroup's funds. ¶¶3-6, 76-77, 186.[5]

Plaintiff alleges that, even at the time of the IPO, all of the Individual Defendants knew of SemGroup's precarious financial condition. ¶¶88, 93, 124, 132-136, 283-87. In fact, SemGroup's margin balance, which was described as a "threat" to the Parent and was draining cash from SemGroup (¶91), had climbed to $1 billion in June 2007. ¶¶14, 64-65, 212, 91, 97, 212, 221. By year-end 2007, the margin balance had increased to $1.7 billion, creating an

---

[5] Kivisto's speculative "naked option" crude oil trades also violated SemGroup's Risk Management Policy ("RMP") and credit agreements. ¶¶66, 75-77, 183, 283, 286, 295.

obvious adverse impact on SemGroup's financial and operating condition and further impairing SemGroup's liquidity.   ¶¶14, 64-65, 212, 91, 97, 212, 221.   Although proceeds from the dropdown transactions with SGLP were used to pay margin calls, Kivisto's cash-hungry trading devoured all of SemGroup's capital as he refused to "call the market" and unwind trading positions at a loss, even as crude oil prices rose.   ¶¶5, 80, 175, 287.   Instead, Kivisto directed all trades to be rolled forward, which further deviated SemGroup's bets from the rising spot price of oil.   ¶¶66-84, 183, 213, 216, 227, 234.   As oil prices steadily increased during the Class Period, however, the Individual Defendants continued to conceal known risks to SemGroup's liquidity resulting from rising crude oil prices.   ¶¶15, 19, 136, 159, 176, 181, 191-92, 199, 221; 244, 246, 254, 265.

Only one year after the IPO, SGLP has been forced to disentangle its assets from its Parent's operations and dissolve all of the contracts with SemGroup that investors were told would assure SGLP's ability to operate profitably.[6]   ¶¶258, 265.   Also, SGLP was forced to disclose that its ability to survive without SemGroup's "support" was highly uncertain.   ¶¶6, 265, 271.   SGLP is not the same going concern that solicited investors with the promise of future acquisitions strengthened by SGLP's affiliation with SemGroup (¶¶126, 128, 165, 203, 207, 209) nor has it even been able to make a quarterly distribution to SGLP unit holders since first quarter 2008.   ¶275.

---

[6]     On June 25, 2008, SemGroup borrowed $150 million from two hedge funds under a line of credit that provided the hedge funds the right to take control of SGLP's General Partner upon an event of default.   Almost immediately after SGLP disclosed that SemGroup was on the brink of bankruptcy, the hedge funds declared **an event of default under SGLP's credit agreement** and effectively took control of the General Partner's Board of Directors and ousted Kivisto Wallace, Foxx, Brochetti and Bishop from the Board.   ¶¶249, 254.   Although SGLP has been granted forebearance of its default, it remains prohibited by its credit agreements from distributing any cash to unit holders.

### III.      LEGAL STANDARDS

#### A.      Rule 12(b)(6)

"[F]aced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A complaint must contain enough facts "'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "'Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Lane v. Page*, No. CIV 06-1071 JB/ACT, 2009 U.S. Dist. LEXIS 65544, at *26 (D.N.M. July 27, 2009) (quoting *Iqbal*, 129 S. Ct. at 1949-50 (2009)).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  In assessing plausibility, courts are to draw all reasonable inferences in favor of plaintiffs. *See id.* at 1950.

"A court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiffs' complaint alone is legally sufficient to state a claim for which relief may be granted." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 (10th Cir. 2003) (quotations omitted).  While plaintiffs must plead factual support for their claims, they need not plead evidence. *See Adams*, 340 F.3d at 1101.  Thus, a claim need not be probable.  Rather, this standard requires plaintiffs plead facts supporting more than a "sheer possibility" of wrongdoing. *Iqbal*, 129 S. Ct. at 1950.

## B.    Section 10(b) and Rule 10b-5 (Count V)

Section 10(b), 15 U.S.C. § 78j (b) and SEC Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent acts done in connection with securities transactions. *Adams*, 340 F.3d at 1094. "Section 10(b) makes it unlawful 'to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Id.* at 1095 (quoting 15 U.S.C. § 78j(b) (brackets in original)). Rule 10b-5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (quoting 17 C.F.R. § 240.10b-5).

In addition, under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), a plaintiff must plead, with sufficient particularity, that: "(1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; [and (2)] the defendant acted with scienter, that is, with intent to defraud or recklessness . . . ." *Adams*, 340 F.3d at 1095. The PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1)(B), and "state with particularity facts giving rise to a strong inference that the defendant acted with . . . [scienter]." 15 U.S.C. § 78u-4(b)(1)(2).[7] In weighing the sufficiency of a complaint, a court must "determine whether, taken

---

[7]    "[N]otwithstanding the use of the word 'all,'" the Tenth Circuit has concluded that the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Adams*, 340 F.3d at 1099-1100 (internal quotation marks and citation omitted); *see also Lane v. Page*, 581 F. Supp. 2d 1094, 1116 (D.N.M. 2008) ("The Tenth Circuit *does not require* a plaintiff to plead literally 'all' the facts underlying the belief") (emphasis added). *Compare Adams*, 340 F.3d at 1099-1100 *with* Thomas Kivisto's Motion to Dismiss and Brief in Support ("Kivisto Br.") at 4 n.2 ("the complaint must state with particularity *all facts* on which that belief is formed") (emphasis in original).

as a whole, [plaintiff's allegations] support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Lane v. Page*, 581 F. Supp. 2d 1094, 1116-1117 (D.N.M. 2008) (quoting *Adams*, 340 F.3d at 1099); *see also Adams*, 340 F.3d at 1102 (applying a "common-sense, case-by-case approach in determining whether a plaintiff has alleged securities fraud with the particularity required by § 78u-4(b)(1)").

C.     **Section 20(a) (Count VI)**

To state a claim under Section 20(a), plaintiffs must allege: "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1313 (D. Utah 2007) (internal quotation marks and citation omitted).   The Tenth Circuit construes Section 20(a) "liberally," finding "control" adequately pled where plaintiffs allege "some indirect means of discipline or influence short of actual direction" by the control person.  *Richardson v. MacArthur*, 451 F.2d 35, 41-42 (10th Cir. 1971); *Adams*, 340 F.3d at 1109 ("we have expressly rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation") (internal quotation marks and citation omitted); *First Interstate Bank v. Pring*, 969 F.2d 891, 896 n.9 (10th Cir. 1992), *rev'd on other grounds sub nom. Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994).[8]

Such control need not be actually exerted and may stem from the power to direct: (1) the day-to-day management or policies of the primary violator; (2) the transaction underlying the fraud; ***or*** (3) the contents of the public statements at issue.  *Cf. First Interstate Bank*, 969 F.2d at 897 (control person "need not have been involved in the particular transaction which became the subject of the litigation" if he controlled day-to-day operations or misstatements); *Schaffer v.*

---

[8]     Wallace's attempt to write a "culpable participat[ion]" element into Section 20(a), *see* Gregory C. Wallace's Motion to Dismiss and Brief in Support ("Wallace Br.") at 35, is contrary to Tenth Circuit authority.  *See Adams*, 340 F.3d at 1109.

*Evolving Sys. Inc.*, 29 F. Supp. 2d 1213, 1225-26 (D. Colo. 1998); *Steinbeck v. Sonic Innovations, Inc.*, No. 2:00-CV-00848PGC, 2003 U.S. Dist. LEXIS 2378, at \*\*28-30 (D. Utah Feb. 10, 2003); *Nature's Sunshine*, 486 F. Supp. 2d at 1313-14.

## IV.  ARGUMENT

### A.   The Complaint Adequately Pleads Materially False and Misleading Statements and Omissions

The Complaint specifically alleges what Class Period statements are false and misleading and/or omitted material information (¶¶126-30, 137, 139, 141, 143, 145, 161-64, 170, 172, 178-79, 181-83, 185, 190, 194, 196-98, 201-03, 205-07, 209-11, 216, 217-20, 222-25, 227, 230, 236, 238, 242), when and where these statements were issued (*id.*), who made the statements (¶¶112, 153, 178, 185, 189, 196-98, 201, 217-20, 222, 236-38, 242), and why the statements are false and/or omitted material information (¶¶132-36, 138, 142, 144-47, 159-60, 166-69, 171, 173, 180, 183-84, 186-87, 191-93, 195, 199, 204, 208, 212-16, 221, 223-29, 234, 237, 242-43).   The Complaint also sets forth the reasons defendants' statements are false and misleading and are based on, among others facts, the Examiner's findings and the account of a confidential witness with firsthand knowledge about the matters to which he is speaking (¶¶67-73, 85, 91-93, 212-13, 221, 229).   Nothing more is required to meet the PSLRA's particularity requirement.   *See Schwartz*, 124 F.3d at 1253; *Croker*, 2006 U.S. Dist. LEXIS 48603, at \*33 ("Neither Rule 9(b) nor the PSLRA requires plaintiffs to plead their evidence in the complaint.") (citing *Adams*, 340 F.3d at 1101); *Nature's Sunshine*, 486 F. Supp. 2d at 1308.[9]

---

[9]    Defendants' "puzzle-pleading" argument (SGLP Defendants' Motion to Dismiss and Brief in Support ("SGLP Defs. Br.") at 15 n.56) is a red herring.  A complaint is not puzzle pled if it "provides notice to each Defendant regarding the statements and omissions that Plaintiffs allege are misleading and the reasons why those statements and omissions are misleading."  *Williams II*, 339 F. Supp. 2d at 1261; *see Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1253 (10th Cir. 1997) ("A fair reading of the Complaint indicates that by cross-referencing as allowed by Rule 10(c), it sufficiently particularizes the circumstances constituting fraud to comply with Rule 9(b)").  The Complaint clearly sets forth actionable statements and provides fair notice of claims pled and the grounds upon which the claims rest.  *See In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008).

Rather than pointing to any pleading defects in the Complaint, defendants challenge the veracity of Plaintiff's falsity allegations. *See e.g.,* Kivisto Br. at 4-12; Wallace Br. at 13-28; SGLP Defs. Br. at 15-29; Brian F. Billings and W. Anderson Bishop's Motion to Dismiss and Brief in Support ("Billings/Bishop Br.") at 13-14; Brent Cooper's Motion to Dismiss and Brief in Support ("Cooper Br.") at 10-11. Substantive challenges to the merits of a complaint, however, are not appropriate under Rule 12(b)(6). *See In re NPS Pharms., Inc., Sec. Litig.*, No. 2:06-cv-00570, 2007 U.S. Dist. LEXIS 48713, at *13 (D. Utah July 3, 2007); *Nature's Sunshine*, 486 F. Supp. 2d at 1308 ("The Court finds that, ***assuming the veracity of these factual allegations***, a reasonable person would believe that the Defendants' reassurances regarding NPS's financial were false or misleading.") (emphasis added); *Schaffer*, 29 F. Supp. 2d at 1223. As explained in *NPS*:

> NPS challenges whether the plaintiff's allegations that the defendants' statements were knowingly made ought to be believed, and whether the statements were actually misleading or were, instead, accompanied by the necessary and appropriate disclaimers. ***But at the motion to dismiss stage, the court cannot and does not weigh the evidence***. And the consolidated complaint, viewed as a whole, sufficiently alleges that the defendants made false or misleading statements to meet the requirements of Rule 9(b) and the PLSRA.

2007 U.S. Dist. LEXIS 48713, at *13 (emphasis added); *Williams II,* 339 F. Supp. 2d at 1252.

For example, Kivisto argues that "Plaintiff cannot claim that statements in SGLP's offering documents [issued in July 2007] and 10-K were false when made simply because SemGroup suffered from liquidity problems months later." Kivisto Br. at 5. The Complaint, by contrast, alleges that SemGroup's speculative trading strained its balance sheet ***before*** the July 2007 IPO. *See* ¶¶71-72. The Complaint buttresses this allegation by pleading that a former manager employed by the Parent personally met with Stallings and Cooper to discuss his

13

concerns about the Parent's rising margin balances in June 2007.  *See* ¶93.  These allegations, among others, undermine defendants' statements regarding the stability of the Parent's business, SGLP's expected "stable" and "contracted" cash flows from the Parent and the actual risks faced by SGLP's investors.  *See e.g.*, ¶¶14, 64-65, 77, 79-80, 82, 84, 91, 93, 99, 106.[10]

Wallace takes issue with the allegation that the Parent's risk management policies were inadequate.  *See* Wallace Br. at 21.  However, as alleged in the Complaint:

> the Examiner concluded that Wallace, Kivisto and Cooper ***failed*** to integrate properly the commodities trading function into SemGroup's financial controls. Similarly, the Examiner concluded that Foxx, Wallace and Kivisto, SemGroup's "business leaders," ***failed*** to develop or implement a suitable risk management policy into SemGroup's business controls, and they ***failed*** to comply with the express Risk Management Policy that did exist.

¶101 (emphasis added).  The remaining defendants apparently concede that the Sarbanes-Oxley ("SOX") certifications they signed and filed with the SEC, attesting that SGLP's financial controls and risk management were adequate, were false.  *See* ¶¶178, 189, 201, 222 (defendants "submitted false SOX certifications").   While defendants attested that adequate control procedures were in place and functioning at SGLP in their SOX certifications, this was hardly the case.  *See id.*; *Nature's Sunshine*, 486 F. Supp. 2d at 1307 ("the Court finds that Plaintiffs have sufficiently pleaded a false and misleading statement as to the … SOX certifications.").  Moreover, Wallace's suggestion that SemGroup's trading activities were neither speculative nor in violation of the Parent's lending covenants, Wallace Br. at 21, is squarely refuted by facts pled in the Complaint.  *See* ¶¶101, 136.[11]  As the Examiner concluded, the "speculative aspects of Kivisto's trading strategy were ***inappropriate and violated SemGroup's internal risk policies***

---

[10]    A *Forbes.com* article dated July 28, 2008 (cited in ¶106), states "***It's a violation of securities laws*** for Kivisto to hide huge undisclosed trading losses . . . He would be as guilty as any of the Enron guys."  (emphasis added).

