**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

———————————————————————
IN RE: SEMGROUP ENERGY
PARTNERS, L.P., SECURITIES
LITIGATION
———————————————————————

)
)
)
)
)

08-MD-1989-GKF-FHM

## OPINION AND ORDER

This matter comes before the court on the following Rule 12(b)(6) motions to dismiss:

•   Defendant Brent Cooper's Motion to Dismiss [Doc. No. 193];

•   Defendant BOSC, Inc.'s Motion to Dismiss [Doc. No. 196];

•   Defendants Brian F. Billings and W. Anderson Bishop's Motion to Dismiss [Doc. No. 197];

•   Defendant Thomas Kivisto's Motion to Dismiss [Doc. No. 200];

•   Motion to Dismiss of Defendants Carlyle/Riverstone Global Energy and Power Fund II, L.P., C/R Semgroup Investment Partnership, L.P., C/R Energy Coinvestment II, L.P., Andrew Ward and E. Bartow Jones (collectively, the "Carlyle/Riverstone Defendants") [Doc. No. 201];

•   Defendant Gregory C. Wallace's Motion to Dismiss [Doc. No. 203];

•   Motion to Dismiss of Defendants A.G. Edwards & Sons, Inc., Citigroup Global Markets Inc., Goldman, Sachs & Co., J.P. Morgan Securities, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Raymond James & Associates Incorporated, RBC Capital Markets Corporation, SMH Capital Inc., UBS Securities LLC and Wachovia Capital Markets LLC (collectively, the "Underwriter Defendants") [Doc. No. 207];

- Motion to Dismiss of Defendants Wachovia Corporation and Wells Fargo & Company (collectively, the "Successor-in-Interest Defendants") [Doc. No. 209];

- Motion to Dismiss of Defendants SemGroup Energy Partners, L.P., SemGroup Energy Partners, G.P. LLC, Kevin L. Foxx, Alex G. Stallings and Michael J. Brochetti (collectively, the "SGLP Defendants") [Doc. No. 211];

- Motion to Dismiss of Defendants A.R. Thane Ritchie and Ritchie Opportunistic Trading, Ltd.[collectively, the "Ritchie Defendants") [Doc. No. 218].

## I. Background/Procedural Status

This federal securities class action arises from the July 2008 collapse and bankruptcy of SemGroup, L.P. ("SemGroup" or the "Parent"), the corporate parent of SemGroup Energy Partners, L.P. ("SGLP" or the "Company"), a publicly traded limited partnership.  SGLP is a limited partnership with a general partner, SemGroup Energy Partners G.P., L.L.C. ("SGLP GP") or the "General Partner"), whose board of directors and officers control SGLP and manage its operations and activities. SGLP provides terminalling, storage, gathering and transportation services for companies engaged in the production, distribution and marketing of crude oil.   It owns and operates an aggregate of approximately 6.7 million barrels of storage capacity. SGLP's crude oil-related assets were contributed to the Company by the Parent in connection with SGLP's Initial Public Offering ("IPO") in July 2007 in exchange for $137.5 million. SGLP also owned and operated 46 liquid asphalt cement terminals, which provide terminal and storage services in the continental United States.  The asphalt facilities were acquired from an affiliate of the Parent in connection with a Secondary Offering in February 2008.

The IPO documents represented that SGLP had a throughput agreement with the Parent,

pursuant to which the Parent would pay SGLP guaranteed monthly minimum fees of $6.4 million in exchange for gathering, transportation, terminalling and storage services provided by SGLP. The relationship with SemGroup was represented as having historically provided over 80 percent of its revenues.  The documents represented that SGLP, because of its relationship with SemGroup, would be able to aggressively pursue acquisitions that would otherwise not be attractive due to commodity price risk.  This is because SGLP would have only minimal direct exposure to commodity price fluctuations.  Moreover, SGLP would enjoy the benefits of overlapping management with SemGroup and its affiliates.  SemGroup's management was described as having significant experience in the energy business.  On July 17, 2007, the IPO was accomplished for SGLP common units.  Defendants and their affiliates publicly sold 14.375 million units of SGLP for $22.00 per unit, generating gross proceeds of approximately $316.3 million.

The Secondary Offering Documents issued in January and February of 2008 made similar representations and additionally reported the SGLP was entering into a terminalling agreement with SemMaterials, a SemGroup subsidiary.  Pursuant to the agreement, SGLP would acquire certain asphalt-related assets from SemMaterials for $378.8 million and would provide throughput services to the parent for guaranteed minimum monthly revenues totaling $58.9 million annually.  SGLP, through its affiliates and underwriters, sold 6.9 million SGLP common units at $23.90 per unit, generating additional gross proceeds of $164.9 million in the Secondary Offering.

On July 17, 2008, SGLP disclosed for the first time that its Parent was "experiencing liquidity issues" and considering filing bankruptcy.   SGLP's unit price dropped more than 52

percent that day, from $22.80 to $11.00 per unit.  Four days later, SemGroup filed for bankruptcy.

By November 2008, SGLP units were trading lower than $1.00 per unit.  In February 2009,

SGLP's units were delisted from the National Association of Securities Dealers ("NASDAQ").

Plaintiff alleges the Parent's collapse was caused by extremely risky, speculative and

unauthorized trading in crude oil and other commodities over a period that began well before the

IPO and continued through the Class Period.  Specifically, plaintiff contends that while it is

customary for energy companies to "hedge" their exposure to commodity price risk through

forward contracts and other arrangements, the Parent's practices deviated sharply from the

industry norm.  SemGroup, plaintiff contends, routinely engaged in trades as fast-profit-seeking

investments that were divorced from any physical inventory or commodity purchases or sales.

Before 2007, the speculative trading program accounted for half of the Parent's revenue.

However, with rising oil prices in 2007 and 2008, SemGroup is alleged to have amassed hundreds

of  millions of dollars of paper losses on its "bets" that oil prices would decrease.  As prices

continued to spiral, SemGroup rolled options forward rather than closing out trades and cutting its

losses.  As SemGroup's "rolled forward" trading positions and unrealized losses increased and as

the price of oil rose, the margin requirements SemGroup needed to pay to maintain its trading

accounts also climbed.  On July 10, 2008, SemGroup advised its lenders that it had run out of

money.  Last minute attempts to increase its credit facility failed.  Since SemGroup could no

longer engage in trading activity because it did not have the necessary funds to meet its margin

call requirements, it transferred its NYMEX trading book to Barclays on July 15, 2008.  As a

result, SemGroup's approximate $2.5 billion unrealized Mark to Market loss previously booked

on its financial statements became a realized loss for financial reporting purposes.  SemGroup's

total trading losses exceeded $3 billion.

Defendants' alleged failure to disclose to SGLP investors SemGroup's trading practices, increasing margins and liquidity problems form the basis of plaintiffs' lawsuit.

On July 22, 2008, the first two of numerous investor lawsuits were filed against SGLP, SemGroup Energy Partners, G.P., LLC, and their principals:  *Carson v. SemGroup Energy Partners, L.P., et al.,* Case No. 08-CV-425-GKF-PJC, filed in this district; and *Charles D. Maurer SIMP Profit Sharing Plan, etc. v. SemGroup Energy Partners, L.P., et al.,* 1:08-6598, filed in the Southern District of New York.

On October 10, 2008, the United States Judicial Panel on Multidistrict Litigation, acting pursuant to 28 U.S.C. §1407, transferred all such litigation to this court for coordinated or consolidated pretrial proceedings with the *Carson* action. [Doc. Nos. 1, 4].  On October 17, 2008, the court entered an order consolidating the cases for pretrial proceedings [Case No. 08-CV-425, Doc. No. 74].  Pursuant to 15 U.S.C. §78-u-4(a)(3)(B), the court on  October 28, 2008, appointed Harvest Fund Advisors LLC ("Harvest Fund") as Lead Plaintiff and approved its selection of lead counsel and liaison counsel. [*Id.,* Doc. No. 84].

## II.  The Complaint

Lead Plaintiff filed its Corrected Consolidated Securities Class Action Complaint ("Complaint") on July 17, 2009.   [Doc. No. 188].  The Complaint names as defendants:

- **Company-Related Defendants:**  SGLP and SemGroup G.P.

- **Individual Defendants:** Kevin L. Foxx, Thomas L . Kivisto, Michael J. Brochetti, Alex Stallings, Gregory C. Wallace, Brent Cooper, W. Anderson Bishop and Brian F. Billings, all of whom served as officers and/or directors of SemGroup

5

and/or SemGroup GP.

- **Underwriter Defendants:** A.G. Edwards & Sons, Inc.; BOSC, Inc.; Citigroup Global Markets Inc.; Goldman, Sachs & Co.; J.P. Morgan Securities, Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Raymond James & Associates, Inc.; RBC Capital Markets Corporation; SMH Capital Inc., UBS Securities LLC ("UBS"); Wachovia Capital Markets, LLC; Wachovia Corporation; Wells Fargo; and Bank of America.

- **Investment Company Defendants:** Ritchie Opportunistic Trading, Ltd. and A.R. Thane Ritchie (the "Ritchie Defendants"); the "Carlyle/Riverstone" entities (C/R SemGroup Investment Partnership, L.P., C/R Energy Coinvestment II, L.P., and Carlyle Riverstone Global Energy and Power Fund II, L.P.), Andrew Ward, and E. Bartow Jones (collectively the "Caryle/Riverstone Defendants").

The Complaint alleges material misrepresentations were made in the IPO and Secondary Offering Documents and in conference calls about the offerings, as well as in SGLP's financial reports. Plaintiff seeks certification of a class of "all persons or entities who purchased or otherwise acquired SGLP Common units during the Class Period, July 17, 2007 through and including July 17, 2008, including all persons who purchased or otherwise acquired SGLP common units pursuant or traceable to IPO Documents or the Secondary Offering Documents." [Doc. No. 188, Complaint, ¶317]. The Complaint asserts six counts against defendants:

**Count I**–Against SGLP; SemGroup GP; the Underwriter Defendants; and the Individual Defendants, except Cooper, for violations of §11 of the Securities Act, 15 U.S.C. §77k.