[11]    This is not Wallace's first attempt to downplay the severity of SemGroup's problems.  As noted by the Examiner, claims for fraud/false statements can be asserted against Wallace for falsely claiming that "SemGroup's liquidity issues were exaggerated."  Examiner's Report at 19.

14

***and its lender covenants***." Examiner's Report at 6 (emphasis added); *see NPS*, U.S. Dist. LEXIS 48713, at \*\*12-13; *see also Lane*, 581 F. Supp. 2d at 1116.[12]

Defendants also erroneously suggest that their statements about SGLP's indirect exposure to commodity price fluctuations were sufficient to make their failure to disclose SemGroup's speculative trading practices, margin balance and liquidity issues not misleading. SGLP Defs. Br. at 17; Kivisto Br. at 6. It is well-settled law, however, that a statement may be "misleading, though not technically false, if it amounts to a half-truth by omitting some material fact."[13] Here, Plaintiffs allege that defendants' assertion that SGLP was ***indirectly*** exposed to commodity prices was highly misleading when, given its Parent's speculative trading positions and its near-total reliance on its Parent for revenue, its ability to survive as a going concern was ***directly*** tied to the price of oil. *See e.g., Williams II*, 339 F. Supp. 2d 1206, 1254-55 (omission of nature of interest rate and credit risk of company's energy marketing and trading was actionable).

Defendants also mischaracterize the Complaint as pleading "fraud by hindsight," or that defendants' statements were not false when made (*see* SGLP Defs. Br. at 1-2; 17-18 & n.63; Kivisto Br. at 4-5; *see also* Wallace Br. at 21-22). Where a complaint pleads facts stating that defendants knew of and were obligated to disclose certain information at the time statements were issued Plaintiffs plead fraud, not fraud by hindsight. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222 n.4 (N.D. Okla. 2003) ("*Williams I*") ("These allegations do not constitute

---

[12] Wallace's hypothetical question asking "would SemGroup's lending syndicate loan SemGroup $3 billion based on loan agreements that did not require trades to be based on 'physical possession of the commodity being traded' if that, indeed, was considered speculative?" (Wallace Br. at 16) is properly directed to a jury. In any case, without discovery from SemGroup's lending syndicate, Plaintiff cannot know what these entities were told about the extent of SemGroup's reliance on naked trading to drive profits or whether these entities were defrauded like SGLP's investors.

[13] *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004); *see also In re Mesa Airlines, Inc.*, No. 94-690 JC/WWD, 1996 U.S. Dist. LEXIS 22820, at \*\*39-40 (D.N.M. May 31, 1996); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (holding that statements can be literally true but still misleading) (citation omitted).

15

fraud-by-hindsight because the Complaint alleges with specificity the facts then-existing during the Class Period that called for a write-down of these assets"). Here, the Complaint is replete with factual allegations demonstrating that defendants were aware of the Parent's exposure to massive losses from its speculative trading operations before SGLP's IPO and continuing throughout the Class Period. *See e.g.*, ¶¶14, 64-65, 77, 79-80, 84, 91, 93, 98-99, 106.

For example, the Complaint recounts specific details of meetings including Stallings and Cooper in June 2007 – one month before SGLP's IPO – to discuss concerns about SemGroup's "rising margin balance." ¶93. These issues did not abate after the IPO and in fact continued to diminish SGLP's ability to rely on its Parent for cash flows throughout the Class Period. ¶¶65, 98.[14] Moreover, the Examiner's finding that Kivisto, Wallace and Cooper had subjected themselves to claims for "fraud and false statements," combined with defendants' invocation of their Fifth Amendment rights, seriously undermine defendants' claims that they were mere victims of changed economic conditions and unpredictable changes in the price of oil. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) ("The Court will not be distracted by … macroeconomic arguments").

The SGLP Defendants argue that "Plaintiff alleges no facts that the SGLP Defendants knew—or were reckless in not knowing—that oil prices would skyrocket from $90 per barrel in February 2008 to over $140 per barrel in July 2008 and that such an historic phenomenon would bankrupt the Private Company." SGLP Defs. Br. at 18; *see also* Wallace Br. at 15. This, too, ignores Plaintiff's allegations. Whether oil prices moved up or down, defendants should have, but failed to, disclose that the Company's primary source of revenue (*i.e.*, the Parent) was being run like a commodities casino with wildly risky positions. Indeed, the Examiner analogized

---

[14]     Kivisto's argument that "Plaintiff fails to offer any contemporaneous facts known to SGLP that would make its affirmative statements false ***at the time they were made***," Kivisto Br. at 5 (emphasis in original), therefore, is without merit.

SemGroup's speculative trading strategy to a game of "roulette" which required increasingly larger bets to offset losses. *See* Examiner's Report at 7-8.[15]  Had the Parent's reliance on this risky business model been disclosed, investors would have been able to assess SGLP's risk exposure, properly value the price of SGLP's common units and factor in an appropriate rate of return for the risk they were unwittingly made to shoulder.[16]  *See*, *e.g.*, *Williams I*, 339 F. Supp. 2d at 1222 n.4.[17]   Investors were not given that chance.

### B.   SemGroup's Speculative Trading, Rising Margin Balance and Impaired Liquidity were Material to SGLP's Investors

"A failure to disclose is actionable under Section 10(b) when the defendants are under a duty to disclose the information. The duty arises from a fiduciary or other, similar relation of trust and confidence between the parties." *Croker*, 2006 U.S. Dist. LEXIS 48603, at *17

---

[15]      The fact that SemGroup's business model may have "worked extremely well for 7 years," Wallace Br. at 21, is not relevant to defendants' duty to disclose the speculative nature of SemGroup's dire financial condition to SGLP's investors.  Years of purported "success" do not exculpate defendants from liability for fraud.  Bernard Madoff passed off fraudulent activity as a sound business with purported positive returns for more than 18 years before the true nature of his scheme was revealed.

[16]      Defendants' reliance on the Bowen Report (SGLP Defs. Br. at 8-9, 25) is also entirely misplaced as the Bowen Report actually **supports** Plaintiff's position. Defendants concede that Bowen assessed whether SemGroup's trading violated the terms of its lending covenants – not whether its trading was reckless or, if left undisclosed, would mislead SGLP common unit holders.  *See* Wallace Br. at 31.  As such, Bowen's suggestion that SemGroup's trading "deviated very little from its RMP" is not pertinent to whether defendants violated their Rule 10b-5 disclosure duty.  In addition, Bowen only considered SemGroup's trades **prior to** April 2007, not whether its trading deviated from SemGroup's RMP **during the Class Period**.  Appendix to Defendants' Joint Request for Judicial Notice ("Def. App.") Ex. 1 at 54 (Examiner's Report).  Moreover, defendants ignore Bowen's findings that SemGroup's margin balance was "driven by an unusually high level of activity resulting from [its] delta hedge positions," Def. App. Ex. 1D at 5-7 (Bowen Report), which corroborates Plaintiff's allegations that its trading was a material undisclosed risk for SGLP investors.  ¶¶16, 95.  As such, the Bowen Report actually supports Plaintiff's allegations.

[17]      Wallace suggests that "[u]nder plaintiff's theory, every officer of a company is charged with being able to predict the future price of oil, and every oil company that did not make billions in the futures market would be liable for securities fraud for not disclosing its inability to predict the future." Wallace Br. at 15 n.7.  Had SGLP properly disclosed that its primary source of revenue depended on the success of what amounted to a casino, perhaps Wallace's argument would have some appeal.  However, defendants did not disclose the actual risks to SGLP's investors when SGLP touted its "stable" "contracted" fees from its Parent.  In any case, Wallace's assertion of his Fifth Amendment rights against self-incrimination (¶302) speaks more to his liability **in this case** than Wallace's effort to evade liability by grouping himself with "every officer of a company."  If anything, Wallace's admission that the Parent's "extremely profitable" success ended in 2006 supports Plaintiff's theory that the defendants knew – but withheld from SGLP's investors – that the Parent was under significant pressure from its trading positions at the time of SGLP's IPO.

(citations omitted).   Under Rule 10b-5, insiders have an affirmative duty to disclose material facts that would affect a reasonable investor's "investment judgment."  *Garcia v. Cordova*, 930 F.2d 826, 829 (10th Cir. 1991) (under Rule 10b-5,); *Adams*, 340 F.3d at 1095.   Here, defendants were the limited partners, managers and directors of SemGroup **and** SGLP and were therefore directly responsible for overseeing the speculative trading practices that ultimately befell SemGroup and damaged SGLP's investors.   *See* Complaint at ¶¶26-30, 112, 153, 201. Accordingly, the Complaint clearly alleges that there were relations of trust and confidence between the Individual Defendants and SGLP's investors.  *See Croker*, 2006 U.S. Dist. LEXIS 48603, at **17-18 ("a jury could find that the defendants had a duty").

Defendants also paid themselves millions in "distribution" payments from the proceeds of SGLP's Offerings and signed SGLP's SEC filings.[18]  ¶¶147, 169, 201, 289, 291.  As such, they were required to disclose all facts material to SGLP's investors.  *See Garcia*, 930 F.2d at 829; *Croker*, 2006 U.S. Dist. LEXIS 48603, at **17-18 (corporate officers owe shareholders a duty to disclose material facts "[w]here, as here, the defendants create[] a market for [the company's] stock by their actions and statements" (citations omitted)).

Despite the foregoing, defendants claim they had no duty to disclose anything about SemGroup to SGLP's investors.   The case upon which defendants rely for this startling proposition is *J&R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384 (6th Cir. 2008).  *See* Billings/Bishop Br. at 13-14; Wallace Br. at 14; Kivisto Br. at 11; SGLP Defs. Br. 29 n.92. Defendants' reliance on *J&R Marketing* is misplaced.  There, the Sixth Circuit upheld the dismissal of plaintiffs' claims because the plaintiffs could "not contend that GMAC had any knowledge about the information at GM."  *Id.*, at 391.  Here, by contrast, the overlapping

---

[18]     Indeed, all of the Individual Defendants (except Cooper) signed the Registration Statements used in connection with the IPO and/or Secondary Offering.  *See* ¶¶26-30, 32-33, 112, 153.

relationship between SemGroup's high-ranking executives and SGLP (*see e.g.*, ¶¶26-30), and their knowledge about SemGroup's dire financial condition, without more, distinguishes *J&R Marketing*.

Moreover, *J&R Marketing* does not address whether a defendant is required to disclose "firm-specific" information. *See J&R Marketing*, 549 F.3d at 391, n.2 ("we need not address . . . the concept of 'firm-specific' information"). *J&R Marketing* found, however, that the court could easily find a duty to disclose non-firm-specific information where, as here, defendants knew of such information and its material adverse effect on the company. *See id.*, 549 F.3d at 391, n.2.  In addition, "[w]here, as here, the defendants created a market for [SGLP] stock by their actions and statements . . . and thus induced the plaintiffs to purchase the stock, a jury could find that the defendants had a duty to make a full and truthful disclosure of the facts…" *Croker*, 2006 U.S. Dist. LEXIS 48603, at *17.  Here, defendants literally created a market for SGLP common units in the IPO, and induced Lead Plaintiff and other members of the class to purchase SGLP common units with their false statements and omissions throughout the Class Period.  *See* ¶¶125-47; 159-73; 178-254; *N.J. v. Sprint Corp.*, No. 03-2071-JWL, 2004 U.S. Dist. LEXIS 17765, at **20-21 (D. Kan. Sept. 3, 2004) (disclosure duty may arise from a rule of law requiring disclosure, a fiduciary relationship, or where necessary to make other statements not misleading) (collecting cases); *Croker*, 2006 U.S. Dist. LEXIS 48603, at **17-18; *see also Schaffer*, 29 F. Supp. 2d at 1221 ("'A duty to speak the **full** truth arises when a defendant undertakes at duty to say anything.'"(citation omitted)); *In re Giant Interactive Group, Inc.*, No. 07Civ. 10588 (RWS), 2009 U.S. Dist. LEXIS 69414, at **20-22 (S.D.N.Y. Aug. 7, 2009).

Importantly, Plaintiff does not allege that defendants were required to disclose each and every fact in existence regarding SemGroup – just those facts that were material to SGLP's

investors. *See Garcia*, 930 F.2d at 828-29 (the questions of duty and materiality are "intertwined"); *In re Fuwei Films Sec. Litig.*, No. 07 Civ. 9416 (RJS), 2009 U.S. Dist. LEXIS 59658, at *47 (S.D.N.Y. Jul. 10, 2009) (same) (citations omitted). And facts are material if a "reasonable investor would consider it important in determining whether to buy or sell stock." *Nature's Sunshine*, 486 F. Supp. 2d at 1308; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224, 239 (1988); *see also Garcia*, 930 F.2d at 828 (under Rule 10b-5 insiders have an "affirmative duty to disclose material facts which are known to them by virtue of their position but which are not known to person with whom they deal and which, if known, would affect their investment judgment").