**Count II**–Against SGLP and the Underwriter Defendants for violations of §12(a)(2) of

the Securities Act, 15 U.S.C. §77(a)(2).

**Count III**–Against SemGroup GP, the Ritchie Defendants and the Carlyle/Riverstone

Defendants, for violations of §15 of the Securities Act, 15 U.S.C. §77o.

**Count IV**–Against all Individual Defendants, for violations of §15 of the Securities Act,

15 U.S.C. §77o.

**Count V**–Against SGLP, SemGroup GP and the Individual Defendants, for violations of

§10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5.

**Count VI**–Against the Individual Defendants, SemGroup GP, the Ritchie Defendants and

the Carlyle/Riverstone Defendants, for violations of §20(a) of the Exchange Act (control person

liability).  Plaintiff alleges SGLP committed a primary violation of §10(b) of the Exchange Act,

15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5 and each of the Individual Defendants,

as well as SemGroup GP, the Ritchie Defendants and the Carlyle/Riverstone Defendants had

direct control and/or supervisory involvement in the operations of SemGroup, SemGroup GP,

SemGroup Holdings and/or SGLP.

### III.  Analysis

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short

and plain statement of the claim showing that the pleader is entitled to relief."  The United States

Supreme Court clarified this standard in *Bell Atlantic Corp. v. Twombly*, ruling that to withstand a

motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief

that is plausible on its face." 550 U.S. 544, 570 (2007).  "While a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

7

provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the  elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted).   On a motion dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

Under the *Twombly* standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Robbins v. Oklahoma,*  519 F.3d 1242, 1247 (10th Cir. 2008), quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).   "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1965 (internal quotations omitted).   "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*.

Although the new *Twombly* standard is "less than pellucid," the Tenth Circuit Court of Appeals has interpreted it as a middle ground between "heightened fact pleading," which is expressly rejected, and complaints that are no more than "labels and conclusions," which courts should not allow.  *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1964, 1965, 1974. Accepting the allegations as true, they must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief.  *Robbins*, 519 F.3d at 1247.  "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them."  *Id*. at 1248.  The Tenth Circuit Court of Appeals instructed in *Robbins* that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need

to include sufficient factual allegations, depends on context. . . .[and] the type of case." *Id.* (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008)).  A simple negligence action may require significantly less allegations to state a claim under Rule 8 than a case alleging anti-trust violations (as in *Twombly*) or constitutional violations (as in *Robbins*).  *Id.*

Rule 12(b)(6) dismissals of securities claims are difficult to obtain because the cause of action deals primarily with fact-specific inquiries such as materiality.  *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir. 1997).  However, "courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omission or plainly immaterial, or where the plaintiff has failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)."  *Id.*

### B.  Alleged Violations of §10(b) of Exchange Act of 1934

Section 10(b) of the Exchange Act of 1934 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j.  Rule 10b-5 provides in pertinent part:

It shall be unlawful for any person...

* * *

(B) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading...

\* \* \*

in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

In order to state a deception claim under Section 10(b) of the Exchange Act and Rule 10b-5, plaintiff must allege that: (1) each defendant made an untrue statement of material fact or failed to state a material fact; (2) the conduct occurred in connection with the purchase or sale of a security; (3) the defendant made the statement or omissions with scienter; and  (4) plaintiff relied upon the misrepresentation and sustained damages as a proximate result thereof.  *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215, 1225 (10th Cir. 1996);  *In re: Williams Securities Litigation,* 339 F. Supp. 1206, 1218 (N.D. Okla. 2003) "*Williams I*").  The fourth element has been referred to as the "loss causation" requirement.  *See Alaska Elec. Pension Fund v. Olofson,* No. 08-2344-CM, 2009 U.S. Dist. LEXIS 46564, at *25-26 (D. Kan. 2009); *In re ICG Commc'ns, Inc. Sec. Litig.,* Nos. 00-RB-1864 (BNB), *et al.,* 2006 U.S. Dist. LEXIS 6695, at *27-29 (D. Colo. Feb. 7, 2006)

Prior to passage of the Private Securities Litigation Reform Act ("PSLRA") in 1995, Fed.R.Civ.P. 9(b) set the standard for the level of particularity required when pleading the elements of a securities fraud claim.  *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1095 (10th Cir. 2003).  Under the heightened pleading standards of the PSLRA, a plaintiff must plead with sufficient particularity that: "(1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; [and (2)] the defendant acted with scienter, that is, with intent to defraud or recklessness." *Id.*

The Complaint lists numerous alleged material false statements and omissions which

plaintiff claims it relied upon to its detriment.  Defendants do not dispute these statements were made.  However, they contend the Complaint fails to allege facts which, if taken as true, support plaintiff's contention that the alleged misstatements or omissions were untrue, material or made with scienter.  Additionally, defendant Kivisto contends plaintiff has failed to allege facts establishing the "loss causation" element of the claim.

### 1.  Materiality

 A statement or omission of fact is material "if a reasonable investor would consider it important in determining whether to buy or sell stock."  *Grossman,* 120 F.3d 1112, 1119 (10th Cir. 1997), citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976), *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988).  The standard contemplates "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significant in the deliberations of the reasonable shareholder."  *TSC Industries,* 426 U.S. at 449.  "Whether information is material also depends on other information already available to the market; unless the statement significantly altered the total mix of information available, it will not be considered material."  *Id.* (citations and quotations omitted).

The issue of materiality "may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts."  *Id.* at 450. "The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *Id.*

The PSLRA requires that a private securities plaintiff  "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C.

§78-u-4(b)(1).  A complaint satisfies the Tenth Circuit's standard for pleading securities fraud if it alleges the who, what, when, where and why of the alleged misrepresentations with reasonably sufficient corroborating facts. *Williams I,* 339 F.Supp.2d at 1211, citing *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1124 (10th Cir. 1997) and *In re Caletron Systems, Inc.,* 311 F.3d 11, 29-30 (1st Cir. 2002).  Defendants assert plaintiff failed to plead with requisite particularity that any statement was false or misleading when made, or that any statements or omissions were material. However, the Complaint alleges–at length–the who, what, when, where and why of the alleged misrepresentations.  Specifically:

**Who**–The Complaint alleges SGLP, SemGroup GP and the Individual Defendants (Foxx, Brochetti, Stallings, Kivisto, Wallace, Cooper, Bishop and Billings) participated in or made material untrue statements. [Doc. No. 188, Complaint,  ¶360].

**What and Why**–The Complaint lists numerous alleged untrue and misleading statements of material facts and omissions of material facts in both the IPO and the Secondary Offering documents and statements. [*Id.,* ¶¶126-130, 137, 139, 141, 143, 145, 147 (for IPO) and 161-64, 170, 172, 178-79, 181-83, 185, 190, 194, 196-98, 201-03, 205-07, 209-11, 216, 217-20, 222-25, 227, 230, 236, 238, 242 (for Secondary Offering)].  Plaintiff alleges that the IPO Documents and statements represented, *inter alia,* that: 1) SGLP's Throughput Agreement with SemGroup would provide SGLP with "minimum revenues of $6.4 million per month" [*Id.,* ¶127];  2) SGLP's "relationship with its Parent" was touted as a "competitive strength," that would enable it to expand its storage capacity and would be instrumental in SGLP's success and growth and its ability to generate stable cash flows  [*Id.,* ¶¶128-29]; 3) as a result of its close relationship with SemGroup, SGLP had minimal exposure to commodity price fluctuations and changes in crude

12

oil prices because SGLP did not take title to, or marketing responsibility for, the crude oil it gathered, transported, terminalled and stored   [*Id.,* ¶131]; and 4) SGLP benefited from SemGroup's experienced management team [*Id.,* ¶137].  The Complaint alleges the IPO Documents and statements failed to disclose:  1) that SemGroup's speculative trading accounted for approximately 50% of SemGroup's revenue in the years before 2007 and before the IPO [*Id.,* ¶¶77, 126]; 2) SemGroup's trading strategy went beyond merely managing risk and hedging against crude oil supplies and pricing, and moreover that it had begun to fail and SemGroup was in desperate need of additional cash to post as collateral for its trading positions  [*Id.,* ¶132]; 3) the true nature of SemGroup's troubled business presented a real and material risk to SGLP  [*Id.,* ¶133]; and 4) SemGroup's liquidity was impaired and Kivisto had caused SemGroup to engage in speculative commodities trading that was draining billions of dollars of cash from its operations [*Id.,* ¶134].