Such facts include SemGroup's trading practices and commodities price risk, including its margin balance and unrealized trading losses. These issues adversely impacted SGLP's financial stability and made defendants' statements touting the benefits of its relationship with SemGroup misleading. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (holding that if defendant "puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success.'" (citation omitted)); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239-41, 243 (5th Cir. 2009); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-cv-01265-WDM-MEH, 2008 U.S. Dist. LEXIS 90278, at **17-18 (D. Colo. Nov. 6, 2008) (finding omission of impairment to two contracts supplying 70% of revenues material). Defendants also were required to, but did not, disclose SemGroup's billions in margin obligations and unrealized losses, and liquidity issues.[19] *See Connett v. Justus Enters. of Kansas, Inc.*, 68 F.3d 382, 385

---

[19]     SemGroup's rising margin balance – which grew to $1 billion by the time of the IPO, $1.7 billion by the Secondary Offering and $2.4 billion by the time SemGroup filed for bankruptcy just a year after the IPO (¶¶93, 97), and liquidity concerns, constituted known trends that required disclosure under Item 303 of Regulation S-K, 17 C.F.R. § 229.303, as they impaired the Parent's ability to satisfy its contractual obligations to SGLP. *See, e.g.,*

(10th Cir. 1995) (citing *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993)); *see also Sprint*, 2004 U.S. Dist. LEXIS 17765, at *20; *Schaffer* 29 F. Supp. 2d at 1221 ("when [defendants] chose to release selected, positive information … they should have revealed the potentially negative information as well").[20]

Defendants suggest they had no duty to disclose SemGroup's trading business and its attendant risks to SGLP's investors because these practices reflected instances of mismanagement which are not actionable under the securities laws. *See* Cooper Br. at 6; Kivisto Br. at 25-26; SGLP Defs. Br. at 32-33; Wallace Br. at 22-23. Defendants misstate their disclosure obligations and the allegations in the Complaint. The Complaint alleges a case of intentional concealment of known risks – not mismanagement. *See In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007) ("the Individual Defendants are not alleged to be simply poor managers-they are alleged to be dishonest ones"). Further, even if defendants' conduct can be deemed mismanagement, this "will not preclude a claim under the federal securities laws if the[y] . . . failed to disclose a specific material fact resulting from that mismanagement." *In re Donna Karan Int'l, Inc. Sec. Litig.*, No. 97 Civ. 2011, 1998 U.S. Dist. LEXIS 22435, at *28 (E.D.N.Y. Aug. 14, 1998); *see also Lane*, 581 F. Supp. 2d at 1113.[21]

---

*Sprint*, 2004 U.S. Dist. LEXIS 17765, at *21 (citing *Backman v. Polaroid Corp.*, 910 F.2d 10, 20 (1st Cir. 1990) (a statute or regulation may create a duty to disclose material facts)); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 591 (D.N.J. 2001) (defendants were required to disclose their loading and shipping practices under Item 303) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 at 70-74 (2d Cir. 2001) (publisher's failure to disclose trends in declining sales and increasing returns, as required by Item 303, violated Section 10(b)).

[20]     Defendants' assertion that no investor would have understood their statements as making a "guarantee" about SGLP's revenues, *see* SGLP Defs. Br. at 18-19, is belied by the plain language of their statements.

[21]     *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 759 n.14 (S.D.N.Y. 2001) (rejecting mismanagement argument where the "basis of plaintiffs' claim is not that they disagree with the Company's business choices, but rather, that the Prospectus failed to disclose known objective facts" existing at the time of the offering); *abrogated on other grounds by In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

Hence, defendants' failure to disclose fully the nature and magnitude of risk to SGLP posed by SemGroup's trading is actionable and rendered their statements touting the benefits of SGLP's relationship with SemGroup, ¶¶ 128-29, 131, materially misleading. *See Lormand*, 565 F.3d at 239-41, 243; *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 329-330 (2d Cir. 2002) (Citibank's failure to disclose its hedging strategy was "clearly sufficient" to state a Rule 10b-5 claim and "easily" satisfied the test for materiality).

### C.     The Bespeaks Caution Doctrine Does Not Shield Defendants From Liability

Defendants' reliance on the "bespeaks caution" doctrine is without merit. *See, e.g.,* SGLP Defs. Br. at 26-29; Billings/Bishop Br. at 14-15.   Under the bespeaks caution doctrine, "forward-looking statements are immaterial when a defendant has provided the public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter to nullify any potentially misleading effect."   *Williams I*, 339 F. Supp 2d at 1219 (emphasis added).   Statements of present or historical facts do not fall within the protections of the doctrine and the doctrine does not negate defendants' duty to disclose present facts that belie future projections.[22]   *See Croker*, 2006 U.S. Dist. LEXIS 48603, at *19 (refusing to apply bespeaks caution doctrine where defendant "created for itself a duty to disclose information that belied its putative optimism"); *Williams I*, 339 F. Supp. 2d at 1231 (bespeaks caution doctrine is a narrow defense that only applies to statements concerning the future) (citation omitted); *Rosenbaum*, 549 F. Supp. 2d at 1190 (same).

---

[22]     The adequacy of cautionary language is normally a jury question, which may not be resolved on a motion to dismiss unless "'reasonable minds' could not disagree that the challenged statements were not misleading.'" *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005).  Moreover, the doctrine "does not confer a *carte blanche* to *lie* in such representations of current fact." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) (emphasis added).

The doctrine is inapplicable here for two reasons.  First, the Complaint does not allege forward-looking statements.  Specifically, when the defendants touted the Company's "guaranteed" "stable, fee-based, contracted cash flows" from its Parent and its "minimal direct risk" to increasing commodity prices, they assumed a duty to speak fully on these issues and to inform investors about Parent's reliance on derivative transactions to drive its revenues.[23]  *See Croker*, 2006 U.S. Dist. LEXIS 48603, at **18-19.  Here, the Parent's existing vulnerability to its trading activities (and thereby SGLP's exposure to changes in commodity prices) and the impact of these risks on SGLP's "guaranteed" revenues was known to the defendants at the time of the IPO and should have been disclosed to investors.  Such facts relate to SemGroup's (and, hence, SGLP's) then ***present*** exposure to its speculative commodities trading activities and are therefore not protected by the bespeaks caution doctrine.  *Id.*; *Schaffer*, 29 F. Supp. 2d at 1224 (doctrine "does not apply to misleading statements concerning 'present factual conditions'") (citation omitted).

Next, even if the statements at issue were deemed forward looking (which they are not), defendants' failure to provide meaningful cautionary disclosures precludes their reliance on the bespeaks caution doctrine.  "Cautionary language is meaningful when it warns investors of risks of a significance similar to that actually realized." *Williams I*, 339 F. Supp. 2d at 1220 (citation omitted).  Risk disclosures are not deemed meaningful when defendants, as here, possess knowledge undermining their risk disclosures or if the defendants do not specifically warn about the risks plaintiffs allege caused their loss.  *See Williams I*, 339 F. Supp. 2d at 1231 ("for cautionary language to be effective, the forward-looking, statement must be 'accompanied' by 'sufficiently specific risk disclosures or other cautionary statements concerning the subject

---

[23]        *See*, *e.g.*, ¶220 (stating that there is no impact on SGLP's business if energy prices rise).

matter of the statements at issue to nullify any potentially misleading effect.'") (citations omitted); *Giant Interactive*, 2009 U.S. Dist. LEXIS 69414, at *20 (cautionary language that did not warn about specific risks leading to investors' losses does not fall within the protection of the bespeaks caution doctrine).

A general laundry list of warnings of risks that have already materialized is not a "meaningful" disclosure of specific risks triggering the bespeaks-caution doctrine.[24]   *See NPS*, U.S. Dist. LEXIS 48713, at *17 (bespeaks caution does not apply where "plaintiff has alleged many of the defendants had actual knowledge that their misleading statements were false when they were made"); *cf. Schaffer*, 29 F. Supp. 2d at 1224 ("the safe harbor provision provides no refuge for Defendants who make statements with 'actual knowledge' of their falsity") (citation omitted).  The "risk factors" defendants cite fall far short of the exacting standards needed to trigger the bespeaks-caution doctrine.[25]   Defendants have not (and cannot) point to any disclosure *specifically* warning SGLP's investors about the Parent's exposure to or mounting losses from its unauthorized and undisclosed trading activities and the impact its trading had on SGLP's "guaranteed" revenues.  "[C]autionary language that did not expressly warn of, or directly relate to, the risk that Plaintiffs allege brought about their loss . . . cannot trigger the 'bespeaks caution' doctrine and shield Defendants from liability." *Giant Interactive*, 2009 U.S. Dist. LEXIS 69414, at *20 (citations omitted).  "Moreover, the cautionary language remained fixed [throughout the Class Period] eve as the risks changed." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 735 (7th Cir. 2004).

---

[24]     "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 427 (S.D.N.Y. 2003) (citations omitted).

[25]     SGLP Defs. Br. at 28 & n.90; *see also* Wallace Br. at 27-30.

For example, defendants generally mention the Parent's inability to manage "commodity price risks resulting from its ownership of crude oil and petroleum products" as a disclosed risk factor which sufficiently warned SGLP's investors about the risks associated with their investment in SGLP. SGLP Defs. Br. at 12. However, this case does not turn on the Parent's inability to manage prices based on its ownership of crude oil and petroleum products. Plaintiff alleges that SemGroup's exposure to losses stemmed from its "***naked***" (or speculative) options transactions. *See e.g.,* ¶¶4-5, 10, 71, 75-76, 84, 94, 204, 214. *See also In re Sadia, S.A. Sec. Litig.*, No. 08 Civ. 9528(SAS), 2009 U.S. Dist. LEXIS 66998, at **22-23 (S.D.N.Y. Jul. 29, 2009) (defendants' failure to disclose "speculative" nature of currency hedging is actionable under Section 10(b)). Indeed, defendants cannot point to a single disclosure of the Parent's massive exposure to "naked" commodities-trading activities. *See e.g.,* SGLP Defs. Br. at 11-12 & n.39-41; Billings/Bishop Br. at 14-15; Wallace Br. at 27-28. And, of course, it was this very exposure that resulted in SemGroup's bankruptcy.

Ultimately, defendants' failure to disclose the Parent's existing speculative trading positions vitiates any reliance defendants place on the sufficiency of SGLP's risk disclosures.[26] *See Williams II*, 339 F. Supp. 2d at 1257 (dissemination of intentionally misleading information is not protected by adding cautionary language); *Giant Interactive*, 2009 U.S. Dist. LEXIS 69414, at *19 (defendants' failure to disclose "facts known for many months" does not absolve defendants from liability under bespeaks where risks warn of only potential "negative[] affect" on defendants' business).[27] "The doctrine of bespeaks caution provides no protection to

---

[26]     *See also FSP Stallion 1 v. Luce*, No. 2:08-CV-01155-PMP-PAL, 2009 U.S. Dist. LEXIS 41592, at *17 (D. Nev. May 1, 2009) ("To prevent defendants from attempting to insulate false statements with cautionary language, the [bespeaks caution] doctrine applies 'only to precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus.'") (citation omitted).

[27]     Kivisto suggests that "SGLP did not state that SemGroup had no speculative trading program, or that it was shielded from commodity price fluctuations." Kivisto Br. at 11. Kivisto's call to retreat to the days of *caveat emptor*

someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 427 (S.D.N.Y. 2003) (citations omitted).

### D.    The Group Pleading Doctrine Is Viable in This Circuit

"The group pleading doctrine permits plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) (citation omitted).   Application of the group pleading doctrine permits a plaintiff to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent." *Id.*, at 637; *see Celestial Seasonings, Inc.,* 124 F.3d at 1254.

Certain defendants contest application of the "group pleading" doctrine, suggesting that the PSLRA abolished it or that its viability in this Circuit is "dubious."  Kivisto Br. at 20; *see* Billings/Bishop Br. at 16-19.  Courts in this Circuit, however, take a different view – namely that "[t]he Court of Appeals for the Tenth Circuit adopted the group pleading doctrine" and that "the group pleading doctrine survived the enactment of the PSLRA. . . . ." *Williams II*, 339 F. Supp. 2d at 1259-60; *Steinbeck*, 2003 U.S. Dist. LEXIS 2378, at *25 (adopting group pleading doctrine).  "The Tenth Circuit has stated, ***post-PSLRA***, that: 'Identifying the individual sources

---

as the rule by which disclosures are judged should be rejected.  *See also* Wallace Br. at 27 n.15 (attempting to differentiate between indirect and direct exposure to commodity risk).  Under Kivisto's reasoning, corporate officers can do whatever they please without informing shareholders so long as they have not specifically stated that they would not act in a certain manner.  The Supreme Court has squarely rejected such a narrow reading of the Exchange Act.  *See Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 151 (1972) ("The Court has said that the 1934 Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'") (citation omitted).

of statements is ***unnecessary*** when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers.'" *Lane*, 581 F. Supp. 2d at 1118 (citation omitted and emphasis added); *see also Schaffer*, 29 F. Supp. 2d at 1225 (quoting *Celestial Seasonings*, 124 F.3d at 1254). Accordingly, Plaintiff is entitled to rely on the group published doctrine to hold each of the Individual Defendants responsible for SGLP's misstatements.[28]

Plaintiff does not (and need not) rely on group pleading to assert claims against those defendants who made statements or signed SEC filings, like Foxx, Brochetti, Stallings, Kivisto, Wallace, Bishop and Billings. *See e.g.,* ¶¶112, 152, 178, 189, 196, 201, 217, 222, 236, 242; *see also In re Cabletron Sys. Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) (each outside director that signed Form 10-K accepted responsibility for its contents).[29] In addition, each of the Individual Defendants is alleged to have had actual (or had the power to exercise) control over the day-to-day operations of SGLP and/or had access to inside information. *See* ¶¶26-31, 146, 285.