With respect to the Secondary Offering, the Complaint alleges defendants made statements representing: 1) that SGLP already had a Throughput Agreement with the Parent with a guaranteed stream of $76.1 annual revenues and the Terminalling Agreement would provide an additional guaranteed revenue stream of $58.9 million annually from the parent  [*Id.,* ¶¶160-161]; that SGLP's ability to leverage its relationship with its Parent would minimize its exposure to commodity price risk [*Id.,* ¶162]; 2) that the acquisition of the asphalt assets would provide key strategic benefits, including enhancing SGLP's "ability to generate stable and predictable cash flows" and that the Throughput and Terminalling Agreements were a competitive strength to SGLP because they provided "stable, fee-based, contracted cash flows"  [*Id.,* ¶¶163-164]; 3) that SGLP had certain "Competitive Strengths" that positioned it to achieve its primary business

13

objectives and execute its business strategies, including that, following the Secondary Offering, "substantially all of our operations will generate fee-based revenues, including contracted minimum revenues under the Throughput Agreement and the Terminalling Agreement," and the Parent's knowledgeable management team [*Id.,* ¶165].  The Complaint alleges: 1) defendants failed to disclose: that SemGroup was engaged in a speculative trading strategy that went well beyond merely managing risks and hedging against crude oil supplies and pricing and rendered the likelihood of stable, consistent revenues from its Parent highly unpredictable [*Id.,* ¶167]; 2) despite the fact that SGLP did not take title to or marketing responsibility for the crude oil or liquid asphalt cement it terminalled and stored for its Parent, it was still highly exposed to commodity price fluctuation because of its heavy dependence on its Parent for revenues and Kivisto's undisclosed speculative trading strategy [*Id.*]; 3) Kivisto's and SemGroup's trading strategy had begun to fail and SGLP's ability to grow or even survive was seriously hampered [*Id.*] ; 4) the Parent was in desperate need of additional cash to post as collateral for its trading positions, which adversely impacted its ability to satisfy its obligations to SGLP under the Throughput and Terminalling Agreements [*Id.*]; and 5) SemGroup's management team did not have a system of controls in place to address these issues [¶144].  The Complaint also alleges defendants failed to disclose that the Individual Defendants, Carlyle/Riverstone, Ritchie and others received distribution payments totaling more than $85 million from the Secondary Offering. [*Id.,* ¶169].  Further, the Complaint alleges "defendants failed to disclose that Kivisto's trading business had impaired the liquidity of SemGroup at the time of the Secondary Offering and that the proceeds of the Secondary Offering (and borrowings under SGLP's credit facility) were being used to pay down SemGroup's borrowings under its credit facilities to pay for margin

14

calls and collateral for SemGroup's massive NYMEX trading positions and unrealized losses." [*Id.,* ¶173].

With respect to both the IPO and Secondary Offerings, the Complaint alleges defendants provided "general warnings" that were boilerplate in character, about potential conflicts of interest of members of its management team based on SGLP's structure and management [*Id.,* ¶¶137, 145, 170]; SGLP's dependence on its Parent [¶¶139, 141, 170]; and the potential adverse effect if SGLP's General Partner failed to develop or maintain an effective system of internal controls. [*Id.,* ¶¶143, 170].  Plaintiff alleges these disclosures were inadequate because, *inter alia,* defendants failed to disclose that SemGroup's executives, who effectively controlled SGLP, were engaging in speculative trading strategies that exposed both SemGroup and SGLP to virtually unlimited risk of commodities trading losses.  [*Id.,* ¶¶146, 171].

The Complaint sets forth at length the reasons why–in plaintiff's view–the statements and omissions made in the IPO and Secondary Offering were materially misleading. [*Id.,* ¶¶132-36, 138, 142, 144-47, 159-60, 166-69, 171, 173, 180, 183-84, 186-87, 191-93, 195, 199, 204, 208, 212-16, 221, 223-29, 234, 237, 242-43].   Without repeating the entire litany, the gist of plaintiff's allegations is that "[i]n light of SGLP's parasitic dependency on its Parent, Defendants were obligated to disclose SemGroup's speculative trading." [*Id.,* ¶124].

**When and Where–**The alleged misrepresentations and omissions occurred during the Class Period from July 17, 2007, to July 18, 2008.  They were made in the IPO and Secondary Offering Documents; SGLP's 2Q07 10-Q; a conference call hosted on August 16, 2007, by SGLP to discuss its earnings for the second quarter 2007, participated in by Stallings, Foxx and Brochetti; SGLP's 3Q07 10-Q for the third quarter of 2007; in a conference call hosted by SGLP

15

on January 16, 2008 to discuss its intent to acquire asphalt assets from SemMaterials; in SGLP's

year-end 2007 10-K filed March 6, 2008; in a conference call hosted by SGLP on March 6, 2008

to discuss year-end 2007 financial results; in SGLP's First Quarter 2008 Report, the 1Q08 10-Q;

in a May 12, 2008 press release filed with the SEC on Form 8-K announcing SGLP had acquired

from its parent a 130-mile pipeline in Ardmore for $45 million. [*Id., ¶*236]; in a May 20, 2008

press release filed with the SEC on Form 8-K announcing that SemGroup was dropping down to

SGLP additional crude oil storage assets located at the Cushing Interchange for $90 million [*Id.,*

¶238]; in a May 22, 2008, investor conference hosted by SGLP and Foxx for which published

materials were made publicly available on SGLP's website [*Id.,* ¶242].

  **Corroborating Facts**–The allegations of the Complaint are made upon personal

knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters.

[*Id.,* p. 1].  Plaintiff's information and belief, in turn, is based on a review and analysis of public

documents pertaining to SGLP, the Individual Defendants, the Parent and its subsidiaries and

affiliates; SGLP's filings with the SEC; press releases published by SGLP and the Parent; analyst

reports concerning SGLP; pleadings in other actions in which SGLP, SemGroup or any Individual

Defendant is a party; interviews with former employees of SGLP and the Parent; pleadings and

other documents filed in the Parent's consolidated bankruptcy proceedings; newspaper and

magazine articles and other media coverage regarding SGLP, the Parent, or any Individual

Defendant; and the Final Report of Louis J. Free, the court-appointed Examiner in SemGroup's

bankruptcy proceedings (the "Examiner's Report"). [*Id.*].  The Complaint provides a plethora of

16

facts from these sources corroborating its claims. [*Id.,* ¶¶67-73, 85, 91-93, 212-13, 221, 229].[1]

### a.  Disclosure of Information About Parent

Citing *Wielgos v. Commonwealth Edison,* 892 F2d. 509, 517 (7th Cir. 1989) and *J &R Marketing, SEP v. General Motors Corp.,* 549 F.3d 384 (6th Cir. 2008), defendants contend they had no affirmative duty to disclose information about the Parent, even if it was material**.**   In *Wielgos,* the court held that Commonwealth Edison did not violate §11 of the Securities Act of 1933 when it told investors it was building five nuclear reactors which it could not operate without licenses from the Nuclear Regulatory Commission ("NRC"), and environmental groups were opposing its applications**,** but did not disclose the applications were pending before the Atomic Safety and Licensing Board, an arm of the NRC,  rather than some other part of the NRC.

---

[1]For example, a confidential witness ("CW1") who worked at SemGroup as a financial manager in SemGroup's corporate headquarters from 2001 through June 2007, and who monitored trading activity data, stated that at the beginning of his tenure with SemGroup, trading that was "standard practice" in the energy business occurred in SemGroup. [*Id.,* ¶¶67, 70]. However, by at least July 2007, SemGroup's trading practices had lost the characteristics of being a hedging mechanism and had become highly speculative. [*Id.,* ¶71].  CW1 stated that by this time, SemGroup traders were trading "paper barrels" as opposed to "wet barrels"–a practice which went well beyond SemGroup's commercial hedging needs and which "dangerously exposed SemGroup to oil-price volatility. [*Id.,* ¶¶71-73].  The Examiner's Report concluded that Kivisto personally conducted and directed "a complex trading strategy that was speculative and placed SemGroup at increased risk in 2007 and 2008 when oil prices rose to unprecedented levels and experienced extreme volatility." [*Id.,* ¶74].  One SemGroup trader, Coen, admitted to the Examiner that, under the direction of Kivisto, he routinely engaged in options trades that were unrelated to the physical inventory or commodities purchases of SemGroup; consequently SemGroup engaged in what is known as speculative "naked options" transactions. [*Id.*].  The Examiner stated that "SemGroup's agreements with its creditors precluded speculative trading." [*Id.*]   The Examiner's Report stated that SemGroup's trading activity "comprised 20% of [all] market positions for crude oil options beyond three months to expiry." [*Id.,* ¶76].  According to the Examiner's Report, Kivisto used commodities trading to generate substantial revenue for SemGroup and commodities trading revenue was referred to as "marketing" revenue. [*Id.*]   The Examiner's Report stated that according to Kevin Foxx, "prior to 2007, approximately 50% of SemGroup's revenues came from operations and 50% came from marketing." [*Id.,* ¶77].  The Complaint alleges none of this information was disclosed to SGLP investors. [*Id.,* ¶¶76-78].

892 F.2d at 517.  In so ruling, the court stated:

> Issuers of securities must reveal firm-specific information.  Investors combine
> this with public information to derive estimates about the securities' value.  It
> is pointless and costly to compel firms to reprint information already in the public
> domain.

*Id.  Wielgos,* though, is distinguishable from this case.  Here, *none* of the omitted information was

available in the public domain.  The relationship with the Parent and its financial strength were

trumpeted as cornerstones to the anticipated success of SGLP, yet the Parent's increasingly shaky

condition was not disclosed, and investors had no means of investigating it in the public domain.

   *J & R Marketing* is also distinguishable.  There, the court held defendant GMAC  did not

violate §11 of the Securities Act of 1933 by failing to disclose its parent, GM, had overstated cash

flows for fiscal years 2002 and 2003 because plaintiffs did not claim GMAC had *any* knowledge

about the information from GM.  549 F.3d at 390-91.[2]  Here, plaintiff has alleged defendants,

many of whom were officers and directors of the parent, *knew* of the speculative trading practices,

increasing margin calls and impaired liquidity.