### 1. Billings and Bishop Are Liable as Outside Directors

Billings and Bishop argue that the group published doctrine cannot apply to them as a matter of law because they are self-identified as "outside" directors.[30] *See* Billings/Bishop Br. at

---

[28]     Wallace admits to signing SGLP's IPO and Secondary Offering Documents and the 2007 10-K but argues that he cannot be held accountable for statements made in SGLP documents that he did not sign. *See* Wallace Br. at 13 n.5. Wallace had specific knowledge of the Parent's speculative trading positions while he sat as a director of SGLP. ¶88. Thus, Wallace was clearly akin to an insider and is liable for SGLP's group published documents.

[29]     The group published doctrine is applicable to statements issued by SGLP in its prospectuses, registration statements, annual reports, quarterly reports, press releases and other published material provided to investors. *See e.g.,* ¶¶112, 115, 126-31, 137, 139-41, 143, 145, 153-54, 159, 161-66, 170, 172, 178-79, 181, 183, 189-90, 201-03, 205-07, 209-11, 215-16, 222-25, 227, 233, 236, 238, 242.

[30]     Billing's and Bishop's "group pleading" arguments are limited attacking their liability as to statements issued by SGLP ***and which they did not sign***. *See e.g.*, ¶¶153, 201 (Billings and Bishop signed SGLP's 2007 10-K and Secondary Offering Documents). Neither defendant argues that he did not make a statement with respect to documents he signed.

16-19. Not so.[31] "[O]utside directors . . . can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider." *Schnall v. Annuity and Life Re (Holdings) Ltd.,* No. 3:02 CV 2133(GLG), 2004 U.S. Dist. LEXIS 1601, at *11 (D. Conn. Feb. 4, 2004) (citations omitted); *Philip Servs.*, 383 F. Supp. 2d at 483-84 (group pleading doctrine applied to "outside" directors); *Schaffer*, 29 F. Supp. 2d at 1225 (rejecting arguments by the "Outside Director Defendants . . . that they are not responsible for the prospectus because the group-published information does not apply to them in the wake of the PSLRA"). Here, Lead Plaintiff alleges that Billings and Bishop were akin to corporate insiders. *See* Complaint at ¶¶32-33, 249.

### 2. Cooper Is Liable For Statements Directed at SGLP's Shareholders

Cooper argues that he is not liable under Section 10(b) because he did not make any public Class Period statements. *See* Cooper Br. at 10-12. Courts routinely, however, attach primary liability under Section 10(b) to corporate officers like Cooper. *See Menkes v. Stolt-Nielsen S.A.*, No. 03-cv-409(DJS), 2006 U.S. Dist. LEXIS 42644, at **19-23 (D. Conn. June 19, 2006); *Alstom*, 454 F. Supp. 2d at 203 ("two recent district court decisions in this Circuit have similarly concluded that officers of subsidiaries, whose corporate parent, and not the subsidiary, issued statements directly to the public, could be held primarily liable under Section 10(b)")

---

[31]       Defendants' reliance on *Prescott Group Aggressive Small Cap, L.P. v. Blackwell*, No. 02-CV-0517-EA (M), 2003 U.S. Dist. LEXIS 27079, at *16 (N.D. Okla. Aug. 25, 2003), cited by Billings/Bishop Br. at 16-17; Wallace Br. at 13 n.5, is unavailing. There, the court stated that outside directors' membership on committees did not support a conclusion that they had day-to-day control over a corporation. Here, however, Plaintiff argues that Billing and Bishop were members on committees responsible for, *inter alia*, ensuring the accuracy of SGLP's financial results provided them access to information which made them akin to corporate insiders. *See In re Philip Servs Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 483 (S.D.N.Y. 2004). *Prescott* did not analyze whether any special relationship between the outside directors and the corporation based on the directors' access to information. Accordingly, *Prescott* is distinguishable from the matter at bar. Likewise, *In re CFS-related Sec. Fraud Litig.*, Magistrate's Report and Recommendation, No. 99-CV-825-K(J), at 57 (N.D. Okla. Dec. 21, 2001) (*see* Billings/Bishop Br. at 17; Wallace Br. at 13 n.5) (attached as Ex. 22 to Def. App.), which reaffirms the viability of group pleading doctrine in the Tenth Circuit, does not analyze the applicability of the group published doctrine based on defendants' access to information.

(citing *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006);

*Menkes*, 2006 U.S. Dist. LEXIS 42644, at *22).  As explained by Judge Marrero in *Alstom*:

> In *Menkes*, the Court declined to dismiss a Section 10(b) claim against officers of a subsidiary that allegedly had engaged in anti-competitive behavior that rendered the corporate parent's statements regarding its results misleading. *See Menkes*, 2006 U.S. Dist. LEXIS 42644. The Court found that the subsidiary's officers could be held primarily liable as their participation went "well beyond simply enabling or turning a blind eye to" the parents's [sic] fraud. *Id.*  Rather, the officers allegedly were aware of the anti-competitive behavior long before it was revealed to the public, and they therefore could have disclosed the conduct to the parent and render the parent's statements truthful "but, at best, they failed to do so, or at worst, they conspired with [the parent] to mask and conceal the improper activities implemented by [the subsidiary] in connection with its antitrust measures."  *Menkes*, 2006 U.S. Dist. LEXIS 42644, at *22. In either instance, the Court concluded, the subsidiary's officers could be held liable because the parent was either a "mere conduit" for the subsidiary to perpetuate the fraud or was a co-conspirator.

*Alstom*, 454 F. Supp. 2d at 203-04.[32]

Here, Cooper served as SemGroup's Treasurer and managed the day-to-day financial decisions for SemGroup and monitored its cash flow and uses of cash, including margin calls and liquidity.  ¶31.  The Complaint further alleges that Cooper had specific knowledge about Kivisto's speculative trading activity (¶88) and that employees discussed SemGroup's "rising margin balance" with Cooper one month before SGLP's IPO (¶93).  In addition, the Court may draw an adverse inference from Cooper's assertion of his Fifth Amendment privilege against self-incrimination (¶302).  Given Cooper's knowledge of the Parent's exposure to billions of dollars in derivative trading positions and his role as the Treasurer for the Parent – which

---

[32]   Cooper alleges that "blanket" references to "defendants" is insufficient to plead claims under the PSLRA. *See* Cooper Br. at 11.  Relying on the group pleading doctrine, this very argument was rejected in *Lane.*  581 F. Supp. 2d at 1118 (applying group pleading and stating that requiring plaintiff to replace "defendants" with a list of names "would be elevating form over substance."). *Lillard v. Stockton*, 267 F. Supp. 2d 1081 (N.D. Okla. 2003) (cited by Cooper Br. at 11) does not address the group pleading doctrine and is therefore distinguishable from the matter before the Court.  Likewise, *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006) (Cooper Br. at 11), addressed pleading fraud claims under the False Claims Act and did not address the applicability of group pleading doctrine in securities fraud cases.

controlled SGLP (¶¶25, 56) – Cooper was aware of the Parent's exposure to risky speculative positions "long before it was revealed to the public, and . . . therefore could have disclosed the conduct to" SGLP's investors.  *See Alstom*, 454 F. Supp. 2d at 203-04; *Menkes*, 2006 U.S. Dist. LEXIS 42644, at *22.  Cooper is, therefore, a primary participant in the Parent's fraud (¶¶101, 302) and, by virtue of his position within the Parent is responsible for the false statements (and omissions) issued by SGLP in group published documents.  *See Williams II*, 339 F. Supp. 2d at 1259-60.

### E.   Defendants' Statements Are Not Inactionable "Puffery"

The SGLP Defendants argue that their false statements are not actionable because they are "incapable of verification."  *See* SGLP Defs. Br. at 28-29.  Vague statements of corporate optimism (or puffery) cannot be materially misleading because "generalized statements of optimism are not capable of objective verification and reasonable investors do not rely on them in making investment decisions." *Williams I*, 339 F. Supp. 2d at 1219 (citation omitted).  Courts dismissing statements on puffery grounds "have identified declaration of intention, hope, or projections of future earnings as the hallmarks of inactionable puffery." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009).  "As described by the Tenth Circuit, '[s]tatements classified as 'corporate optimism' or 'mere puffing' are typically forward–looking statements, or are generalized statements of optimism that are not capable of objective verification." *See In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1217 (D. Kan. 2002) (citation omitted) (brackets in original).

Here, the statements the SGLP Defendants characterize as mere puffery ***are not*** forward-looking, ***are*** capable of verification, and are thus material and actionable.  For example, the SGLP Defendants argue that the Company's statements regarding its maintenance of "stable

cashflows" are not actionable. *See* SGLP Defs. Br. at 29 & n.91 (citing ¶129). Not so. Rather than merely expressing unsubstantiated hope for stable cash flows the defendants issued statements elaborating why SGLP's cash flows *are* stable. *See* ¶127 (Parent committed to provide "minimum revenues of $6.4 million"). Likewise, defendants' statements about SGLP's "competitive strength" (SGLP Defs. Br. at 29 n.91) (citing ¶165) are immediately followed by bullet points touting SGLP's "contracted minimum revenues under the Throughput Agreement." *See* ¶165.

Defendants also knew that the Parent was exposed to billions of dollars in liability from speculative trading activity at the time of SGLP's IPO. *See* ¶¶19, 286. Accordingly, even if the statements cited by the SGLP Defendants are considered statements of optimism (which clearly they are not), then defendants' knowledge of the Parent's true condition renders the statements actionable given that the defendants opted to speak about the Parent's commitment to provide "stable" minimum payments to SGLP. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (statements are not puffery where "defendants did not genuinely or reasonably believe the positive opinions they touted . . . ."); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 U.S. Dist. LEXIS 47748, at **52-53 (D. Colo. Mar. 28, 2008).[33]

---

[33]     Defendants' reliance on *Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) for the proposition that Lead Plaintiff needs to plead that it personally attended SGLP's conference calls in order to allege false statements therefrom, SGLP Defs. Br. at 28 n.89, is unavailing. As an initial matter, statements made on the conference calls at issue in *Pirraglia* were alleged to have been made to a select group of investors. *See Pirraglia*, 339 F.3d at 1189. In contrast, SGLP's conference calls are publicly available and accessible by any investor. As each of the statements in the Complaint are public, "[t]he 'fraud on the market' doctrine, endorsed by the Supreme Court in *Basic*, *see Basic*, 485 U.S. at 241-42, 108 S.Ct. 978, recognizes that in an open, efficient, and developed market, where millions of shares are traded daily, investors must rely on the market to perform a valuation process which incorporates all publicly available information, including misinformation. *See id.* at 241-47, 108 S.Ct. 978. Consequently, the reliance of individual plaintiffs on the integrity of a price in such a market, and implicitly the misinformation that contributed to that price, may be presumed." *In re Ribozyme Pharms., Inc. Securities Litigation*, 119 F. Supp. 2d 1156, 1164 (D. Colo. 2000); *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 78 (2d Cir. 2004); *see also* ¶¶312-16 (pleading that the SGLP's common units traded in an efficient market). Lead Plaintiff is simply

### F.   The Complaint Pleads Compelling Facts that Give Rise to a Strong Inference of Scienter

### 1.   Legal Standards for Pleading Scienter

A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  "A strong inference of scienter is a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Adams*, 340 F.3d at 1105. To plead a Rule 10b-5 violation, plaintiffs "may rely upon either actual intent to mislead or recklessness." *In re Ribozyme Pharms., Inc. Sec. Litig.,* 209 F. Supp. 2d 1106, 1113 (D. Colo. 2002).  To establish scienter in a case alleging "non-disclosure of potentially material facts," Plaintiffs must demonstrate that defendants knew (1) "the potentially material fact," and (2) "that failure to reveal the potentially material fact would likely mislead investors."  *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001).  The required "knowledge" can be "satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware of both its materiality and that its non-disclosure would likely mislead investors." *Williams II*, 339 F. Supp. 2d at 1258 (quoting *Fleming*, 264 F.3d at 1261).

The Tenth Circuit defines recklessness as conduct that is "an extreme departure from the standards of ordinary care, and which presents danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Fleming*, 264 F.3d at 1258 (quoting *Anixter v. Home Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)).  In *Tellabs*, the Supreme Court resolved a circuit split and explained the standards for pleading a "strong inference" of scienter under the PSLRA.  551 U.S. 314.  First, the

---

not required to plead that it read and relied on every public statement issued by the defendants in order to allege that the defendants' statements were false. *See Id.*

Supreme Court reiterated that district courts must accept all factual allegations in the complaint as true.  *See N.J. v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1279-80 (D. Kan. 2008) ("*Sprint II*") (citing *Tellabs*, 127 S. Ct. at 2509) (other citation omitted).  The Supreme Court also stated that scienter allegations ***must*** be considered collectively:

> The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.
>
>           \*        \*        \*
>
> We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.

*Tellabs*, 551 U.S. at 326.  This, of course, has long been the law in this Circuit.  *See Fleming*, 264 F.3d at 1263 (plaintiff's allegations should be examined "in their entirety" to determine whether, "taken as a whole," they give rise to a strong inference of scienter).

Scienter allegations are sufficient "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 127 S. Ct. at 2510.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'"  *Id.*  (citations omitted).  Thus, if two explanations – one culpable and the other nonculpable – are ***equally*** compelling, scienter is satisfied.  *See Sprint II*, 531 F. Supp. 2d at 1281 (*Tellabs* "awards the draw to the plaintiff" where there are equally strong inferences for and against scienter) (citing *Pirraglia*, 339 F.3d at 1188); *see also Frank v. Dana Corp.*, 547 F.3d 564, 570-71 (6th Cir. 2008); *Lormand* 565 F.3d at 239.