   Under Section 10(b), a failure to disclose is actionable where a defendant is under a duty

to disclose the information.  *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit.*

*Ins. Corp.,* 805 F.2d 342, 347 (10th Cir. 1986), *cert. denied,* 480 U.S. 947 (1987).  The duty arises

from a fiduciary or other, similar relation of trust and confidence between the parties.  *Id.*

Insiders involved in securities transactions have an affirmative duty to "disclose material facts

which are known to them by virtue of their position but which are not known to persons with

---

   [2]The Sixth Circuit declined to consider whether only "firm-specific" information need be
disclosed because it found that–absent a contention that GMAC knew of the information–there
was no duty to disclose it.  549 F.3d at 391 n. 2.

whom they deal and which, if known, would affect their investment judgment." *Garcia v. Cordova,* 930 F.2d 826, 828-29 (10th Cir. 1991).  This–as opposed to the issue of whether the information was "firm specific"–is the proper focus of inquiry.  Here, those Individual Defendants who were officers and directors of the General Partner  were insiders and thus may be liable if the information they possessed can be considered "material facts, which, by virtue of their insider status, they were obligated to disclose."  *See Garcia,* 930 F.2d at 829.  The question of whether defendants were under a duty to disclose the Parent's trading practices, its rising margin balance or impaired liquidity is "intertwined with the question of whether the [facts were] material facts." *Id.*  The allegations of the Complaint adequately pled that, in light of SGLP's dependence on the Parent for the majority of its anticipated income stream and defendants' dual management responsibilities for both entities, defendants owed a duty to investors to disclose the Parent's speculative trading practices, increasing margin balance and growing liquidity crisis.

### b.  Defendants' "Mismanagement" Argument

Defendants assert the Parent's trading practices reflect instances of  "mismanagement" which are not actionable under securities laws.  However, the Complaint alleges defendants intentionally concealed known risks–conduct that is actionable under §10b and Rule 10b-5.  *See In re Faro Techs. Sec. Litig.,* 534 F.Supp.2d 1248, 1263 (M.D. Fla. 2007) ("the Individual Defendants are not alleged to be simply poor managers–they are alleged to be dishonest ones"). Further, even if defendants' conduct can be deemed mismanagement, this "will not preclude a claim under the federal securities laws if the[y]...failed to disclose a specific material fact resulting from that mismanagement**."**  *In re Donna Karan Int'l, Inc. Sec. Litig.,* No. 97 Civ. 2011, 1998 U.S. Dist. LEXIS 22435, at *28 (E.D.N.Y. Aug. 14, 1998); *Lane v. Page,* 581 F.Supp.2d

1094, 1113 (D.N.M. 2008).

### c.  The "Bespeaks Caution" and"Forward Looking" Defenses

Under the PSLRA "safe harbor" provision, "a person ... shall not be liable with respect to any forward-looking statement ... if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A)(i).[3]  Similarly, the common law "bespeaks caution" doctrine may provide protection "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language that warn investors of exactly the risk that plaintiffs claim was not disclosed."  *Williams I,* 339 F.Supp.2d at 1231 (citations and quotations omitted).  Additionally, statements may be too vague and immeasurable to be considered material.  *J & R Marketing,* 549 F.3d at 396.

The SGLP Defendants contend "all of the allegedly fraudulent statements are immaterial as a matter of law, either because they contained adequate cautionary disclosures or because they are the type of vague and immeasurable statements on which no reasonable investor would rely."[4]  [Doc. No. 211, p. 22].

Plaintiff disputes defendants' claim that the statements were "forward looking"

---

[3]The safe harbor explicitly excludes from protection forward-looking statements made in connection with an initial public offering.  15 U.S.C. §78u-5(b)(2)(D).

[4]The SGLP Defendants specifically identify allegations in ¶¶126-31, 137 and 140 (IPO Documents); 161-62 and 164-65 (Feb. 2008 Offering Documents); 185 (2Q07 10-Q Conference Call), 197-98 (Feb. Offering Conference Call), 203, 207, 209 (2007 10-K); and 217, 219 (Year-end 2007 Conference Call) as being forward-looking statements accompanied by meaningful cautionary language.

statements, arguing that, at the time the statements were made, the Parent had an *existing* vulnerability based on its trading practices and the impact of these risks on SGLP's "guaranteed" revenues was known and should have been disclosed.  *See Schaffer v. Evolving Systems, Inc.,* 29 F.Supp.2d 1213, 1224 (D. Colo. 1998); *Croker v. Carrier Access Corp.,* No. 05-cv-01011-LTB-OES, 2006 U.S. Dist. LEXIS 48603 (D. Colo. Jul. 18, 2006) at **18-19.  Further, plaintiff contends that even if the statements were "forward looking," defendants' failure to provide meaningful cautionary disclosures precludes their reliance on the bespeaks caution doctrine. "Cautionary language is meaningful when it warns investors of risks of a significance similar to that actually realized."  *Williams I,* 339 F.Supp.2d at 1220 (citation omitted).

Dismissal on the pleadings under the bespeaks caution doctrine requires a showing of sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading.  *Livid Holdings Ltd. V. Salomon Smith Barney, Inc.*  416 F.3d 940, 947 (9th Cir. 2005).  Defendants have not established that "reasonable minds could not disagree" that the alleged misstatements and omissions were not misleading. Therefore, the court rejects defendants' argument that the bespeaks caution doctrine mandates dismissal of plaintiff's fraud claims.

### d.  Puffery

The SGLP Defendants also contend many of the alleged statements are immaterial as a matter of law because they are "simply immeasurable or incapable of verification." [Doc. No. 211, pp. 28-29].[5]  Vague statements of corporate optimism or "puffery" cannot be materially

---

[5]The SGLP Defendants identify statements in ¶¶129 and165 as falling into this category. These paragraphs alleged statements that SGLP's "operations have minimal direct exposure to changes in crude oil Prices" and "are indirectly affected by commodity prices"; that the

misleading because "generalized statements of optimism are not capable of objective verification and reasonable investors do not rely on them in making investment decisions." *Williams I,* 339 F.Supp.2d at 1259-60. However, an optimistic statement's materiality must be evaluated in light of the "total mix" of information available to the market, *TSC Indus.,* 426 U.S. at 449, and optimistic statements may be actionable where material, nondisclosed information undermines the truth of those statements. *See Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995). Here, plaintiff has alleged that the statements at issue were materially misleading because they failed to disclose the Parent's speculative trading strategy and its impact on the Parent's ability to fulfill its contractual obligations to SGLP. Thus, the court rejects defendants' contention that the statements were immaterial as a matter of law.

### e. "Fraud by Hindsight"

Defendants argue the alleged misrepresentations and omissions are inactionable because the Parent Company's financial difficulties were unforeseen and unforeseeable. They take the position that the Parent's liquidity crisis was solely caused by an unprecedented spike in oil prices in 2008–a development they contend was unforeseen.

This argument completely ignores plaintiff's contention that, because SGLP was so dependent on its Parent, and because the Parent's trading strategy was extremely speculative, defendants had a duty to disclose to investors the nature and extent of the Parent's speculative trading strategy regardless of oil price levels. As plaintiff aptly observes, "Had the Parent's

---

documents claimed SGLP had certain "Competitive Strengths" that positioned SGLP well "to successfully achieve [its] primary business objectives and execute [its] business strategies," including "contracted minimum revenues under the Throughput Agreement and the Terminalling Agreement," and the Parent's "knowledgeable management team with significant experience..."

reliance on this risky business model been disclosed, investors would have been able to assess SGLP's risk exposure, properly value the price of SGLP's common units and factor in an appropriate rate of return for the risk they were unwittingly made to shoulder." [Doc. No.221, p. 17].  Plaintiff's allegations do not constitute fraud-by-hindsight because the Complaint alleges with specificity the facts then existing during the Class Period that gave rise to a duty to disclose the Parent's trading practices.  *See Williams I,* 339 F.Supp.2d at 1222 n. 4.

### f..  Group Pleading Doctrine

The "group pleading" doctrine allows plaintiffs to rely on a presumption that statements in group-published information are the collective work of those individuals with direct involvement in the everyday business of the company.  *In re Pfizer Inc. Sec. Litig.,* 584 F.Supp.2d 621, 637 (S.D.N.Y. 2008).  Defendants Kivisto, Billings and Bishop contend the doctrine was abolished by the PSLRA.  However, post-PSLRA, the Tenth Circuit has stated:  "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."  *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1254 (10th Cir. 1997).  In line with the appellate court's statement in *Celestial Seasonings,* district courts in the Tenth Circuit continue to hold that the doctrine remains viable. *See In re Williams Sec. Litig.,* 339 F.Supp.2d 1242, 1259 (N.D. Okla. 2003) (*"Williams II"*); *Steinbeck v. Sonic Innovations, Inc.,* 2:00-CV-00848PGC, 2003 U.S. Dist. LEXIS 2378, at *25 (D. Utah Feb. 10, 2003); *Lane v. Page,* 581 F.Supp.2d 1094, 1118 (D.N.M. 2008).

Individual Defendants Foxx, Brochetti, Stallings, Kivisto, Wallace, Bishop and Billings are alleged to have signed SEC filings or made statements.  Thus, plaintiff need not rely on the

group pleading doctrine with respect to documents signed by these defendants.  Kivisto, Bishop and Billings contend statements in group-published documents they did *not* sign cannot be attributed to them.  All three, however, were directors of SemGroup GP and had actual control or the power to exercise control over the day-to-day operations of SGLP.  [Doc. No. 188, ¶¶27, 32, 33].  The fact that Billings and Bishop were outside directors does not absolve them of liability. *See Schnall v. Annuity and Life Re (Holdings) Ltd.,* No. 3:02 CV 2133 (GLG) 2004 U.S. Dist. LEXIS 1601, at *11 (D. Conn. Feb. 4, 2004) ("[O]utside directors . . . can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider."); *See also, Schaffer v. Evolving Sys. Inc.* 29 F.Supp.2d 1313, 1225 (D. Colo. 1998) (rejecting arguments by outside directors that group-published information did not apply to them).