## 2.	The Complaint Supports a Strong Inference of Scienter

In challenging the Complaint's scienter allegations, defendants fail to consider Plaintiff's scienter allegations ***as a whole***.  *See Nature's Sunshine*, 486 F. Supp. 2d at 1311.  Instead, they

attempt to dissect the scienter allegations piecemeal and then improperly summarize many of the allegations. Defendants then criticize each allegation independently of the others, and invite the Court to do the same. Defendants' piecemeal approach runs afoul of the Supreme Court's holding in *Tellabs*. *See* 551 U.S. at 322-23 ("The inquiry . . . is whether *all* of the facts alleged, taken *collectively*, give rise to a strong inference of scienter, *not* whether any individual allegation, scrutinized in isolation, meets that standard." (emphasis added)); *see* §IV.F., *infra*.

One of the "classic fact patterns" giving rise to a strong inference of scienter is that defendants made certain statements "when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (collecting cases). Here, the Complaint is replete with detailed factual allegations that demonstrate actual knowledge on the part of Kivisto, Cooper, Wallace, Stallings, Foxx and Brochetti. *See* ¶¶13-16, 276-302; *Adams*, 340 F.3d at 1095; *see also* §IV.F.2., *infra*.

### a.   Defendants' Positions within SemGroup Support a Strong Inference of Scienter

Defendants' positions at SemGroup and SGLP also support a strong inference of scienter. *See Adams*, 340 F. 3d at 1105-1106. Due to their executive positions and responsibilities and access to material non-public information, Plaintiff alleges that the Individual Defendants knew that adverse material facts regarding SemGroup's core operations and financial condition had not been disclosed to SGLP's investors. ¶¶276-82; *see In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1197 (D. Colo. 2004) (allegations that individual defendants knew material information based upon their company positions combined with other compelling allegations of motive support scienter) (citing *Adams*, 396 F.3d at 1106); *Williams II*, 339 F. Supp. 2d at

1258.[34]   In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F. 3d 702 (7th Cir. 2008), Judge

Posner explained as follows:

> And at the top of the corporate pyramid sat Notebaert, the CEO.  The 5500 and the 6500 were his company's key products.  Almost all the false statements that we quoted emanated directly from him.  ***Is it conceivable that he was unaware of the problems*** of his company's two major products and merely repeating lies fed to him by other executives of the company?  ***It is conceivable, yes, but it is exceedingly unlikely***.

*Id.* at 711 (emphasis added).

Here, given their positions at SemGroup and SGLP, it is similarly unlikely that the

Individual Defendants were unaware of the massive problems plaguing SemGroup at the time of

the IPO and throughout the Class Period.  *See id.*; *No. 84 Employer-Teamster Joint Council

Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) ("absurd

to suggest" that directors would not discuss serious reports coming into corporation); *Danis v.

USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 938 (N.D. Ill. 1999) (management "may be presumed

to have been aware" of pervasive problems at corporation).

### b.    Defendants' SOX Certifications Support a Strong Inference of Scienter

Plaintiff also alleges that defendants personally signed and caused SGLP to file

materially false and misleading reports with the SEC – including SOX certifications – which

contradicted facts that were then available to them regarding SemGroup's impaired financial

condition and resulting credit risks.  *See*  ¶¶26, 28, 178, 189, 201, 222.  This, too, is indicia of

---

[34]     *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made.");  *see also Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989) (strong inference that defendant directors "had knowledge" of undisclosed adverse facts about "a potentially significant source of income for the company"); *South Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis.").

scienter. *See Williams I*, 339 F. Supp. 2d at 1235; *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *50 (D. Or. Jan. 3, 2006); *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2006 U.S. Dist. LEXIS 40548 (W.D. Mo. June 19, 2006); *Croker*, 2006 U.S. Dist. LEXIS 48603, at **30-31; *see also Nature's Sunshine*, 486 F. Supp. 2d at 1307-08.

SOX's certification requirements were expressly designed by Congress to prevent top executives from adopting a "head in the sand" defense, as defendants have done here, to actions for securities fraud committed on their watch. The SEC recognized as much in implementing §302, by expressly warning corporate officers that "a false certification potentially could be subject to . . . both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5." SEC Act Release No. 8124, Pt. II.B.6, 2002 SEC LEXIS 2240, at *33 (Aug. 28, 2002) (*also available at* www.sec.gov/rules/final/33-8124.htm).

As required by §302, Foxx and Brochetti, for example, attested that adequate control procedures were in place and functioning when they signed SOX certifications during the Class Period. ¶¶26, 28. By submitting the certifications as Exhibits to SGLP's quarterly reports on Forms 10-Q and the 2007 10-K, defendants attested that they had reviewed each of these SEC filings, and that, based on their knowledge, none of the information presented in those reports was false or misleading. *Id*. The SOX certifications defendants signed provide additional strong evidence that defendants were at least reckless in causing or permitting the fraudulent statements to be published. *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (finding that the failure to maintain effective internal controls was sufficiently indicative of scienter); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 508-09, 516-18 (W.D. Pa. 2002)

(upholding claims based on concealment of defects in internal accounting systems and controls); *Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 927-29 (N.D. Ill. 1998).

Defendants' signatures on SGLP's other SEC filings, and their participation in SGLP conference calls with analysts and investors, also demonstrate their knowing participation in disseminating materially-false and misleading information to SGLP shareholders. *See e.g.*, ¶¶112, 153, 178, 185-86, 189, 197-99, 201, 217-21, 222, 285. *See Startek*, 2008 U.S. Dist. LEXIS 47748, at **22-23 (if defendant knew and failed to disclose the true state of affairs when signing an SEC filing, there is "a strong inference of scienter"). "[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (citation omitted).

Contrary to Kivisto's argument, then, his signature on these documents demonstrates his involvement in disseminating materially-false and misleading information. *See* Kivisto Br. at 17. Furthermore, mere months after he signed and SGLP filed its 2007 10-K on March 6, 2008, SGLP disclosed that SemGroup was insolvent and that the adverse impact on SGLP was uncertain (because SGLP derived "a substantial majority of its revenues" from SemGroup), which undeniably was caused by Kivisto's commodities trading, also supports a strong inference of scienter. *See* ¶¶244, 247. "[T]hese allegations show that the defendants had access to information about the company's business success and to information about the company's financial data, which, in combination with the Sarbanes-Oxley certifications and other allegations discussed below, provide 'adequate corroborating details,' sufficient to create an inference of *scienter*." *Lattice Semiconductor*, 2006 U.S. Dist. LEXIS 262, at *50; *Faro Techs.*,

534 F. Supp. 2d at 1264 (signing certifications is reckless in view of their known falsity) (citations omitted).

### c.        Defendants' Public Offerings Support Inference of Scienter

Defendants' decision to take SGLP public in the IPO and subsequently raise capital through the Secondary Offering, while SGLP's stock price was artificially inflated, also supports a strong inference of scienter.  *See In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648 (E.D. Va. 2000) (finding defendants' desire to raise capital through public offerings probative of scienter where plaintiffs included concrete details such as timing, amounts sold and insider selling); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001); *In re Lason, Inc. Sec. Litig*, 143 F. Supp. 2d 855, 858-59, 861 (E.D. Mich. 2001); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) ("to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital" is a sufficient allegation of motive).

To accomplish these Offerings, the Individual Defendants deliberately and recklessly touted SemGroup as a burgeoning company with a cartel of desirable assets positioned for outstanding growth through SGLP, without disclosing any risks from SemGroup's trading or margin balance, much less the true nature of the trading operation.  ¶¶125-47, 159-73.  Then, by spinning off assets and saddling SGLP with massive debt, the Individual Defendants up-streamed cash to SemGroup to keep it afloat.  ¶109.  *See Howard*, 228 F.3d at 1064 (sufficient scienter shown for summary judgment purposes where optimistic statements were made in the face of "alarm signals" of "possible financial crisis").  When combined with others indicia of wrongdoing, "the desire to raise capital by means of a . . . public offering – gives rise to a 'strong inference' of scienter."  *In re Res. Am. Sec. Litig.*, No. 98-5446, 2000 U.S. Dist. LEXIS 10640, at **18-19 (E.D. Pa. July 26, 2000) (citation omitted);  *Queen Uno Ltd. P'ship v. Coeur D'Alene*

*Mines Corp.*, 2 F. Supp. 2d 1345, 1359 (D. Colo. 1998) (allegations that defendants inflated stock price to complete $150 million convertible debentures offering, coupled with other scienter allegations, sufficient to plead scienter under PSLRA), *abrogated on other grounds by Adams*, 340 F.3d 1083; *Howard*, 228 F.3d at 1064.

That defendants used these Offerings to distribute hundreds of millions of dollars to themselves and to Carlyle/Riverstone and Ritchie, *before* SemGroup's liquidity crisis became known further compels an inference of scienter.  In *Williams I*, the court held that plaintiffs properly alleged scienter where the complaint pled a scheme in which a parent company was able to spin off an underperforming subsidiary and relieve the parent of responsibility for a large "debt load" to improve its balance sheet at the expense of the subsidiary's shareholders, while insider defendants paid themselves "significant bonuses."  *Williams I*, 339 F. Supp. 2d at 1234.

The facts in *Williams I* are substantially similar to those alleged here.  In addition, here, all of the Individual Defendants authorized asset drop downs from SemGroup to SGLP, knowing or recklessly disregarding obvious risks that SemGroup's increasing margin needs and the resulting strain on its liquidity jeopardized its ability to fulfill its related contractual obligations to SGLP.  ¶¶109-10.  These facts and circumstances demonstrate a strong inference of scienter. *See NPS*, 2007 U.S. Dist. LEXIS 48713, at **14, 21 (defendants' knowing concealment of risks and false dissemination of related positive information creates a compelling inference of scienter).

> **d.    The Proximity in Time Between Defendants' Last Misstatements and the Disclosure of Fraud Also Supports a Strong Inference of Scienter**

Another factor supporting an inference of scienter is the temporal proximity between an allegedly fraudulent statement or omission and the later disclosure of inconsistent information. *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995); *In re Grand Casinos, Sec. Litig.*, 988 F.

Supp. 1273, 1283 (D. Minn. 1997) (seven months between omissions and disclosures supports finding of scienter). The close proximity in time between the disclosure of SemGroup's liquidity crisis in July 2008, and the MLP dropdowns to SGLP in the Offerings in July 2007 and February 2008, and again in two rapid-fire dropdowns in May 2008, supports an inference of scienter. *See Williams I,* 339 F. Supp. 2d at 1232.

Similarly, the close gap in time between SemGroup's demise and the repeated false public assurances that SGLP had "minimal" exposure to spiking oil prices, further supports scienter. *See* ¶¶8, 131, 162, 164, 179, 196, 205. Indeed, SemGroup falsely represented that its liquidity position had not changed from year-end 2007 to May 8, 2008, when internal operating reports showed a material decline in SemGroup's cash position. *See* ¶¶226-28. *See also Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 9 (1st Cir. 2006) (the "short time" between misstatements and later disclosure of inconsistent information is relevant for scienter).

### e. Defendants Lucrative Distributions and Bonuses Supports an Inference of Scienter

Significant financial motives demonstrate scienter where "the magnitude and timing of the financial benefit is 'unusual'" or there is other evidence of a "heightened" motive to commit fraud. *In re Nash Finch Co. Sec. Litig.*, 323 F. Supp. 2d 956, 963 (D. Minn. 2004); *Green Tree*, 270 F.3d at 661. Notwithstanding SemGroup's impaired liquidity and desperate need for cash, defendants caused SemGroup and SGLP to distribute more than $150 million to themselves and their affiliates in the IPO. ¶¶289, 291; *Tellabs, Inc.*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"). And then in connection with the Secondary Offering, SemGroup's Management Committee members, including defendants Kivisto, Wallace, Foxx, Thane Ritchie, Ward and Jones, authorized a $100 million distribution to themselves and other partners. ¶289.

SemGroup insiders and their affiliated trusts received $26 million from the distribution. In total, Plaintiff alleges that Kivisto, Wallace, Cooper and other SemGroup insiders received over **$517 million** during the Class Period as a result of, and in furtherance of, their fraud.  ¶291. Thus, Plaintiff has more than adequately alleged that defendants benefitted from their fraud in a "concrete and personal way."  *See Qwest*, 387 F. Supp. 2d at 1147 (citing *Fleming*, 264 F.3d at 1261); *see also Fleming*, 264 F.3d 1262 ("evidence of motive and opportunity may be relevant to a finding of scienter, and thus may be considered as part of the mix of information that can come together to create 'strong inference' of scienter required by the PSLRA.").

Notably, none of these payments was disclosed to SGLP's investors in the IPO Offering Documents.  *See Williams II,* 339 F. Supp. 2d at 1259 (finding such undisclosed payments as evidence of scienter).  Instead, investors first learned of these payments through SemGroup's bankruptcy proceedings.  The failure to disclose these payments to investors is further indicia of the SGLP Defendants' and the Individual Defendants' scienter.  *See id*.  In light of these massive distributions from the SGLP Offerings and the lucrative salaries and other bonuses, *see id.*, all of these defendants had strong incentives to conceal the risks posed by Kivisto's dangerous trading and SemGroup's impaired liquidity from SGLP investors, which is more than sufficient to allege motives that compel an inference of scienter.