Defendant Cooper's relationship with SGLP was more attenuated than the other Individual Defendants'.   Although Cooper was Treasurer of the Parent, he was not an officer or director of SemGroup GP, which managed the operations of SGLP.  He signed no public documents associated with SGLP and made no public statements concerning the limited partnership.   Nevertheless, plaintiff urges that Cooper's position with the Parent, coupled with his knowledge of the Parent's speculative trading, growing margin balances and impaired liquidity, are sufficient to state a claim for securities fraud against him.[6]  In support of this

---

[6]The Complaint alleges Cooper, as SemGroup's Treasurer, managed the day-to-day financial decisions for SemGroup and monitored its cash flow and uses of cash, including margin calls and liquidity. [Doc. No. 188, Complaint, ¶31].  Further, it alleges Cooper had specific knowledge about Kivisto's speculative trading activity [*Id.,* ¶88] and that employees discussed SemGroup's "rising margin balance" with Cooper one month before SGLP's IPO.  [*Id.,* ¶93]. The Complaint alleges Cooper refused to cooperate with the Examiner's investigation of the facts and circumstances giving rise to SemGroup's collapse and invoked his Fifth Amendment

position, plaintiff cites *In re Alstom SA Securities Litigation*, 454 F.Supp.2d 187 (S.D.N.Y. 2006) and *Menkes v. Stolt-Nielsen S.A.,* 2006 WL 1699603 (D.Conn.).

In *Alstrom,* the court held that a complaint stated a claim against two former vice presidents of a subsidiary company who were alleged to have been responsible for preparing, producing and reviewing financial information provided to the parent company–the primary violator–because their roles "rose to a level of active participation in the dissemination of false or misleading information sufficient to state a claim of primary liability."  454 F.Supp.2d at 202-03. Similarly, in *Menkes,* the individual defendants, who were CEO and Chairman of a wholly owned subsidiary, had actively participated in the dissemination of false information by the parent company.

Here, the Complaint's fact-specific allegations about Cooper establish that Cooper had *knowledge* of the Parent's trading activities and financial condition but *not* that he *actively participated* in preparing or issuing SGLP's SEC's filings and other publications, or in any other dissemination of false information by SGLP.  Knowledge alone, however, is not sufficient.  Even applying the group pleading doctrine, the PSLRA still requires a plaintiff to allege facts that support an inference that the statement is attributable to individual defendants.  *See Johnson v. Tellabs, Inc.,* 262 F.Supp.2d 937, 946-47 (N.D .Ill. 2003) (A plaintiff must at least "include

_____

privilege against self-incrimination when questioned under oath in depositions by the Examiner. [*Id.,* ¶302].  In its Request for Judicial Notice, plaintiff states Cooper also refused to produce documents in *this* case based on the Fifth Amendment. [Doc. No. 25, p. 2].  Thus, plaintiff argues, Cooper is "a primary participant in the parent's fraud and by virtue of his position within the Parent is responsible for the false statements (and omissions) issued by SGLP in group published documents." [Doc. No. 221, p. 30].  These allegations do not, though,  establish Cooper made any material misrepresentations in connection with the SGLP offerings.

allegations in the complaint relating to an individual's duties or legal obligations that create a presumption that the company's statement was somehow caused by or attributable to an individual defendant.  Simply alleging an individual defendant's title is not enough."); *In re Sunterra Corporations Securities Litigation* 199 F.Supp.2d 1308, 1327-28 (M.D. Fla. 2002).  In *Sunterra,* the court dismissed §10b claims against two individuals, concluding the amended complaint did not adequately allege a misstatement or omission attributable to them.  In so ruling, the court commented, "These Defendants are not alleged to have signed the allegedly fraudulent SEC filings, to have been in positions of control over the content of the filings, or to have been involved in the day-to-day management of Sunterra (the primary violator)."  *Id.* at 1329.

Similarly, here, the Complaint does not allege Cooper signed the allegedly fraudulent filings, had any control over the content of the filings or was involved in the day-to-day management of either SGLP or the General Partner.  Thus, the court concludes the Complaint does not adequately allege a misstatement or omission attributable to Cooper.  Cooper's Motion to Dismiss the §10b fraud claim against him must be granted.

## 2.  Scienter

Pre-PSLRA, the pleading requirement for scienter in securities cases was governed by Fed.R.Civ.P. 9(b), which requires that "averments of fraud...be stated with particularity." *City of Philadelphia,* 264 F.3d at 1258.  "Scienter" was described as "a mental state embracing intent to deceive, manipulate, or defraud."  *Id.,* citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 1854, 193 n. 12 (1976).

The PSLRA mandates a more stringent pleading standard for securities fraud actions in general and for scienter allegations in particular.  *Id.*  Under the PSLRA, a complaint asserting a

§10(b) violation "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding a statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."  15 U.S.C. §78u-4(b)(1).  Further, the PSLRA states:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. §78u-4(b)(2).

The Tenth Circuit, citing *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000), *cert. denied,* 531 U.S. 1012 (2000), has stated: "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior.  Recklessness is much harder to define adequately." *City of Philadelphia,* 264 F.3d at 1260.  The court stated:

> In *Anixter,* we stated both that "recklessness satisfies the scienter requirement for a primary violation of §10(b)" and that recklessness is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.,* quoting *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215, 1232 (10th Cir. 1996).

The Tenth Circuit went on to note that prior to passage of the PSLRA, several circuits had held that scienter could be alleged through a showing of the defendant's motive and opportunity to commit securities fraud.  *Id.* at 1261.  In light of the more stringent pleading requirements of the PSLRA, the court adopted the approach of the First and Sixth Circuits, described as follows:

> The PSLRA was obviously intended to eliminate frivolous securities litigation through its heightened scienter pleading requirements.  Allegations of motive and opportunity, with nothing more, could allow potentially frivolous lawsuits

to go forward with only minimal allegations of scienter.  But evidence of motive and opportunity may be relevant to a finding of  scienter, and thus may be considered as part of the mix of information than can come together to create the "strong inference" of scienter required by the PSLRA.  *When reviewing a plaintiff's allegations of scienter under the PSLRA, a court should therefore examine the plaintiff's allegations in their entirety, without regard to whether those allegations fall into defined, formalistic categories such as "motive and opportunity," and determine whether the plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter.*

*Id.* at 1263 (emphasis added).

The Supreme Court has described the scienter inquiry as follows:

The strength of  an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable., *i.e.,* of the "smoking gun" genre, or even the "most plausible of competing inferences". ... Yet the inference of scienter must be more than merely "reasonable" or "permissible"–it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights, LTD.,* 551 U.S. 308, 324 (2007).

"The requirement of knowledge...may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors."  *City of Philadelphia,* 264 F.3d at 1261.  "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate."  *Florida State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 664 (8th Cir. 2001).

28

With these guidelines in mind, the court examines the allegations concerning defendants' scienter.

### a.  Kivisto, Wallace, Stallings, Foxx and Brochetti

The following allegations in the Complaint support a "strong inference" of scienter against Individual Defendants Kivisto, Wallace, Stallings, Foxx and Brochetti[7]:

- Defendants' positions at SemGroup and SemGroup GP gave them access to material non-public information regarding SemGroup's core operations and financial condition that they knew had not been disclosed to SGLP's investors.[8] [*Id.*, ¶¶276-82].  Although standing alone, the fact that a defendant was a senior executive in a company cannot give rise to a strong inference of scienter, it is a relevant factor in weighing the totality of the allegations.  *See Adams,* 340 F.3d at 1106.  Given their positions, these executives "were in a position to know this information, understand its materiality, and realize that failure to provide complete

---

[7]Plaintiff also contends these allegations also support a finding of scienter against Cooper.  However, the court has determined the Complaint fails to allege sufficient facts establishing Cooper made material misrepresentations in connection with the SGLP IPO and Secondary Offerings.  Further, the allegations in the Complaint do not support a "strong inference" of  scienter with respect to Cooper, who was not an officer of SemGroup, GP, signed no public statements regarding SGLP, did not contribute information to the public statements regarding SGLP, and is not alleged to have received any bonuses from the IPO or Secondary Offering.

[8]Kivisto was CEO of SemGroup and a Director of the General Partner. [Doc. No. 188, ¶27].  Wallace was SemGroup's CFO, Vice President and Secretary and was a Director of the General Partner. [*Id.,* ¶30].  Stallings was the Chief Accounting Officer of SemGroup and the CAO of the General Partner. [*Id.,*  ¶29].  Foxx was the Chief Operating Officer of SemGroup and the President, CEO and a Director of the General Partner. [*Id.,* ¶26].   Brochetti was a Senior Vice President of SemGroup and CFO and a Director of the General Partner. [*Id.,* ¶28].

and accurate information with regard to these subjects would likely mislead investors." *Williams II,* 339 F.Supp.2d at 1259.

- Defendants personally signed and caused SGLP to file materially false and misleading reports with the SEC–including certifications required by the Sarbanes-Oxley Act of 2002 ("SOX")–which contradicted facts that were then available to them regarding SemGroup's impaired financial condition and resulting credit risks. [*Id.,* ¶¶26, 28, 178, 189, 201, 222].  This, too, is indicia of scienter. *See Williams I,* 339 F.Supp.2d at 1235; *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.,* 2008 U.S. Dist. LEXIS 47748, at **42-43 (D. Colo. March 28, 2008); *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061 (9th Cir. 2000) ("[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true.").

- The Complaint alleges defendants, through the IPO and Secondary Offering, dropped down assets to SGLP, saddled SGLP with debt from a credit facility that was secured by substantially all of SGLP's assets, created a complicated dependent business relationship among SemGroup, its affiliates and SGLP and up-streamed to themselves "hundreds of millions of dollars" raised from the offerings. [Doc. No. 188,  ¶109].  Further, it alleges defendants caused SGLP to enter into service agreements binding SemGroup as SGLP's only major customer, with express guarantees of over $135 million of revenues to SGLP without disclosing to investors significant risks regarding SemGroup's financial capabilities to fulfill its

30

obligations under the service agreements. [*Id.,* ¶110]. These allegations–taken as true–also support a strong inference of scienter. *See Howard,* 228 F.3d at 1064; *In re Res. Am. Sec. Litig.,* No. 98-5446, 2000 U.S. Dist. LEXIS 10640, at **18-19 (E.D. Pa. July 26, 2000).