Given these concrete lucrative benefits, defendants' lack of personal SGLP unit sales during the Class Period should not negate this inference.  *See Pirraglia*, 339 F.3d at 1191 n.12 ("We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors.") (emphasis added); *Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 944 ("the lack of stock sales by a defendant is not dispositive of scienter") (citations omitted); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230,

1247 (N.D. Cal. 2008) (absence of insider trading by a defendant did not weigh against scienter); *Middlesex Ret. Sys*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007) (same); *Batwin v. Occam Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at **43-45 (C.D. Cal. July 1, 2008) (same); *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").[35]  Moreover, defendants' assertion that their failure to sell their SGLP holdings "undermines any supposed intent to deceive" does not present a cogent, non-culpable explanation for defendants' conduct where, under long-term incentive plan and lock-up agreements entered into in connection with the IPO and Secondary Offering, the Individual Defendants were restricted from selling their SGLP units.[36]  Kivisto suggests that the fact that he supposedly lost money in 2008 on his SemGroup interests inoculates him against any suggestion of fraud.[37]  *See* Kivisto. Br. at 13.

The fact that his scheme backfired in July 2008 in no way discounts the genuine financial incentive that Kivisto and other defendants had to implement their fraudulent plan.  The failure of SemGroup's insiders to capitalize personally on their recklessness as much as Kivisto now postulates they could (or should) have is no defense to a Section 10(b) claim.  *In re Nuko Info. Sys. Sec. Litig.*, No. 97-cv-20471, 2000 U.S. Dist. LEXIS 16362, at *19 (N.D. Cal. 2000) (a

---

[35]    Also, defendants' purchases of SGLP units during the Class Period also are of no moment when they controlled SGLP's General Partner and committed to maintain a 2% equity position in SGLP subsequent to both the IPO and Secondary Offering.  *See* ¶¶115, 154.  *See also Hubbard v. BankAtlantic Corp.*, No. 07-61542-CIV, slip op., at **5-6 (S.D. Fla. May 12, 2009) (attached hereto as Exhibit A) (finding stock purchases during class period did not defeat scienter); *In re Loewen Group Inc. Sec. Litig.*, No. 98-6740, 2004 U.S. Dist. LEXIS 16601, at *60 (E.D. Pa. Aug. 18, 2004) (same).

[36]    Following the IPO, defendants were subjected to a lock-up period of 180 days, prohibiting them from disposing of *any* SGLP common units until January 13, 2008. *See* Registration Statement at 147 (March 9, 2007). Then, immediately after the 180-day lock-up period, on January 14, 2008, SGLP issued a press release announcing its plans to conduct the Secondary Offering.  ¶148.  The Secondary Offering took place only one month later on February 14, 2008, initiating a second lock-up period of 90 days, ending May 14, 2008. *See* Ex. 1.1 of 8-K filed Feb. 14, 2008.  Thus, throughout almost the entire Class Period, defendants were restricted from trading.

[37]    In addition to their IPO distributions and payments totaling over $38 million, defendants Kivisto and Wallace also distributed to themselves exorbitant bonuses totaling over $11 million for Kivisto and $7.5 million for Wallace during the Class Period. ¶¶289-90.  Kivisto also received the benefit of approximately *$300 million* from SemGroup by trading on his own behalf in Eaglwing's account and causing SemGroup to post margin balances for Westback trades.  ¶291.

strong inference of scienter is not negated by the fact that defendants' "alleged attempt to commit fraud was short-lived and basically unsuccessful"); *In re Oxford Health Plan, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (governmental investigations can provide inference of scienter).

**f.     Defendants' Resignations and Invocations of the Fifth Amendment Support a Strong Inference of Scienter**

Defendants' immediate and sudden ousters from SemGroup on the heels of SemGroup's bankruptcy and defendants' invocations of the Fifth Amendment, further support a strong inference of scienter. *See* ¶¶26-28, 30, 249, 302. In *Albert Fadem Trust v. American Electric Power Co.*, 334 F. Supp. 2d 985 (S.D. Ohio 2004), the court noted that allegations of resignations could support an inference of scienter if a plaintiff provided the "significance of the dates of the resignations" or the reasons for the resignations. *Id.* at 1014; *see In re McKesson Sec. Litig.*, 126 F. Supp. 2d 1248, 1275 n.16 (N.D. Cal. 2000). Plaintiff has done just that.

Plaintiff alleges that Kivisto, Wallace, Cooper, and Bishop were ousted as executives or directors of SemGroup and SGLP immediately prior to SemGroup's bankruptcy filing in July 2008. *See Alstom*, 454 F. Supp. 2d at 208 (termination of employees can be one of several factors used to support an inference of scienter). When questioned under oath by the Examiner regarding the events leading to the collapse of SemGroup, Kivisto, Wallace and Cooper also asserted their Fifth Amendment privilege against self-incrimination. ¶302. The Court can and should apply an adverse inference from these defendants' resignations and assertions of the Fifth Amendment. *See* ¶302. *Alstom*, 454 F. Supp. 2d at 208, n.17; *see also S.E.C. v. Merrill Scott & Assoc., Ltd.,* 505 F. Supp. 2d 1193, n.15 (D. Utah 2007) (drawing an adverse inference from defendant's assertion of the Fifth Amendment) (citing *Baxter v. Palmigiano*, 425 U.S. 308 (1976)); *Hix Corp. v. National Screen Printing Equip., Inc.,* No. 00-211-KHV, 2000 U.S. Dist.

43

LEXIS 10543, at *7 n.2 (D. Kan. Jul. 6, 2000) ("The Fifth Amendment allows adverse inferences against parties in a civil action who invoke their Fifth Amendment right.") *Parsons & Whittemore Enters. Corp. v. Schwartz*, 387 F. Supp. 2d 368, 371-72 (S.D.N.Y. 2005) (adverse inferences from invocation of the Fifth Amendment rights are permitted in civil litigation).[38]

### g.    The Magnitude of SemGroup's Speculative Trading and Margin Balance is Further Evidence of Scienter

Scienter is also supported by the magnitude of Kivisto's trading and SemGroup's $1.7 billion margin balance, which constituted over 25% of SemGroup's assets on its balance sheet as of year-end 2007.[39]   *See Adams*, 340 F.3d at 1106 (magnitude of the alleged falsity strengthens the inference of scienter); *Croker,* 2006 U.S. Dist. LEXIS 48603, at **25-26 (magnitude of financial misstatement was sufficient to infer knowledge by senior executives with motive to inflate stock price for public offering); *Williams I,* 339 F. Supp. 2d at 1235 (problems that were "so large, pervasive and fundamental, that their existence must have been known").

Defendants suggest that it is only with "hindsight" that Plaintiff can allege that the margin balance was material to SemGroup's liquidity.  SGLP Br. at 33. Given that the Examiner reported that margin needs were straining the balance sheet in July 2007 (¶14), and Stallings was participating in meetings in June 2007 to discuss the resulting serious implications (¶93). Defendants' arguments lack merit.

---

[38]    Defendants' reckless disregard of the fact that Kivisto's trading violated SemGroup's Risk Management Policy ("RMP") and loan covenants, which expressly precluded speculative trading, also supports an inference of scienter.  *See* ¶295; *Sadia*, 2009 U.S. Dist. LEXIS 66998, at **34-35 (inferring strong inference of scienter by considering many factors surrounding undisclosed speculative transactions, including allegations that transactions were "unaligned" with the corporate defendant's hedging policy).

[39]    *See* Excerpt from Exhibit 45 to Examiner's Report (attached hereto as Exhibit B) (a complete copy was submitted as Exhibit 1F Def. App.).

h.      **Plaintiff's Allegations Demonstrate Scienter For Billings and Bishop and Defendants' Scienter Can Be Imputed to SGLP**

Both Billings and Bishop argue that they had no actual knowledge regarding SemGroup's speculative trading or impaired liquidity.  Billings/Bishop Br. at 7.  They also argue that Plaintiff alleges that the trading was secret.  *Id.* at 8.  Billings and Bishop misconstrue Plaintiff's allegations.  The Complaint alleges that the trading and resulting liquidity problems were concealed *from investors* – not from SGLP's Board members.  *See, e.g.,* ¶6.  Given that Billings and Bishop were on the Conflicts Committee – the same committee that vetted the asset drop downs from SemGroup to SGLP – it is not plausible that they lacked an understanding of SemGroup's financial condition or the growing billion-plus margin balance that was explicitly disclosed on SemGroup's balance sheet.  *See Williams I,* 339 F. Supp. 2d at 1235.  Indeed, even if they did not develop an understanding of these facts, then Billings and Bishop were highly reckless and are thus liable for the resulting fraud on SGLP investors.

Under the "common sense" approach endorsed by the Tenth Circuit, s*ee Adams,* 340 F.3d at 1102, the Court should draw upon all of these facts reasonably to infer that the Complaint adequately states scienter for Billings and Bishop sufficient to survive at this early stage of the litigation.  *See Schaffer,* 29 F. Supp. 2d at 1225 (director defendants are responsible for contents and misrepresentations in documents they sign); *Sprint,* 232 F. Supp. 2d at 1223 (because of their positions, directors and officers had access to material, non-public information about problems, knew that material information had not been disclosed, assisted in the scheme and were in positions to do so to given their control over the company).

The Individual Defendants' collective scienter can also be imputed to SGLP and its General Partner.[40]  *See Adams,* 340 F.3d at 1106 ("The scienter of the senior controlling officers

---

[40]      Like SGLP and its General Partner, SemGroup is a primary violator of Section 10(b) and Rule 10b-5.

of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.") (citations omitted); *Startek*, 2008 U.S. Dist. LEXIS 47748, at *49 ("the complaint adequately alleges scienter on the part of the four executive officers, those allegations are also sufficient to allege scienter to defraud on the part of [the company] itself") (citing *Adams*).

> ### i.   The Totality of Lead Plaintiff's Allegations Strongly Infer Scienter and Defendants' Arguments to the Contrary Are Neither Cogent Nor Compelling

Considering all of the factors surrounding defendants' failure to disclose SemGroup's speculative commodities trading business, margin balance and impaired financial condition, and the enormous financial incentives for the Individual Defendants to close the public offerings, "*all* of the facts alleged, taken *collectively*, give rise to a strong inference of scienter. *See Tellabs*, 551 U.S. at 323 (emphasis added).   As Judge Marbley aptly noted in *In re Cardinal Health, Inc. Securities Litigation*, 426 F. Supp. 2d 688, 741 (S.D. Ohio 2006), "the scienter analysis in these types of securities fraud cases is akin to looking at a painting.   Though one or two brush strokes may be more powerful up close, to fully appreciate the painting, the viewer must step back to take in the 'big picture.'"   Here, the big picture leads to but one conclusion:   Defendants defrauded Lead Plaintiff and the class.

Defendants, of course, contest scienter.[41]  *Ribozyme*, 209 F. Supp. 2d at 1106 ("when the question of intent is disputed [] its resolution involves many intangible factors, such as witness

---

Defendant Cooper cannot avoid liability simply because SemGroup has sought bankruptcy protection, which precludes it from being named as a defendant in this action.   Cooper and other SemGroup officers and directors participated with SemGroup in a scheme to defraud SGLP investors.   Liability also attaches to Cooper in this action as a control person of SemGroup, SemGroup Holdings and SGLP.   *See* §IV.J., *infra*.

[41]     *See* SGLP Defs. Br. at 29-31; Kivisto Br. at 4-20; Wallace Br. at 29-34; Cooper Br. at 11-13; Billings/Bishop Br. at 6-11, 15-19.

credibility that are best left to the consideration of a fact finder after full trial.") (citing *Buell Cabinet Co.*, 608 F.2d 431, 433 (10th Cir. 1979)). Foxx, Brochetti and Stallings, for instance, deny that they were aware of SemGroup's liquidity concerns during the Class Period.[42]  *See* SGLP Defs. Br. at 8-10, 23. In addition, they raise three other challenges to Plaintiff's scienter allegations: (1) their fraudulent conduct was nothing more than negligent "mismanagement" (SGLP Defs. Br. at 32); (2) the MLP drop downs were not part of a fraudulent scheme (*Id.* at 31); and (3) their "compensation" should not be viewed as indicative of any scienter (*Id.* at 34). When weighed against Plaintiff's allegations, none of these arguments offers a plausible non-culpable explanation for their knowing or reckless misconduct. *See Sawant v. Ramsey*, 570 F. Supp. 2d. 336, 343-44 (D. Conn. 2008).

Plaintiff has more than adequately alleged that Foxx, Stallings and Brochetti knew that SemGroup was experiencing a serious liquidity crisis that strained its balance sheet at the time of the IPO and continuing throughout the Class Period.  ¶¶91-93, 283-86.  Foxx, Brochetti and Stallings acknowledged to the Examiner that they were aware that commodities trading contributed significantly to SemGroup's revenue (¶301); that going into First Quarter 2008, the price of crude oil "continued to increase, which continued to stress SemGroup's liquidity position" (¶98); and that Foxx and Stallings were "very concerned" about SemGroup's margin amount.  ¶221.  In the face of these undeniable admissions, their false assurance to investors on quarterly conference calls further demonstrates their scienter.  *See* ¶¶185-87, 196-98, 217-21.

Moreover, Stallings' attempt to assure Kivisto's ability to pay a $300 million debt to SemGroup from speculative oil trades does not compel a non-culpable inference as he suggests.

---

[42]      During the Class Period, Foxx served as SemGroup's Executive Vice President, Chief Operating Officer and a Management Committee member, and as SGLP's President and CEO and also served as a director of SGLP. ¶26.  Brochetti served as SemGroup's Senior Vice President of Finance, and as SGLP's CFO and also was a director of SGLP.  ¶28.  Stallings served as the Chief Accounting Officer for both SemGroup and SGLP throughout the Class Period.  ¶29.