•   The short lapse of time between the IPO and Secondary Offerings, which touted SGLP's "minimal exposure" to spiking oil prices, and the public disclosure of SemGroup's liquidity crisis, also support a strong inference of scienter. *Williams I,* 339 F.Supp.2d at 1233-34, citing *Helwig v. Vencor, Inc.,* 251 F.3d 540, 552 (6th Cir. 2001) (*en banc*) ("closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is one factor supporting an inference of scienter).

•   The Complaint alleges notwithstanding SemGroup's impaired liquidity and desperate need for cash, defendants caused SemGroup and SGLP to distribute more than $150 million to themselves and their affiliates in the IPO. [Doc. No. 188, ¶¶289, 291]. Then, in connection with the Secondary Offering, SemGroup's Management Committee members, including defendants Kivisto, Wallace, Foxx, Thane Ritchie, Ward and Jones, authorized a $100 million distribution to themselves and other partners. [*Id.,* ¶289]. Additionally, Kivisto and Wallace distributed to themselves bonuses totaling over $11 million for Kivisto and $7.5 million for Wallace during the Class Period, without Management Committee approval. [*Id.,* ¶290]. None of these payments was disclosed to SGLP's investors.

The undisclosed bonuses and distributions are indicia of scienter.[9]  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., ,* 551 U.S. 308, 325 (2007) ("Personal financial gain may weigh heavily in favor of a scienter inference."); *Williams II,* 339 F.Supp.2d at 1259 (The failure to disclose the size of compensation extended to defendants during the Class Period is an indicia of scienter).

- The Complaint alleges Kivisto and Wallace were ousted as executives and directors of SemGroup and SemGroup GP immediately before SemGroup's bankruptcy filing in July 2008. [Doc. No. 188, ¶¶27, 30, 249].  Additionally, it alleges Kivisto and Wallace refused to cooperate with the Examiner's investigation and both invoked their Fifth Amendment privilege against self-incrimination when questioned under oath in depositions by the Examiner regarding SemGroup's trading operations. [*Id.,* ¶302.]  Defendants' resignations support a strong inference of scienter.  *See Albert Fadem Trust v. American Power Co.,* 344 F.Supp.2d 985, 1014 (S.D. Ohio 2004).   Similarly, the court may make adverse inferences against defendants based on their assertion of the Fifth Amendment privilege in a civil proceeding.  *Alstom,* 454 F.Supp.2d at 208 n. 17; *S.E.C. v. Merrill Scott & Associates, Ltd.,* 505 F.Supp.2d 1193, 1212 n. 15 (D. Utah 2007)

---

[9]Defendants assert the fact that they did not sell their SGLP holdings undermines any supposed intent to deceive. *See, e.g.,*  Kivisto's Motion to Dismiss and Brief in Support [Doc. No. 200, p. 13]; Wallace's Motion to Dismiss and Brief in Support [Doc. No. 203, p. 32].  The absence of insider trading, however, is not dispositive of the scienter analysis.  *See Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1191 n. 12 (10th Cir. 2003); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding,* 320 F.3d 920, 944 (9th Cir. 2003). Moreover, plaintiff asserts defendants were restricted from disposing of any of their SGLP common units during most of the Class Period. [Doc. No. 221, Plaintiff's Response, p. 42, n. 36].

citing *Baxter v. Palmigiano,* 425 U.S. 308,   (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them...").

• The Complaint alleges that by December 31, 2007, SemGroup's margin balance had increased to $1.7 billion and its Mark-to-Market liability had increased to $2.04 billion. [Doc. No. 188, ¶¶14, 97].   The magnitude of speculative trading and margin balance alleged in the Complaint further evidences scienter.  *See Adams,* 340 F.3d at 1106; *Croker,* 2006 U.S. Dist. LEXIS 48603, at **25-26; *Williams I,* 339 F.Supp.2d at 1235.

The court concludes the Complaint alleges facts supporting a "strong inference" of scienter against Individual Defendants Kivisto, Wallace, Stallings, Foxx and Brochetti.

### b.  Billings and Bishop

Bishop was a Director of SemGroup GP, from July 17, 2007 through July 18, 2008, and Billings was a Director of SemGroup GP, from October 3, 2007 through the end of the Class Period. [Doc. No. 188, ¶¶32-33].  Bishop signed or authorized the Registration Statements issued in connection with both the IPO and Secondary Offerings and the 2007 10-K. [*Id.,*  ¶32].  Billings signed or authorized the Registration Statement for the Secondary Offering as well as the 2007 10-K. [*Id.,* ¶33].  Both Bishop and Billings served as members of SemGroup GP's conflicts committee, audit committee and compensation committee. [*Id.,* ¶249].  Bishop was removed as a director and member of these committees on July 18, 2008. [*Id.*].  Billings remained on the Board of SemGroup GP and continued to serve on the committees. [*Id.*].

Plaintiff contends since both defendants were on the conflicts committee, which it alleges

33

vetted the asset drop downs from SemGroup to SGLP,  "it is not plausible that they lacked an understanding of SemGroup's financial condition or the growing billion-plus margin balance that was explicitly disclosed on SemGroup's balance sheet." [Doc. No. 221, Plaintiff's Response, p. 45].  Further, plaintiff argues, '[E]ven if they did not develop an understanding of these facts, then Billings and Bishop were highly reckless and are thus liable for resulting fraud on SGLP investors." [*Id.*]

However, examining the pleadings as a whole, as required by *Fleming,* the court finds the Complaint fails to allege facts supporting a "strong inference" of scienter against Bishop and Billings.  Neither held a position with the Parent.  Neither is alleged to have received a bonus or any other extraordinary benefit from the offerings.   Neither is alleged to have had access to inside information or knowledge of SemGroup's trading strategy or precarious financial condition.  *See In re Philip Servs. Corp. Securities Litigation,* 383 F.Supp.2d 463, 483 (S.D.N.Y. 2004).  Their position as directors of SGLP and members of SGLP committees is not sufficient to establish scienter.  *Pedroli v. Bartek,* 564 F.Supp.2d 683, 692-93 (E.D. Tex. 2008) ("Mere membership on a committee, without more, will not suffice to withstand a 12(b)(6) challenge.")  Therefore, the securities fraud claim against these two Individual Defendants must be dismissed.

### c.  SGLP and SemGroup GP

The scienter of senior controlling officers of a company may be attributed to the company itself to establish liability as a primary violator of §10(b) and Rule 10b-5.  *Adams,* 340 F.3d at1106.  Thus, the factual allegations of the Complaint establishing a strong inference of scienter against Kivisto, Wallace, Stallings, Brochetti and Foxx suffice to state a claim against SGLP and

its general partner, SemGroup GP.

### 3. Loss Causation

A plaintiff who claims securities fraud must prove that the defendants' fraud caused an economic loss or "loss causation." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 338 (2005). To establish "loss causation," the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff. *Alaska Elec. Pension Fund v. Olofson,* at *25. Loss causation requires only a "short and plain statement [that] must provide the defendants with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura,* 544 U.S. at 346. A plaintiff adequately alleges loss causation by pleading "inflation of the stock price due to defendants' painting the company in a favorable, albeit untruthful, light, disclosure of the true state of the company at some later point, and an immediate decline in the stock price as a result of the marked reaction to the belated disclosure." *In re ICG Commc'ns, Inc. Sec. Litig.,* at *29.

The Complaint alleges the price of SGLP's common units was inflated during the Class Period because the defendants concealed known operations risks to SGLP arising from its Parent's highly speculative trading strategies. [Doc. No. 188, Complaint, ¶¶303-04]. It further alleges the market effect of these concealed risks materialized on July 17, 2008, when news about Semgroup's liquidity crisis leaked to the public. [*Id.,* ¶305]. As a result, SGLP's common units dropped 51.75% on July 17, 2008, on unusually heavy trading. [*Id.,* ¶306]. After the markets closed on July 17, SGLP confirmed the earlier news stories about its Parent's liquidity problem. [*Id.,* ¶307].

These allegations clearly provide defendants with "fair notice of what plaintiff's claim is

35

and the grounds upon which it rests," as required by *Dura*.  Therefore, the court finds plaintiff has

adequately pled this element of its securities fraud claim.

### C. §20(a) Violations

Section 20(a) of the 1934 Act provides in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be
> liable jointly and severally with and to the same extent as the controlled person
> to any person to whom such controlled person is liable, unless the controlling
> person acted in good faith and did not directly or indirectly induce the act or
> acts constituting the violation or cause of action.

15 U.S.C. §78t(a).

Liability under §20(a) is derivative in nature.  To state a claim under §20(a), plaintiff must

allege (1) a primary violation of the securities lawsand (2) the defendant's control over the

primary violator.  15 U.S.C. §78t(a); *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1305 (10th

Cir. 1998).

The court has concluded plaintiff has successfully pled primary violations of §10(b) and

Rule 10b-5 by, *inter alia,* SGLP.  Thus, the first element of a prima facie claim under §20(a) has

been established.  To establish the second element–that a defendant was a "controlling person" of

the primary violator–plaintiff must allege facts which indicate the defendant had "possession,

direct or indirect, of the power to direct or cause the direction of the management and policies of

a person, whether through the ownership of voting securities, by contract, or otherwise."  *Id.* at

1305 citing 17 C.F.R. §230.405.  The statute is remedial and is to be construed liberally. *Id.* It has

been interpreted as requiring only some indirect means of discipline or influence short of actual

direction to hold a controlling person liable.  *Id.*

36

The Complaint alleges the Individual Defendants, SemGroup GP, the Ritchie Defendants and the Carlyle/Riverstone Defendants either had direct control and/or supervisory involvement in the operations of SemGroup, SemGroup GP, SemGroup Holdings and/or SGLP.  Keeping in mind the definition of a controlling person as one who possessed the direct or indirect power to control the primary violator, the court analyzes the role of the defendants who are alleged to have violated §20(a).