SGLP Defs. Br. at 36-37.  To the contrary, it demonstrates his actual knowledge of speculative trading with company funds and the materiality of the debt and trading to SemGroup's solvency. Although defendants aptly point to the turmoil in the crude oil market, their argument that the unprecedented spike in oil prices somehow undermines scienter simply ignores the relevant facts.  SemGroup's undisputed spectacular exposure to the spike in oil prices only further demonstrates the highly reckless nature of Kivisto's and the other defendants' conduct. Defendants' authorities do not compel a different inference.[43]

Defendants' "mismanagement" characterization is likewise at odds with the scienter allegations of the Complaint.  *See, e.g.*, SGLP Defs. Br. at 32-33.  Plaintiff alleges that defendants knowingly and recklessly concealed material risks from SGLP unit holders – and not simply that they "mismanaged" SemGroup's trading or the risks it faced as an energy company with exposure to commodities prices.[44]  *See, e.g.*, ¶234; *Suez Equity Equity Investors, L.P. v. Tornonto Bank*, 250 F.3d 87, 99 (2d. Cir. 2001).  Because the Complaint alleges that the SGLP Defendants fully appreciated, or were severely reckless in not appreciating, the extent of obvious risks to SGLP from Kivisto's dangerous trading and margin calls, their conduct cannot be excused as negligent mismanagement.  *See also Norfolk County Ret. Sys. v. Ustian*, No. 07 C 65731, 2009 U.S. Dist. LEXIS 65731, at *35 (N.D. Ill. July 28, 2009) (negligence can always be offered as an excuse for fraudulent behavior).

The SGLP Defendants also attempt to use inconclusive findings (that have not yet been made available to Plaintiff) from an internal investigation to recast their fraudulent conduct as

---

[43]     *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594 (E.D. Pa. 2009) is distinguishable because, there, plaintiffs alleged a technical accounting requirement that defendants had allegedly violated by delaying to write down the value of an asset and the timing of the writedown had been specifically approved by the company's auditor.

[44]     *See Countrywide*, 588 F. Supp. 2d at 1173-1174 (rejecting argument that an "unprecedented" external "liquidity crisis" caused all (or most) of Countrywide's decline).

mere negligence.  *See* SGLP Defs. Br. at 30 n.96.  The subcommittee's findings actually provide additional facts demonstrating the SGLP Defendants' scienter.  The SEC filing discloses that: (i) certain senior executive officers of our general partner who were also senior executive officers of the Private Company *knew and understood, beginning as early as July 2007 and at various times thereafter, about a lack of liquidity at the Private Company* that imperiled the Private Company's ability to meet its obligations to [SGLP]; and (ii)  each of the officers had access to and reviewed Private Company financial information, including information regarding the Private Company's commodity trading activities, from which they could have developed an understanding of the nature and significance of the trading activities that led to liquidity problems at the Private Company *well before they say they did* (July 2008).  *See* ¶272.  This is grave indicia of defendants' knowing conduct.

Citing the Examiner's Report, defendants also suggest that their conduct was determined to be mere mismanagement, not fraud.  SGLP Defs. Br. at 32-33.  In *Enron*, as here, "the purpose of the Examiner's report [in Enron's bankruptcy proceedings] was not to find violations of federal securities law and thus its language should not be taken out of context.  *See In re Enron Sec. Litig.*, 2005 U.S. Dist. LEXIS 41240, at *24 n.12 (S.D. Tex. Dec. 22, 2005).  "[E]ven if the purpose of the report had been to find securities fraud…Plaintiff is not restricted to or bound by the Examiner's findings and conclusions, which were made in a different context for a different purpose."[45]

---

[45]    To the extent that the Examiner's Report provides "two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant," as defendants suggest, it is "inappropriate for [the Court] to make a determination on a motion to dismiss as to which inference will ultimately prevail, for doing so would invade the traditional role of the factfinder."  *Startek*, 2008 U.S. Dist. LEXIS 47748, at *37 (citing *Pirraglia*, 339 F.3d at 1188).  Also, it is well-settled that *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), "does not . . . 'preclude an action under the Exchange Act based on a material nondisclosure or misrepresentation simply because the undisclosed facts involved might also support a breach of fiduciary claim.'"  *Lane*, 581 F. Supp. 2d at 1106 (citation omitted).

The SGLP Defendants' attacks on Plaintiff's reliance on CW1 to support allegations of fraud are unfounded. *See* SGLP Defs. Br. at 21-22. Under established Tenth Circuit law, anonymous sources described with sufficient particularity to support the probability that they would possess the information alleged are properly used to meet PSLRA pleading standards. *See Adams*, 340 F.3d at 1102; *NPS*, 2007 U.S. Dist. LEXIS 48713, at *19 (stating that confidential witness statements may be relied upon if they are "sufficiently specific, detailed, and concrete."). Plaintiffs need not identify by name their confidential source in a complaint. *Adams*, 340 F.3d at 1102 (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *NPS*, 2007 U.S. Dist. LEXIS 48713, at **18-19 ("just as the court will not weigh evidence at this stage, it will not entertain a challenge to the credibility of confidential witnesses."); s*ee also In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006) ("at the pleading stage the issue is not whether these confidential witnesses are telling the truth. It is whether there is a probability that they know what they are talking about."). CW1 is described with sufficient particularity and his statements, detailed in the Complaint, are without question "sufficiently specific, detailed, and concrete."[46] *Adams*, 340 F.3d at 1102; *In re NPS*, 2007 U.S. Dist. LEXIS 48713, at **18-19; ¶¶68-73, 91-93.

Wallace erroneously claims that no facts establish that he was "actually aware" of the non-disclosed information. Wallace Br. at 31. On the other hand, Plaintiff alleges that SemGroup's written RMP required Wallace to meet monthly and evaluate SemGroup's trading

---

[46]     Citing a Seventh Circuit opinion, defendants seize upon language from an opinion rejecting the confidential sources under specific circumstances that are not present here. *See* SGLP Defs. Br. at 22 n.73; Wallace Br. at 26; *see also* SGLP Defs. Br. at 22 (suggesting that CW1 has an "axe to grind") (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). Judge Posner, who sat on the *Higginbotham* panel, has since explained that confidential sources were discounted in *Higginbotham* because the alleged misconduct took place in a Brazilian subsidiary far away from its corporate parent in America, and "[t]here was no basis," to assert that the parent was aware of the fraud. *Makor Issues*, 2008 U.S. App. LEXIS 975, at **26-27 (accepting confidential witnesses as valid sources to support plaintiff's allegations). Such is not the case here.

activity.  ¶¶292, 295.  Cooper, on the other hand, does not dispute that he knew about Kivisto's trades or the "resulting margin issues."  Cooper Br. at 14.  Instead, he argues that no allegation "mentioning" his name relates to SGLP in any way.  *Id.*  Cooper is wrong; the Complaint alleges that Cooper participated in a scheme to defraud SGLP unit holders for his own personal financial benefit and he knew that Kivisto was using SemGroup's funds to engage in options trading on his own behalf through Westback.[47]  ¶¶87, 138, 146, 285; *see Startek,* 2008 U.S. Dist. LEXIS 47748, at *22-24 (allegations of scheme by company insiders who did not make alleged misleading statements are sufficient to state a claim under Section 10(b)); *Williams II,* 339 F. Supp. 2d at 1258-59 (scienter is alleged for individuals holding senior positions with parent company and having strong motives of significant bonuses as a reward for completing a spin-off).  Cooper was required to "sign off" on all margin payments.  ¶93.  Thus, Cooper was well aware of SemGroup's trading and margin needs.  ¶100.[48]

## G.    The Complaint Adequately Pleads Loss Causation

Every defendant, save Kivisto, concedes that Plaintiff has adequately alleged loss causation.  Kivisto Br. at 28-29.  This is not surprising.  This case reflects a clear example of loss causation – a 51.75% stock price drop over a single-day when the shocking news of the Parent's liquidity problems – a direct consequence of its highly speculative and concealed trading strategies – entered the market on July 17, 2008.  ¶¶305-06.   SGLP's common units then

---

[47]    Cooper was also required to "sign off" on all margin payments.  ¶93.  As early as June 2007, Cooper was also meeting with Stallings and others to discuss serious concerns about SemGroup's dangerously-increasing margin balance and its negative impact on its operating capital.  *Id.*  After SemGroup's margin demands ultimately caused SemGroup to run out of cash and collapse on the brink of bankruptcy, Cooper "resigned" from SemGroup.  ¶300.

[48]    The SGLP Defendants also contend that the MLP structure could not have been used to implement their fraudulent scheme because it had been planned for years.  *See* SGLP Defs.Br. at 31.  The results of the Examiner's investigation , however,  demonstrates that the "Dropdown Schedule" for SemGroup assets was fast-tracked in 2008, with the dropdown of SemMaterials assets to SGLP accelerated from fourth quarter 2009 to first quarter 2008.  *See* Exhibit 7 to Examiner's Report at 2 (attached hereto as Exhibit C).  Through the SemMaterials divestiture alone, defendants funneled more than $300 million from SGLP's coffers.  ¶¶9, 148, 151.  The Examiner further expressly stated in his Report that "[s]ome of the money SemGroup received from the dropdown of assets was used to pay daily margin calls from its trading activities."  *See* Examiner's Report at 14.

continued to plummet in the following days, losing more than 65% of their value.   ¶¶308-11 (falling from $22 to $7.55 per share). In the face of uncontroverted facts, Kivisto suggests that Plaintiff's loss causation allegations are somehow insufficient because they do not particularize the mechanism by which the news of Semgroup's liquidity crisis made its way into the market. Kivisto Br. at 29.

Loss causation, however, requires only a "short and plain statement [that] must provide the defendants with *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Dura*, 544 U.S. at 346 (internal quotations omitted and emphasis added).  "To establish loss causation, 'the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff.'" *Alaska Elec. Pension Fund v. Olofson*, No. 08-2344-CM, 2009 U.S. Dist. LEXIS 46564, at *25 (D. Kan. June 3, 2009). A plaintiff adequately alleges loss causation by pleading "inflation of the stock price due to defendants' painting the company in a favorable, albeit untruthful, light, disclosure of the true state of the company at some later point, and an immediate decline in the stock price as a result of the marked reaction to the belated disclosure." *In re ICG Commc'ns, Inc. Sec. Litig.*, Nos. 00-RB-1864 (BNB), *et. al.*, 2006 U.S. Dist. LEXIS 6695, at *29 (D. Colo. Feb. 7, 2006); *see also Dura*, 544 U.S. at 347 (recognizing that there will be cases in which "the relevant truth begins to leak out" and stating that plaintiffs must allege "some indication of the loss and the causal connection that the plaintiff has in mind.").

Plaintiff's allegations clearly satisfy the notice pleading requirement for loss causation established by *Dura*.  *See Enron*, 2005 U.S. Dist. LEXIS 41240, at *61 ("[*Dura*] . . . appeared to suggest that Federal Rule of Civil Procedure 8(a)(2)'s standard, 'a short plain statement of the claim showing that the pleader is entitled to relief.'"   First, Plaintiff alleges that the price of

SGLP's common units was inflated during the Class Period because the defendants concealed known operational risks to SGLP arising from its Parent's highly speculative trading strategies. ¶¶303-04.  The market effect of these concealed risks materialized on July 17, 2008 when news about Semgroup's liquidity crisis leaked to the public.  ¶305.  This materialization of the previously concealed risks caused SGLP's common units to drop 51.75% on July 17, 2008, on unusually heavy trading.  ¶306.  After the markets closed on July 17, SGLP confirmed the earlier news stories about its Parent's liquidity problem.  ¶307.[49]

It is beyond dispute that these clear allegations of loss causation provide defendants with "fair notice" of Plaintiff's theory of loss and adequately plead loss causation under the standards set forth by *Dura*.  *See Dura*, 544 U.S. at 346; *Alaska Elec. Pension Fund*, 2009 U.S. Dist. LEXIS 46564, at **25-26.

## H.    The Complaint Adequately Pleads Claims Under Section 20(a)

Because Plaintiff adequately alleges a primary securities law violation, the only remaining issue is whether defendants Bishop, Billings, Kivisto, Wallace, Cooper, Carlyle/Riverstone, Ward, Jones, Ritchie Opportunistic Trading and Thane Ritchie are "control" persons of SGLP.[50]  These defendants each contend that they are not "control" persons within the

---

[49]     Kivisto also argues that Plaintiffs' loss causation allegations are inadequate because SGLP only disclosed its Parent's liquidity problems after the markets closed on July 17, amounting to a claim that only a Company's "mea culpa" can be a corrective disclosure.  Kivisto Br. at 28-29.  This argument has been soundly rejected.  *Lormand, Inc.*, 565 F.3d at 264 ("We agree with the great weight of federal courts, which have held that *Dura* does not prevent a plaintiff from alleging or proving loss causation by showing partial or indirect disclosures of such truth by persons other than the defendants.").  *See also See Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure **would allow wrongdoers to immunize themselves with a protracted series of partial disclosures**.").

[50]     Defendants SemGroup GP, Foxx, Stallings and Brochetti do not dispute that they had "control" over SGLP.  *See* SGLP Defs. Br. at 3, 39-40.  Thus, having adequately pled a primary violation of Section 10(b) by SGLP, *see supra*, Lead Plaintiff also adequately states a Section 20(a) claim against defendants SemGroup GP, Foxx, Stallings and Brochetti.  *See* ¶¶ 25, 26, 28, 29, 35, 369-73, 375-77; *see also In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 130-31 (4th Cir. 2009) (parent company was control person where it wholly-owned subsidiary and parent and subsidiary shared a common director); *N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1143-45 (D. Kan. 2004) (sustaining § 20(a) claims against company executives who "clearly" are control persons) (citing *Maher*, 144 F.3d at 1305).

meaning of Section 20(a).  Defendants' contentions, however: (1) misconstrue the standard for pleading "control" in the Tenth Circuit; (2) raise impermissible factual arguments not appropriate for resolution on a motion to dismiss, *Maher v. Durango Metals*, *Inc.*, 144 F.3d 1302, 1306 (10th Cir. 1998); and (3) are belied by the allegations in the Complaint.  *See Steinbeck*, 2003 U.S. Dist. LEXIS 2378, at **28-29; *Williams II,* 339 F. Supp. 2d at 1269-70.