### 1.   SemGroup GP, Foxx, Stallings and Brochetti

Defendants SemGroup GP, Foxx, Stallings and Brochetti do not dispute that they had "control" over SGLP and since the court has determined the Complaint adequately alleges primary violations by SGLP, the court concludes plaintiff has stated a claim for violation of §20(a) by these defendants.

### 2.  Kivisto, Wallace, Cooper, Billings and Bishop

These Individual Defendants contest control person liability.  The Complaint alleges facts which, if taken as true, support a conclusion that Kivisto and Wallace were "controlling persons" within the meaning of §20(a).  Kivisto was CEO of SemGroup, a member of SemGroup's Management Committee and a Director of SGLP GP.  Wallace was CFO, Vice President and Secretary of SemGroup, a member of SemGroup's Management Committee and a director of SGLP GP.   Each signed public documents related to SGLP's IPO and Secondary Offering. Therefore, plaintiff has alleged facts which, if taken as true, would support a conclusion that Kivisto and Wallace had the power to directly or indirectly control SGLP.  *See Maher,* 144 F.3d at 1306.

However, the allegations concerning Cooper do not support such a conclusion.  As noted

in Section III.B.1.f. above, Cooper was Treasurer of the Parent but was neither an officer nor director of SemGroup GP.   He signed no public documents in connection with the IPO or Secondary Offering and is not alleged to have received any benefit from the offerings.  Although the Complaint alleges "the Individual Defendants participated in the preparation and dissemination of the Registration Statements and Prospectuses," it is devoid of any specific allegations concerning actions taken by Cooper in furtherance of the process.[10]  The only specific allegations about Cooper in the Complaint are that he knew about SemGroup's growing margins [*See, i.e.,* Doc. No. 188, ¶¶93, 100], and that he failed to integrate properly the commodities trading function into SemGroup's financial controls. [*Id.,* ¶101].[11]  The Complaint makes no specific allegations of *any* action taken by Cooper in connection with *SGLP* or *SemGroup GP.* Therefore, the court finds plaintiff has failed to allege facts sufficient to infer Cooper was a control person of SGLP within the meaning of §20(a).

The Complaint alleges both Billings and Bishop were directors of SemGroup GP and served on its conflicts, audit and compensation committees.  Further, the Complaint alleges the executive officers and directors of SemGroup GP operated collectively and conducted SGLP's

_____

[10]While all well-pleaded allegations in the Complaint must be taken as true, the court is not required to accept as true *conclusory* allegations.  *Adams v. Kinder-Morgan,* 340 F3d. At 1088.  The Complaint contains numerous blanket allegations about the "Individual Defendants" which–with respect to Cooper–are unsupported by the facts specifically alleged.  For example, contrary to the assertions in ¶¶ 371-372, Cooper was *not* an officer or director of SemGroup GP and did *not* sign or authorize signing of any public documents

[11]In its Supplemental Brief, plaintiff–citing the Examiner's Report–also alleges Cooper made false statements to one of SemGroup's lenders, Bank of Oklahoma, including that all of SemGroup's trades were backed by physical inventory. [Doc. No. 239, p. 5].  However, this allegation, if taken as true, does not advance plaintiff's claim that Cooper was a "control person" of SGLP.

business pursuant to agreements and formal memoranda as a Board [Doc. No. 188, ¶¶279-280]. These  allegations are sufficient to infer Bishop and Billings  had direct or indirect control over SGLP.  *See Maher,* 144 F.3d at 1306.

### 3.  Ritchie Defendants and Carlyle/Riverstone Defendants

Ritchie Capital, through its affiliates, held a 25.2% interest in the Parent and the Carlyle/Riverstone entities held a 29.3% interest in Parent.  A.R. Thane Ritchie was Ritchie Capital's designee and Andrew Ward and E. Bartow Jones were designees of the Carlyle/Riverstone entities on the Parent's Management Committee.  The Complaint alleges the Ritchie Defendants and the Carlyle/Riverstone Defendants all  have "control person" liability under §20(a) for alleged securities fraud violations by SGLP.   Citing *Maher,* Defendants contend their minority ownership interest in the Parent and membership on the Parent's Management Committee do not establish "control" of SGLP.[12]

In *Maher,* the Tenth Circuit held  an allegation of a defendant's minority ownership interest in the alleged primary violator, even when coupled with the right to appoint a board member, was not sufficient to establish control person liability.  144 F.3d at 1305-06.  Here, the defendants owned interests in the Parent, which is *not* named as a primary violator.  Thus, the relationship between these defendants and SGLP is more tenuous than is the relationship between Individual Defendants who served as officers or directors of both the Parent and SemGroup GP.  However, the Parent, through SemGroup Holding, owned 100% of SemGroup GP and 47.7% of the units of SGLP. [¶¶57, 116].  Moreover, plaintiff alleges defendants Thane Ritchie, Ward and

---

[12]SemGroup owned 100% of SemGroup Holdings, L.P., which in turn owned 100% of SemGroup GP and beneficially held the Parent's SGLP units. [Doc. No. 188, ¶57].

Jones, as members of the Parent's Management Committee, signed memoranda of action authorizing the drop down of assets in connection with the Secondary Offering [Doc. No. 188, ¶¶236, 239], and that the Ritchie Defendants and Carlyle/Riverstone defendants reaped distributions from the IPO and Secondary Offering totaling $48,383,432 for the Ritchie Defendants and $56,361,878 for the Carlyle/Riverstone Defendants. [*Id., ¶*291]. These facts, taken as a whole, create a sufficient inference of indirect control by the Ritchie Defendants and Carylyle/Riverstone of SGLP and SemGroup GP.

"Ultimately, as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss and dismissal should only be granted when a plaintiff does not plead any facts from which it can be reasonably inferred the defendant was a control person." *In re Mutual Funds Investment Litigation*, 566 F.3d 111, 130 (4th Cir. 2009) (internal quotations and citations omitted). The court finds plaintiff has alleged facts sufficient to state a claim for control person liability against the Ritchie Defendants and the Carlyle/Riverstone Defendants.

### D.  Alleged §11 and §12(a)(2) Violations

Section 11 of the Securities Act of 1933 creates a right of action for damages by securities purchasers when a registration contains untrue statements or omissions of material fact. 15 U.S.C. §77k; *Williams II,* 339 F.Supp.2d at 1262 (internal citations omitted). Persons who signed the registration, directors of the issuer, persons named in the registration statement as about to become a director, and underwriters are liable under §11. 15 U.S.C. §77k. Section 12(a)(2) of the 1933 Act provides a rescission remedy against sellers who make material misrepresentations and omissions in connection with the sale of securities. 15 U.S.C. §77*l*.   In contrast to §10b of the

Exchange Act, §11 and §12(a)(2) claims do *not* require a showing of scienter.  15 U.S.C. §§77k,

77*l*.  Plaintiff asserts a §11 claim against all Individual Defendants except Cooper; SemGroup

GP; and the Underwriter Defendants, and a §12(a)(2) claim against SGLP and the Underwriter

Defendants.

Defendants urge dismissal of the claims on the following grounds: 1) Plaintiff has not pled

the  claim with sufficient particularity; 2) the allegations of the Complaint fail to establish alleged

misrepresentations and omissions were material; 3) Plaintiff cannot demonstrate it bought

securities pursuant to a registration statement; and 4) Plaintiff cannot demonstrate it was

damaged.[13]

### 1. Applicability of Fed.R.Civ.P. 9(b)

Defendants contend that because plaintiff's §11 and §12(a)(2) claims are predicated on the

same allegedly fraudulent and intentionally wrongful conduct as the §10(b) claims, Fed.R.Civ.P.

9(b) requires they be pled with particularity.  However,  the Complaint expressly states Counts I

and II are *not* based on fraud but rather on negligence.  Thus, these claims do not require Rule

----

[13]BOSC, Inc., claiming to be unique among the underwriters named in this suit, filed a separate Motion to Dismiss [Doc. No. 196].  BOSC's arguments largely mirror those of the other Underwriter Defendants.  However, BOSC, which only participated in the IPO,  also contends the §11 and §12(a)(2) claims against it should be dismissed because the Complaint does not break out liability for alleged misrepresentations in the IPO separately from those in the Secondary Offering.  This, BOSC asserts, violates Fed.R.Civ.P. 10(b), which states:

> If doing so would promote clarity, each claim founded upon a separate transaction or occurrence–and each defense other than a denial–must be stated in a separate claim or defense.

Fed.R.Civ.P. 10(b).  The court rejects BOSC's argument.  Although Counts I and II do not separate the IPO and Secondary Offerings, the Complaint itself details with specificity the alleged misrepresentations in public documents and statements for each of the offerings.

9(b) scrutiny.  *See Celestial Seasonings, Inc.,* 124 F.3d at 1252;  *Williams II,* 339 F.Supp.2d at

1263.

## 2.  Materiality

The court has determined, in connection with its analysis of the §10b claim, that the

Complaint alleges facts sufficient to establish–for purposes of the motions to dismiss–the

materiality of alleged misrepresentations and omissions.  *See* §III.B.1., *supra.*   In essence,

plaintiff contends that defendants, having heavily emphasized the benefit of SGLP's close

relationship with SemGroup, had a duty to disclose SemGroup's speculative trading practice,

growing margin balance and impaired liquidity.  In light of SGLP's dependency on SemGroup,

this was information "a reasonable investor would consider...important in determining whether to

buy or sell stock."  *Grossman,* 120 F.3d at 1119.