### 1.    Defendants Bishop and Billings, Kivisto, Wallace, and Cooper are Control Persons of SGLP

Kivisto, Wallace, Bishop and Billings indisputably exercised "control" over SGLP by signing the 2007 10-K and the Registration Statements for the IPO and Secondary Offering, in their capacity as members of SGLP's Board of Directors.  *See* ¶¶25, 27, 30, 32, 33, 35, 369-73, 375-77; *see also Sprint*, 314 F. Supp. 2d at 1144-45 ("the majority of district courts that have addressed this issue [and] have held that an allegation that a board member signed an SEC filing that contains a misleading or fraudulent statement can raise a sufficient inference of control") (internal quotation marks omitted) (collecting cases).[51]

In addition, defendants Kivisto, Wallace and Cooper controlled SemGroup and, thus, SGLP.  Specifically, Kivisto founded SemGroup, was its President and CEO and a member of its Management Committee, owned a substantial interest in the Parent, and directed its trading program; thus he controlled SemGroup in this capacity.  ¶27.  Wallace was SemGroup's CFO, Vice-President and Secretary, and a member of its Management Committee.  ¶¶30, 276.  Cooper

---

[51]      *Sprint* does not "conflict with the Tenth Circuit's prohibition on pleading control based on status alone...." Billings/Bishop Br. at 26 n.6; *see also Adams*, 340 F.3d at 1108 (holding that one's status as a director, ***without more***, does not establish "control" for purposes of pleading a § 20(a) claim).  Rather, *Sprint* comports with a long line of cases that have similarly "presumed that the [outside] director exercised actual authority and control, at least over the contents of and/or release of" a registration statement that he signed.  *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 U.S. Dist. LEXIS 8125, at **49-50 (N.D. Cal. Feb. 4, 2009) ("It makes sense that the authority to sign and certify the contents of a registration statement implies the authority to effectuate changes to that statement by withholding certification – for example, where misrepresentations are known or suspected.  Otherwise, the certification authority is meaningless."); *accord In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (collecting cases finding that signing of SEC filings containing misstatements established control of outside director).

was SemGroup's Treasurer and approved SemGroup's margin payments.  ¶93.  These defendants collectively maintained a substantial ownership interest (30.5%) in SemGroup and managed its affairs.  ¶137.  The Parent, in turn, owned a 100% interest in SemHoldings, which wholly-owned SemGroup GP (SGLP's General Partner), which had "a legal duty to manage [SGLP]."  ¶145; *see also* ¶281.  Thus, Kivisto's, Wallace's and Cooper's control over SemGroup extends to SGLP through the Parent's ownership control over SemHoldings and SemGroup GP, which indisputably controlled SGLP.  *See First Interstate Bank*, 969 F.2d at 898 & n.11 (finding that a defendant's position as the sole general partner of an entity who held a minority interest in an entity that controlled the issuer of the bonds subject to the lawsuit was sufficient to establish such defendant's power to control the bond issuer); *Maher*, 144 F.3d at 1305 (control can be direct or indirect).[52]

### 2. Defendants Ritchie Capital, Thane Ritchie, Carlyle/Riverstone, Ward and Jones are Control Persons of SGLP

Ritchie Capital, Thane Ritchie, Carlyle/Riverstone, Ward and Jones similarly had the power to control SGLP through their majority ownership interest in SemGroup and right to appoint a majority of SemGroup's Management Committee, or position on the Management Committee, which oversaw SemGroup's operations, including its trading, as well as the drop-down of assets from SemGroup to SGLP via the IPO and Secondary Offering.  *See* ¶¶53-55, 236, 239, 281, 289, 374; *Mutual Funds Inv. Litig.*, 566 F.3d at 130 ("[T]he legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries or other agents acting on their behalf to accomplish ends that would be

---

[52]       *See also In re Charles Schwab Corp*, 2009 U.S. Dist. LEXIS 8125, at **32-33 (control-person liability adequately pled against parent entity even where defendants may ultimately establish that mutual fund was "completely separate from parent or any of its subsidiaries"); *accord In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) (finding control even absent allegations of stock ownership where "the top executives of [defendant] held the top two positions at [the primary violator corporation] and that at least one of those executives was involved" in the actions at issue.).

forbidden directly by the securities laws.") (quoting *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008)); *First Interstate Bank*, 969 F.2d at 898 and n.11 (defendant's minority interest in primary violator established control); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (non-majority ownership interest supplied control).[53]

## V.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully submits that the Court should deny defendants' Motions to Dismiss in their entirety.


Dated: September 1, 2009              /s/ Ramzi Abadou
                                      **BARROWAY TOPAZ KESSLER**
                                      **MELTZER & CHECK, LLP**
                                      Stuart L. Berman (*admitted pro hac vice*)
                                      Lauren Wagner Pederson (*admitted pro hac vice*)
                                      Sharan Nirmul (*admitted pro hac vice*)
                                      Naumon A. Amjed (*admitted pro hac vice*)
                                      Michelle M. Newcomer (*admitted pro hac vice*)
                                      280 King of Prussia Road
                                      Radnor, PA 19087
                                      Tel:  (610) 667-7706
                                      Fax:  (610) 667-7056
                                            and
                                      Ramzi Abadou (*admitted pro hac vice*)
                                      Erik D. Peterson (*admitted pro hac vice*)
                                      580 California Street, Suite 1750
                                      San Francisco, CA 94104
                                      Tel: (415) 400-3000
                                      Fax: (415) 400-3001

                                      *Lead Counsel for Lead Plaintiff and the Class*

                                      **NELSON, ROSELIUS, TERRY**
                                      **O'HARA & MORTON**

---

[53]   Carlyle/Riverstone attempts to undermine its ability to control SemGroup's Management Committee with Ritchie through their board appointments, asserting that it only had the right to three of nine representatives. Opening Brief in Support of Motion to Dismiss with Prejudice Plaintiff's Corrected Consolidated Complaint, on Behalf of Defendants Carlyle/Riverstone, *et al.*, at 5-6.  However, during the Class Period, the Management Committee consisted of only six members, with Carlyle/Riverstone and Ritchie designating a controlling half of those members.

Douglas A. Terry (Bar Number 15855)
Jason E. Roselius (Bar Number 16721)
Guy R. Wood (Bar Number 15875)
P. O. Box 138800
Oklahoma City, Oklahoma 73113-8800
Tel: (405) 705-3600
Fax: (405) 705-2573

*Liaison Counsel for Lead Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I certify that on the 1st day of September 2009, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF Registrants:

### Electronic Mail Notice List

- Alfred Robert Pietrzak      rpietrzak@sidley.com

- Archer Scott McDaniel      smcdaniel@mhla-law.com, jwaller@mhla-law.com

- B Warren Pope      wpope@kslaw.com

- Bruce W Collins      bcollins@ccsb.com

- Carolyn R Raines      craines@ccsb.com, jmcnatt@ccsb.com

- Christopher Wayne Ahart      ahartc@gtlaw.com, bartonr@gtlaw.com, worshamj@gtlaw.com

- Clark Otto Brewster      Cbrewster@brewsterlaw.com, jcobler@brewsterlaw.com, rcornelius@brewsterlaw.com

- Colin Hampton Tucker      chtucker@rhodesokla.com, scottom@rhodesokla.com

- Daniel Allan McLaughlin      dmclaughlin@sidley.com

- Don G Holladay      dholladay@holladaychilton.com, jwarner@holladaychilton.com, lspencer@holladaychilton.com

- Douglas Anthony Terry      terry@nrtlaw.com, docketing@nrtlaw.com, rhendrickson@nrtlaw.com

- Douglas Michael Todd      dmtodd@phillipsmurrah.com, pjbrown@phillipsmurrah.com

- Edward John Main      emain@secresthill.com, tlaignel@secresthill.com

- Edwin Takeshi Aradi      earadi@akingump.com, pdismuke@akingump.com, txdocketing@akingump.com

- Emily Coleman McCall      emccall@ccsb.com

- Frederic Dorwart      fdorwart@fdlaw.com, vvessels@fdlaw.com

- Gary S Chilton      gchilton@holladaychilton.com

- Gerald Joseph Lovoi      GLovoi@aol.com

- Gideon Andrew Lincecum     glincecum@holladaychilton.com,
  lgorrell@holladaychilton.com

- Heidi J Long     hlong@holladaychilton.com

- James David Jorgenson     pf@att.net, djorgenson@att.net

- James E Warner     jwarner@holladaychilton.com

- James Keith Secrest , II     jsecrest@secresthill.com,
  dcrutcher@secresthill.com, mcasey@secresthill.com

- Jesse Z Weiss     weissjz@gtlaw.com, cisnerosc@gtlaw.com,
  worshamj@gtlaw.com

- Joe H Witherspoon     joewitherspoon@cox.net, D.Malone100@yahoo.com,
  Michelle.quarles@sbcglobal.net

- John H Tucker     jtuckercourts@rhodesokla.com, gbarber@rhodesokla.com,
  lwhite@rhodesokla.com

- Joshua Z Rabinovitz     joshua.rabinovitz@kirkland.com,
  deirdre.oreilly@kirkland.com

- Kimberly Geiler Davis     daviskg@gtlaw.com, bartonr@gtlaw.com,
  worshamj@gtlaw.com

- Laurence Lindsay Pinkerton     pf@att.net, pinknav@aol.com

- Lisa S Gallerano     lgallerano@akingump.com

- Mark Byron Jennings     MJennings@brewsterlaw.com

- Mary Quinn-Cooper     general_delivery@ecslok.com, mcooper@ecslok.com

- Michael J Biles     bilesm@gtlaw.com, bryankat@gtlaw.com,
  worshamj@gtlaw.com

- Michael Paul Kirschner     mike@tklf.com, docketclerk@tklf.com

- Michael R Smith     mrsmith@kslaw.com, blee@kslaw.com,
  wpope@kslaw.com

- Michael W Youtt     myoutt@kslaw.com, ibutler@kslaw.com,
  scaracio@kslaw.com

- Nora Rose O'Neill     noneill@fdlaw.com, kmintz@fdlaw.com

- Orrin Harrison , III     oharrison@akingump.com, cblea@akingump.com,
  cvarner@akingump.com, kdunning@akingump.com

- Owen H Smith    osmith@sidley.com

- Paul Richard Bessette    bessettep@gtlaw.com, cisnerosc@gtlaw.com, worshamj@gtlaw.com

- Randall Edwin Long    rlong@rhodesokla.com, bcalnan@rhodesokla.com

- Robert Bradley Sartin    sartin@barrowgrimm.com, dcampbell@barrowgrimm.com

- Ronald L Oran    roran@velaw.com, aberman@velaw.com, cthau@velaw.com

- Stacy L Acord    sacord@mhla-law.com, jwaller@mhla-law.com, rwhitt@mhla-law.com

- Stuart William Emmons    swe@federmanlaw.com, law@federmanlaw.com, ngb@federmanlaw.com

- William Bernard Federman    wbf@federmanlaw.com, law@federmanlaw.com, ngb@federmanlaw.com

- William Brad Heckenkemper    brad@barrowgrimm.com, t.costa@barrowgrimm.com

- William Robert Burns    bburns@kslaw.com, jkmiec@kslaw.com, scaracio@kslaw.com

I further certify that on the 1st day of September, 2009, I served the same document by U.S. Postal service on the following, who are not registered participants of the ECF system:

**Penny P Reid**
Weil Gotshal & Manges (New York)
767 5th Ave
New York, NY 10153

**Roger W Kirby**
**Mark A Strauss**
**Richard L Stone**
**Ira M Press**
Kirby McInerney LLP
825 THIRD AVE, 16TH FLOOR
NEW YORK, NY 10022

**Steven J Toll**

**Samuel H Rudman**
**David A Rosenfeld**
Coughlin Stoia Geller Rudman & Robbins LLP (NY)
58 S SERVICE RD  STE 200
MELVILLE, NY 11747

**Darren J Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 N BROADWAY STE 1900
SAN DIEGO, CA 92101

**Michael Swick**

**Daniel S Sommers**
**Catherine A Torell**
**Jason M Leviton**
Cohen Milstein Sellers & Toll PLLC
1100 NEW YORK AVE NW STE 500
WASHINGTON, DC 20005-3964

**Joseph Weiss**
**Mark D Smilow**
**Moshe Balsam**
Weiss & Lurie (New York)
551 FIFTH AVE
NEW YORK, NY 10176

**Alan I Ellman**
**Christopher J Keller**
**Andrei V Rado**
Labaton Sucharow LLP
140 BROADWAY
NEW YORK, NY 10005

**Robert Craig Finkel**
**Natalie Marie Mackiel**
Wolf Popper LLP
845 3rd Ave
New York, NY 10022

**Kim Elaine Miller**
Kahn Gauthier Swick, LLC
12 E 41ST ST
12TH FLOOR
NEW YORK, NY 10017

**Laurence D Paskowitz**
Paskowitz & Associates
60 E 42ND ST FLR 46TH
NEW YORK, NY 10165

**Roy L Jacobs**
Roy Jacobs & Associates
60 E 42ND ST FLR 46TH
NEW YORK, NY 10165

/s/ Ramzi Abadou
Ramzi Abadou