## 3. Damages/Tracing Under §11

In order to state a claim under §11, plaintiffs "must allege that they purchased securities

pursuant to a materially false or misleading registration statement or that they purchased such

securities in the aftermarket, but only if they can demonstrate they bought their securities

pursuant to the registration statement, a concept referred to as 'tracing.'" *West Palm Beach*

*Firefighters' Pension Fund v. Startek,* 2008 U.S. Dist. LEXIS 47748 at *16, citing *Joseph v.*

*Wiles,* 223 F.3d 1155, 1159 (10th Cir. 2000).

Defendants contend the Complaint, considered along with the Certification of Named

Plaintiff Pursuant to Federal Securities Laws filed in connection with plaintiff's motion to be

named lead plaintiff and the schedule of trades attached to the Certification, establishes

conclusively that plaintiff suffered *no* loss on its purchases of securities in the IPO.  Further, they allege plaintiff cannot trace any loss on its purchases of securities during the Class Period to the Secondary Offering.  Plaintiff asserts that the schedule of purchases and sales demonstrates–at a minimum–that it suffered a loss on the 25,000 SGLP common units it purchased on January 15, 2008, and it argues that damages is a fact issue unsuitable for adjudication at this stage.  The court agrees.  Under §11 and §12(a)(2), damages are presumed at the pleading stage.  *In re Dynegy, Inc. Sec. Litig.,* 226 F.R.D. 263, 283 (S.D. Tex. 2004).  Plaintiff has alleged it suffered losses from purchases made pursuant to both the IPO and Secondary Offering and the purchases are traceable to the offerings.  The Tenth Circuit permits plaintiffs to avail themselves of tracing at the pleading stage.  *See Joseph,* 223 F.3d at 1159.  How much damage–if any–plaintiff suffered as a result of the purchases, the actual tracing of the purchases to specific defendants, and applicability of potential affirmative defenses are fact-intensive issues, the resolution of which is not appropriate at this stage.

Plaintiff has adequately alleged a §11 claim against the underwriters who actually participated in the IPO and Secondary Offerings.

### 4.  The Successor-in-Interest Defendants

Defendants Wachovia Corporation ("Wachovia Corp.") and Wells Fargo & Company ("Wells Fargo") acquired ownership of underwriters who participated in the IPO and/or Secondary Offering *after* the offerings occurred.  Specifically, A.G. Edwards served as an underwriter of the July 2007 IPO.  In October 2007, A.G. Edwards was acquired by Wachovia Corp. [Doc. No. 188, ¶¶36, 47].  A.G. Edwards was not an underwriter of the Secondary Offering. Plaintiff sues Wachovia Corp. "as the successor-in-interest to A.G. Edwards." [*Id.,* ¶47].

43

Wachovia Capital Markets, LLC ("WCM") served as an underwriter for the July 2007 IPO and the February 2008 Secondary Offering. [*Id.,* ¶46].  Plaintiff alleges that Wells Fargo acquired WCM on December 31, 2008. [*Id.,* ¶¶36, 48].  Plaintiff sues Wells Fargo "as a successor-in-interest to WCM."  [*Id.,* ¶48].

   Wachovia Corp. and Wells Fargo have moved to dismiss the §11 and §12(2) claims on the basis the Complaint fails to state a claim because they were neither underwriters of the offerings nor control persons.  Additionally, they seek an award of attorneys' fees and costs.

   The Complaint does *not* allege Wachovia Corp. and Wells Fargo were underwriters of the offering–a category of persons liable under §11.  The sole alleged basis for liability is that the two entities were "successors-in-interest" to underwriters.  It is "deeply ingrained in our economic and legals systems that a parent corporation...is not liable for the acts of its subsidiaries" simply by virtue of corporate ownership.  *United States v. Bestfoods,* 524 U.S. 51, 61 (1998) (quotations and internal citations omitted). The Tenth Circuit has held that "[i]n order for a corporation that acquires all, or substantially all, the assets of another corporation to succeed to the debts and liabilities of the selling corporation there must be some evidence that (1) there was an agreement to assume such debts or liabilities, (2) there was a de facto merger, (3) the transaction was fraudulent in fact, or (4) the purchasing corporation was a mere continuation of the selling company."  *Williams v. Bowman Livestock Equip. Co.,* 927 F.2d 1128, 1132  n. 4 (10th Cir. 1991).

   Wachovia Corp. and Wells Fargo concede that one way for a corporation to assume responsibility for the acts of another is to expressly assume the other corporation's liabilities.  Harvest contends this is an unresolved question of fact. [Doc. No. 220, p. 14 n. 24].   This court

may not consider the factual allegations of Wachovia and Wells Fargo in this motion.  If discovery reveals that entities other than Wachovia and Wells Fargo succeeded to the liabilities of A.G. Edwards and WCM, plaintiff may seek to substitute those entities as parties defendant. Therefore, the court finds plaintiff has sufficiently alleged plausible §11 claims against Wachovia Corp. and Wells Fargo.  Additionally, the request for fees and costs is denied.

### 5.  Section 12(a)(2)

Section 12(a)(2) of the Securities Act of 1933 provides that a person who "offers or sells" newly issued securities "by means of a prospectus" that misrepresents or omits a material fact is "liable...to the person purchasing such security from him."  15 U.S.C. §77*l*.  Section 12(a)(2) applies only to sales of securities in public offerings and not to secondary market transactions. *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 578 (1995).

Liability under §12(a)(2) extends not only to the person who owned the security, but also to anyone who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.  *See Maher,* 144 F.3d at 1307 n. 10. Thus, a plaintiff seeking to establish liability under §12(2) must allege either that the defendant was in privity with him or, if the defendant was a collateral participant, that the defendant solicited the sales in question for financial gain.  *See In re Mesa Airlines, Inc. Secs. Litig.,* 1996 WL 33419894, at *10 (D. N.M.).

Plaintiff has alleged SGLP issued the Prospectuses and was an offeror and/or solicitor of sales of securities for the IPO and Secondary Offering. [Doc. No. 188, ¶340].  It also alleges the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the prospectuses in the IPO and Secondary Offering.  [*Id.,* ¶342].  Further, it alleges

the Underwriter Defendants were sellers within the meaning of §12(a)(2) because: a) they transferred title of SGLP common units to plaintiff and other members of the class who purchased such units; b) transferred title to common units to other underwriters and/or broker-dealers who sold the securities as agents for the Underwriter Defendants, and; c) solicited the purchase of SGLP common units by plaintiff and other class members, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interests, including but not limited to commissions on their owns sales of SGLP securities and separate commissions and fees on the sale of those securities by non-underwriter broker-dealers. [*Id.,* ¶343].  The Underwriter Defendants are alleged to have generated approximately $26 million in fees in the IPO and Secondary Offering. [*Id.,* ¶¶117, 156].   Plaintiff is not, at this stage, required to prove it purchased specific common units from specific underwriters.  The Complaint adequately states a prima facie case for§12(a)(2) liability against SGLP and the Underwriter Defendants who actually participated in the offerings.  *See Schaffer v. Evolving Systems, Inc.,* 29 F.Supp.2d 1213, 1222-23 (D. Colo. 1998).

As discussed in Section III.D.4. above, plaintiff has sufficiently alleged successor-in-interest claims against the Successor-in-Interest Defendants.  Therefore, their motion to dismiss the Section 12(a)(2) claim is denied.

### 5.  Section 15 Control Claims

To state a claim for controlling person liability, plaintiff must allege a primary violation of the underlying federal securities statute and "control" by the alleged controlling person. *Maher,* 144 F.3d at 1304-5, citing *First Interstate Bank of Denver, N.A. v. Pring,* 969 F.2d 891, 897 (10th Cir. 1992), *rev'd on other grouns sub nom. Central Bank v. First Interstate Bank,* 511 U.S. 164

46

(1994).  In Count III, Plaintiff asserts §15 claims against SemGroup GP, the Ritchie Defendants and the Carlyle/Riverstone Defendants.  In Count IV, it asserts §15 claims against the Individual Defendants, including Cooper.

For the reasons set forth in Section III.C.1-3 above, the court finds plaintiff has alleged facts sufficient to establish control of the primary violator, SGLP, by SemGroup GP, and all Individual Defendants except Cooper.

As discussed in Section III.C.3, the Ritchie Defendants and the Riverstone/Carlyle Defendants owned minority interests in the Parent Company but had no interest in SGLP or SemGroup, GP.  Thane Ritchie, Ward and Johnson were members of the Management Committee of the Parent but did not serve as officers or directors of SemGroup, GP or SGLP.  The Complaint fails to allege facts supporting these defendants were "controlling persons" under §15.

Cooper was Treasurer of the Parent but, unlike the other Individual Defendants, was not an officer or director of SemGroup GP and signed no public offering documents.  Therefore, the Section 15 claim must be dismissed with respect to Cooper.

## IV.  Conclusion

For the reasons set forth below, the court rules on the pending motions to dismiss as follows:

- Defendant Brent Cooper's Motion to Dismiss [Doc. No. 193] is granted.

- Defendant BOSC, Inc.'s Motion to Dismiss [Doc. No. 196] is denied.

- Defendants Brian F. Billings and W. Anderson Bishop's Motion to Dismiss [Doc. No. 197] is granted with respect to Count V and denied with respect to Counts I, IV and VI.

- Defendant Thomas Kivisto's Motion to Dismiss [Doc. No. 200] is denied.

- The Motion to Dismiss of the Carylyle/Riverstone Defendants [Doc. 201] is denied.

- Defendant Gregory C. Wallace's Motion to Dismiss [Doc. No. 203] is denied.

- The Underwriter Defendants' Motion to Dismiss [Doc. No. 207] is denied.

- The Motion to Dismiss of the Successor-in-Interest Defendants [Doc. No. 209] is denied.

- The Motion to Dismiss of the SGLP Defendants [Doc. No. 211] is denied.

- The Motion to Dismiss of the Ritchie Defendants [Doc. No. 218] is denied.

ENTERED this 30th day of April, 2010.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

48